**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**ANDREW J. MAXWELL,** not individually, but as Trustee for the estate of Eduardo Garcia and Julia Escamilla (nka Julia Garcia); **EDUARDO GARCIA**; **JULIA GARCIA**; **BYRON GARCIA**; and **MIRIAHM GARCIA**, individually,

Plaintiffs,

v.

**WELLS FARGO BANK, N.A.**,

Defendant.

**Case No. 1:20-cv-02402**

**Jury Trial Demanded**

**COMPLAINT**

Plaintiffs, Andrew J. Maxwell, not individually, but as Trustee for the estate of Eduardo Garcia and Julia Escamilla (now known as Julia Garcia), Eduardo Garcia, Julia Garcia, Byron Garcia, and Miriahm Garcia (hereinafter the "Garcias"), for their complaint against Wells Fargo Bank, N.A. ("Wells Fargo"), state, as follows:

**WHY PLAINTIFFS BRING THIS CASE**

1. Like many folks, Eduardo and Julia Garcia encountered financial difficulty in the wake of the 2008 financial crisis. When they had problems paying their mortgage, they reached out to their loan servicer, Wells Fargo, to apply for a loan modification. They completed an application and provided Wells Fargo with all of the documents and information requested.

2. Wells Fargo denied their application for a loan modification.

3. Unknown to the Garcias, Wells Fargo had improperly evaluated the application due to what the bank would later casually describe as a "computer glitch."

4. Wells Fargo has now publicly admitted that this "computer glitch" resulted in the improper denial of several hundred loan modification applications, resulting in the loss of those folks' homes.

5. The Garcias are victims of Wells Fargo's outrageous conduct.

6. The Garcias needlessly lost their Family Home at public auction after Wells Fargo filed for foreclosure.

7. After Wells Fargo foreclosed, they obtained a deficiency judgment against Eduardo and Julia Garcia personally.

8. This had the effect of forcing Eduardo and Julia Garcia to file a Chapter 7 bankruptcy petition.

9. The double whammy of foreclosure and bankruptcy financially ruined Eduardo and Julia Garcia.

10. However, Wells Fargo concealed its conduct from the Garcias and from the Trustee until July 26, 2019 when Wells Fargo mailed the Garcias a letter explaining what had happened which included a check for $14,500 for the Garcias' "troubles."

11. Upon learning of Wells Fargo's misconduct, the Garcias sought out counsel to assist them in their pursuit of justice for the needless harms inflicted upon them by Wells Fargo.

**PARTIES, JURISDICTION AND VENUE**

12. Eduardo and Julia Garcia purchased 407 Beach Ave., LaGrange Park, Illinois 60526 (their "Family Home") in 2002. To do so, they borrowed money from Wells Fargo and executed a note and granted a mortgage. The note and mortgage are collectively referred to as the "Loan."

13. Eduardo and Julia Garcia lived in the Family Home with their children as their primary residence.

14. Byron Garcia and Miriahm Garcia are the children of Eduardo and Julia Garcia. At the time of Wells Fargo's denial of the loan modification and foreclosure of the Family Home, Byron and Miriahm were teenagers in high school. The family will be collectively referred to as "the Garcias."

15. The Garcias are each a natural person residing in this District.

16. The bankruptcy trustee, Andrew J. Maxwell, is entitled to bring suit on behalf of Eduardo and Julia Garcia's bankruptcy estate to recover amounts claimed by creditors of their bankruptcy estate and a trustee's commission. The trustee is authorized to bring the claims asserted herein on behalf of the estate pursuant to 11 U.S.C § 323.

17. The Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a corporation existing under the laws of the State of Delaware and maintains its principal place of business at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104.

18. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds $75,000.00 exclusive of punitive damages, and/or interest and costs, and is between citizens of different States. This matter also arises under the Bankruptcy Code and therefore this Court has "arises under" jurisdiction pursuant to the Code.

19. This Court has supplemental jurisdiction to hear all state statutory and common law claims pursuant to 28 U.S.C. § 1367.

20. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

21. The Plaintiffs have a private right of action under the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq. ("ICFA"), which provides for actual damages, attorneys' fees, and punitive damages. *Id.* The Plaintiffs also make a claim for gross negligence.

22. The Plaintiffs seek recovery of all damages available under the law including compensatory and punitive damages as well as attorney fees and costs.

**THE FACTS**

23. The Family Home Affordable Modification Program (HAMP) was designed to provide the very help that Eduardo and Julia Garcia needed to maintain ownership of their home.

24. Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

25. Similar threshold requirements were incorporated into the mortgage modification requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac, and the Federal Housing Administration (FHA).

26. As ultimately admitted by Wells Fargo, Eduardo and Julia Garcia met the threshold requirements for a mortgage modification. Wells Fargo, as their mortgage servicer, was required to offer them a loan modification as a HAMP participant.

27. However, Wells Fargo, because of an alleged "faulty calculation" failed to offer Eduardo and Julia Garcia a loan modification.

28. Instead, Wells Fargo needlessly foreclosed on their Family Home, sold it at judicial sale, evicted them and obtained a deficiency judgment of nearly $200,000 against Eduardo and Julia Garcia, personally.

29. Wells Fargo has attempted to cast its conduct here as resulting from a "faulty calculation." However, Wells Fargo's problem goes much deeper than a single miscalculation.

30. Wells Fargo's conduct here reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

31. Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements - allowing life-changing errors to remain uncorrected for years on end.

32. Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether Family Homeowners met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have - and should have - used the free software instead.

33. As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other legal and regulatory requirements over a period of at

least eight years. Wells Fargo's actions caused widespread consumer harm including hundreds of families needlessly losing their homes.

34. Wells Fargo's outrageous conduct and utter indifference to its legal obligations directly and proximately resulted in needless harm to the Garcias.

35. Wells Fargo's actions caused the Garcias to lose their Family Home.

36. Wells Fargo's actions directly resulted in the denial of a loan modification for Eduardo and Julia Garcia. Wells Fargo admitted this in its letter to Eduardo and Julia Garcia that prompted this litigation.

37. Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency ("OCC") found numerous deficiencies in its mortgage modification and foreclosure practices.

38. The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

39. Wells Fargo agreed to correct these deficiencies in two different 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company ("WFC")), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

40. Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised

to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

41. Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

42. In one of the consent orders, the Federal Reserve specifically ordered WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

43. Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in callous disregard of the well-being of their customers.

44. Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements; had not ensured that the Bank's audit and compliance programs had the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' Family Homes.

45. In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

46. As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

47. Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in October 2015 - one of the errors at issue in this case - which caused the Bank to wrongly deny mortgage modifications to 625 customers.

48. Even though Wells Fargo had just been fined $70 million dollars for its indefensible conduct, Wells Fargo decided not to tell anybody it had discovered this error - possibly as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

49. Whatever the reason, Wells Fargo obviously learned nothing from the $70 million dollar penalty. This could be because a penalty of $70 million dollars equated to 3/1000 of 1% of Wells Fargo's net income for 2015. This is like issuing a fine of $.50 (fifty cents) to a person making $50,000.

50. The Bank's seven-member Board of Directors signed the stipulation under which the Bank accepted the $70 million penalty and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in 2013-2014. These directors did not disclose that the Bank had discovered another error - either because their oversight was so non-existent that they did not know, or because they chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the business restrictions it had imposed on the Bank.

51. To make matters worse, even after discovering the 2015 error, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect approximately 870 customers were not discovered until three years later.

52. The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities - and did so to a shocking degree.

53. Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."

54. Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

55. In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

56. Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

57. Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

58. Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger. As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

59. A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2015 error - first to its shareholders in its Q2 and Q3 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q for the quarter ending June 30, 2018, that approximately 625 customers were incorrectly denied a loan modification between April 13, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

60. Three months later, in its next Form 10-Q for the quarter ending September 30, 2018, Wells Fargo disclosed that a "subsequent expanded review" had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 incorrectly denied a loan modification or not offered a loan modification or repayment plan, and resulting in completed wrongful foreclosures to approximately 545 customers.

61. Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its 2018 Annual Report, Wells Fargo disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern." In its 2019 Annual Report, Wells Fargo disclosed to shareholders that as ongoing reviews continue, "it is possible that in the future we may identify additional items or areas of potential concern."

**THE GARCIAS' STRUGGLE**

62. Eduardo and Julia Garcia purchased 407 Beach Ave., LaGrange Park, IL 60526, for $203,000.00 on December 12, 2002, in order to live in it as their primary residence. Eduardo and Julia, along with Byron and Miriahm, both under the age of 10 at the time, moved into the home right away.

63. When the family moved into the Family Home, Miriahm was in grammar school. Miriahm had special needs and required special education.

64. Eduardo and Julia specifically chose to live in LaGrange Park because its school district was known to have a very good special education program.

65. Miriahm flourished in LaGrange Park's schools and her parents noticed significant improvements as she "came out of her shell."

66. LaGrange Park, Illinois is a middle-class village with higher than average priced homes. Eduardo and Julia considered themselves extremely lucky to find the Beach Avenue property at the price they did, as it was the only one in the area that was affordable to them. The property, however, was in desperate need of extensive repairs and updating.

67. Over the nine years that the Garcias owned and lived in their Family Home, they invested over $40,000.00 and extensive time in completely rehabbing it themselves.

68. On January 26, 2006, Eduardo and Julia refinanced the Mortgage. They were put into a subprime adjustable rate mortgage, on the promise that they could refinance out of it into a fixed rate loan later.

69. The mortgage loan had an interest rate of 8.14% for the first 24 months and would then adjust every 6 months thereafter. The adjustments would be calculated by adding 6.5% to the "current index," with a maximum rate of 15.14%, and a minimum rate of 8.14%.

70. In February 2008, the Garcias' monthly payment increased drastically as part of an adjustment.

71. The Garcias tried to refinance their mortgage loan but the housing market crash had significantly devalued the Family Home.

72. Eduardo and Julia tried their best to continue to pay the Mortgage after their monthly payment skyrocketed but were only able to make approximately 6 more monthly payments.

73. Mr. Garcia, who was self-employed at the time, had his business go under and he was left unemployed.

74. Living only on Mrs. Garcia's income, they were unable to make the full monthly payments as of September 2008.

75. Mr. and Ms. Garcia immediately began trying to work with Wells Fargo to obtain a loan modification, as they believed they could pay a reasonable modified mortgage payment. They submitted application after application, document after document, seeking a forbearance or a modification, anything that would allow them to make reasonable payments and remain in the Family Home that they had been in for the past 9 years.

76. Wells Fargo filed its foreclosure action on January 8, 2009.

77. Over the next 24 months, Eduardo and Julia worked tirelessly to try to obtain a modification. They began working with a housing counselor and submitted application after application, continuously sending in the same documents over and over, only to be told by Wells Fargo that they had not submitted documents, or that they did not qualify for a modification.

78. With high unemployment caused by the housing market crash, Mr. Garcia was unable to find a job, so Mrs. Garcia took as much overtime as she could at her job, hoping that the increased income would allow them to keep their Family Home. She began working an average of 60 hours per week.

79. This created a difficult situation, where Mr. Garcia, who speaks predominantly Spanish, would have to attend court dates and meet housing counselors on his own, requiring the services of an interpreter or the involvement of Byron Garcia to act as an interpreter. Mrs. Garcia is bilingual but was unable to attend these important events due to her increased work schedule.

80. Wells Fargo denied Eduardo and Julia a loan modification on at least four separate occasions. *See* Wells Fargo denial letters dated November 20, 2008; November 12, 2010; December 1, 2010; and February 7, 2011; collectively attached as ***Exhibit A***.

81. Wells Fargo sold the Family Home to itself for the price of $144,500 on February 18, 2011, just eleven days after sending the last denial letter.

82. The Garcias found out about the judicial sale the day before it was held.

83. On March 29, 2011, Wells Fargo received approval of the judicial sale and the court entered an eviction order against the Garcias.

84. Additionally, after filing the foreclosure, Wells Fargo began to pay for force-placed insurance. The force-placed insurance was significantly more expensive than standard Family

Homeowner's insurance that Eduardo and Julia had in place, which ultimately increased the amount of the foreclosure judgment entered against them.

85. Wells Fargo's final judgment against Eduardo and Julia was for $296,182.64, leaving a deficiency of $151,682.64 after the sale of the Family Home at judicial sale.

86. Faced with the insurmountable deficiency judgment, Eduardo and Julia were forced to file a Chapter 7 Bankruptcy on May 26, 2011, two months after losing the Family Home.

87. Eduardo and Julia faced significant struggles in attempting to rent an apartment after the foreclosure and bankruptcy. They wanted to remain in LaGrange Park so that Miriahm would not be forced to transfer out of the LaGrange Park special education program.

88. Throughout the process of foreclosure, eviction and bankruptcy, Eduardo and Julia worried constantly that the loss of the Family Home would cause devastating harm to Miriahm's education and development. Eduardo and Julia did everything in their power to remain in LaGrange Park after this process.

89. In applying for rental apartments, they were rejected time after time due to the damage done to their credit profile by the outrageous actions of Wells Fargo that led directly to both the foreclosure and the bankruptcy filing.

90. On a number of occasions after the foreclosure and bankruptcy, Eduardo and Julia were told by persons in the real estate industry in LaGrange Park that they were "looking in the wrong area." This treatment resulting from the foreclosure and bankruptcy caused by Wells Fargo inflicted severe and substantial humiliation and embarrassment upon Eduardo and Julia.

91. The Garcias ended up signing a lease for a very small apartment that was in poor condition in Brookfield, Illinois, believing that it was located in the LaGrange Park School District, which would have allowed Miriahm to continue her education there. They hastily signed this lease

one day before Wells Fargo forced them to move out of the Family Home, as the only other option at the time would have been homelessness.

92. However, it turned out that the Brookfield Apartment was one block outside of the LaGrange Park school district. Mr. and Mrs. Garcia had to beg and plead the school district to allow Miriahm to remain at her school, which the school district eventually agreed to do.

93. In moving into the Brookfield apartment, the Garcias were also forced to part with their two dogs, because the apartment did not allow pets. This was particularly devastating for Miriahm, who had grown very attached to the family pets.

94. After the Brookfield apartment, the Garcias were eventually forced to move to Cicero, Illinois, the only place they were able to find an apartment that did not require a credit check.

95. On or about August 3, 2018, Wells Fargo filed a Form 10-Q with the United States Securities and Exchange Commission.

96. The Form 10-Q identified a:

> "[C]alculation error that affected certain accounts that were in the foreclosure process between April 13, 2010, and October 20, 2015, when the error was corrected … [a]s a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not otherwise offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances … a foreclosure was completed."

Wells Fargo Form 10-Q Quarterly Report for the Period Ended June 30, 2018 (page 5), may be found at https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2018/second-quarter-10q.pdf.

97. On or about November 6, 2018, Wells Fargo filed a Form 10-Q with the United States Securities and Exchange Commission.

98. The Form 10-Q identified a:

> "[C]alculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 13, 2010, and October 2, 2015, when the error was corrected. A subsequent expanded review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 1028, when new controls were implemented.… [a]s a result of these errors, taken together and subject to final validation, approximately 870 customers were incorrectly denied a loan modification or were not offered a modification or repayment plan in cases where they otherwise would have qualified. In approximately 545 of these instances … a foreclosure was completed."

Wells Fargo Form 10-Q Quarterly Report for the Period Ended September 30, 2018 (page 6), may be found at: https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2018/third-quarter-10q.pdf.

99. On or about July 26, 2019, Wells Fargo sent a letter to Eduardo and Julia (the "WF First Letter") with the subject: "We made a mistake when we reviewed you for payment assistance." *See* WF First Letter attached as ***Exhibit B***.

100. The WF First Letter admits that "Wells Fargo Family Home Mortgage is a division of Wells Fargo Bank, N.A." *Id*.

101. The WF First Letter states:

> "We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. **If it had been correct, you would have been approved for a trial modification.**
>
> **We want to make things right."**

*Id*.

102. Along with the WF First Letter, Wells Fargo sent Eduardo and Julia a check in the amount of $14,500.00. *Id.*

103. Upon receiving Wells Fargo's letter, the Garcias were in utter disbelief. At first they believed the letter was some type of scam. The Garcias did not believe that a national bank in the United States could inflict massive needless harm on their entire family, take their Family Home and then send them a letter nearly 10 years later that amounted to "Oops, we made a little mistake."

104. The Garcias believed that Wells Fargo had failed to "make things right," and they were very untrusting that the same bank that had destroyed their lives for the last decade was acting in good faith, so they instead opted to seek legal representation.

105. In the weeks and months after sending the check, Wells Fargo representatives began to call the Garcias and to ask when they were going to cash the check.

106. The Garcias informed the Wells Fargo representatives that they were seeking the counsel of an attorney in the matter before deciding what to do.

107. The Garcias ultimately retained counsel.

108. On or about October 31, 2019, the Garcias informed the Wells Fargo representative who called them that they had retained counsel, and that all communications going forward should be done through counsel.

109. Despite this, on or about November 18, 2019, Wells Fargo directly sent the Garcias a second letter ("WF Second Letter"), and included a second check, this time for $10,000.00. *See* WF Second Letter attached as ***Exhibit C***.

110. The WF Second Letter states:

> "Although you did not request mediation, we've further considered how our decision may have affected you. We have decided to provide additional compensation, which is enclosed with this letter. We take this matter seriously and are sorry that this happened."

*Id.*

111. On or about November 25, 2019, Wells Fargo sent the Garcias a third letter ("WF Third Letter"), wherein it reminded the Garcias that they had not cashed their check yet. *See* WF Third Letter attached as ***Exhibit D***.

**DAMAGES CAUSED BY WELLS FARGO**

112. If Wells Fargo's conduct in this case were a book the title would be *The Needless Destruction of an American Family*.

113. Wells Fargo's conduct here resulted in substantial harms that no person or family should ever be expected to endure.

114. Wells Fargo directly, proximately, and needlessly caused the Garcias to lose their Family Home.

115. Flowing directly from this needless harm, the Garcias suffered the following damages:

A. Wells Fargo took away the opportunity for Eduardo and Julia Garcia to obtain a permanent loan modification.

B. Wells Fargo denied the Garcias the ability to remain in the Family Home.

C. The Garcias were subject to a foreclosure on the Family Home.

D. Eduardo and Julia Garcia were subject to a financially ruinous deficiency judgment in favor of Wells Fargo.

E. The Garcias were evicted from their Family Home.

F. Eduardo and Julia Garcia were forced to file bankruptcy.

G. Eduardo and Julia's creditworthiness was obliterated. After the foreclosure and bankruptcy they were often unable to finance anything and had difficulty procuring basic services and necessities.

H. Due to the stress and subsequent deterioration of her physical and mental health, Mrs. Garcia was eventually forced to quit her job,

which significantly and permanently derailed her professional career.

I. Miriahm Garcia was also directly impacted by Wells Fargo's actions - in a session with a school counselor, she confided that her family was suffering financial problems, and that this caused stress for her.

J. Miriahm watched her parents suffer severe mental and emotional distress related to the loss of the Family Home during their dealings with Wells Fargo and the aftermath of the foreclosure and bankruptcy.

K. Miriahm later confided to her parents that during the time of the foreclosure she felt anxiety, stress, and fear that she would have to leave her school and start over at a new school.

L. Miriahm also developed physical medical problems, when the stress and anxiety caused by the foreclosure led to her developing stomach and gastro-intestinal problems that persist to this day, nearly ten years after the foreclosure.

M. Byron Garcia also suffered as a result of Wells Fargo's actions. Byron was often thrust into adult roles related to the foreclosure and its deleterious effects while trying to act as an interpreter for his father.

N. Byron also observed his parents suffer severe mental and emotional distress related to the loss of the Family Home during their dealings with Wells Fargo and the aftermath of the foreclosure and bankruptcy.

O. Byron had planned to study music and theology at DePaul University or College of DuPage, but after losing the Family Home and the resulting financial harms, this path was closed to Byron. Instead, Byron elected to attend National Louis University because they offered him a scholarship; however, that scholarship limited him to three majors, none of which were in fields of interest. As a result, Byron never had a passion for study while in college and was never able to finish and obtain a college degree.

P. Eduardo and Julia Garcias' creditworthiness suffered the following issues all arising from Wells Fargo's outrageous conduct:

   a. Wells Fargo reported Eduardo and Julia's mortgage as delinquent after improperly denying them a loan modification.

b. Wells Fargo reported its foreclosure on Eduardo and Julia's credit reports after improperly denying them a loan modification.

c. After Wells Fargo's actions forced Eduardo and Julia to file Chapter 7 Bankruptcy that information became part of their credit profile;

d. Wells Fargo's destruction of Eduardo and Julia's creditworthiness made them unable to qualify to rent almost any form of housing in LaGrange Park, ultimately forcing them to live in a much less desirable area, where credit checks for apartments were not required;

e. Eduardo and Julia were unable to finance a car even at above-market, high interest rates. This forced Eduardo and Julia to buy several cars of little value for cash. These cars, because of their condition, were constantly subject to breakdowns and significant costs for repairs and maintenance; and

f. Eduardo and Julia suffered difficulties procuring basic services and providing necessities.

Q. Wells Fargo deprived Eduardo and Julia of being able to realize $182,586 of equity in the Family Home. At the time of the filing of this case, the Family Home was valued at approximately $352,388[1], which is $207,888 more than what Wells Fargo sold it for at Judicial Sale. *See* Zillow Appraisal attached as ***Exhibit E***.

R. Eduardo and Julia suffered economic losses related to their time spent on the loan modification, attending court hearings, the cost of moving out of the family home and other out of pocket costs including but not limited to increased costs of deposits for utilities.

S. Eduardo and Julia suffered extreme emotional distress, resulting from:

a. The unproductive and repetitive loss mitigation process;

[1] https://www.zillow.com/homes/407-Beach-Ave-La-Grange-Park,-IL,-60526_rb/3787312_zpid/ last visited on April 18, 2020 at 10:46 a.m. CDT.

b. The wrongful denial of their loss mitigation application due to the "faulty calculation" error;

c. The continuance of the foreclosure case;

d. Julia blamed herself for the loss of the Family Home, believing that Wells Fargo's denying them for a modification was because of her husband's translation difficulties, which she would have not faced if she hadn't worked such long hours;

e. Eduardo believed the loss of the Family Home was due to his temporary unemployment;

f. The loss of the Family Home;

g. Profound guilt associated with losing the Family Home and feeling that they had failed their children;

h. Embarrassment, humiliation and shame associated with losing their Family Home, feelings of failure, loss of creditworthiness and watching the struggles of their children that followed the loss of their Family Home; and

i. The cumulative stress of all of these experiences over a period of years.

T. These harms drastically affected Mrs. Garcia's physical and mental health, in that:

a. She was diagnosed with Major Depressive Disorder;

b. She was diagnosed with fibromyalgia;

c. She began suffering extreme migraines;

d. She has had to undergo therapy;

e. She lost the ability to drive due to her medical problems and required medications; and

f. Her marriage to Mr. Garcia suffered and deteriorated.

U. These harms drastically affected Mr. Garcia's mental health, in that:

a. For years after the foreclosure, he would spend days at a time where he was unable to get out of bed;

b. He lost motivation and had a very difficult time finding work;

c. His family describes him as noticeably "not the same man"; and

d. His marriage to Mrs. Garcia suffered and deteriorated.

V. Byron Garcia suffered the following harms from Wells Fargo's conduct:

a. Depression;

b. Anxiety;

c. Fear of being homeless;

d. Worry over his parents physical and mental health;

e. Trauma of witnessing his father fall into such a deep depression that he would stay in bed for days at a time;

f. Trauma of witnessing his mother go into uncontrollable "episodes of emotion and anger";

g. Trauma of witnessing his parents' marriage deteriorate;

h. Loss of sense of security and place;

i. Anger issues;

j. Relationship issues;

k. Stress;

l. Loss of time related to his attendance of hearings with his father; and

m. Loss of school friends.

W. Miriahm Garcia suffered the following harms resulting from Wells Fargo's conduct:

a. Miriahm's high school years were dominated by the family's financial concerns related to the foreclosure;

b. The foreclosure and eviction disrupted both Miriahm's junior and senior years of high school;

c. Grade disruptions;

d. Isolation;

e. Loneliness;

f. Disruption of her parental relationships, including an almost complete loss of a typical mother/daughter relationship;

g. The loss of her beloved dogs;

h. Stress;

i. Anxiety;

j. Worry;

k. Stomach and digestive issues;

l. Loss of personal possessions as a result of the foreclosure; and

m. Loss of school friends.

X. As a result of the harms proximately caused by Wells Fargo's wrongful conduct, Byron Garcia and Miriahm Garcia experienced extreme emotional distress and mental anguish.

116. Receiving Wells Fargo's First Letter and learning that Wells Fargo "made a mistake" in taking their Family Home almost a decade ago has also been very traumatic for the entire Garcia family. Wells Fargo's first letter triggered all the emotions experienced over the last ten years in a tidal wave of pain and mental harm for the Garcia family. They have been left to wonder what might have been if Wells Fargo had simply fulfilled their legal obligations.

117. Since receiving the letter, Mrs. Garcia has suffered bouts of uncontrollable crying with no warning, has had difficulty concentrating, and has had difficulty sleeping.

118. Mr. Garcia has had strong feelings of anger, has found himself to be "on edge" a lot of the time, has had difficulty concentrating, and difficulty sleeping.

119. Byron Garcia has experienced strong feelings of anger and deep resentment.

120. Miriahm Garcia has experienced significant anxiety and has lost a significant amount of time over thoughts of how Wells Fargo's actions have altered her life.

**COUNT ONE**

**[Violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq ("ICFA")]**

121. Plaintiffs restate and incorporate all prior paragraphs and allegations as if fully rewritten herein.

122. The Illinois Consumer Fraud and Deceptive Business Practices Act provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception or fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

123. At all times herein, the entire Garcia family were consumers as that term is defined in the Act. 815 ILCS 505/1(e).

124. At all times herein, Wells Fargo engaged in trade or commerce as those terms are defined in the Act. 815 ILCS 505/1(f).

125. As alleged in paragraphs 1-120 herein, Wells Fargo engaged in unfair acts in its dealings with the Garcias and other consumers in violation of law.

126. Wells Fargo's conduct was directed at consumers generally.

127. Wells Fargo's conduct needlessly caused consumers, including the Garcias, considerable economic damages including the loss of equity in their home, the loss of their home, moving expenses, time associated with loss mitigation efforts and court appearances and other forms of economic loss.

128. Wells Fargo's conduct also needlessly caused the Garcia family significant, life altering, non-economic harm that has defined their life for more than a decade.

129. All the needless harms suffered by the Garcia family proximately resulted from Wells Fargo's unfair acts and practices.

130. The Plaintiffs demand such economic, non-economic and punitive damages as a jury deems reasonable and may award after hearing the evidence in this case.

131. The Plaintiffs request the Court award them statutory attorney's fees and the costs of the litigation as well.

**COUNT TWO**

**[Gross Negligence]**

132. Plaintiffs restate and incorporate all prior allegations as if fully rewritten herein.

133. Wells Fargo owed a duty to exercise reasonable care in evaluating Eduardo and Julia Garcia's eligibility for a loan modification because Wells Fargo undertook to review their mortgage loan for a loan modification.

134. Wells Fargo breached their duty by miscalculating the Garcia's eligibility for a trial modification utilizing a defective calculator built by Wells Fargo.

135. After miscalculating the Garcia's eligibility for a trial modification Wells Fargo aggressively continued the foreclosure and eviction process.

136. As a direct and proximate result of Wells Fargo's conduct, the Garcias suffered both monetary and non-monetary harms as pled, *supra*, ¶¶ 112-120, including subparts.

137. The damage to the Garcia family was foreseeable because Wells Fargo knew the Garcia family would lose their Family Home after Wells Fargo improperly denied them a loan modification.

138. Wells Fargo's conduct herein was so outrageous and so close to intentional conduct as to be grossly negligent rather than merely negligent.

139. The Plaintiffs seek such an amount of economic, non-economic and punitive damages as a jury deems reasonable and might award after hearing the evidence in this case at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the entry of judgment granting the following relief:

I. Economic Damages in an amount sufficient to pay all of the Garcias' creditors in bankruptcy other than Wells Fargo;

II. Economic Damages for all other amounts shown by the evidence to have been proximately caused by Wells Fargo's actions;

III. Non-Economic Damages in an amount sufficient to compensate each member of the Garcia family for the life altering needless harms inflicted upon them by the outrageous conduct of Wells Fargo;

IV. Punitive damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs demand trial by struck jury on all matters contained in this complaint.

Respectfully Submitted,

*/s/ Rusty A. Payton*
Rusty A. Payton,
PAYTON LEGAL GROUP
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
(773) 682-5210
info@payton.legal

*/s/ Salvador J. Lopez*
Salvador J. Lopez
ROBSON & LOPEZ, LLC
180 W. Washington Street, Suite 700
Chicago, Illinois 60602
312-523-2166
lopez@robsonlopez.com

*/s/ Nick Wooten*
Nicholas H. Wooten
NICK WOOTEN, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
nick@nickwooten.com
***Lead Trial Counsel***

***Counsel for the Plaintiff***