UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW J. MAXWELL, not individually, but as Trustee for the estate of Eduardo Garcia and Julia Escamilla, now known as Julia Garcia; EDUARDO GARCIA; JULIA GARCIA; and their minor children, individually, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) No. 20 C 2402 |
| v. | ) Judge Rebecca R. Pallmeyer |
| WELLS FARGO BANK, N.A., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Eduardo and Julia Garcia and their two children, B. and M., filed this lawsuit last year, together with Andrew J. Maxwell, the trustee of the Garcias' bankruptcy estate, to challenge Defendant Wells Fargo Bank's failure to refinance the Garcias' home mortgage in 2010. In 2002, the Garcias took out a mortgage loan with Defendant Wells Fargo to purchase a home in LaGrange Park, Illinois. Four years later, not long before the 2008 housing crisis, the Garcias refinanced their mortgage at a subprime adjustable rate. In February 2008, their monthly mortgage payment skyrocketed, and by September 2008, they could no longer afford the monthly payments. In January 2009, Wells Fargo filed an action to foreclose on the Garcias' property. At that point, the Garcias began making requests that Wells Fargo grant them a loan modification under the Family Home Affordable Modification Program (hereinafter "HAMP"). Although the Garcias met the threshold criteria to receive a loan modification from Wells Fargo under HAMP, a software error mistakenly concluded that the Garcias were not eligible. Wells Fargo rejected their requests. Eventually, Wells Fargo foreclosed on the mortgage, the house sold in a judicial sale, and the deficiency judgment on the foreclosure sale forced the Garcias into bankruptcy.

In 2019, the Garcias received a letter from Wells Fargo notifying them that Wells Fargo had discovered the software error that resulted in the rejection of their loan modification request. The Garcias declined the $24,500 that Wells Fargo offered in apology and instead filed this lawsuit [1], alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (Count I) and gross negligence (Count II). Now, Wells Fargo asks this court to dismiss both counts [14] for failure to state a claim upon which relief can be granted. For the reasons stated below, the court grants Wells Fargo's motion as it relates to Plaintiffs' negligence claim but denies the motion as it relates to Plaintiffs' ICFA claim. The court also rules that only Maxwell, as trustee of the Garcias' estate, has standing to continue to pursue either of these claims.

## BACKGROUND

The facts as alleged in the complaint are as follows: Plaintiffs Eduardo and Julia Garcia purchased the property at 407 Beach Avenue, LaGrange Park, IL 60526 on December 12, 2002 for $203,000. (Compl. ¶ 62.) They financed the purchase with a mortgage from Defendant Wells Fargo. (*Id.* ¶ 12.) Immediately thereafter, the Garcias moved into this property (hereinafter "the Garcia House") along with their children, B. and M. Garcia. (*Id.* ¶ 62.) Both children were under the age of ten at the time (*id.*), and one had a need for special education. (*Id.* ¶ 63.) Eduardo and Julia specifically chose to live in LaGrange Park because its school district had a good special education program (*id.* ¶ 64), and the Garcias considered themselves lucky to have found their home at this price, as it was the only one in the area that they could afford. (*Id.* ¶ 66.) When the family bought the Garcia House, it was "in desperate need of extensive repairs and updating." (*Id.*) In the nine years that the Garcias owned and lived in the house, they completely rehabilitated it themselves, investing over $40,000 and extensive time in doing so. (*Id.* ¶ 67.)

On January 26, 2006, the Garcias refinanced their mortgage at a subprime adjustable rate. (*Id.* ¶ 68.) In February 2008, the monthly payment was adjusted upward; the significant increase in the amount due prompted the Garcias to attempt to refinance their mortgage again. (*Id.* ¶¶ 70–71.) Unfortunately, due to the housing market crash associated with the Great

Recession, the value of their home had plummeted, and they were unable to refinance a second time. (*Id.* ¶ 71.) At the time, Mrs. Garcia was still working, but Mr. Garcia, who had been self-employed, was no longer working. (*Id.* ¶¶ 73–74.) By September 2008, the family was unable to make their full monthly payments. (*Id.* ¶ 74.) At some point before November 2008, the Garcias began seeking a loan modification from Wells Fargo; the Garcias believed they would be able to pay a reasonable modified mortgage payment. (*Id.* ¶¶ 75, 80.) According to the complaint, the Garcias "submitted application after application, document after document, seeking a forbearance or a modification" that would allow them to stay in the Garcia House. (*Id.*) On November 20, 2008, the Garcias received the first of several letters from Wells Fargo denying their request. (*Id.* ¶ 80; Denial Letters, Ex. A to Compl. [1-1] (hereinafter "Denial Letters"), at 2.) That letter also stated, "You have failed to adhere to the agreed upon terms of the forbearance plan. Borrower did not pay the scheduled repayment plan payment." (Denial Letters at 2.) The complaint provides no other context surrounding this "scheduled repayment plan payment" that the Garcias failed to pay, though the court presumes that it refers to the monthly payments that the Garcias failed to make in September 2008. (Compl. ¶ 74.) On January 8, 2009, Wells Fargo filed an action to foreclose on the Garcias' property. (*Id.* ¶ 76.)

Over the next two years, the Garcias continued their efforts to obtain a loan modification, working with a housing counselor and repeatedly submitting applications and necessary documentation. (*Id.* ¶ 77.) During that time, Mr. Garcia remained unable to find work. (*Id.* ¶ 78.) To compensate, Mrs. Garcia began working as much overtime as possible, leaving Mr. Garcia to attend the court dates and meet housing counselors without her. (*Id.* ¶¶ 78–79.) Although Mrs. Garcia is bilingual, Mr. Garcia speaks predominantly Spanish and had to bring one of his children to act as an interpreter. (*Id.* ¶ 79.) Wells Fargo denied at least four separate loan modification requests from the Garcias, sending denial letters on November 20, 2008; November 12, 2010; December 1, 2010; and February 7, 2011. (*Id.* ¶ 80; Denial Letters at 2–7.) In the February 7, 2011 letter, Wells Fargo noted that the Garcias' monthly income was $2,759.64 while their

monthly expenses were $4,565.92. (Denial Letters at 7.) On February 18, 2011—eleven days after sending the final denial letter—Wells Fargo purchased the Garcia House in the foreclosure proceedings for $144,500. (Compl. ¶ 81.) Wells Fargo's final judgment against the Garcias was for $296,182.64, leaving the Garcias with a deficiency of $151,682.64 after the judicial sale. (*Id.* ¶ 85.)

Throughout the foreclosure process, the Garcias worried about ensuring the family could stay in LaGrange Park so that their child could continue receiving quality special education services from the LaGrange Park school district. (*Id.* ¶ 88.) When they applied for rental units, however, the Garcias were repeatedly rejected due to their poor credit stemming from the foreclosure. (*Id.* ¶ 89.) On March 29, 2011, the judicial sale was approved, and the court entered an eviction order against the Garcias. (*Id.* ¶ 83.) The day before Wells Fargo forced them to move out of the house, the Garcias "hastily signed" a lease for an apartment in Brookfield, Illinois in order to avoid becoming homeless. (*Id.* ¶ 91.) The apartment was "very small" and "in poor condition." (*Id.*) The Garcias believed the apartment was in the LaGrange school district when, in fact, it was one block outside of that district; after the Garcias "begged and pleaded," the school district agreed to permit their child to continue the child's education within the district. (*Id.* ¶¶ 91–92.) In order to live in this apartment, however, the Garcias had to part with their two dogs, as the apartment did not allow pets. (*Id.* ¶ 93.)

On May 26, 2011, the Garcias—facing a $151,682.64 deficiency—filed for Chapter 7 Bankruptcy. (*Id.* ¶¶ 85–86.) They continued to search for a rental property but struggled due to their poor credit. (*Id.* ¶¶ 89–90, 94.) Some people in the real estate industry in LaGrange Park even told them they were "looking in the wrong area," leading them to feel "severe and substantial humiliation and embarrassment." (*Id.* ¶ 90.) Eventually, the Garcias moved to Cicero, Illinois, the only place they could find an apartment that did not require a credit check. (*Id.* ¶ 94.)

On or about July 26, 2019, Wells Fargo sent a letter to the Garcias (hereinafter "July 2019 letter") with the subject line: "We made a mistake when we reviewed you for payment assistance."

(*Id.* ¶ 99; July 2019 Apology Letter, Ex. B to Compl. [1-2] (hereinafter "First Apology Letter"), at 1.)

The letter stated as follows:

> We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. If it had been correct, you would have been approved for a trial modification.
>
> We want to make things right.
>
> We realize that our decision impacted you at a time you were facing a hardship. We've carefully considered what we can do for you. You'll find a payment enclosed to help make up for your financial loss. You may cash this check without waiving or releasing any rights you may have, and you retain the right to pursue all other applicable legal remedies. We're also reaching out to the consumer reporting agencies to ask them to remove any negative reporting.

(First Apology Letter at 1.) Along with this letter, Wells Fargo sent the Garcias a check for $14,500. (Compl. ¶ 102.) The letter also offered to pay for the costs of mediation, should the Garcias choose to seek to mediate disputes with Wells Fargo, and notified the Garcias that lawyers had recently filed a class action lawsuit on behalf of borrowers subject to the loan modification error.[1] (First Apology Letter at 1.)

The "faulty calculation" in the Wells Fargo letter related to a determination of whether, when the Garcias had applied for loan modifications in 2010 and 2011,[2] they met the threshold requirements for a mortgage modification under the Family Home Affordable Modification Program (hereinafter "HAMP"). (Compl. ¶¶ 23–27.) Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers—such as Wells Fargo—

---

[1] The class action suit in question, *Hernandez v. Wells Fargo Bank, N.A.*, settled on October 12, 2020. No. C 18-07354 WHA, 2020 WL 6020593, at *7 (N.D. Cal. Oct. 12, 2020). Neither party has commented on whether the Garcias qualify as class members in that case, nor, if so, whether the Garcias have opted out or plan to opt out of the class in question.

[2] The complaint also lists a rejection letter from November 20, 2008, but, according to Wells Fargo's quarterly statements filed with the SEC, the errors in question affected loan modification requests between April 13, 2010 and October 20, 2015. (Compl. ¶¶ 95–98.) Thus, if the quarterly statements are accurate, only the November 12, 2010; December 1, 2010; and February 7, 2011 denials were affected by the software error. (*Id.* ¶ 80; *see generally* Denial Letters.)

5

to offer loan modifications to borrowers who met certain threshold requirements. (*Id.* ¶ 24.) Borrowers who met those requirements could lower their mortgage payments to a manageable level—typically 31 percent of the borrower's monthly income. (*Id.*) In order to participate in HAMP as a mortgage servicer, Wells Fargo executed a Servicer Participation Agreement (hereinafter "SPA") with the Treasury Department. (April 2009 Servicer Participation Agreement, Ex. A to Pl.'s Opp'n [17-1] (hereinafter April 2009 SPA); HAMP Directive, Ex. B to Pl.'s Opp'n [17-2] (hereinafter "HAMP Directive"); *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement* (2010), https://www.treasury.gov/initiatives/financial-stability/ TARP-Programs/housing/mha/Documents_Contracts_Agreements/wellsfargobankna_ Redacted.pdf (last visited Mar. 29, 2021) [hereinafter "March 2010 SPA"].) Wells Fargo executed one SPA on April 13, 2009 (April 2009 SPA at 12), and an updated SPA on March 16, 2010. (March 2010 SPA at 14.) In return for participating in HAMP, Wells Fargo became eligible to receive incentive payments based on the number of modified loans it provided, as well as how successful those modified loans were at reducing monthly mortgage payments and preventing defaults.[3] (HAMP Directive at 23.)

Wells Fargo admitted in the July 2019 letter that when the Garcias applied for loan modifications in 2010 and 2011, they met the HAMP threshold requirements for a mortgage modification. (Compl. ¶ 26; First Apology Letter at 1.) Yet Wells Fargo failed to offer the Garcias a loan modification based on what the July 2019 letter described as a "faulty calculation" that erroneously stated that the Garcias did not meet those requirements. (Compl. ¶ 27; First Apology

---

[3] Plaintiffs assert that the government promised to pay Wells Fargo up to $6.5 billion in exchange for Wells Fargo's willingness to participate in HAMP. (Pl.'s Opp'n [17] at 4.) As explained in the March 2010 SPA, "[t]he value of the Agreement is limited to $6,406,790,000," labeled as the "Program Participation Cap" (March 2010 SPA at 4)—a number that appears to include compensation payments for Wells Fargo, as well as money for investors and borrowers that Wells Fargo is required to either remit to investors or apply to borrowers' mortgage loan obligations. (April 2009 SPA at 3 ¶¶ 4.B., 4.D.; HAMP Directive at 23 ("The amount of funds available to pay servicer, borrower and investor compensation in connection with each servicer's modifications will be capped pursuant to each servicer's Servicer Participation Agreement (Program Participation Cap).").)

Letter at 1.) Wells Fargo discovered this error as early as August 3, 2018 when it disclosed in a quarterly report to the Securities and Exchange Commission ("SEC") that a "calculation error . . . affected certain accounts that were in the foreclosure process between April 13, 2010, and October 20, 2015, when the error was corrected . . . . " (Compl. ¶¶ 95–96.) The report to the SEC stated that, based on this error, approximately 625 customers were incorrectly denied a loan, and "[i]n approximately 400 of these instances . . . a foreclosure was completed." (*Id.*) As set forth in the next quarterly report, a subsequent expanded review of this and related errors led Wells Fargo to increase those numbers to 870 and 545, respectively. (*Id.* ¶¶ 97–98.)

As the court reads the July 2019 letter, acceptance of the $14,500 payment would not have precluded the Garcias from pursuing other claims against Wells Fargo. The Garcias themselves evidently did not see things this way. Believing that the $14,500 check enclosed in the July 2019 letter was insufficient to "make things right," and unable to trust Wells Fargo, the Garcias chose not to cash the check and instead sought legal representation. (*Id.* ¶¶ 104–07.) Wells Fargo representatives began calling in the following weeks and months to ask when the Garcias planned to cash the check. (*Id.* ¶ 105.) On October 31, 2019, the Garcias informed the Wells Fargo representative who had called them that they had retained counsel and that any further communication should be with their attorney. (*Id.* ¶ 108). On November 18, 2019, Wells Fargo sent the Garcias a second letter (hereinafter "November 2019 letter") that included a second check—this time for $10,000. (*Id.* ¶ 109.) The letter stated, "[W]e've further considered how our decision may have affected you. We have decided to provide additional compensation, which is enclosed with this letter. We take this matter seriously and are sorry that this happened." (November 18, 2019 Apology Letter, Ex. C to Compl. [1-3] (hereinafter "Second Apology Letter"), at 1.) This letter again informed the Garcias about the pending class action lawsuit related to the error that caused the Garcias' loan denial and reminded the Garcias that cashing the enclosed check would not amount to waiving or releasing any rights. (*Id.*) On November 25, 2019, Wells Fargo sent the Garcias a third letter, reminding them that they had still not cashed the original

7

$14,500 check. (November 25, 2019 Apology Letter, Ex. D to Compl. [1-4] (hereinafter "Third Apology Letter"), at 1.)

On March 30, 2020, the Garcias filed this lawsuit against Wells Fargo [1], alleging a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (hereinafter "ICFA"), as well as gross negligence. (Compl. ¶¶ 121–39.) In supporting these claims, the Garcias allege that Wells Fargo's issues run far deeper than this simple "faulty calculation." (*Id.* ¶ 29.) The complaint alleges that the government provides mortgage servicers a free software tool for use in determining whether family homeowners meet threshold requirements. (*Id.* ¶ 32.) Rather than using that free software, Plaintiffs alleges, Wells Fargo chose to develop its own automated decision-making tool. (*Id.* ¶¶ 31–32.) Plaintiffs allege that, between 2010 and 2018, Wells Fargo failed both to verify that its software was correctly calculating customers' eligibility for a mortgage modification and to properly audit the software for compliance with government requirements. (*Id.* ¶ 31.) This led Wells Fargo to fail to detect multiple systematic errors that would persist uncorrected for years and ultimately to deny a loan modification to the Garcias. (*Id.* ¶¶ 31, 36.)

In 2010, the Office of Comptroller of the Currency (hereinafter "OCC") found numerous deficiencies in Wells Fargo's mortgage modification and foreclosure practices. (*Id.* ¶ 37.) Wells Fargo pledged to correct these deficiencies in two 2011 consent orders in which it agreed, among other things, to engage in ongoing testing for compliance with HAMP and to ensure the Bank's mortgage modification practice was regularly reviewed. (*Id.* ¶¶ 39–40.) The responsible individuals at Wells Fargo, however, failed to fulfill these obligations over the course of several years so that by 2015—four years after the 2011 consent orders—the OCC found Wells Fargo was still failing to either maintain testing for compliance with HAMP or to ensure that deficiencies in the mortgage modification practice could be identified and promptly remedied. (*Id.* ¶ 43.) As a result of these shortcomings, Wells Fargo continued to fail to catch errors, leading the mortgage servicer to "wrongly deny mortgage modifications to 184 customers between March 2013 and

October 2014" and to wrongly deny mortgage modifications to 625 more customers based on an error discovered in October 2015. (*Id.* ¶¶ 46–47.) In the three years after that, related errors would affect 870 more customers. (*Id.* ¶ 51.)

In this lawsuit, the Garcias argue that these overarching behaviors lend support to their gross negligence and ICFA claims. Now, Wells Fargo has filed a motion to dismiss both counts [14] for failure to state a claim.[4]

## DISCUSSION

The relevant question on a 12(b)(6) motion for failure to state a claim is whether the complaint contains sufficient allegations to "state a claim to relief that is plausible on its face." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *See Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018). But the court need not similarly accept "legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (internal quotations omitted). In reaching its decision, the court can also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Henderson v. Marker*, No. 13 CV 2621, 2014 WL 886833, at *1 (N.D. Ill. Mar. 5, 2014) (quoting *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013)). Wells Fargo asserts that Plaintiffs have failed to adequately plead either their negligence claim or their ICFA claim. The court will examine each argument in turn.

---

[4] Plaintiffs assert that "Wells Fargo's arguments completely ignore the claims of the Garcia children," and therefore, Wells Fargo concedes the viability of those claims. (Pl.'s Opp'n at 1.) The court finds no merit in this argument. The complaint did not explain how the children's claims were, in any way, distinct from Mr. and Mrs. Garcia's claims, and Plaintiffs did not highlight any reason that Wells Fargo's arguments would affect the Garcia parents' claims any differently than the Garcia children's claims.

### A. Negligence

To state a claim for negligence in Illinois, a plaintiff "must establish the existence of a duty of care owed by the defendant." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 270, 864 N.E.2d 249, 263 (2007). The mere existence of a relationship between a borrower and lender does not, in itself, create such a duty. *LaSalle Bank Nat'l Ass'n v. Paramont Props.*, 588 F. Supp. 2d 840, 852–53 (N.D. Ill. 2008) ("Illinois does not, and would not, recognize a general duty of care owed by lenders to borrowers") (collecting cases); *cf. Miller v. Am. Nat'l Bank & Tr.*, 4 F.3d 518, 520 (7th Cir. 1993) ("Under the law of Illinois . . . a bank generally owes no fiduciary duty to its depositors . . . The relationship consists simply of an arms-length transaction between debtor and creditor." (internal citations omitted)). Nor do Plaintiffs argue, or identify any caselaw suggesting, that a lender develops such a duty by entering loan modification negotiations with a borrower.[5] Instead, Plaintiff argues that Wells Fargo voluntarily entered into an SPA with the Treasury Department, requiring it to consider consumers for loan modification under the HAMP guidelines, and therefore, "Wells Fargo's conduct is properly analyzed under the negligence standard for a voluntary undertaking." (Pl.'s Opp'n at 5.)

In Illinois, "one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for . . . harm caused to the other by one's failure to exercise due care in the performance of the undertaking." *Rhodes v. Ill. Cent. Gulf R.R.*, 172 Ill. 2d 213, 239, 665 N.E.2d 1260, 1273 (1996). In such a situation, the duty of care which arises is "limited to the extent of the undertaking." *Id.* "[W]hether a voluntary undertaking has been assumed is necessarily a fact-specific inquiry." *LM ex rel. KM v. United States*, 344 F.3d 695, 700 (7th Cir.

---

[5] The court notes that cases cited by Wells Fargo do not address this issue in the negligence context. *Kinsella v. Cap. One*, No. 17 C 05236, 2018 WL 5884520, at *5 (N.D. Ill. Nov. 9, 2018) (in the fraud context); *Bank of Am., N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158, 165–75, 928 N.E.2d 42, 50–58 (1st Dist. 2010) (in the context of succeeding on the merits of the underlying foreclosure); *FirstMerit Bank v. Quanstrom-Rose*, 12 C 10051, 2013 WL 6577028, at *4 (N.D. Ill. Dec. 13, 2013) (unclean hands defense); *N. Tr. Co. v. VIII S. Mich.*, 276 Ill. App. 3d 355, 368, 657 N.E.2d 1095, 1104–05 (1st Dist. 1995) (covenant of good faith and fair dealing).

2003). Here, Plaintiffs argue that Wells Fargo voluntarily entered into the SPA with the Treasury Department, creating a duty of care owed by Wells Fargo to the Garcias and other consumers who would rely on Wells Fargo to modify their loans according to the HAMP guidelines. The court is not persuaded.

To begin, Plaintiffs have identified no case in which a court held that entering into a contract with the federal government constitutes a voluntary undertaking to protect third-party beneficiaries of that contract. Indeed, Plaintiffs have cited only three cases that speak to voluntary undertaking law in Illinois at all, and in two of those cases, the relevant court did not find a duty arising out of a voluntary undertaking. *Rhodes*, 172 Ill. 2d at 240, 665 N.E.2d at 1273 (rejecting an argument that "a party voluntarily undertakes a legal duty to rescue an injured stranger by simply calling the police"); *LM ex rel. KM*, 344 F.3d at 702 (noting that, although the court did not reach the question in this case, the plaintiff was unlikely to have been able to establish any element necessary to show a voluntary undertaking). In the third case, *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 217, 531 N.E.2d 1358,1365 (1988), the court held that a voluntary undertaking did create a duty of care. But that case involved a commercial landlord who "assumed a duty to take reasonable precautions to prevent unauthorized entries by individuals possessing [the] keys [to personal offices]" and has little relevance here. *Id.* at 221–22, 531 N.E.2d at 1367. The caselaw cited by Plaintiffs does not appear to support a conclusion that by entering the SPA with the Treasury Department, Wells Fargo assumed a voluntary undertaking to protect the rights of the Garcias and all other consumers in their position.

A number of other courts have concluded that violations of the HAMP guidelines do not create a duty of care that could support a negligence claim on the part of borrowers. *See Fed. Nat'l Mortg. Ass'n v. Carr*, No. 3:12–cv–1295, 2013 WL 5755083, at *4 (M.D. Tenn. Oct. 23, 2013) ("As these cases demonstrate, Tennessee law does not impose any 'special duty' on financial institutions acting as mortgagees, even when they review HAMP modification requests and fail to adhere to the HAMP guidelines.") (collecting cases); *see also Brown v. U.S. Bank Nat'l Ass'n*, No.

11

3:19-cv-1-TCB, 2019 WL 5388000, at *2 (N.D. Ga. Aug. 19, 2019) (citing *Moragon v. Ocwen Loan Servicing, LLC*, No. 6:17-cv-2028-Orl-40KRS, 2018 WL 3761036, at *7 (M.D. Fla. June 22, 2018)) ("The law is clear that HAMP cannot serve as the basis for a negligence claim.").[6]

With this in mind, and without authority for the argument that Wells Fargo voluntarily undertook to protect the Garcias' rights simply by executing the SPA with the Treasury Department, the court declines to find that HAMP—or Wells Fargo's decision to enter the SPA—created a duty here. For that reason, the court dismisses Plaintiffs' negligence claim without prejudice.[7]

**B.    ICFA violations**

Next, Wells Fargo asks the court to dismiss Plaintiffs' claim under the ICFA. The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business

---

[6] In *Wigod v. Wells Fargo Bank, N.A.*, the Seventh Circuit explained that, among the eighty or so federal cases it had examined in which plaintiffs alleged HAMP-related claims, courts had almost uniformly rejected two arguments: (1) that HAMP created a private right of action, and (2) that plaintiffs might recover as third-party beneficiaries of a lender's contract to enter an SPA. 673 F.3d 547, 559 n.4 (7th Cir. 2012). With this in mind, one might conclude that Plaintiffs' state law claims here are attempts to evade these federal law barriers, and to dismiss Plaintiffs' claims on that ground. But the Seventh Circuit in *Wigod* explicitly rejected a similar argument from defendant that plaintiff's state law claims "[we]re 'HAMP claims in disguise' and an 'impermissible end-run around the lack of a private action in . . . HAMP.'" *Id.* at 581. The Seventh Circuit allowed plaintiff's state law claims to proceed, explaining in part, "There is no general rule that where a state common law theory provides for liability for conduct that is also violative of federal law, a suit under the state common law is prohibited so long as the federal law does not provide for a private right of action." *Id.* at 582 (internal quotations omitted).

[7] Wells Fargo also argued here that the economic loss doctrine bars Plaintiff's negligence claim. "The economic loss doctrine, also known as the *Moorman* doctrine in Illinois, bars recovery in tort for purely economic losses arising out of a failure to perform contractual obligations." *Gray Ins. Co. v. Zosky*, No. 13 CV 3593, 2014 WL 3881546, at *5 (N.D. Ill. Aug. 6, 2014) (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 81–82, 435 N.E.2d 443, 448–49 (1982)). See also *Wigod*, 673 F.3d at 567 (economic loss doctrine barred recovery for negligent servicing of plaintiff's mortgage loan). It is not clear whether the economic loss rule would apply here given that Plaintiffs alleged non-economic damages along with associated physical ailments, such as fibromyalgia, migraines, and stomach and gastro-intestinal problems brought on by the stress and anxiety caused by these incidents. (Compl. ¶ 115.) The court need not decide the issue today but will do so if it is raised in response to an amended complaint alleging negligence.

practices." *Siegel v. Shell Oil*, 612 F.3d 932, 934 (7th Cir. 2010) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416–17, 775 N.E.2d 951, 960 (2002)). To state a claim under the ICFA, a plaintiff must allege "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Id.* In addition, "a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury." *Siegel*, 612 F.3d at 935 (citing *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149, 776 N.E.2d 151, 160 (2002)). Plaintiffs in this case allege that Wells Fargo's actions were unfair. (Compl. ¶ 125.); *see Robinson*, 201 Ill. 2d at 417, 775 N.E.2d at 961 ("Recovery may be had for unfair as well as deceptive conduct."). Wells Fargo argues that the court should dismiss Plaintiffs' claims because Plaintiffs have failed to identify an unfair act or practice and because Plaintiffs have failed to allege that the identified act or practice caused Plaintiffs' injuries. The court rejects both arguments.

      1.    **Unfair practice**

In determining whether a given act or course of conduct is unfair, Illinois courts look to three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson*, 201 Ill. 2d at 417–18, 775 N.E.2d at 960–61. "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 630 (N.D. Ill. 2019) (quoting *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008)). On balance, the complaint here contains sufficient allegations of unfair practices under these criteria.

First, "[a] practice offends public policy under ICFA where it violates statutory or administrative rules establishing a certain standard of conduct." *Saccameno*, 372 F. Supp. 3d at 630; *see also Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002 (7th Cir. 2018) (holding conduct

was unfair based on a violation of a state statute and a state administrative rule). In fact, "a plaintiff may predicate an ICFA unfairness claim on violations of other statutes or regulations . . . that themselves do not allow for private enforcement." *Lowry v. Wells Fargo Bank, N.A.*, No. 15 C 4433, 2016 WL 4593815, at *6 (N.D. Ill. Sept. 2, 2016) (quoting *Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 753 (N.D. Ill. 2011)). The Garcias have alleged that Wells Fargo's "deficient auditing and compliance procedures . . . repeatedly violated HAMP and other legal regulatory requirements . . . ." (Compl. ¶¶ 33, 37–44.) Courts in this district have repeatedly held that "a plaintiff may predicate an ICFA unfairness claim on violations of . . . HAMP . . . ." *Boyd*, 787 F. Supp. 2d at 752; *accord Lowry*, 2016 WL 4593815, at *7 ("Failure to honestly and effectually implement HAMP guidelines constitutes an unfair business practice under the ICFA."). This factor thus favors a finding of unfairness.[8]

Second, Plaintiffs may also argue that Wells Fargo's conduct was "immoral, unethical, oppressive, or unscrupulous." Under the ICFA, a practice meets that standard "if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Saccameno*, 372 F. Supp. 3d at 631 (internal quotations omitted). In support of this factor, Plaintiffs cite *Saccameno*,

---

[8] In support of their allegations of unfairness, Plaintiffs also note that Wells Fargo's behavior violated the two consent decrees that it signed in 2011. (Compl. ¶¶ 39–45.) Courts in this district have found violations of consent decrees to be acts that offend public policy. *Saccameno*, 372 F. Supp. 3d at 630 (citing *Lowry*, 2016 WL 4593815, at *9) ("A practice offends public policy under ICFA where it violates . . . standards of conduct imposed by consent decrees and settlement agreements."). Although Plaintiffs have not alleged precisely when the first of these two consent decrees was signed (Compl. ¶ 39), it appears likely, based on the OCC website, that it was signed in April 2011. *Enforcement Actions Search Tool "Wells Fargo,"* Office of the Comptroller of the Currency, https://apps.occ.gov/EASearch/Search/Table? Search=wells %20fargo&CurrentPageIndex=3&Category=&Sort=StartDate&ItemsPerPage=100&AutoComplet eSelection= (last visited Mar. 30, 2021). In this case, the final letter denying a loan modification request from the Garcias was dated February 7, 2011 (Denial Letters at 7), and the judicial sale became final on March 29, 2011. (Compl. ¶ 83.) The relevant consent decrees thus appear to have been entered into after the Garcias received their final rejection. It was likely, however, that those decrees were the product of negotiation over several weeks or months, and the court takes note of Plaintiffs' allegations that Wells Fargo was in violation of those decrees as late as June 2015. (*Id.* ¶ 44.) Finally, in April 2018, the OCC stated, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law." (*Id.* ¶ 53.)

where Judge Gottschall upheld a jury verdict in favor of Plaintiffs' ICFA claim against defendant mortgage servicer, Ocwen, after Ocwen mistakenly marked her mortgage loan as delinquent and continued to treat it as such despite plaintiff's providing evidence to the contrary. *Id.* at 620–23, 632. The *Saccameno* court held that "a jury could reasonably have concluded that Ocwen's conduct left Saccameno with a lack of meaningful choice" because "Saccameno had no choice in selecting Ocwen as her loan servicer and she had no ability to get rid of Ocwen after it began mishandling her account." *Id.* at 631. This case arguably differs in that although Plaintiffs were seeking a loan modification from their original lender (Wells Fargo), they presumably could have sought refinancing from another lender as well. And this court in *Rodriguez v. Chase Home Fin., LLC* found that a plaintiff challenging a lender's conduct surrounding plaintiff's request to modify a mortgage fails to allege that defendant's conduct deprived her of any "meaningful choice" where "it was the original (unchallenged) mortgage . . . that put [plaintiff in the financial bind of trying to lower her payments." No. 10 C 05876CH, 2011 WL 5076346, at *4 (N.D. Ill. Oct. 25, 2011).

Still, Wells Fargo's behavior in this case might nevertheless be understood as oppressive or unscrupulous. Although Wells Fargo suggests otherwise, Plaintiffs have alleged that Wells Fargo's behavior ran far deeper than a simple "faulty calculation." Rather, in 2010, the Office of Comptroller of the Currency found numerous deficiencies in Wells Fargo's mortgage modification and foreclosure practices (*id.* ¶ 37), including that Wells Fargo "failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures." (*Id.* ¶ 38.) Wells Fargo also repeatedly failed to identify and correct these problems despite repeated pledges to do so, albeit on dates well after the bank had denied the Garcias' loan requests. (*Id.* ¶¶ 37–61.) For these reasons, the court finds that this second factor also suggests Plaintiffs have adequately alleged unfairness.

Third, "[a] practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers." *Saccameno*, 372 F. Supp. 3d at 631 (quoting *Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc.*, 633 F.

15

Supp. 2d 610, 617 (N.D. Ill. 2009)). If Plaintiffs are able to establish a causal link between Wells Fargo's actions and their injuries, there is no doubt that the harms they suffered were substantial. The Garcias lost their home, were forced to file for bankruptcy, had their creditworthiness destroyed, lost substantial equity in their home, and suffered a host of emotional damages. (Compl. ¶ 115.) Moreover, Wells Fargo's August 3, 2018 and November 6, 2018 quarterly updates to the SEC reveal that this episode was likely not isolated. (*Id.* ¶¶ 95–98.) *See Saccameno*, 372 F. Supp. 3d at 631–32 (upholding jury finding of "substantial injury" for purposes of the ICFA where loan servicer's conduct caused plaintiff significant emotional distress and "had the potential to injure a large number of other consumers").

Plaintiffs have sufficiently alleged that Wells Fargo's conduct was unfair under the ICFA.

### 2. Causation

Next, Wells Fargo argues that Plaintiffs have failed to sufficiently plead that the damages they sustained were causally related to the "faulty calculation" that led Wells Fargo to erroneously deny the Garcias a loan modification. In particular, Wells Fargo asserts that, even if Wells Fargo had approved the request for a loan modification, Plaintiffs fail to allege "whether and how they could have made the required payments." (MTD [15] at 9.) In support of this argument, Wells Fargo cites the fact that Mr. Garcia remained unemployed at the time of the requested loan modification (*id.* ¶¶ 73, 78), and that (at least as stated in letters from Wells Fargo itself), by February 2011, the time of their final request for a loan modification from Wells Fargo, their monthly income was $2,759 while their monthly expenses were $4,565. (Denial Letters at 7.) As Wells Fargo points out in its Notice of Supplemental Authority [20], some courts have dismissed consumer fraud claims on this basis at the pleading stage. *Duncan v. Wells Fargo Bank, N.A.*, No. 319CV00172BRMTJB, 2021 WL 22086, at *5 (D.N.J. Jan. 4, 2021) ("Because Wells Fargo's error solely pertained to a trial modification, not a permanent one, Plaintiff pleads no facts indicating she would have qualified for a permanent modification or made all of the necessary payments to under [*sic*] a permanent modification until the mortgage was paid off."); *Van Brunt v.*

16

*Wells Fargo Bank, N.A.*, No. 319CV00170BRMTJB, 2020 WL 7868153, at *5 (D.N.J. Dec. 31, 2020) (same); *see Stanford West v. Wells Fargo Bank, N.A.*, No. 5:19-CV-286-JMH-MAS, 2020 WL 6706351, at *3 (E.D. Ky. Nov. 12, 2020) ("[E]ven if the Wests were granted the trial modification they were erroneously denied, there was no guarantee Wells Fargo would have subsequently given them a permanent loan modification because Wells Fargo was under no obligation to do so.").[9]

But the court here is not prepared to make findings of fact on this issue. The complaint alleges that the Garcias "believed they could pay a reasonable modified mortgage payment" when they requested a loan modification. (Compl. ¶ 75.) Notably, Wells Fargo's own letter to the Garcias acknowledged that, "When you were considered for a loan modification, you weren't approved, and now we realize that you should have been." If, at the summary judgment or trial stage, the Plaintiffs are unable to establish that they would have been able to keep up with monthly mortgage payments under any new HAMP-style refinancing that they should have been eligible for, then the Plaintiffs may not be able to establish their claim at that point. At this stage, however, the court concludes Plaintiffs have plausibly alleged that they would have pursued and done what was necessary to keep up with a refinanced loan had Wells Fargo offered it.

Overall, Plaintiffs have successfully alleged that an unfair practice under the ICFA caused the Garcias' bankruptcy and the damages that followed. For that reason, the court denies Wells Fargo's motion to dismiss Plaintiffs' ICFA claim.

**C.     Standing**

Wells Fargo argues that the Garcias themselves lack standing to press their claims here. "In liquidation proceedings, *only* the trustee [of a bankrupt estate] has standing to prosecute or

---

[9] Wells Fargo cites the *Stanford West* case in support of its defense to Plaintiffs' negligence claim as well. In *Stanford West*, the Eastern District of Kentucky acknowledged that "[a]s a general matter, a mortgagee has no duty to reach an agreement on a loan modification with a mortgagor in default," but the court ultimately dismissed the negligence claim on grounds of causation rather than duty. *Stanford West*, 2020 WL 6706351, at *3.

defend a claim belonging to the estate." *Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 505 (7th Cir. 2016) (emphasis in original) (internal quotations omitted). This remains true so long as "all of the elements of the cause of action had occurred as of the time the bankruptcy case was commenced, so that the claim is sufficiently rooted in the debtor's prebankruptcy past." *Putzier v. Ace Hardware*, 50 F. Supp. 3d 964, 982 (N.D. Ill. 2014) (internal quotations omitted); *Kleven v. Walgreen Co.*, 373 F. App'x 608, 610 (7th Cir. 2010) ("[I]f the event giving rise to the claim occurred before the debtor filed, the claim belongs to the trustee, who has exclusive power to prosecute it."). Here, given that the Plaintiffs argue that the "faulty calculation" and Wells Fargo's failure to detect and correct it *led to* the Garcias' bankruptcy, there is no question that the elements giving rise to the Garcias' claims arose before the bankruptcy case was commenced. The final letter from Wells Fargo denying a loan modification to the Garcias was dated February 7, 2011 (Denial Letters at 7), while the Garcias filed for bankruptcy in May 2011. (Compl. ¶ 86.)

Plaintiffs do not contest the underlying law on this issue. Instead, they cite the bankruptcy case *In re Sharif* for the premise that once all of the creditors' claims are paid, the Garcias have the right to receive all remaining estate funds. 446 B.R. 870, 884–85 (Bankr. N.D. Ill. 2011). Plaintiffs argue that the net impact of the claims *against* the bankrupt estate and this claim *for* the bankrupt estate is likely to yield profits for the estate. Therefore, Plaintiffs argue, they ought to have standing to pursue this claim in the interest of the net recovery that might be returned to them after creditors have all been paid. But the court in *In re Sharif* did not suggest that the potential for such recovery restores standing to the original owners of the bankrupt estate. 446 B.R. at 884–85. Nor do Plaintiffs identify any other case that does so. Among the cases the parties have identified on this issue, the court has found no suggestion of the sort of exception that Plaintiffs suggest. The court concludes that the Garcias do not have standing to pursue these claims moving forward, and all further filings in this case must be filed in the name of Andrew J. Maxwell, the trustee of the Garcias' estate.

18

## CONCLUSION

For the above-stated reasons, the court grants Defendant Wells Fargo's motion to dismiss [14] in part, dismissing Plaintiffs' negligence claim without prejudice but allowing Plaintiffs' ICFA claim to proceed. Additionally, the court finds that only Maxwell, as trustee of the bankruptcy estate, has standing to continue pursuing these claims.

ENTER:

Dated: March 31, 2021

_____
REBECCA R. PALLMEYER
United States District Judge