## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ANDREW J. MAXWELL**, not individually, but as Trustee for the estate of Eduardo Garcia and Julia Escamilla (nka Julia Garcia), | ) ) ) ) | |
| Plaintiff, | ) ) | <u>C.A. No. 1:20-cv-02402</u> |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., | ) ) | **DEFENDANT WELLS FARGO BANK, N.A.'S ANSWER TO COMPLAINT** |
| Defendant. | ) ) ) ) | |

## ANSWER TO COMPLAINT

Defendant Wells Fargo Bank, N.A. (the "Bank"), for itself and no other individual or entity,

hereby responds to the Plaintiff, Andrew J. Maxwell, not individually, but as Trustee for the estate

of Eduardo Garcia and Julia Escamilla (now known as Julia Garcia), (collectively, the "Garcias"),[1]

in the above-captioned matter as follows:

## WHY PLAINTIFFS BRING THIS CASE

1.     Like many folks, Eduardo and Julia Garcia encountered financial difficulty in the
wake of the 2008 financial crisis.  When they had problems paying their mortgage, they reached
out to their loan servicer, Wells Fargo, to apply for a loan modification.  They completed an
application and provided Wells Fargo with all of the documents and information requested.

**RESPONSE:** The Bank admits that it previously serviced the Garcias' mortgage and that the

Garcias applied for one or more loan modifications during the time Wells Fargo serviced their

loan.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity

---

[1] In light of this Court's March 31, 2021 order dismissing Plaintiffs' gross negligence claim and ruling that Plaintiffs Eduardo Garcia, Julia Garcia, Byron Garcia, and Miriahm Garcia lack standing individually to pursue the claims herein, Wells Fargo responds to Plaintiff Andrew J. Maxwell, as trustee of the Garcias' bankruptcy estate, only.  *See Maxwell v. Wells Fargo Bank, N.A.*, No. 20 C 2402, 2021 WL 1209023, at *1 (N.D. Ill. Mar. 31, 2021).

of the remaining allegations in paragraph 1, and, on that basis, denies the remaining allegations in paragraph 1.

2.      Wells Fargo denied their application for a loan modification.

**RESPONSE:** The Bank admits that the Garcias were denied one or more trial mortgage loan modifications, including on or around August 24, 2010.

3.      Unknown to the Garcias, Wells Fargo had improperly evaluated the application due to what the bank would later casually describe as a "computer glitch."

**RESPONSE:** The Bank admits that in 2018, it disclosed that a calculation error in its mortgage loan modification underwriting tool led to some borrowers being incorrectly denied a trial loan modification.  The Bank denies the remaining allegations in paragraph 3.

4.      Wells Fargo has now publicly admitted that this "computer glitch" resulted in the improper denial of several hundred loan modification applications, resulting in the loss of those folks' homes.

**RESPONSE:** The Bank admits that in 2018, it disclosed that a calculation error in its mortgage loan modification underwriting tool led to some borrowers being incorrectly denied a trial loan modification, and that for some of those borrowers, a foreclosure was completed.  The Bank denies the remaining allegations in paragraph 4.

5.      The Garcias are victims of Wells Fargo's outrageous conduct.

**RESPONSE:** The Bank denies the allegations in paragraph 5.

6.      The Garcias needlessly lost their Family Home at public auction after Wells Fargo filed for foreclosure.

**RESPONSE:** The Bank denies the allegations in paragraph 6.

7.      After Wells Fargo foreclosed, they obtained a deficiency judgment against Eduardo and Julia Garcia personally.

**RESPONSE:** The Bank denies the allegations in paragraph 7.

8.      This had the effect of forcing Eduardo and Julia Garcia to file a Chapter 7 bankruptcy petition.

**RESPONSE:** The Bank denies the allegations in paragraph 8.

9.     The double whammy of foreclosure and bankruptcy financially ruined Eduardo and Julia Garcia.

**RESPONSE:** The Bank denies the allegations in paragraph 9.

10.     However, Wells Fargo concealed its conduct from the Garcias and from the Trustee until July 26, 2019 when Wells Fargo mailed the Garcias a letter explaining what had happened which included a check for $14,500 for the Garcias' "troubles."

**RESPONSE:** The Bank states that it began a voluntary remediation program in the fall of 2018, and, as a part of that program, the Bank admits that it sent the Garcias a letter dated July 26, 2019 and an unconditional $14,500 payment.  To the extent paragraph 10 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents. The Bank denies the remaining allegations in paragraph 10.

11.     Upon learning of Wells Fargo's misconduct, the Garcias sought out counsel to assist them in their pursuit of justice for the needless harms inflicted upon them by Wells Fargo.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 11, and, on that basis, denies the allegations in paragraph 11.

## PARTIES, JURISDICTION AND VENUE

12.     Eduardo and Julia Garcia purchased 407 Beach Ave., LaGrange Park, Illinois 60526 (their "Family Home") in 2002.  To do so, they borrowed money from Wells Fargo and executed a note and granted a mortgage.  The note and mortgage are collectively referred to as the "Loan."

**RESPONSE:** Upon information and belief, the Bank admits that the Garcias purchased a home located at 407 Beach Ave., LaGrange Park, Illinois 60526.  The Bank specifically denies that it originated the Garcias' 2002 loan.  The Bank denies the remaining allegations in paragraph 12.

13.     Eduardo and Julia Garcia lived in the Family Home with their children as their primary residence.

**RESPONSE:** Upon information and belief, the Bank admits that Eduardo and Julia Garcia lived in the home located at 407 Beach Ave., LaGrange Park, Illinois 60526 with their children as their primary residence. The Bank denies the remaining allegations in paragraph 13.

14. Byron Garcia and Miriahm Garcia are the children of Eduardo and Julia Garcia. At the time of Wells Fargo's denial of the loan modification and foreclosure of the Family Home, Byron and Miriahm were teenagers in high school. The family will be collectively referred to as "the Garcias."

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 14, and, on that basis, denies the allegations in paragraph 14.

15. The Garcias are each a natural person residing in this District.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 15, and, on that basis, denies the allegations in paragraph 15.

16. The bankruptcy trustee, Andrew J. Maxwell, is entitled to bring suit on behalf of Eduardo and Julia Garcia's bankruptcy estate to recover amounts claimed by creditors of their bankruptcy estate and a trustee's commission. The trustee is authorized to bring the claims asserted herein on behalf of the estate pursuant to 11 U.S.C § 323.

**RESPONSE:** No response is required to the legal conclusions in paragraph 16. To the extent that a response is required, the Bank does not dispute that Andrew J. Maxwell is the bankruptcy trustee for the Garcias' bankruptcy estate. Pursuant to a March 31, 2021 order from this Court, the Bank specifically denies that any of the Garcias have standing to pursue any of the claims asserted herein. *See Maxwell v. Wells Fargo Bank, N.A.*, No. 20 C 2402, 2021 WL 1209023, at *1 (N.D. Ill. Mar. 31, 2021). The Bank denies the remaining allegations in paragraph 16.

17. The Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a corporation existing under the laws of the State of Delaware and maintains its principal place of business at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104.

**RESPONSE:** The Bank admits that it is a national banking association with its main office in Sioux Falls, South Dakota. The Bank denies the remaining allegations in paragraph 17.

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds $75,000.00 exclusive of punitive damages, and/or interest and costs, and is between citizens of different States. This matter also arises under the Bankruptcy Code and therefore this Court has "arises under" jurisdiction pursuant to the Code.

**RESPONSE:** No response is required to the legal conclusions in paragraph 18. To the extent that a response is required, the Bank does not dispute the subject matter jurisdiction of this Court under 28 U.S.C. § 1332.

19.     This Court has supplemental jurisdiction to hear all state statutory and common law claims pursuant to 28 U.S.C. § 1367.

**RESPONSE:** No response is required to the legal conclusions in paragraph 19. To the extent that a response is required, the Bank does not dispute the supplemental jurisdiction of this Court under 28 U.S.C. § 1367.

20.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**RESPONSE:** No response is required to the legal conclusions in paragraph 20. To the extent a response is required, the Bank denies the allegations in paragraph 20.

21.     The Plaintiff has a private right of action under the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq. ("ICFA"), which provides for actual damages, attorneys' fees, and punitive damages. *Id*. The Plaintiff also makes a claim for gross negligence.

**RESPONSE:** No response is required to the legal conclusions in paragraph 21. To the extent a response is required, the Bank denies the allegations in paragraph 21.

22.     The Plaintiff seeks recovery of all damages available under the law including compensatory and punitive damages as well as attorney fees and costs.

**RESPONSE:** No response is required to the legal conclusions in paragraph 22. To the extent a response is required, the Bank admits that Plaintiff seeks "recovery of all damages available under

the law including compensatory and punitive damages as well as attorney fees and costs" but denies that the Plaintiff is entitled to any such relief.

## THE FACTS

23.     The Family Home Affordable Modification Program (HAMP) was designed to provide the very help that Eduardo and Julia Garcia needed to maintain ownership of their home.

**RESPONSE:** The Bank admits that the Home Affordable Modification Program ("HAMP") was introduced pursuant to the Emergency Economic Stabilization Act of 2008. The Bank denies the remaining allegations in paragraph 23.

24.     Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

**RESPONSE:** The Bank admits that the HAMP was introduced pursuant to the Emergency Economic Stabilization Act of 2008. The Bank denies the remaining allegations in paragraph 24.

25.     Similar threshold requirements were incorporated into the mortgage modification requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac, and the Federal Housing Administration (FHA).

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 32 and, on that basis, denies the allegations in paragraph 25.

26.     As ultimately admitted by Wells Fargo, Eduardo and Julia Garcia met the threshold requirements for a mortgage modification. Wells Fargo, as their mortgage servicer, was required to offer them a loan modification as a HAMP participant.

**RESPONSE:** The Bank denies the allegations in paragraph 26.

27.     However, Wells Fargo, because of an alleged "faulty calculation" failed to offer Eduardo and Julia Garcia a loan modification.

**RESPONSE:** The Bank admits that a 2019 letter sent to the Garcias stated that the Bank based its decision to deny the Garcias a trial loan modification on a faulty calculation. The Bank denies the remaining allegations in paragraph 27.

28. Instead, Wells Fargo needlessly foreclosed on their Family Home, sold it at judicial sale, evicted them and obtained a deficiency judgment of nearly $200,000 against Eduardo and Julia Garcia, personally.

**RESPONSE:** The Bank admits that a foreclosure sale was completed on the property securing the Garcias' loan. Upon information and belief, the Bank states that a deficiency judgment was obtained by Deutsche Bank as Trustee for a Morgan Stanley Trust. The Bank denies the remaining allegations in paragraph 28.

29. Wells Fargo has attempted to cast its conduct here as resulting from a "faulty calculation." However, Wells Fargo's problem goes much deeper than a single miscalculation.

**RESPONSE:** The Bank denies the allegations in paragraph 29.

30. Wells Fargo's conduct here reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

**RESPONSE:** The Bank denies the allegations in paragraph 30.

31. Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

**RESPONSE:** The Bank denies the allegations in paragraph 31.

32. Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether Family Homeowners met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

**RESPONSE:** The Bank denies the allegations in paragraph 32.

33.    As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other legal and regulatory requirements over a period of at least eight years.  Wells Fargo's actions caused widespread consumer harm including hundreds of families needlessly losing their homes.

**RESPONSE:**  The Bank denies the allegations in paragraph 33.

34.    Wells Fargo's outrageous conduct and utter indifference to its legal obligations directly and proximately resulted in needless harm to the Garcias.

**RESPONSE:**  The Bank denies the allegations in paragraph 34.

35.    Wells Fargo's actions caused the Garcias to lose their Family Home.

**RESPONSE:**  The Bank denies the allegations in paragraph 35.

36.    Wells Fargo's actions directly resulted in the denial of a loan modification for Eduardo and Julia Garcia.  Wells Fargo admitted this in its letter to Eduardo and Julia Garcia that prompted this litigation.

**RESPONSE:**  The Bank denies the allegations in paragraph 36.

37.    Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency ("OCC") found numerous deficiencies in its mortgage modification and foreclosure practices.

**RESPONSE:**  The Bank denies the allegations in paragraph 37.

38.    The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

**RESPONSE:**  To the extent paragraph 38 purports to describe specific findings by the OCC, the Bank refers to those findings for a complete statement of their terms.  The Bank denies the allegations in paragraph 38 to the extent they are inconsistent therewith.

39.    Wells Fargo agreed to correct these deficiencies in two different 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company ("WFC")), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

**RESPONSE:**  The Bank admits the existence of a 2011 Consent Order (the "2011 OCC Consent Order").  To the extent paragraph 39 purports to describe the specific contents of the 2011 OCC

Consent Order, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations in paragraph 39 to the extent they are inconsistent with the terms of the 2011 OCC Consent Order.

40.     Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

**RESPONSE:** To the extent paragraph 40 purports to describe the specific contents of the 2011 OCC Consent Order, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations in paragraph 40 to the extent they are inconsistent with the terms of the 2011 OCC Consent Order.

41.     Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

**RESPONSE:** To the extent paragraph 41 purports to describe the specific contents of the Bank's reports to the Federal Reserve, the Bank refers to those reports for a complete statement of their contents. The Bank denies the allegations in paragraph 41 to the extent they are inconsistent with the Bank's reports to the Federal Reserve.

42.     In one of the consent orders, the Federal Reserve specifically ordered WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

**RESPONSE:** To the extent paragraph 42 purports to describe the specific contents of the 2011 or

other OCC Consent Order, the Bank refers to that document for a complete statement of its terms.

The Bank denies the allegations in paragraph 42 to the extent they are inconsistent with the terms

of the 2011 OCC Consent Order.

43.     Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in callous disregard of the well-being of their customers.

**RESPONSE:** The Bank denies the allegations in paragraph 43.

44.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements; had not ensured that the Bank's audit and compliance programs had the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' Family Homes.

**RESPONSE:** The Bank admits the existence of a 2015 Consent Order (the "2015 OCC Consent

Order"). To the extent paragraph 44 purports to describe the specific contents of the 2015 OCC

Consent Order, the Bank refers to that document for a complete statement of its terms. The Bank

denies the allegations in paragraph 44 to the extent they are inconsistent with the terms of the 2015

OCC Consent Order.

45.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

**RESPONSE:** To the extent paragraph 45 purports to describe the specific contents of the 2015

OCC Consent Order, the Bank refers to that document for a complete statement of its terms. The

Bank denies the allegations in paragraph 45 to the extent they are inconsistent with the terms of the 2015 OCC Consent Order.

46. As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

**RESPONSE:** The Bank admits the existence of a 2016 Consent Order (the "2016 Consent Order"). To the extent paragraph 46 purports to describe the specific contents of the 2016 Consent Order, the Bank refers to that document for a complete statement of its terms. The Bank denies the allegations in paragraph 46 to the extent they are inconsistent with the terms of the 2016 Consent Order.

47. Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in October 2015—one of the errors at issue in this case—which caused the Bank to wrongly deny mortgage modifications to 625 customers.

**RESPONSE:** The Bank denies the allegations in paragraph 47.

48. Even though Wells Fargo had just been fined $70 million dollars for its indefensible conduct, Wells Fargo decided not to tell anybody it had discovered this error—possibly as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

**RESPONSE:** The Bank denies the allegations in paragraph 48.

49. Whatever the reason, Wells Fargo obviously learned nothing from the $70 million dollar penalty. This could be because a penalty of $70 million dollars equated to 3/1000 of 1% of Wells Fargo's net income for 2015. This is like issuing a fine of $.50 (fifty cents) to a person making $50,000.

**RESPONSE:** The Bank denies the allegations in paragraph 49.

50. The Bank's seven-member Board of Directors signed the stipulation under which the Bank accepted the $70 million penalty and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in 2013-2014. These directors did not disclose that the Bank had discovered another error—either because their oversight was so non-existent that they did not know, or because they chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the business restrictions it had imposed on the Bank.

**RESPONSE:** The Bank denies the allegations in paragraph 50.

51.     To make matters worse, even after discovering the 2015 error, Wells Fargo still did not reform its auditing and verification practices.  Related errors that would affect approximately 870 customers were not discovered until three years later.

**RESPONSE:** The Bank denies the allegations in paragraph 51.

52.     The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident.  As scandal after scandal comes to light, it has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities—and did so to a shocking degree.

**RESPONSE:** The Bank denies the allegations in paragraph 52.

53.     Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government.  Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities.  As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."

**RESPONSE:** The Bank denies the allegations in paragraph 53.

54.     Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

**RESPONSE:** The Bank denies the allegations in paragraph 54.

55.     In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

**RESPONSE:** To the extent paragraph 55 purports to describe the contents of the "Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended" in the matter of *Wells Fargo & Company, San Francisco, California*, Docket No. 18-007-B-HC (the "2018 Order"), the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank

denies the allegations in paragraph 55 to the extent they are inconsistent with the terms of the 2018 Order.

56.     Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

**RESPONSE:**  To the extent paragraph 56 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations in paragraph 56 to the extent they are inconsistent with the terms of the 2018 Order.

57.     Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

**RESPONSE:**  To the extent paragraph 57 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations in paragraph 57 to the extent they are inconsistent with the terms of the 2018 Order.

58.     Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.  As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

**RESPONSE:**  To the extent paragraph 58 purports to describe the contents of the 2018 Order, the Bank refers to the 2018 Order for a complete statement of its terms.  The Bank denies the allegations in paragraph 58 to the extent they are inconsistent with the terms of the 2018 Order. Further, to the extent paragraph 58 purports to describe the contents of specific articles or writings, the Bank refers to those writings for a complete statement of their contents.

59.     A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2015 error—first to its shareholders in its Q2 and Q3 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error.  Wells Fargo wrote in its 10-Q for the quarter ending June 30, 2018, that approximately 625 customers were

incorrectly denied a loan modification between April 13, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

**RESPONSE:** To the extent that paragraph 59 purports to describe the contents of Wells Fargo & Company's Form 10-Q for the quarterly period ended June 30, 2018 (the "Q2 2018 10-Q"), the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations in paragraph 59 to the extent they are inconsistent with the contents of the Q2 2018 10-Q.

60.     Three months later, in its next Form 10-Q for the quarter ending September 30, 2018, Wells Fargo disclosed that a "subsequent expanded review" had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 incorrectly denied a loan modification or not offered a loan modification or repayment plan, and resulting in completed wrongful foreclosures to approximately 545 customers.

**RESPONSE:** To the extent paragraph 60 purports to describe the specific contents of Wells Fargo & Company's Form 10-Q for the quarterly period ended September 30, 2018 (the "Q3 2018 10-Q"), the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations in paragraph 60 to the extent they are inconsistent with the contents of the Q3 2018 10-Q.

61.     Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its 2018 Annual Report, Wells Fargo disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern." In its 2019 Annual Report, Wells Fargo disclosed to shareholders that as ongoing reviews continue, "it is possible that in the future we may identify additional items or areas of potential concern."

**RESPONSE:** To the extent paragraph 61 purports to describe the contents of Wells Fargo & Company's 2018 Form 10-K and 2019 Form 10-K, the Bank refers to those documents for a complete statement of their contents. The Bank denies the allegations in paragraph 61 to the extent

they are inconsistent with the contents of Wells Fargo & Company's 2018 Form 10-K and 2019 Form 10-K. The Bank denies the remaining allegations in paragraph 61.

## THE GARCIAS' STRUGGLE

62.    Eduardo and Julia Garcia purchased 407 Beach Ave., LaGrange Park, IL 60526, for $203,000.00 on December 12, 2002, in order to live in it as their primary residence. Eduardo and Julia, along with Byron and Miriahm, both under the age of 10 at the time, moved into the home right away.

**RESPONSE:** Upon information and belief, the Bank admits that the Garcias purchased and lived in a home located at 407 Beach Ave., LaGrange Park, Illinois 60526 as their primary residence. The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations in paragraph 62, and, on that basis, denies the remaining allegations in paragraph 62.

63.    When the family moved into the Family Home, Miriahm was in grammar school. Miriahm had special needs and required special education.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 63, and, on that basis, denies the allegations in paragraph 63.

64.    Eduardo and Julia specifically chose to live in LaGrange Park because its school district was known to have a very good special education program.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 64, and, on that basis, denies the allegations in paragraph 64.

65.    Miriahm flourished in LaGrange Park's schools and her parents noticed significant improvements as she "came out of her shell."

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 65, and, on that basis, denies the allegations in paragraph 65.

66.     LaGrange Park, Illinois is a middle-class village with higher than average priced homes.  Eduardo and Julia considered themselves extremely lucky to find the Beach Avenue property at the price they did, as it was the only one in the area that was affordable to them.  The property, however, was in desperate need of extensive repairs and updating.

**RESPONSE:**  The Bank lacks knowledge and information sufficient to form a basis as to the truth

or falsity of the allegations in paragraph 66, and, on that basis, denies the allegations in paragraph

66.

67.     Over the nine years that the Garcias owned and lived in their Family Home, they invested over $40,000.00 and extensive time in completely rehabbing it themselves.

**RESPONSE:**  The Bank lacks knowledge and information sufficient to form a basis as to the truth

or falsity of the allegations in paragraph 67, and, on that basis, denies the allegations in paragraph

67.

68.     On January 26, 2006, Eduardo and Julia refinanced the Mortgage.  They were put into a subprime adjustable rate mortgage, on the promise that they could refinance out of it into a fixed rate loan later.

**RESPONSE:**  The Bank admits the Garcias refinanced a mortgage loan in January 2006 with First

NLC Financial Services, LLC, which the Bank acquired servicing rights to thereafter.  To the

extent paragraph 68 purports to describe the contents of the Garcias' refinanced loan, the Bank

refers to those documents for a complete statement of their contents.  The Bank denies the

allegations in paragraph 68 to the extent they are inconsistent with the contents of the Garcias'

Adjustable Rate Note and Mortgage.  The Bank lacks knowledge and information sufficient to

form a basis as to the truth or falsity of the allegation that the Garcias were "promise[d] that they

could refinance out of [their adjustable rate mortgage] into a fixed rate loan later" by another lender

or servicer, and, on that basis, denies the remaining allegations in paragraph 68.

69.     The mortgage loan had an interest rate of 8.14% for the first 24 months and would then adjust every 6 months thereafter.  The adjustments would be calculated by adding 6.5% to the "current index," with a maximum rate of 15.14%, and a minimum rate of 8.14%.

**RESPONSE:** To the extent paragraph 69 purports to describe the contents of the Garcias' Adjustable Rate Note and Mortgage, the Bank refers to those documents for a complete statement of their contents. The Bank denies the allegations in paragraph 69 to the extent they are inconsistent with the contents of the Garcias' Adjustable Rate Note and Mortgage.

70. In February 2008, the Garcias' monthly payment increased drastically as part of an adjustment.

**RESPONSE:** The Bank admits that the Garcias were sent a payment adjustment notice in January 2008 advising their principal and interest payment would adjust as of March 1, 2008. The Bank denies the remaining allegations in paragraph 70.

71. The Garcias tried to refinance their mortgage loan but the housing market crash had significantly devalued the Family Home.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 71, and, on that basis, denies the allegations in paragraph 71.

72. Eduardo and Julia tried their best to continue to pay the Mortgage after their monthly payment skyrocketed but were only able to make approximately 6 more monthly payments.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the paragraph 72 allegation that the Garcias were able to make approximately six (6) more monthly payments after attempting to refinance their mortgage, and, on that basis, denies this allegation in paragraph 72. The Bank also denies the remaining allegations in paragraph 72.

73. Mr. Garcia, who was self-employed at the time, had his business go under and he was left unemployed.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 73, and, on that basis, denies the allegations in paragraph 73.

74.     Living only on Mrs. Garcia's income, they were unable to make the full monthly payments as of September 2008.

**RESPONSE:**  The Bank admits that the last payment received from the Garcias was in October 2008.  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the remaining allegations in paragraph 74, and, on that basis, denies the remaining allegations in paragraph 74.

75.     Mr. and Ms. Garcia immediately began trying to work with Wells Fargo to obtain a loan modification, as they believed they could pay a reasonable modified mortgage payment. They submitted application after application, document after document, seeking a forbearance or a modification, anything that would allow them to make reasonable payments and remain in the Family Home that they had been in for the past 9 years.

**RESPONSE:**  The Bank denies the allegations in paragraph 75.

76.     Wells Fargo filed its foreclosure action on January 8, 2009.

**RESPONSE:**  The Bank admits that it initiated foreclosure proceedings on January 8, 2009.

77.     Over the next 24 months, Eduardo and Julia worked tirelessly to try to obtain a modification.  They began working with a housing counselor and submitted application after application, continuously sending in the same documents over and over, only to be told by Wells Fargo that they had not submitted documents, or that they did not qualify for a modification.

**RESPONSE:**  The Bank admits that it worked with the Garcias to try to lower their mortgage payments.  The Bank denies the remaining allegations in paragraph 77.

78.     With high unemployment caused by the housing market crash, Mr. Garcia was unable to find a job, so Mrs. Garcia took as much overtime as she could at her job, hoping that the increased income would allow them to keep their Family Home.  She began working an average of 60 hours per week.

**RESPONSE:**  The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 78, and, on that basis, denies the allegations in paragraph 78.

79.     This created a difficult situation, where Mr. Garcia, who speaks predominantly Spanish, would have to attend court dates and meet housing counselors on his own, requiring the services of an interpreter or the involvement of Byron Garcia to act as an interpreter.  Mrs. Garcia is bilingual but was unable to attend these important events due to her increased work schedule.

**RESPONSE:** The Bank lacks knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 79, and, on that basis, denies the allegations in paragraph 79.

80.     Wells Fargo denied Eduardo and Julia a loan modification on at least four separate occasions.  See Wells Fargo denial letters dated November 20, 2008; November 12, 2010; December 1, 2010; and February 7, 2011; collectively attached as Exhibit A.

**RESPONSE:** The Bank admits that it sent the Garcias loan modification denial letters on November 20, 2008; November 12, 2010; December 1, 2010; and February 7, 2011.  The Bank denies the remaining allegations in paragraph 80.

81.     Wells Fargo sold the Family Home to itself for the price of $144,500 on February 18, 2011, just eleven days after sending the last denial letter.

**RESPONSE:** The Bank admits that a foreclosure sale for the property located at 407 Beach Ave., LaGrange Park, Illinois 60526 occurred on February 18, 2011, shortly after a denial letter was sent to the Garcias, and the property sold for $144,500 to the Bank as the beneficiary.  The Bank denies the remaining allegations in paragraph 81.

82.     The Garcias found out about the judicial sale the day before it was held.

**RESPONSE:** The Bank denies the allegations in paragraph 82.

83.     On March 29, 2011, Wells Fargo received approval of the judicial sale and the court entered an eviction order against the Garcias.

**RESPONSE:** The Bank admits that a judicial sale for the property located at 407 Beach Ave., LaGrange Park, Illinois 60526 was approved on March 29, 2011 and an order for possession was entered by the court on the same day.  The Bank denies the remaining allegations in paragraph 83.

84.     Additionally, after filing the foreclosure, Wells Fargo began to pay for force-placed insurance.  The force-placed insurance was significantly more expensive than standard Family Homeowner's insurance that Eduardo and Julia had in place, which ultimately increased the amount of the foreclosure judgment entered against them.

**RESPONSE:** The Bank denies the allegations in paragraph 84.

85.     Wells Fargo's final judgment against Eduardo and Julia was for $296,182.64, leaving a deficiency of $151,682.64 after the sale of the Family Home at judicial sale.

**RESPONSE:**  The Bank admits the allegations in paragraph 85.  Upon information and belief, the

Bank states that a deficiency judgment was obtained by Deutsche Bank as Trustee for a Morgan

Stanley Trust.

86.     Faced with the insurmountable deficiency judgment, Eduardo and Julia were forced to file a Chapter 7 Bankruptcy on May 26, 2011, two months after losing the Family Home.

**RESPONSE:**  Upon information and belief, the Bank admits that the Garcias filed for Chapter 7

bankruptcy on May 26, 2011.  The Bank denies the remaining allegations in paragraph 86.

87.     Eduardo and Julia faced significant struggles in attempting to rent an apartment after the foreclosure and bankruptcy.  They wanted to remain in LaGrange Park so that Miriahm would not be forced to transfer out of the LaGrange Park special education program.

**RESPONSE:**  The Bank lacks knowledge or information sufficient to form a basis as to the truth

or falsity of the allegations in paragraph 87, and, on that basis, denies the allegations in paragraph

87.

88.     Throughout the process of foreclosure, eviction and bankruptcy, Eduardo and Julia worried constantly that the loss of the Family Home would cause devastating harm to Miriahm's education and development.  Eduardo and Julia did everything in their power to remain in LaGrange Park after this process.

**RESPONSE:**  The Bank lacks knowledge or information sufficient to form a basis as to the truth

or falsity of the allegations in paragraph 88, and, on that basis, denies the allegations in paragraph

88.

89.     In applying for rental apartments, they were rejected time after time due to the damage done to their credit profile by the outrageous actions of Wells Fargo that led directly to both the foreclosure and the bankruptcy filing.

**RESPONSE:**  The Bank denies the allegations in paragraph 89.

90.     On a number of occasions after the foreclosure and bankruptcy, Eduardo and Julia were told by persons in the real estate industry in LaGrange Park that they were "looking in the wrong area."  This treatment resulting from the foreclosure and bankruptcy caused by Wells Fargo inflicted severe and substantial humiliation and embarrassment upon Eduardo and Julia.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegation that "[o]n a number of occasions after the foreclosure and bankruptcy, Eduardo and Julia were told by persons in the real estate industry in LaGrange Park that they were 'looking in the wrong area.'" The Bank denies the remaining allegations in paragraph 90.

91. The Garcias ended up signing a lease for a very small apartment that was in poor condition in Brookfield, Illinois, believing that it was located in the LaGrange Park School District, which would have allowed Miriahm to continue her education there. They hastily signed this lease one day before Wells Fargo forced them to move out of the Family Home, as the only other option at the time would have been homelessness.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 91, and, on that basis, denies the allegations in paragraph 91. The Bank specifically denies the paragraph 91 allegations that it "forced them to move out of the Family Home."

92. However, it turned out that the Brookfield Apartment was one block outside of the LaGrange Park school district. Mr. and Mrs. Garcia had to beg and plead the school district to allow Miriahm to remain at her school, which the school district eventually agreed to do.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 92, and, on that basis, denies the allegations in paragraph 92.

93. In moving into the Brookfield apartment, the Garcias were also forced to part with their two dogs, because the apartment did not allow pets. This was particularly devastating for Miriahm, who had grown very attached to the family pets.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 93, and, on that basis, denies the allegations in paragraph 93.

94. After the Brookfield apartment, the Garcias were eventually forced to move to Cicero, Illinois, the only place they were able to find an apartment that did not require a credit check.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth

or falsity of the allegations in paragraph 94, and, on that basis, denies the allegations in paragraph

94.

95.     On or about August 3, 2018, Wells Fargo filed a Form 10-Q with the United States Securities and Exchange Commission.

**RESPONSE:** The Bank admits that it filed its Q2 2018 10-Q with the United States Securities

and Exchange Commission on August 3, 2018.

96.     The Form 10-Q identified a:

> "[Calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010, and October 20, 2015, when the error was corrected ... [a]s a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not otherwise offered a modification in cases where they would have otherwise qualified.  In approximately 400 of these instances ... a foreclosure was completed."

Wells Fargo Form 10-Q Quarterly Report for the Period Ended June 30, 2018 (page 5), may be found at  https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2018/third-quarter-10.pdf.

**RESPONSE:** To the extent that paragraph 96 purports to describe the contents of Wells Fargo &

Company's Q2 2018 10-Q, the Bank refers to that document for a complete statement of its

contents.  The Bank denies the allegations in paragraph 96 to the extent they are inconsistent with

the contents of the Q2 2018 10-Q.

97.     On or about November 6, 2018, Wells Fargo filed a Form 10-Q with the United States Securities and Exchange Commission.

**RESPONSE:** The Bank admits that it filed its Q3 2018 10-Q with the United States Securities

and Exchange Commission on November 6, 2018.

98.     The Form 10-Q identified a:

> "[Calculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 13, 2010, and October 2, 2015, when the error was corrected.  A subsequent expanded

> review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 1028, when new controls were implemented.... [a]s a result of these errors, taken together and subject to final validation, approximately 870 customers were incorrectly denied a loan modification or were not offered a modification or repayment plan in cases where they otherwise would have qualified. In approximately 545 of these instances ... a foreclosure was completed."

Wells Fargo Form 10-Q Quarterly Report for the Period Ended September 30, 2018 (page 6), may be found at: https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2018/third-quarter-10.pdf.

**RESPONSE:** To the extent that paragraph 98 purports to describe the contents of Wells Fargo & Company's Q3 2018 10-Q, the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations in paragraph 98 to the extent they are inconsistent with the contents of the Q3 2018 10-Q.

99. On or about July 26, 2019, Wells Fargo sent a letter to Eduardo and Julia (the "WF First Letter") with the subject: "We made a mistake when we reviewed you for payment assistance." *See* WF First Letter attached as *Exhibit B.*

**RESPONSE:** The Bank admits that it sent the Garcias a letter dated July 26, 2019. To the extent paragraph 99 purports to describe the contents of the letter, the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations in paragraph 99 to the extent they are inconsistent with the contents of the letter.

100. The WF First Letter admits that "Wells Fargo Family Home Mortgage is a division of Wells Fargo Bank, N.A." *Id.*

**RESPONSE:** To the extent paragraph 100 purports to describe the contents of the July 26, 2019 letter, the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations in paragraph 100 to the extent they are inconsistent with the contents of the letter.

101. The WF First Letter states:

> "We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty

calculation, and we're sorry.  **If it had been correct, you would have been approved for a trial modification**.

**We want to make things right**."

*Id.*

**RESPONSE:**  To the extent paragraph 101 purports to describe the contents of the July 26, 2019 letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations in paragraph 101 to the extent they are inconsistent with the contents of the letter.

102.     Along with the WF First Letter, Wells Fargo sent Eduardo and Julia a check in the amount of $14,500.00.  *Id.*

**RESPONSE:**  The Bank admits that it began a voluntary remediation program in the fall of 2018, and that remediation program included an unconditional payment to the Garcias for $14,500.  The Bank denies the remaining allegations in paragraph 102.

103.     Upon receiving Wells Fargo's letter, the Garcias were in utter disbelief.  At first they believed the letter was some type of scam.  The Garcias did not believe that a national bank in the United States could inflict massive needless harm on their entire family, take their Family Home and then send them a letter nearly 10 years later that amounted to "Oops, we made a little mistake."

**RESPONSE:**  The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 103, and, on that basis, denies the allegations in paragraph 103.

104.     The Garcias believed that Wells Fargo had failed to "make things right," and they were very untrusting that the same bank that had destroyed their lives for the last decade was acting in good faith, so they instead opted to seek legal representation.

**RESPONSE:**  The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 104, and, on that basis, denies the allegations in paragraph 104.

105.     In the weeks and months after sending the check, Wells Fargo representatives began to call the Garcias and to ask when they were going to cash the check.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 105, and, on that basis, denies the allegations in paragraph 105.

106.     The Garcias informed the Wells Fargo representatives that they were seeking the counsel of an attorney in the matter before deciding what to do.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 106, and, on that basis, denies the allegations in paragraph 106.

107.     The Garcias ultimately retained counsel.

**RESPONSE:** The Bank admits that the Garcias retained counsel in the above-captioned matter.

108.     On or about October 31, 2019, the Garcias informed the Wells Fargo representative who called them that they had retained counsel, and that all communications going forward should be done through counsel.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 108, and, on that basis, denies the allegations in paragraph 108.

109.     Despite this, on or about November 18, 2019, Wells Fargo directly sent the Garcias a second letter ("WF Second Letter"), and included a second check, this time for $10,000.00.  *See* WF Second Letter attached as *Exhibit C*.

**RESPONSE:** The Bank admits that it sent the Garcias a letter dated November 18, 2019.  The Bank also admits that it began a voluntary remediation program in the fall of 2018, and that remediation program included a second, unconditional, payment to the Garcias for $10,000.  To the extent paragraph 109 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents.  The Bank denies the allegations in paragraph 109 to the extent they are inconsistent with the contents of the letter.

110.     The WF Second Letter states:

> "Although you did not request mediation, we've further considered how our decision may have affected you. We have decided to provide additional compensation, which is enclosed with this letter. We take this matter seriously and are sorry that this happened."

*Id*.

**RESPONSE:** To the extent paragraph 110 purports to describe the contents of the November 18, 2019 letter, the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations in paragraph 110 to the extent they are inconsistent with the contents of the letter.

111.    On or about November 25, 2019, Wells Fargo sent the Garcias a third letter ("WF Third Letter"), wherein it reminded the Garcias that they had not cashed their check yet. *See* WF Third Letter attached as *Exhibit D*.

**RESPONSE:** The Bank admits that it sent the Garcias a letter dated November 25, 2019. To the extent paragraph 111 purports to describe the contents of that letter, the Bank refers to that document for a complete statement of its contents. The Bank denies the allegations in paragraph 111 to the extent they are inconsistent with the contents of the letter.

## DAMAGES CAUSED BY WELLS FARGO

112.    If Wells Fargo's conduct in this case were a book the title would be The Needless Destruction of an American Family.

**RESPONSE:** The Bank denies the allegations in paragraph 112.

113.    Wells Fargo's conduct here resulted in substantial harms that no person or family should ever be expected to endure.

**RESPONSE:** The Bank denies the allegations in paragraph 113.

114.    Wells Fargo directly, proximately, and needlessly caused the Garcias to lose their Family Home.

**RESPONSE:** The Bank denies the allegations in paragraph 114.

115.    Flowing directly from this needless harm, the Garcias suffered the following damages:

A.  Wells Fargo took away the opportunity for Eduardo and Julia Garcia to obtain a permanent loan modification.

B.  Wells Fargo denied the Garcias the ability to remain in the Family Home.

C.  The Garcias were subject to a foreclosure on the Family Home.

D.  Eduardo and Julia Garcia were subject to a financially ruinous deficiency judgment in favor of Wells Fargo.

E.  The Garcias were evicted from their Family Home.

F.  Eduardo and Julia Garcia were forced to file bankruptcy.

G.  Eduardo and Julia's creditworthiness was obliterated. After the foreclosure and bankruptcy they were often unable to finance anything and had difficulty procuring basic services and necessities.

H.  Due to the stress and subsequent deterioration of her physical and mental health, Mrs. Garcia was eventually forced to quit her job, which significantly and permanently derailed her professional career.

I.  Miriahm Garcia was also directly impacted by Wells Fargo's actions - in a session with a school counselor, she confided that her family was suffering financial problems, and that this caused stress for her.

J.  Miriahm watched her parents suffer severe mental and emotional distress related to the loss of the Family Home during their dealings with Wells Fargo and the aftermath of the foreclosure and bankruptcy.

K.  Miriahm later confided to her parents that during the time of the foreclosure she felt anxiety, stress, and fear that she would have to leave her school and start over at a new school.

L.  Miriahm also developed physical medical problems, when the stress and anxiety caused by the foreclosure led to her developing stomach and gastro-intestinal problems that persist to this day, nearly ten years after the foreclosure.

M.  Byron Garcia also suffered as a result of Wells Fargo's actions. Byron was often thrust into adult roles related to the foreclosure and its deleterious effects while trying to act as an interpreter for his father.

N.  Byron also observed his parents suffer severe mental and emotional distress related to the loss of the Family Home during their dealings with Wells Fargo and the aftermath of the foreclosure and bankruptcy.

O.   Byron had planned to study music and theology at DePaul University or College of DuPage, but after losing the Family Home and the resulting financial harms, this path was closed to Byron. Instead, Byron elected to attend National Louis University because they offered him a scholarship; however, that scholarship limited him to three majors, none of which were in fields of interest. As a result, Byron never had a passion for study while in college and was never able to finish and obtain a college degree.

P.   Eduardo and Julia Garcias' creditworthiness suffered the following issues all arising from Wells Fargo's outrageous conduct:

   a.   Wells Fargo reported Eduardo and Julia's mortgage as delinquent after improperly denying them a loan modification.

   b.   Wells Fargo reported its foreclosure on Eduardo and Julia's credit reports after improperly denying them a loan modification.

   c.   After Wells Fargo's actions forced Eduardo and Julia to file Chapter 7 Bankruptcy that information became part of their credit profile;

   d.   Wells Fargo's destruction of Eduardo and Julia's creditworthiness made them unable to qualify to rent almost any form of housing in LaGrange Park, ultimately forcing them to live in a much less desirable area, where credit checks for apartments were not required;

   e.   Eduardo and Julia were unable to finance a car even at above-market, high interest rates. This forced Eduardo and Julia to buy several cars of little value for cash. These cars, because of their condition, were constantly subject to breakdowns and significant costs for repairs and maintenance; and

   f.   Eduardo and Julia suffered difficulties procuring basic services and providing necessities.

Q.   Wells Fargo deprived Eduardo and Julia of being able to realize $182,586 of equity in the Family Home. At the time of the filing of this case, the Family Home was valued at approximately $352,388,[2] which is $207,888 more than what Wells Fargo sold it for at Judicial Sale. *See* Zillow Appraisal attached as *Exhibit E*.

R.   Eduardo and Julia suffered economic losses related to their time spent on the loan modification, attending court hearings, the cost of moving out of

---

[2]  https://www.zillow.com/homes/407-Beach-Ave-La-Grange-Park,-IL,-60526_rb/3787312_zpid/ last visited on April 18, 2020 at 10:46 a.m. CDT.

the family home and other out of pocket costs including but not limited to increased costs of deposits for utilities.

S.   Eduardo and Julia suffered extreme emotional distress, resulting from:

   a.   The unproductive and repetitive loss mitigation process;

   b.   The wrongful denial of their loss mitigation application due to the "faulty calculation" error;

   c.   The continuance of the foreclosure case;

   d.   Julia blamed herself for the loss of the Family Home, believing that Wells Fargo's denying them for a modification was because of her husband's translation difficulties, which she would have not faced if she hadn't worked such long hours;

   e.   Eduardo believed the loss of the Family Home was due to his temporary unemployment;

   f.   The loss of the Family Home;

   g.   Profound guilt associated with losing the Family Home and feeling that they had failed their children;

   h.   Embarrassment, humiliation and shame associated with losing their Family Home, feelings of failure, loss of creditworthiness and watching the struggles of their children that followed the loss of their Family Home; and

   i.   The cumulative stress of all of these experiences over a period of years.

T.   These harms drastically affected Mrs. Garcia's physical and mental health, in that:

   a.   She was diagnosed with Major Depressive Disorder;

   b.   She was diagnosed with fibromyalgia;

   c.   She began suffering extreme migraines;

   d.   She has had to undergo therapy;

   e.   She lost the ability to drive due to her medical problems and required medications; and

   f.   Her marriage to Mr. Garcia suffered and deteriorated.

U.     These harms drastically affected Mr. Garcia's mental health, in that:

    a.     For years after the foreclosure, he would spend days at a time where he was unable to get out of bed;

    b.     He lost motivation and had a very difficult time finding work;

    c.     His family describes him as noticeably "not the same man"; and

    d.     His marriage to Mrs. Garcia suffered and deteriorated.

V.     Byron Garcia suffered the following harms from Wells Fargo's conduct:

    a.     Depression;

    b.     Anxiety;

    c.     Fear of being homeless;

    d.     Worry over his parents physical and mental health;

    e.     Trauma of witnessing his father fall into such a deep depression that he would stay in bed for days at a time;

    f.     Trauma of witnessing his mother go into uncontrollable "episodes of emotion and anger";

    g.     Trauma of witnessing his parents' marriage deteriorate;

    h.     Loss of sense of security and place;

    i.     Anger issues;

    j.     Relationship issues;

    k.     Stress;

    l.     Loss of time related to his attendance of hearings with his father; and

    m.     Loss of school friends.

W.     Miriahm Garcia suffered the following harms resulting from Wells Fargo's conduct

    a.     Miriahm's high school years were dominated by the family's financial concerns related to the foreclosure;

b.      The foreclosure and eviction disrupted both Miriahm's junior and senior years of high school;

c.      Grade disruptions;

d.      Isolation;

e.      Loneliness;

f.      Disruption of her parental relationships, including an almost complete loss of a typical mother/daughter relationship;

g.      The loss of her beloved dogs;

h.      Stress;

i.      Anxiety;

j.      Worry;

k.      Stomach and digestive issues;

l.      Loss of personal possessions as a result of the foreclosure; and

m.      Loss of school friends.

X.      As a result of the harms proximately caused by Wells Fargo's wrongful conduct, Byron Garcia and Miriahm Garcia experienced extreme emotional distress and mental anguish.

**RESPONSE:** The Bank denies the allegations in paragraph 115, including the allegations in each of paragraph 115's subparagraphs.

116.    Receiving Wells Fargo's First Letter and learning that Wells Fargo "made a mistake" in taking their Family Home almost a decade ago has also been very traumatic for the entire Garcia family. Wells Fargo's first letter triggered all the emotions experienced over the last ten years in a tidal wave of pain and mental harm for the Garcia family. They have been left to wonder what might have been if Wells Fargo had simply fulfilled their legal obligations.

**RESPONSE:** The Bank denies the allegations in paragraph 116.

117.    Since receiving the letter, Mrs. Garcia has suffered bouts of uncontrollable crying with no warning, has had difficulty concentrating, and has had difficulty sleeping.

**RESPONSE:** The Bank lacks knowledge or information sufficient to form a basis as to the truth or falsity of the allegations in paragraph 117, and, on that basis, denies the allegations in paragraph 117.

118. Mr. Garcia has had strong feelings of anger, has found himself to be "on edge" a lot of the time, has had difficulty concentrating, and difficulty sleeping.

**RESPONSE:** The Bank denies the allegations in paragraph 118.

119. Byron Garcia has experienced strong feelings of anger and deep resentment.

**RESPONSE:** The Bank denies the allegations in paragraph 119.

120. Miriahm Garcia has experienced significant anxiety and has lost a significant amount of time over thoughts of how Wells Fargo's actions have altered her life.

**RESPONSE:** The Bank denies the allegations in paragraph 120.

## COUNT ONE
### [Violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq ("ICFA")]

121. Plaintiffs restate and incorporate all prior paragraphs and allegations as if fully rewritten herein.

**RESPONSE:** The Bank incorporates by reference its responses to each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

122. The Illinois Consumer Fraud and Deceptive Business Practices Act provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception or fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

**RESPONSE:** To the extent that paragraph 122 purports to describe a specific provision of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1(e)) (the "Act"),

the Bank refers to the Act for a complete statement of its provisions. The Bank denies the allegations in paragraph 122 to the extent they are inconsistent with the Act.

123.    At all times herein, the entire Garcia family were consumers as that term is defined in the Act. 815 ILCS 505/l(e).

**RESPONSE:** To the extent paragraph 123 states a legal conclusion, no response is required. To the extent a response is required, the Bank denies the allegations in paragraph 123.

124.    At all times herein, Wells Fargo engaged in trade or commerce as those terms are defined in the Act. 815 ILCS 505/1 (f).

**RESPONSE:** To the extent paragraph 124 states a legal conclusion, no response is required. To the extent a response is required, the Bank denies the allegations in paragraph 124.

125.    As alleged in paragraphs 1-120 herein, Wells Fargo engaged in unfair acts in its dealings with the Garcias and other consumers in violation of law.

**RESPONSE:** The Bank denies the allegations in paragraph 125.

126.    Wells Fargo's conduct was directed at consumers generally.

**RESPONSE:** The Bank denies the allegations in paragraph 126.

127.    Wells Fargo's conduct needlessly caused consumers, including the Garcias, considerable economic damages including the loss of equity in their home, the loss of their home, moving expenses, time associated with loss mitigation efforts and court appearances and other forms of economic loss.

**RESPONSE:** The Bank denies the allegations in paragraph 127.

128.    Wells Fargo's conduct also needlessly caused the Garcia family significant, life altering, non-economic harm that has defined their life for more than a decade.

**RESPONSE:** The Bank denies the allegations in paragraph 128.

129.    All the needless harms suffered by the Garcia family proximately resulted from Wells Fargo's unfair acts and practices.

**RESPONSE:** The Bank denies the allegations in paragraph 129.

130.    The Plaintiffs demand such economic, non-economic and punitive damages as a jury deems reasonable and may award after hearing the evidence in this case.

**RESPONSE:** The Bank admits that Plaintiff seeks recovery of actual damages and punitive damages, but denies that Plaintiff is entitled to any such relief.

131.   The Plaintiffs request the Court award them statutory attorney's fees and the costs of the litigation as well.

**RESPONSE:** The Bank admits that Plaintiff seeks recovery of statutory attorneys' fees and costs, but denies that Plaintiff is entitled to any such relief.

## COUNT TWO
### [Gross Negligence]

132.   Plaintiffs restate and incorporate all prior allegations as if fully rewritten herein.

**RESPONSE:** No response is required because Plaintiff's gross negligence claim was dismissed without prejudice. *See Maxwell v. Wells Fargo Bank, N.A.,* No. 20 C 2402, 2021 WL 1209023, at *1 (N.D. Ill. Mar. 31, 2021) (dismissing Plaintiffs' negligence claim).

## PRAYER FOR RELIEF

The Bank denies that Plaintiff has any valid claim and denies that Plaintiff is entitled to any of the relief requested in his Prayer for Relief.

## AFFIRMATIVE DEFENSES

Without conceding that it bears the burden of proof or persuasion as to any of the issues raised in these defenses (whether denominated as affirmative defenses or otherwise), as separate and distinct affirmative defenses to Plaintiff's Complaint, the Bank alleges as follows:

## FIRST DEFENSE

(Failure to State a Claim for Relief)

Neither the Complaint nor any claim for relief asserted therein states facts sufficient to constitute a claim for relief against the Bank.

## SECOND DEFENSE

### (No Actual or Proximate Injury)

The relief sought by Plaintiff is barred, in whole or in part, because the Garcias were not actually and proximately injured by reason of any action(s) or omission(s) of the Bank.

## THIRD DEFENSE

### (Unjust Enrichment)

Plaintiff's claims are barred, in whole or in part, because the estate would be unjustly enriched if allowed to recover any portion of the damages alleged in the Complaint.

## FOURTH DEFENSE

### (Failure to Mitigate)

Plaintiff's claims for relief are barred, in whole or in part, because the Garcias failed to mitigate, reduce, or otherwise avoid the damages that they allegedly suffered.

## FIFTH DEFENSE

### (Lack of Deception or Misrepresentation)

Plaintiff's claims are barred, in whole or in part, because there was no deceptive act or practice, and no misrepresentation or omission.

## SIXTH DEFENSE

### (Good Faith)

The action is barred, in whole or in part, because the Bank at all times acted in good faith and honesty in fact, and always observed reasonable commercial standards of fair dealing in the trade, when dealing with the Garcias.

### SEVENTH DEFENSE

(Plaintiff's Breach of Contract)

Plaintiff's claims are barred, in whole or in part, as a result of the Garcias' breach of the mortgage contract.

### RESERVATION OF DEFENSES

(Additional Defenses)

The Bank presently has insufficient knowledge or information on which to form a belief as to whether it may have available additional, as yet stated, defenses. The Bank hereby reserves the right to assert other defenses and affirmative defenses as this action proceeds, the right to file an amended answer asserting additional defenses or affirmative defenses, and/or file a cross-complaint, in the event that discovery indicates that such pleadings are appropriate.

Dated: April 21, 2021                              Respectfully submitted,

                                                   /s/ *Scott P. Glauberman*
                                                   Scott P. Glauberman
                                                   Winston & Strawn LLP
                                                   35 West Wacker Drive
                                                   Chicago, IL 60601
                                                   Phone: 312-558-5600
                                                   Fax: 312-558-5700
                                                   Email: SGlauber@winston.com

                                                   *Attorney for Wells Fargo Bank, N.A.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 21st day of April, 2021, the foregoing was filed electronically with the Clerk of the Court for the United States District Court for the Northern District of Illinois, and was served by operation of that Court's electronic filing system, upon the following:

Rusty A. Payton
Payton Legal Group
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
(773) 682-5210
info@payton.legal

Salvador J. Lopez
Robson & Lopez, LLC
180 W. Washington Street, Suite 700
Chicago, Illinois 60602
(312) 525-2166
lopez@robsonlopez.com

Nicholas H. Wooten
Nick Wooten, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
nick@nickwooten.com

*Attorneys for Plaintiffs*

/s/ *Scott P. Glauberman*