# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EDUARDO GARCIA and JULIA GARCIA,

Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

Defendant.

Case No. 1:20-cv-02402

Judge Rebecca Pallmeyer

Judge Heather K. McShain

**JULIA GARCIA'S ANSWERS TO DEFENDANT WELLS FARGO BANK, N.A.'S FIRST SET OF INTERROGATORIES**

Plaintiff Julia Garcia ("Julia"), by and through her undersigned counsel, hereby submits the following answers and objections to the First Set of Interrogatories propounded by Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") pursuant to the provisions of Rule 33 of the Federal Rules of Civil Procedure. Julia reserves the right to supplement her answers.

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify Your employment since January 26, 2006, and please Include the dates of employment, the Identity of the employer(s), supervisor(s), and evaluator(s), and the reason(s) such employment ended.

**ANSWER:**

From 01/26/2006 to approximately 9/13/2012, Julia was employed full time at Alivio Medical Center. Her supervisor during a short period in 2006 was Carmen Velazquez, after that her supervisor became Antonia Rodriguez. Julia resigned from Alivio in September 2012.

Since 2012, Julia has sporadically and infrequently worked as a consultant or independent

contractor with several not-for-profit organizations. Some jobs were compensated with stipends, others were as a volunteer. The projects that were more formal and more than just a day were with Family Bridges in 2014, where her supervisor was Maria Buchanan, and with *Viva la Salud Studies* (University of Illinois, Rush University, and University of Chicago) on and off throughout the years. Dr. Lisa Sanchez-Johnsen was the supervisor of that program. Julia also more recently in 2020 lead a Covid Education program, that lasted about three months, in partnership with Alivio Medical Center under a Department of Human Services grant. Julia's supervisor for that program was Susan Vega.

In 2015 Julia began several different volunteer positions with Seminario Biblico Hispano. In or around 2018, Julia became a professor there teaching one class a semester as an independent contractor, which she continues doing through today. Julia's supervisor there is Martha Polo Koehler.

**INTERROGATORY NO. 2:**

Have You had any Communications or discussions with the employer(s), supervisor(s), evaluator(s) and/or co-worker(s) Regarding Your ability to effectively perform Your employment duties alleged in paragraph 115(H) of the Complaint? If so, please Identify the employer(s), supervisor(s), evaluator(s) and/or co-worker(s) and state the date, location, and substance of Each such Communication or discussion.

**ANSWER:** Julia has spoken about these issues with her primary care doctor – Dr. Anita Pilai – over the years. Julia has also spoken with her husband and children about these issues. Julia likely also discussed these issues with her co-workers at Alivio at the time – Marco Garduno, Elena Briseño, Susan Vega, and Humberto Nava, but given that it has been 10 years, she does not remember the exact dates or details of these conversations. Julia likely also spoke about it with her

supervisor at the time, Antonia Rodriguez. Julia also likely discussed these issues with members of her church at the time, one member that she was particularly close to at the time was Carolina Duran. But again, since it has been 10 years, Julia doesn't remember which exact details she would have discussed with whom.

**INTERROGATORY NO. 3:**

If You claim that you were unemployed at any time since January 26, 2006, please Identify the names of Each individual You named as a professional reference while seeking employment.

**ANSWER:** Given her ongoing health problems since the relevant time period, Julia has been unable to seek full time employment since 2012.

**INTERROGATORY NO. 4:**

Identify the amount of monthly rent You paid as a tenant at the Brookfield Apartment, as defined in the Complaint and as alleged in paragraphs 91–94 in the Complaint.

**ANSWER:** Julia believes that it was approximately $1,300.00 per month, but she does not remember the exact amount.

**INTERROGATORY NO. 5:**

Identify the individual or entity who owned the Brookfield Apartment, as defined in the Complaint, at the time you became a tenant there.

**ANSWER:** Julia believes the owner was identified as 4630 Vernon LLC. Julia believes Frank Adorno was the owner of this LLC. The information Julia has for him is: 1918 N 76th Court, Elmwood Park, IL 60707, (708) 975-1966. However, Julia always communicated with Frank Adorno, Jr., who identified himself as the owner's son and manager of the property.

**INTERROGATORY NO. 6:**

Identify Each rental property that You applied to, or otherwise considered moving into,

after the foreclosure of Your Mortgage.

**ANSWER:** Julia objects to this Interrogatory on the basis that Wells Fargo foreclosed on the Garcias' property over 10 years ago and it is unreasonable for Wells Fargo to expect her to remember "each" rental property the Garcias applied to, or otherwise considered moving into, after Wells Fargo wrongly foreclosed on the Garcia's property and forced them to vacate the property on short notice.

Subject to and without waiving this objection, Julia will testify as to the significant time and financial investment made in finding new housing and trying to stay within the same school district after they were evicted with a short notice to vacate the home.

Julia believes the family considered approximately twenty-five apartments.

**INTERROGATORY NO. 7:**

Identify Each doctor or healthcare provider, Including Each mental healthcare provider, therapist, or counselor, with whom You have consulted since January 26, 2006, and please include the dates of treatment, the doctor or healthcare provider's specialty (if applicable), the reason(s) for the consultations, Each diagnosis made, and the treatment(s) prescribed for Each such diagnosis.

**ANSWER:** Julia refers Wells Fargo to her 3,691 pages of medical records and the additional medical records that Wells Fargo has received in response to its subpoenas in this case.

**INTERROGATORY NO. 8:**

Identify all prescription medications, over-the-counter medications or remedies, and other non-prescription medications You have taken since January 26, 2006, and please include the name of the prescriber (if applicable), the date of the prescription (if applicable), the diagnosis or medical condition for which You took such medication or remedy, and the dates on which You took such

medication or remedy.

**ANSWER:** Julia refers Wells Fargo to her produced prescription records for 05/22/2007 to 09/13/2021 (*see* JULIA'S MED RECS 03203-03322) and these records, along with Julia's already produced medical records provide all of the information requested. *See* JULIA'S MED RECS 00001-03691.

**INTERROGATORY NO. 9:**

Have You had any Communications or discussions with any healthcare provider(s), Including mental healthcare provider(s), therapist(s), or counselor(s), about Your mental health or emotional well-being, Including stress, anxiety, or depression since January 26, 2006? If so, please Identify the healthcare provider(s) and state the date, location, and substance of Each such Communication or discussion.

**ANSWER:** Julia refers Wells Fargo to her already produced medical records and the any additional records produced as a result of Wells Fargo's subpoenas in this case as containing all of the information responsive to this interrogatory.

**INTERROGATORY NO. 10:**

Have You had any Communications or discussion with any healthcare provider(s), Including mental healthcare provider(s), therapist(s), or counselor(s), about Your mental health or emotional well-being Regarding Your ability to maintain full or part-time employment? If so, please Identify the healthcare provider(s) and state the date, location, and substance of Each such Communication or discussion.

**ANSWER:** Julia refers Wells Fargo to her already produced medical records and the any additional records produced as a result of Wells Fargo's subpoenas in this case as containing all of the information responsive to this interrogatory. Further responding, Julia is sure she has

discussed

these feelings with her primary care physician, Dr. Anita Pilai, and possibly other of her treating doctors.

**INTERROGATORY NO. 11:**

If You claim that Your Children experienced educational difficulties from the actions alleged in the Complaint, Identify the name and location of any school attended by Your Child(ren), and include the dates of attendance and the name(s) of Your Child(ren)'s teacher(s).

**ANSWER:** Byron attended Lyons Township High School from approximately 2006-2010. Miriahm attended Lyons Township High School from approximately 2008-2012. Byron attended National Louis University from approximately 2010 through approximately 2014 or 2015. Miriahm attended National Louis University from 2012 through 2017.

**INTERROGATORY NO. 12:**

If You claim that Your Child experienced educational difficulties because of the actions alleged in the Complaint, Identify the name and location of any school or post-secondary institution attended by Your Child, and include the dates of attendance, dates of withdrawal, the reason(s) for withdrawal, and the names of Your Child's institution administrators who were involved in Your Child's withdrawal process.

**ANSWER:** See Julia's response to interrogatory 11 above.

**INTERROGATORY NO. 13:**

If You claim that Your Child experienced educational difficulties at National Louis University because of the actions alleged in the Complaint, Identify the names of any of Your Child's college/university roommates, college/university co-workers, and college/university residential assistants.

**ANSWER:** Both Byron and Miriahm attended National Louis University, but never lived on campus.

**INTERROGATORY NO. 14:**

If You claim that Your Children experienced educational difficulties from the actions alleged in the Complaint, Identify the name of Each healthcare provider, Including doctors, nurses, social workers, and counseling and mental health providers, who consulted with Your Child(ren) Regarding the problems Your Child(ren) experienced, and include the date of Each consultation, the reason(s) for Each consultation, the diagnosis made or result of the consultation, and the treatment(s) and solution(s) Communicated to You.

**ANSWER:** Julia objects to this Interrogatory on the basis that medical records were produced for Byron and Miriahm, and school records containing information regarding Miriahm's hearing impairment were produced (*see* BYRON'S MED RECS 00001-00292; MIRIAHM'S MED RECS 00001-00840 and MIRIAHM'S SCHOOL RECORDS 00001-00210). Furthermore, Wells Fargo subpoenaed medical records and those records will contain all of the information requested in this Interrogatory.

**INTERROGATORY NO. 15:**

Identify Each lawsuit to which you have been a party, other than this action.

**ANSWER:** *Asset Acceptance v. Julia Escamilla*
Cook County Case No. 2010-M1-204569
GARCIA 01743-01784

*Household Finance v. Julia Escamilla*
Cook County Case No. 2009-M1-121723
GARCIA 01785-01787

*Deutsche Bank vs. Garcias, et al.*
2009-CH-00855
GARCIA 00015-00060

*In Re: Eduardo Garcia and Julia Escamilla*
Chapter 7 Bankruptcy Case No. 11-22208
GARCIA 00061-00113

**INTERROGATORY NO. 16:**

Identify and itemize all elements of damages, past or future, You claim or allege to be caused by Wells Fargo in this Action, and as to Each, Identify the amount claimed, the method, if any, by which You computed the amount, the figures used in that computation, and the facts and assumptions upon which your claim is based.

**ANSWER:** Julia objects to this interrogatory on the grounds that the damages claimed are unliquidated and within the province of the jury to determine. Without waiving said objection, and solely for the edification and understanding of Wells Fargo regarding the various ways in which Wells Fargo's action caused massive needless harm to Julia, the following information is provided relative to Julia's claims:

Actual Damages:

Non-Economic Damages:

- Emotional Distress damages including:
  - Mental Anguish associated with the loss of the family's home,
  - Shame associated with the loss of the family's home,
  - fear of being homeless,
  - disruption of the parental relationship with her children,
  - the loss of her daughter's dogs, which ultimately proved temporary, but was especially difficult for Miriahm,
  - disruption of her marital relationship with Eduardo,
  - embarrassment over the loss of the Family Home,
  - feelings of failure associated with the loss of the Family Home,
  - interference with her spiritual and church relationships,
  - depression,
  - stress,
  - anxiety,
  - worry,
  - loss of sense of place,
  - loss of what she considered a meeting space for the family's church community, the family home had become the go-to space for their church members, bible studies, and youth meetings. Not to mention the favorite

hangout for the children and their friends. Over the years it had become a weekly tradition for the bible study group to meet at the Family Home, and also a favorite hangout location for the church youth. They would pray, sing, practice musical instruments. The Family Home was considered a safe space for the meetings by the Garcias' church family and the Garcias. In fact, at one point the Garcias decided to eliminate a wall between the dining room and living room to create an open concept specifically because of the meetings in the Family Home. This all ended when Wells Fargo took the Garcias' Family Home and the Garcias moved to the Brookfield apartment.

- increased isolation,
- loss of keepsakes and heirlooms,
- the distress of watching Eduardo's mental state sink deeper into despair,
- The anguish of having all the needless harms associated with losing the Family Home explode come washing back over her after receiving the first Wells Fargo letter in 2019,
- Anger associated with learning her family never should have suffered these losses;
- the destruction of Julia's American Dream;

Bodily Injury, Pain and Suffering:

The bodily injuries and pain and suffering resulting from the medical conditions which were caused by, or result from, or were otherwise exaggerated, increased, exacerbated, or caused to be made worse because of Wells Fargo's conduct, including, but not limited to causing or worsening of her major depressive disorder, fibromyalgia, and migraines.

Julia has no training or expertise by which she could value the needless harms Wells Fargo has inflicted upon her in this case. Julia is relying upon her counsel to set the value of her non-economic injuries. Julia's counsel will ask the jury to award $200 per hour for her non-economic damages. As of March 5, 2022, that number is 101,064 hours. As of March 5, 2022, that calculation is $20,212,800 and increasing every day.

Economic Damages:

- Severe damage to her credit rating;
- Inability to access credit to purchase a reliable automobile;
- Inability to access significant parts of the housing market after foreclosure;
- Legal fees for filing of Chapter 7 = $1,750.00; Chapter 7 filing fee = $299.00
- Loss of potential equity = $182,586.00 through the complaint date. This number is almost certain to increase by the time of trial.
- Approximately $1000-1500 in application fees for apartments after Wells Fargo took their Family Home.

- Loss of personal property such as furnishings and appliances the family was forced to give away after the foreclosure.
- Significant time spent working on a loan modification.
- Costs of making copies and mailing information to Wells Fargo for loss mitigation efforts.
- Increased maintenance costs required to maintain the older, cheaper, and less reliable vehicles the family drove because their credit prevented them from purchasing something more reliable.
- Loss of the Family Home the Garcias expected to pass to their children or grandchildren.
- Legal fees and costs for preparing/filing/prosecuting this action. The Garcias object to the production of these documents at this time on the basis of attorney-client privilege and work product doctrine. Documents will be produced as may be ordered by the Court for an award of attorney fees. These attorney's fees will not be claimed in the case in chief, rather, if the Plaintiff prevails then counsel will seek fees under the ICFA.

**INTERROGATORY NO. 17:**

Explain in detail the basis for the discrepancy between Your allegation in paragraph 67 of the Complaint and Your subpoena response to Request for Production of Documents 8, dated November 16, 2021.

**ANSWER:** There is no discrepancy. At the time of filing the Complaint, we had not been able to fully itemize the total we spent on improvements to the Family Home. We knew we had invested "***over $40,000*** and extensive time in completely rehabbing" the Family Home. In responding to Wells Fargo's Request for Production No. 8, we completed the itemization of those costs, and we totaled the costs to an estimated $66,850.00.

**INTERROGATORY NO. 18:**

Explain in detail the basis of Your contention that Wells Fargo caused Your Child, Byron Garcia, to not to attend "DePaul University or College of DuPage," or to "never … finish and obtain a college degree" as alleged in paragraph 115(O) of the Complaint.

**ANSWER:** College of DuPage charges a significantly reduced "in-district" tuition to

students that reside in their District. Our Family Home was in this District for reduced tuition. After Wells Fargo took our Family Home, we no longer lived in the District to receive discounted tuition. College of DuPage is a community college with a very good reputation. I believe College of Dupage is the type of college where Byron could have thrived. After Wells Fargo took our Family Home, Byron told me he was concerned about being a financial burden on his parents and the costs of college became a primary concern for him. Byron no longer believed we could provide him any help financially with the costs of college. After Wells Fargo took our Family Home, Byron lost focus on college and had a number of issues prior to quitting college and going to work. I believe Byron would have flourished and done well in college if Wells Fargo had not taken our Family Home. Byron was changed by the loss of our Family Home and never had the same attitude about college after that loss.

**INTERROGATORY NO. 19:**

Explain in detail the basis of Your contention that Wells Fargo caused You "embarrassment, humiliation, shame" and "feelings of failure" as alleged in paragraph 115(S)(h) of the Complaint.

**ANSWER:** My work has always been in helping my community. Inside my programs, we had partnerships with community organizations to educate our community on good health and sound finances. We had partnerships with organizations such as *The Resurrection Project* and *Instituto del Progreso Latino* on managing budgets, organizing finances, and how to buy your first home. I found myself in the embarrassing position of trying to educate the community in subjects where I felt that I had failed. I also led a team of up to twenty employees and a database of 700 volunteers on these projects. I was supposed to be the motivational leader on educating the community in these areas. Instead, after Wells Fargo took our Family Home, I was in the position

of telling my staff, our volunteers, and other community organization partners to come and take things from my Family Home that we could not take with us because Wells Fargo had taken our Family Home. I was traumatized and embarrassed. I will never forget that experience or the feelings of failure, shame, humiliation, and embarrassment that I felt. I am haunted by this experience even to this day.

I also felt incredible shame seeing my children lose many of their personal possessions they had accumulated over the years. I blamed myself for losing our Family Home until I received Wells Fargo's letters in 2019 and met with my attorney. All that time I felt and believed that I had failed as a mother, wife, protector, and provider. I believed I had failed my children and my husband. I believed that I had failed Eduardo when he needed me the most and there was nothing I could do to relieve the depression and despair he was feeling because of the loss of our Family Home.

I also felt like I was a criminal or a thief having the Court order me to vacate my family's home. I felt like I was being chased away from our Family Home. From the time Wells Fargo took our Family Home until I received the letters from Wells Fargo and talked to my lawyer, I felt incredible shame whenever I was around any friends and family who knew what we had experienced. Prior to losing our Family Home, we had been the part of our extended family who had achieved the American Dream. We had purchased a nice home, which we had worked hard to improve, in a nice neighborhood with good schools in a safe area.

Losing our Family Home made me feel like we were being chased away from this place of shelter and security because we didn't belong. Going around my extended family and friends just increased my sense of shame, humiliation, and feelings of failure. I felt like I had become a bad role model to my children. For me, the the goal of homeownership was not the "American dream."

My American dream was always to build a Family Home for myself and my family. I always dreamed of a safe place, where I could teach my children to be hardworking, happy, and successful. I was and I am devastated by the loss of our Family Home. I was in shock after Wells Fargo took our Family Home. I believed I had lost my American Dream and completely failed everyone that I loved.. Since Wells Fargo took our family's home, I have regretted the efforts I put into trying to find our place. Until I received Wells Fargo's letters in 2019, I felt my efforts had been the wrong choice and had put my family into a nightmare and destroyed our lives financially. If I had known that Wells Fargo was going to take our Family Home the way they did, I would have never chosen home ownership. I would have never allowed my family to suffer the things they have suffered because of Wells Fargo.

Prior to losing our Family Home, I thought of myself as extremely blessed with what I had accomplished, with a positive future and a wonderful career. Losing our Family Home destroyed my belief in myself and my self-worth. I questioned everything I thought was real. I doubted my own abilities and qualifications for my career, I felt like a complete failure to my husband and my children, and I became overwhelmed.

**INTERROGATORY NO. 20:**

Explain in detail the basis of Your contention that Wells Fargo caused Your "Major Depressive Disorder," "fibromyalgia," "extreme migraines," and "marriage to Mr. Garcia [suffer] and [deteriorate]" as alleged in paragraph 115(T)(a), (b), (c), and (f) of the Complaint.

**ANSWER:** I was diagnosed with Major Depressive Disorder in or about 2008 (*see* JULIA'S MED RECS 02438). I was diagnosed with fibromyalgia in or about 2005 (*see* JULIA'S MED RECS 01971). I was diagnosed with migraines in or around 1994, but with treatment they had all but gone away by approximately 2004. However, they returned when the issues with our

Family Home began. The migraines have not gone away completely since. (*see* JULIA'S MED RECS 01706).

My health was greatly affected during the years between 2008 and 2010 while Wells Fargo was pursuing foreclosure on our Family Home. I was working frantically and constantly trying to get a loan modification to save our Family Home.

My physical and mental health continued to deteriorate in the years after Wells Fargo took our Family Home. I have never fully recovered from the loss of our Family Home. I have never been the same person since the loss of our Family Home. My health has deteriorated since that time. As my health problems worsened, I could no longer perform my job duties. I had loved my job, but the sense of failure I felt from the loss of our Family Home and my failing health prevented me from performing my job at the level that the community and my colleagues deserved.

I used to be motivated and inspired by the stress and demands of the job. My work would energize, motivate, and invigorate me. After the loss of our Family Home, the stress and demands just made my health problems and my mental state worse. I was constantly in pain. I was always tired, unmotivated, sad, depressed, and just generally unhappy. For all these reasons, I believed I was failing in my work just as I had failed my family and I resigned my job at Alivio and my career in this field in September 2012. I believed my community and my colleagues deserved better than I could give them after the loss of our Family Home.

My medical conditions were aggravated by stress. I experienced overwhelming stress around the experience of trying to secure a loan modification from Wells Fargo and then Wells Fargo taking our Family Home. The fibromyalgia I was suffering with was aggravated by the lifting, packing and living out of boxes that we experienced after Wells Fargo took our family's home (*see* JULIA'S MED RECS 01689), and by the energy and time it took to find an apartment

to live in afterwards. I believe that the anxiety, shame, grief, and embarrassment I felt around Wells Fargo's taking of our Family Home impacted all of my health conditions. I believe we did all we could to save our Family Home. We communicated with Wells Fargo regularly. We would send and then re-send everything Wells Fargo asked us to provide to obtain a loan modification. Every day of this process I experienced significant stress around our efforts to save our Family Home.

The thought of losing our Family Home caused tension between myself and Eduardo. The tension between us as a couple spilled over onto our children and our relationship with them. We were so consumed with trying to save our Family Home and then the pain of losing our Family Home that our children suffered and our relationships with our children were weakened. Every member of my family, and every one of our relationships with one another was damaged and weakened by this experience. Our Family Home was a happy, safe, and secure place. Our lives have not been the same since Wells Fargo took that from us. During the time we were fighting for our Family Home and in the aftermath of losing our Family Home, Eduardo and I were less tolerant, patient, and flexible with each other. I was suffering myself and was also watching Eduardo suffer in his own way, and I saw how my children were suffering. While all of this was happening, the symptoms and pain from my fibromyalgia and chronic migraines became worse and I became more and more depressed.

After my family received Wells Fargo's letters in 2019, I felt like every ounce of pain, stress, worry, and anxiety I had experienced almost a decade earlier hit me again with full force. I really cannot put into words the hurt, sorrow, and great sadness I feel knowing that Wells Fargo took my Family Home instead of giving us the loan modification we begged for at that time. It is hard to even try to describe how learning of Wells Fargo's mistake has impacted me. Since

receiving Wells Fargo's letter in 2019, my suffering has been magnified by knowing everything my family went through should have never happened. Since receiving Wells Fargo's 2019 letter, I have suffered significant stress, anger, anxiety, frustration, crying spells, sleepless nights, and inconsolable sadness. I am consumed by thoughts of how much different my family's life could have been if Wells Fargo had not taken our Family Home. I think about the nightmare we lived through for more than a decade because of Wells Fargo and how my family has suffered. I try not to let these thoughts overwhelm me. Despite my efforts not to dwell on what Wells Fargo did to my family, I do believe Wells Fargo's conduct is a major factor in my deteriorating health. I cannot shake the fact that this nightmare that has caused so much harm to my family was completely avoidable.

**INTERROGATORY NO. 21:**

Explain in detail the basis of Your contention that Wells Fargo caused Your Child, Byron Garcia, "trauma" as alleged in paragraph 115(V)(f) and (g) of the Complaint.

**ANSWER:** Byron can best answer fully how he believes this has impacted him. I saw how the loss of our Family Home impacted Byron. I saw how the damage to our family relationships changed Byron. I saw Byron's attitude about his own future and his own plans change. I saw Byron be put into positions of acting as an adult when he was still a child. And I observed how Byron suffered over the loss of our Family Home. My child experienced stress, worry, fear, and anxiety he should have never had to experience. My child experienced bouts of sadness and depression that he should have never experienced. My son was changed by this experience and his attitude towards life and his future is different because of Wells Fargo.

Dated: March 7, 2022

*Respectfully submitted*,

*/s/ Nick Wooten*

Nick Wooten
NICK WOOTEN, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
nick@nickwooten.com

Rusty A. Payton,
PAYTON LEGAL GROUP
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
(773) 682-5210
info@payton.legal

Salvador J. Lopez
ROBSON & LOPEZ, LLC
180 W. Washington Street, Suite 700
Chicago, Illinois 60602
312-523-2166
lopez@robsonlopez.com

*Counsel for the Plaintiffs*

VERIFICATION

I, JULIA GARCIA, declare under penalty of perjury that I have read the foregoing answers contained in Plaintiff's Answers to Defendant Wells Fargo Bank, N.A.'s First Set of Interrogatories, and that the answers set forth therein are truthful to the best of my knowledge, information and belief.

Executed this 6 day of March, 2022.

J Garcia
Julia Garcia

**CERTIFICATE OF SERVICE**

I certify that on March 7, 2022, a copy of the foregoing **Julia Garcia's Answers to Defendant Wells Fargo Bank, N.A.'s First Set of Interrogatories** was served via electronic means on:

Scott P. Glauberman
Christopher Parker
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
sglauber@winston.com
cparker@winston.com

Angela A. Smedley
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Asmedley@winston.com

Shawn R. Obi
WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, CA 90071
Sobi@winston.com

*Counsel for Defendant*

*/s/ Nick Wooten*
Nick Wooten