UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **EDUARDO GARCIA** and **JULIA GARCIA**, | ) ) ) Case No. 1:20-cv-02402 |
| Plaintiffs, | ) ) Honorable Rebecca R. Pallmeyer |
| vs. | ) ) |
| | ) Magistrate: Honorable Heather K. McShain |
| **WELLS FARGO BANK, N.A.**, | ) ) |
| Defendant. | ) ) |

**PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION TO COMPEL INDEPENDENT MEDICAL EXAMINATION OF PLAINTIFFS [D.E. 77, 78] AND PLAINTIFFS' CROSS-MOTION FOR PROTECTIVE ORDER**

Plaintiffs, Eduardo Garcia and Julia Garcia, by their undersigned attorneys, respond in opposition to Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Compel Independent Medical Examination of Plaintiffs and file herewith their Cross-Motion for Protective Order. In support, the Garcias state:

### I. Introduction

The Garcias did not initially oppose an IME. When Wells Fargo first requested an IME, it failed to provide any of the Rule 35 required information including manner, conditions, scope of the examination, and the doctors who would perform it. But, after several good faith discussions, and Wells Fargo providing the required information, the parties reached an agreement for two IMEs (physical and mental) for Mrs. Garcia, and one IME for Mr. Garcia (mental).

After the agreement was reached, Wells Fargo pronounced a unilateral change to the agreement. Material to this motion, Wells Fargo demanded the Garcias agree to quadruple the

1

previously agreed upon length of time for the mental IMEs with a different examiner. In making this unilateral change, Wells Fargo abandoned all semblance of a collaborative approach. Instead, Wells Fargo steadfastly insisted the Garcias submit without question to this demand. Wells Fargo's attempt to impose its will on the Garcias made this motion practice necessary.

Wells Fargo should not be rewarded for gamesmanship. Wells Fargo ignores the unique fact pattern in this case and essential issues affecting the Court's *good cause* analysis. Wells Fargo also ignores the Court's discretion in this matter. In spite of their prior willingness to accede to the IME simply to expedite the case, the Garcias contend good cause is lacking for an IME. If the Court is persuaded an IME should be ordered, then Wells Fargo should be held to its initial agreement regarding the length of the examination.

## II.     Standard of Review

"District courts have broad discretion in matters relating to discovery." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 646–47 (7th Cir. 2001); *Rennie v. Dalton*, 3 F.3d 1100, 1110 (7th Cir. 1993). Although there is a strong public policy in favor of disclosure of relevant materials, Rule 26(b)(2) of the Federal Rules of Civil Procedure empowers district courts to limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive."

> Before restricting discovery, the court should consider "the totality of the circumstances, weighing the value of the material sought against the burden of providing it," and taking into account society's interest in furthering "the truthseeking function" in the particular case before the court. *Rowlin v. Alabama*, 200 F.R.D. 459, 461 (M.D.Ala.2001) (placing limits on discovery in employment discrimination case); see generally Fed.R.Civ.P. 26 advisory committee notes; 8 WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2008.1 (1994).

*Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002).

> The party seeking protection from discovery bears the burden of presenting "a particular and specific demonstration of fact" as to the need for that protection. See *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981) (citations omitted); see also *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 6059770, at *2 (N.D. Ill. Dec. 7, 2017) (collecting cases).

*City of Rockford v. Mallinckrodt ARD, Inc.*, 17 CV 50107, 2020 WL 1675593, at *2 (N.D. Ill. Apr. 6, 2020).

Notwithstanding the foregoing, a party seeking a Rule 35 examination must show the party's physical or mental condition is in controversy and there is good cause for the examination.

> In order to [show good cause], the movant must go beyond showing that an examination would be relevant; instead, [movant] must provide evidence that the test would "inform the court and the parties of the true facts as to the ... condition of the party." 8B Charles Alan Wright *et al.*, Fed. Practice & Procedure § 2231, 243 n.6 (3d ed. 2010). Indeed, because Rule 35 is the only federal rule of civil procedure that specifies that necessitates [*sic*] a showing of good cause, this heightened requirement "would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the relevancy standard has already been imposed by Rule 26(b)." *Schlagenhauf*, 379 U.S. at 118.

*Timo Ilves, Petr., v. Jeanna Rhae Ilves, Respt..*, 21-CV-387-WMC (W.D. Wis. Aug. 25, 2021).

"Further, when the information about a mental condition is available by other means, good cause does not support ordering a mental examination. *McElroy*, 2020 WL 6802299, at *1." *de Laire v. Voris*, 21-CV-131-JD, 2021 WL 6883388, at *3 (D.N.H. Nov. 22, 2021). Good cause is also not shown to order a Rule 35 examination where a litigant's prior treatment records are satisfactory for assessing the nature of the injuries suffered. See, *McElroy v. Omni Mt. Washington, LLC*, 19-cv-844-JD, 2020 at *2 (D.N.H. Nov. 19, 2020). "The decision whether to order a mental examination is committed to the sound discretion of the trial court, and the court must satisfy itself that both the "in controversy' and "good cause" requirements are satisfied. *Schlagenhauf v. Holder*, 379 U.S. 104 (1964); see also, 4A J. Moore, J. Lucas, D. Epstein, Moore's Federal Practice ¶ 35.03[5]." *Valita M. v. City of Chicago*, 1986 WL 8736, at *2 (N.D. Ill. Aug. 1, 1986).

### III. Argument

#### A. Factual Background

The vast majority of cases Garcias' counsel located on this topic follow a familiar fact pattern. In most, there is an event such as a car wreck, industrial accident, premises injury, EEOC complaint, or other trigger event which causes an injury. The plaintiff immediately realizes the event gives rise to a legal claim. The plaintiff pursues medical treatment while simultaneously pursuing the legal claim. Most often, the plaintiff also has retained medical experts to support the plaintiff's position. The defendant(s) then seeks a Rule 35 examination to have the plaintiff examined by the defendant's expert to counter the plaintiff's expert(s).

In this normal fact pattern, defendants raise questions about whether the plaintiff is over-treating, whether the plaintiff is malingering, whether the plaintiff is treating to corroborate their claims of injury, whether the plaintiff's treatment is being managed by plaintiff's counsel with collaborative doctors, and all manner of other perceived methods of manipulating the plaintiff's care in search of a larger award of damages. Alternatively, there is a lack of information from which the plaintiff's condition can be determined. This usual fact pattern is not what we have in this case.

The facts of the Garcias' case fall outside any other case contesting an IME that Garcias' counsel could locate in a couple of important ways. Most importantly, a *decade* of medical treatment was received by the Garcias, primarily Julia, before the Garcias were aware there was a possible legal claim against Wells Fargo. The facts here show that Wells Fargo's foreclosure of the Family Home and personal deficiency judgment destroyed the Garcias' financial well-being and forced them into bankruptcy. The Garcias were suffering in silence. They had no inkling of a possible legal claim until Wells Fargo's first letter in July 2019 (despite Wells Fargo having

4

discovered the issue in early 2013). The Garcias were not seeking treatment arising from an existing or ongoing legal claim. They were seeking necessary medical treatment for the medical issues they experienced during the relevant time period. Julia was the most vulnerable member of the Garcia family because she had an existing chronic disease when these events occurred.

From the outset, the Garcias disclosed Julia Garcia's primary care physician, Dr. Anita Pillai as a fact witness in her role as treating physician. Dr. Pillai was deposed on April 15, 2022. Dr. Pillai testified Julia experienced heightened stress, anxiety, and depression around the time of losing the Family Home. Dr. Pillai testified that *only after* the foreclosures of the Family Home did financial problems become a constant stressor for Julia Garcia and the Garcia Family. Dr. Pillai agreed that from the time period involving the loss of the Garcias' Family Home until the present day, Julia Garcia has experienced depression, anxiety, and stress.

Dr. Pillai also testified that Julia had a diagnosis of fibromyalgia that predated any of the facts that give rise to this claim. Dr. Pillai's medical records confirm this testimony. Dr. Pillai testified that depression, stress, and anxiety can worsen the symptoms of fibromyalgia. Likewise, fibromyalgia can worsen depression, stress, and anxiety arising from other sources. In effect, these conditions feed and worsen the other's symptoms, trapping the patient in a vicious cycle.

Dr. Pillai also testified that Julia experienced TMJ pain in 2015. Dr. Pillai testified TMJ pain is often caused by grinding one's teeth, usually during sleep. The grinding of teeth is associated with the body being under stress. Julia also eventually had her jaw become dislocated, essentially falling out of the socket. Dr. Pillai testified that long term TMJ can weaken the temporomandibular joint and allow for dislocation of the jaw.

Dr. Pillai also testified that Julia was diagnosed with essential hypertension in early 2018 after having fluctuations in her blood pressure for a couple of years. Essential hypertension means

that medication is required to treat the hypertension. Dr. Pillai testified that stress acts upon the body's central nervous system by activating the body's "fight or flight" response. The body's fight or flight response acts upon the body's cardiovascular system and is well understood to contribute to, or be *a cause* **of**, high blood pressure. Dr. Pillai testified all of her diagnoses were made to a reasonable degree of medical certainty and that all of her diagnoses had been reached using the differential diagnosis methodology.

Dr. Pillai refused Wells Fargo's invitation to testify that Wells Fargo's conduct was the "sole cause" of any of Julia's medical conditions. Dr. Pillai did testify that the stress, depression, and anxiety she had observed, treated, and diagnosed for more than a decade had adversely impacted Julia's health and that one of the causes of Julia's stress, depression, and anxiety had been the loss of her Family Home and the family's resulting financial stressors. Dr. Pillai also testified that stress can be a cause of essential hypertension, and that stress can exacerbate the symptoms of chronic disease such as fibromyalgia. Dr. Pillai also testified stress can contribute to TMJ pain.

Julia had all of these conditions and had been receiving treatment for all of these issues for years before becoming aware of a possible claim against Wells Fargo. Dr. Pillai has not been retained as an expert by the Garcias and the Garcias have not and are not retaining any medical experts. The Garcias had intended to rely upon Dr. Pillai's testimony in her role as a treating physician and had disclosed Dr. Pillai in that role. In response to receiving the Garcias' disclosures and the Garcia Family's medical records, Wells Fargo issued subpoenas to ***twenty-two*** different treating physicians (some with as few as a single treatment appointment). Wells Fargo has already taken a number of these depositions.

B.   **Good Cause is Lacking Under the Garcia's Fact Pattern**

Under the standards set out above, Wells Fargo bears the burden of demonstrating Rule 35's requirements have been met before the Court will order a defense expert examination. This requires that Wells Fargo demonstrate the matter is in controversy and there is good cause for the examination. The Garcias agree the "in controversy" prong of this test is satisfied.

The Garcias disagree that the "good cause" prong of this test is satisfied here. "The specific requirement of good cause would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the relevancy standard has already been imposed by Rule 26(b). Thus, by adding the words '* * * good cause * * *, 'the Rules indicate that there must be greater showing of need under Rules 34 and 35 than under the other discovery rules.'" *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964).

The *Schlagenhauf* Court explained:

> The courts of appeals in other cases have also recognized that Rule 34's good-cause requirement is not a mere formality, but is a plainly expressed limitation on the use of that Rule. This is obviously true as to the 'in controversy' and 'good cause' requirements of Rule 35. They are not met by mere conclusory allegations of the pleadings - nor by mere relevance to the case - but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination. Obviously, what may be good cause for one type of examination may not be so for another. *The ability of the movant to obtain the desired information by other means is also relevant* (emphasis supplied).

*Id.* The *Schlagenhauf* Court concluded "Mental and physical examinations are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule." *Id.* at 121.

C.   **Wells Fargo has adequate information from other sources**

Here, Wells Fargo has "driven the train" on expanding the scope of medical testimony in this case. Wells Fargo has issued subpoenas to every physician they could identify who provided

7

any treatment to the Plaintiffs since the foreclosure. The Garcias had intended only to depose Julia Garcia's primary care physician, Dr. Anita Pillai. The Garcias have not designated *or retained* any medical experts in this case.

The vast majority of treatment relevant to this case occurred during the decade prior to the Garcias becoming aware of any possible legal claim. Wells Fargo has full access to the thousands of pages of Julia's medical records and Eduardo's more limited medical records. All of the doctors involved in providing treatment are independent medical professionals. No doctor provided treatment or examined any plaintiff in an expert witness capacity. The Garcias' counsel have not spoken to any of the treating physicians outside of the depositions. And as confirmed by the testimony of all the doctors, they did not speak to the Garcias outside of providing treatment to them, and none of the doctors were previously aware of this case.

Under these facts, Wells Fargo can obtain all necessary medical information about the Garcias' medical conditions from existing medical records and treating physician testimony. "Good cause under Rule 35 requires a greater showing of need than the relevancy already indicated by Rule 26(b) and can be gauged by the ability of the movant to obtain the desired information by other means. See *Schlagenhauf*, 379 U.S. at 118, 85 S.Ct. at 242-43." *Briesacher v. AMG Resources, Inc.*, 2:03 CV 331, 2005 WL 2105908, at \*2 (N.D. Ind. Aug. 31, 2005).

Further, Wells Fargo has not made any showing that any treating physician has demonstrated anything other than independent medical judgment and truthful testimony regarding the Garcias' presentation for treatment, their symptoms, and their diagnosis. Wells Fargo has not shown any bias on the part of any treating physician nor any influence, or even attempted influence, over the testimony of the treating physicians. Wells Fargo has failed to point to any deficiencies in the processes and methodologies employed by the Garcias' treating physicians. Wells Fargo has

8

also failed to demonstrate any information needed to accurately determine the Garcias' conditions throughout the relevant time period are lacking.

> Good cause requires a showing that each exam sought "could adduce specific facts relevant to the cause of action and is necessary to the defendant's case." *Womack*, 205 F.R.D. at 447 (court finds exam is the only way to determine the "present psychological state" of plaintiff). In *Pearson v. Norfolk–Southern Ry. Co., Inc*., 178 F.R.D. 580, 582 (M.D.Ala.1998), the court explained that the moving party must demonstrate the examination is necessary by showing that the information it seeks is not available by other means. The court held that the defendant had ample information on the plaintiff's intellectual functioning at the time of the accident through discovered court records, school records, and "copies of all social, medical, psychiatric, psychological testing and evaluations." See also *McLaughlin*, 2007 WL 1108527 at *3 ("plaintiff could probe the adequacy of these doctors' opinions through interrogatories and depositions"); *Shumaker v. West*, 196 F.R.D. 454, 457 (S.D.W.Va. 2000) (ample evidence of plaintiff's PTSD available to defendant; no good cause for Rule 35 exam); *Marroni v. Matey*, 82 F.R.D. 371, 372 (E.D.Pa.1979) (less intrusive discovery methods must be tried first).

[*Riel v. Ayers*, 2010 WL 1980251, at *4 (E.D. Cal. May 17, 2010)](), modified on reconsideration, 2010 WL 3835798 (E.D. Cal. Sept. 30, 2010).

Wells Fargo has issued subpoenas to every treating physician identified in any medical record disclosed by the Garcias. Wells Fargo cannot demonstrate why the voluminous medical records and the testimony of treating physicians is not sufficient to provide the evidence needed here. The [*Valita M. v. City of Chicago*]() Court wrote:

> Defendant must thus come forward with evidence, by affidavit or otherwise, to show that a mental evaluation of plaintiffs now will be of value to the trier of fact on the issue of plaintiffs' damages.
>
> The "good cause" requirement, which is closely related to the "in controversy" requirement, also has not been met by defendant. The cases make clear that the movant must first show that the desired information cannot be obtained by other means. *Id*., see also , Marroni v. Matey, 82 F.R.D. 371, 372 (E.D. Pa. 1979); *Petition of Trinidad Corporation*, 238 F. Supp. 928, 936 (E.D. Va. 1965); 8 C. Wright, A. Miller, Federal Practice and Procedure, § 2234 (1970). Defendant has made no showing of why the deposition testimony of Drs. Abdullah and Bland, as well as the reports prepared by them, cannot be evaluated by Dr. Grossman as a means of preparing a defense to the testimony of those doctors. The court recognizes that this alternative to an independent evaluation by Dr. Grossman may be insufficient. But defendant has the burden of producing evidence to satisfy the

9

court that the mental examination is necessary and that the desired information cannot be otherwise obtained.

1986 WL 8736, at *2 (N.D. Ill. Aug. 1, 1986).

The facts of this case demonstrate that there is not good cause to order an IME. Wells Fargo has access to treating medical professionals, not retained by the Garcias as experts, to learn any information regarding the Garcias medical issues that Wells Fargo does not already know. "A demonstration of good cause requires, initially, that the desired information cannot be obtained by other means. See *Valita M. v. City of Chicago*, 1986 WL 8736, at *2 (N.D. Ill. 1986)." *Johnson v. City of Ecorse*, 137 F. Supp. 2d 886, 894 (E.D. Mich. 2001). Further, Wells Fargo cannot demonstrate their expert cannot prepare his opinions based upon the medical records and testimony of the Garcias' treating physicians.

### D. The Issue is Within the Court's Discretion

"Federal Rules of Civil Procedure, rule 35(a), 28 U.S.C., provides that the trial court 'may order' a physical examination of a party whose physical condition is in issue. It is clear that whether such a motion should be granted rests in the sound discretion of the court." *Bucher v. Krause*, 200 F.2d 576, 584 (7th Cir. 1953). "[D]iscretion denotes the absence of a hard and fast rule. Being a range, not a point, discretion allows two decision-makers-on virtually identical facts to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion." *Johnson v. Jung*, 242 F.R.D. 481, 483–84 (N.D. Ill. 2007) (Internal quotations and citations omitted).

Wells Fargo's motion cannot properly be considered in a vacuum. The Court will recall that up until the Court ordered production of cloned discovery from the *Hernandez* case, Wells Fargo had aggressively argued "proportionality" when the Garcias sought corporate level documents in Discovery. Wells Fargo seemed to have very little interest in conducting any real discovery in this case until the Court ordered production of the *Hernandez* materials. As soon as

10

the Court ordered Wells Fargo to produce the cloned discovery Wells Fargo pivoted to an unbounded discovery strategy.

For example, Wells Fargo, after having sought no testimony in the case prior to the cloned discovery order, immediately noticed nearly 30 non-party depositions to be taken over a ten-day period, with many of those days including multiple overlapping depositions. So far, Wells Fargo has taken or scheduled the depositions of five of the Garcia family's treating physicians but subpoenaed twenty-two different treating physicians (some with as few as a single treatment appointment). Each Doctor's deposition could have been competently conducted in less than an hour. In each instance, Wells Fargo's counsel needlessly spent hours addressing irrelevant matters, utilizing the same script for each doctor's examination irrespective of its applicability to the actual facts of the physician's treatment. Wells Fargo has also thus far taken the depositions of eight fact witnesses. Additionally, with respect to written discovery, Wells Fargo served 12 interrogatories and 28 requests for production on the Trustee, prior to the Garcias being substituted in as Plaintiffs. Since then, Wells Fargo has served a total of 22 interrogatories on Julia and 23 on Eduardo. Wells Fargo has also served 57 requests for production on Julia and 56 on Eduardo. In addition, Wells Fargo served 10 requests for production on each of the Garcias' children. Wells Fargo's most recent interrogatory and 15 requests for production refer to a timeline of January 1, 2002 until the present date. The subject property was not purchased until December 17, 2002 and the loan foreclosed on was a refinance dated January 26, 2006. Most importantly, Wells Fargo's wrongful denial of a loan modification was in 2010, and the order of possession allowing the taking of the Family Home was in 2011.

The Garcias have been extremely patient and cooperative as Wells Fargo has exhausted the bounds of all reasonably necessary discovery in this matter to prepare this case for trial. The

11

Garcias and their counsel have extended every courtesy and consideration during this process as Wells Fargo finally decided to engage in discovery in the last 60 days of the discovery period in this case.

As previously discussed, the Garcias had already consented to two IMEs for Mrs. Garcia, and one for Mr. Garcia. They even offered to reach out to the IME physicians' offices directly to schedule the IMEs so as to avoid any delay. However, once the terms were negotiated, Wells Fargo unilaterally changed the terms in a material way. Counsel for Wells Fargo sent a simple email to the Garcias' counsel stating that "due to issues with the schedule" (noting that no appointment dates were ever proffered or discussed), Wells Fargo would be switching doctors. But buried in the details was also the note that instead of the previously agreed two-hour exam, the new exam would now take 6-7.5[1] hours. The Garcias rightfully objected to this material change, requesting that if this new doctor could not shorten their exam time, that Wells Fargo seek a different expert that could honor the previously agreed upon two-hour exam.

Defendant's counsel responded that it would not be seeking a different examiner, and to notify them if the Garcias were no longer willing to consent so that they could then file a motion to compel. The Garcias also note that, despite this tactic by Wells Fargo, on the afternoon of April 15, 2022, they honored their agreement to proceed with Mrs. Garcia's physical IME, and this was despite the fact that Wells Fargo sent her to Merrillville, Indiana, a drive that took one hour and forty minutes *each way*, requiring Mr. Garcia to take the day off of work in order to drive his wife, as her medical issues prevent her from driving. If Wells Fargo was truly interested in an independent medical opinion of the Garcias' health, and not instead seeking a hired gun for trial that will simultaneously cause harm to Mrs. Garcia's mental health, surely there are thousands of

---

[1] 7.5 hours does not account for what will likely be significant additional time for Eduardo Garcia due to the fact that he requires interpreter services.

suitable, qualified doctors in the Chicagoland area, where Mrs. Garcia could get to with a fifteen-minute Uber ride.

It is important to note that the Garcias did not object to Wells Fargo's material change just for the sake of objecting. Mrs. Garcia has been diagnosed with Fibromyalgia, Chronic Migraines, Major Depressive Disorder, Stress, and Anxiety. Wells Fargo's wrongful taking of the Family Home in 2011 devastated her. Wells Fargo's letter to the Garcia's in 2019 admitting the wrongful taking was in many ways even more devastating to her. This is also without Mrs. Garcia knowing that Wells Fargo could have completely avoided this entire situation had Wells Fargo just honored the terms of its 2011 consent decree with the O.C.C.

This case has been a considerable stressor for Mrs. Garcia's mental and physical health. Initially agreeing to the IMEs did not come easy for her. But then having Wells Fargo change the terms and almost quadruple the time of the exam was just too much. Subjecting Julia Garcia to 7.5 hours of exams, especially when coupled with the actual physical pain of her fibromyalgia and migraines, which are triggered by stressful situations, will be severely detrimental to her mental health. When informed of the requested change, Mrs. Garcia broke down in tears and was unable to continue the phone call until the next day.

No reasonable person can claim that Mrs. Garcia is "faking" or "exaggerating" her conditions for the sake of this case. Her doctors diagnosed and treated her for these conditions for more than a decade before Wells Fargo finally admitted to her family that it wrongfully took their Family Home. Wells Fargo's posture that they should be entitled to such an extensive IME on the basis that there are so many years of medical treatment is illogical, but regardless, it is a problem of Wells Fargo's own making. Wells Fargo could have completely avoided this tragedy by simply freezing all of its ongoing foreclosures in 2011, when it entered the first consent decree with the

O.C.C., until it conducted a reasonable investigation. Instead, Wells Fargo raced through an order of possession approximately ten days after signing the consent decree and kicked the Garcias out of their Family Home. Wells Fargo then spent almost a decade dithering among its own internal teams before finally notifying the Garcias in July 2019 of their admitted wrongdoing.

## Conclusion

Wells Fargo has access to the medical professionals who provided truly independent treatment to the Garcias for more than a decade, and to voluminous medical records. The Garcias have not retained a medical expert and are not retaining a medical expert in this case. Any expert Wells Fargo wishes to retain can review both the medical records and the testimony of the treating physicians to formulate their opinions. There is no good cause for an IME. If the Court disagrees, there is still no basis to order a 7.5-hour IME. Combined with a review of the medical records and testimony of the independent treating physicians, a two-hour exam should be more than sufficient. As such, should the Court find there is good cause for an IME, the Garcias request that the Court bind Wells Fargo to the two-hour exam previously agreed to by the Parties.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

Dated: April 18, 2022

*Respectfully submitted,*

**EDUARDO GARCIA** and
**JULIA GARCIA**

*/s/ Nick Wooten*
Nicholas H. Wooten
NICK WOOTEN, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
nick@nickwooten.com

Rusty A. Payton,
PAYTON LEGAL GROUP
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
(773) 682-5210
info@payton.legal

Salvador J. Lopez
ROBSON & LOPEZ, LLC
180 W. Washington Street, Suite 700
Chicago, Illinois 60602
(312) 523-2166
lopez@robsonlopez.com

*Counsel for the Plaintiffs*

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a copy of the foregoing **PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION TO COMPEL INDEPENDENT MEDICAL EXAMINATION OF PLAINTIFFS [D.E. 77, 78] AND PLAINTIFFS' CROSS-MOTION FOR PROTECTIVE ORDER** was served via the Court's Electronic Filing System on all parties and counsel of record on the following date.

Dated: April 18, 2022                         By: */s/ Nick Wooten*

                                                              One of Plaintiffs' Attorneys