# Exhibit 4

# 2011 CONSENT ORDER

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | AA-EC-11-19 |
| Wells Fargo Bank, N.A. ) | |
| Sioux Falls, South Dakota ) | |
| ) | |

**CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller"), through his national bank examiners and other staff of the Office of the Comptroller of the Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage servicers, has conducted an examination of the residential real estate mortgage foreclosure processes of Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank"). The OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings. The OCC has informed the Bank of the findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011 ("Stipulation and Consent"), that is accepted by the Comptroller. By this Stipulation and Consent, which is incorporated by reference, the Bank has consented to the issuance of this Consent Cease and Desist Order ("Order") by the Comptroller. The Bank has committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

foreclosure processes.  The Bank has begun implementing procedures to remediate the practices addressed in this Order.

ARTICLE I

COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)  The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 8,900,000 residential mortgage loans.  During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions.  The Bank's foreclosure inventory grew substantially from January 2009 through December 2010.

(2)  In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a)  filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b)  filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

2

(c)  litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d)  failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e)  failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f)  failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3)  By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

ARTICLE II

COMPLIANCE COMMITTEE

(1)  The Board shall maintain a Compliance Committee of at least three (3) directors, of which at least two (2) are outside directors who are not executive officers of the Bank or its holding company as defined in 12 C.F.R. § 215.2(e)(1) of Regulation O.  In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge").  The Compliance

3

Committee shall be responsible for monitoring and coordinating the Bank's compliance with the provisions of this Order. The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2) Within ninety (90) days of this Order, and within thirty (30) days after the end of each quarter thereafter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail actions taken to comply with each Article of this order, and the results and status of those actions.

(3) The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Deputy Comptroller for Large Bank Supervision ("Deputy Comptroller") and the Examiner-in-Charge within ten (10) days of receiving such report.

ARTICLE III

COMPREHENSIVE ACTION PLAN

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan containing a complete description of the actions that are necessary and appropriate to achieve compliance with Articles IV through XII of this Order ("Action Plan"). In the event the Deputy Comptroller asks the Bank to revise the Action Plan, the Bank shall promptly make the requested revisions and resubmit the Action Plan to the Deputy Comptroller and the Examiner-in-Charge. Following acceptance of the Action Plan by the Deputy Comptroller, the Bank shall not take any action that would constitute a significant deviation from, or material change to, the requirements of the Action Plan or this

4

Order, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller.

(2) The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the Action Plan. The Board shall further ensure that, upon implementation of the Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and loss mitigation activities (as used herein, the phrase "loss mitigation" shall include, but not be limited to, activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure and be referred to as either "Loss Mitigation" or "Loss Mitigation Activities"), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions. In order to comply with these requirements, the Board shall:

(a) require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b) follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(c) require corrective action be taken in a timely manner for any non-compliance with such actions.

(3) The Action Plan shall address, at a minimum:

(a) financial resources to develop and implement an adequate infrastructure to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(b)  organizational structure, managerial resources, and staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(c)  metrics to measure and ensure the adequacy of staffing levels relative to existing and/or future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(d)  governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the Membership Rules of MERSCORP, servicing guides of the Government Sponsored Enterprises ("GSEs") or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

(4)  The Action Plan shall specify timelines for completion of each of the requirements of Articles IV through XII of this Order.  The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

ARTICLE IV

COMPLIANCE PROGRAM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy

Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the

mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification,

comply with all applicable Legal Requirements, OCC supervisory guidance, and the

requirements of this Order and are conducted in a safe and sound manner ("Compliance

Program").  The Compliance Program shall be implemented within one hundred twenty (120)

days of this Order.  Any corrective action timeframe in the Compliance Program that is in excess

of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The

Compliance Program shall include, at a minimum:

(a)  appropriate written policies and procedures to conduct, oversee, and monitor

mortgage servicing, Loss Mitigation, and foreclosure operations;

(b)  processes to ensure that all factual assertions made in pleadings, declarations,

affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete,

and reliable; and that affidavits and declarations are based on personal knowledge or a review of

the Bank's books and records when the affidavit or declaration so states;

(c)  processes to ensure that affidavits filed in foreclosure proceedings are

executed and notarized in accordance with state legal requirements and applicable guidelines,

including jurat requirements;

(d)  processes to review and approve standardized affidavits and declarations for

each jurisdiction in which the Bank files foreclosure actions to ensure compliance with

applicable laws, rules and court procedures;

(e)  processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security, and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;

(f)  processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(g)  processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(h)  processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;

(i)  processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;

(j) ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k) measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

(l) processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m) processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n) processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed. Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews. An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o) processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that

appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p)  appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

(q)  appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

ARTICLE V

THIRD PARTY MANAGEMENT

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions, including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third-Party Providers").  Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The policies and procedures shall include, at a minimum:

(a)  appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;

(b)  measures to ensure that all original records transferred from the Bank to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c)  measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;

(d)  processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(e)  processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(f)  processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g)  processes to review customer complaints about Third-Party Provider services;

(h)  processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i)  a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j)  a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.

ARTICLE VI

MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan to ensure appropriate controls and oversight of the Bank's activities with respect to the Mortgage Electronic Registration System ("MERS") and compliance with MERSCORPS's membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan").  The MERS Plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The MERS Plan shall include, at a minimum:

(a)  processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Bank;

(b)  processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Bank) are executed by a certifying officer authorized by MERS and approved by the Bank;

(c)  processes to ensure that the Bank maintains up-to-date corporate resolutions from MERS for all Bank employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d)  processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System ("CRMS");

(e)  processes to ensure the accuracy and reliability of data reported to MERSCORP and MERS, including monthly system-to-system reconciliations for all MERS

13

mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports. Unresolved items must be maintained on open-item aging reports and tracked until resolution. The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

   (f) an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

 (2) The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

ARTICLE VII

FORECLOSURE REVIEW

 (1) Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio. The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage

14

note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

    (2)  Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

    (a)  the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank.  The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

    (b)  expertise and resources to be dedicated to the Foreclosure Review;

    (c)  completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

    (d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3)  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a)  whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

(b)  whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c)  whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d)  whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e)  whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f)  whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

(g)  whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

(h)  whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

ARTICLE VIII

MANAGEMENT INFORMATION SYSTEMS

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities to ensure the timely delivery of complete and accurate information to permit effective decision-making.  The MIS plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timeframe that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The plan shall include, at a minimum:

(a)  a description of the various components of MIS used by the Bank for foreclosure and Loss Mitigation or loan modification activities;

(b)  a description of and timetable for any needed changes or upgrades to:

(i)  monitor compliance with all applicable Legal Requirements and supervisory guidance, and the requirements of this Order;

(ii)  ensure the ongoing accuracy of records for all serviced mortgages, including, but not limited to, records necessary to establish ownership and the right to foreclose by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to the borrower; and

(iii)  measures to ensure that Loss Mitigation, loan foreclosure, and modification staffs have sufficient and timely access to information provided by the borrower regarding loan foreclosure and modification activities;

(c)  testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

ARTICLE IX

MORTGAGE SERVICING

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan, along with a timeline for ensuring effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities:  (i) to ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate; and (iv) to ensure that decisions concerning Loss Mitigation or loan modifications continue to be made and communicated in a timely fashion.  Prior to submitting the plan, the Bank shall conduct a review to determine whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a loan modification, and whether Bank employee compensation practices

discourage Loss Mitigation or loan modifications. The plan shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The plan shall include, at a minimum:

(a) measures to ensure that staff handling Loss Mitigation and loan modification requests routinely communicate and coordinate with staff processing the foreclosure on the borrower's property;

(b) appropriate deadlines for responses to borrower communications and requests for consideration of Loss Mitigation, including deadlines for decision-making on Loss Mitigation Activities, with the metrics established not being less responsive than the timelines in the HAMP program;

(c) establishment of an easily accessible and reliable single point of contact for each borrower so that the borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes;

(d) a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact;

(e) measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation, loan modification, and foreclosure activities;

(f) measures to ensure that staff are trained specifically in handling mortgage delinquencies, Loss Mitigation, and loan modifications;

(g)  procedures and controls to ensure that a final decision regarding a borrower's loan modification request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or permanent modification (including the net present value calculations utilized by the Bank, if applicable) by the single point of contact within a reasonable period of time before any foreclosure sale occurs;

(h)  procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that: (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(i)  policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation or modification process, denial of modification requests, the foreclosure process, or foreclosure activities which prevent a borrower from pursuing Loss Mitigation or modification options, and a process for making borrowers aware of the complaint procedures;

(j)  procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(k)  policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and/or escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

21

(l)  policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about loan modification and the pendency of foreclosure proceedings;

(m)  policies and procedures to ensure that foreclosure, Loss Mitigation, and loan modification documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information; and

(n)  policies and procedures to consider loan modifications or other Loss Mitigation Activities with respect to junior lien loans owned by the Bank, and to factor the risks associated with such junior lien loans into loan loss reserving practices, where the Bank services the associated first lien mortgage and becomes aware that such first lien mortgage is delinquent or has been modified.  Such policies and procedures shall require the ongoing maintenance of appropriate loss reserves for junior lien mortgages owned by the Bank and the charge-off of such junior lien loans in accordance with FFIEC retail credit classification guidelines.

ARTICLE X

RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1)  Within ninety (90) days of this Order, the Bank shall conduct a written, comprehensive assessment of the Bank's risks in mortgage servicing operations, particularly in the areas of Loss Mitigation, foreclosure, and the administration and disposition of other real estate owned, including, but not limited to, operational, compliance, transaction, legal, and reputational risks.

(2)  The Bank shall develop an acceptable plan to effectively manage or mitigate identified risks on an ongoing basis, with oversight by the Bank's senior risk managers, senior management, and the Board.  The assessment and plan shall be provided to the Deputy Comptroller and the Examiner-in-Charge within one hundred twenty (120) days of this Order.

ARTICLE XI

APPROVAL, IMPLEMENTATION AND REPORTS

(1)  The Bank shall submit the written plans, programs, policies, and procedures required by this Order for review and determination of no supervisory objection to the Deputy Comptroller and the Examiner-in-Charge within the applicable time periods set forth in Articles II through X.  The Bank shall adopt the plans, programs, policies, and procedures required by this Order upon submission to the OCC, and shall immediately make any revisions requested by the Deputy Comptroller or the Examiner-in-Charge.  Upon adoption, the Bank shall immediately implement the plans, programs, policies, and procedures required by this Order and thereafter fully comply with them.

(2)  During the term of this Order, the required plans, programs, policies, and procedures shall not be amended or rescinded in any material respect without the prior written approval of the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Order).

(3)  During the term of this Order, the Bank shall revise the required plans, programs, policies, and procedures as necessary to incorporate new or changes to applicable Legal Requirements and supervisory guidelines.

23

(4)  The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Order.

(5)  Within thirty (30) days after the end of each calendar quarter following the date of this Order, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The progress report shall include information sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC.  The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(6)  All communication regarding this Order shall be sent to:

(a)  Vance S. Price
Deputy Comptroller
Large Bank Supervision
Office of the Comptroller of the Currency
250 E Street, SW
Washington, DC 20219

(b)  Scott J. Wilson
Examiner-in-Charge
National Bank Examiners
343 Sansome Street, Suite 1150
MAC A0163-110
San Francisco, CA, 94163-0101

ARTICLE XII

COMPLIANCE AND EXTENSIONS OF TIME

(1)  If the Bank contends that compliance with any provision of this Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Order, the Board shall submit a written request to the Deputy Comptroller asking for relief.  Any

24

written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision, that require the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Order.

(2)  All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies.  The Deputy Comptroller's decision concerning a request is final and not subject to further review.

ARTICLE XIII

OTHER PROVISIONS

(1)  Although this Order requires the Bank to submit certain actions, plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2)  In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a)  authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b)  require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(c)  follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

25

(d)  require corrective action be taken in a timely manner of any material non-compliance with such actions.

(3)  If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(4)  This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the unsafe or unsound practices described in the Comptroller's Findings set forth in Article I of this Order.  Provided, however, that nothing in this Order shall prevent the Comptroller from instituting other enforcement actions against the Bank or any of its institution-affiliated parties, including, without limitation, assessment of civil money penalties, based on the findings set forth in this Order, or any other findings.

(5)  This Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(6)  Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.

(7)  The terms and provisions of this Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to this Order.  The Bank shall integrate any foreclosure or mortgage servicing activities done by a subsidiary into its plans, policies, programs, and processes required by this Order.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

(8)  This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States.  Nothing in this Order shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency, to the extent permitted under applicable law.

(9)  The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(10)  Nothing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

(11)  The Bank consents to the issuance of this Order before the filing of any notices, or taking of any testimony or adjudication, and solely for the purpose of settling this matter without a formal proceeding being filed.

IT IS SO ORDERED, this 13th day of April, 2011.


___/s/_____
Vance S. Price
Deputy Comptroller
Large Bank Supervision

27

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| Wells Fargo Bank, N.A. ) | AA-EC-11-19 |
| Sioux Falls, South Dakota ) | |
| ) | |

**STIPULATION AND CONSENT TO THE ISSUANCE**
**OF A CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller")
intends to impose a cease and desist order on Wells Fargo Bank, N.A., Sioux Falls, South
Dakota ("Bank") pursuant to 12 U.S.C. § 1818(b), for unsafe or unsound banking
practices relating to mortgage servicing and the initiation and handling of foreclosure
proceedings.

The Bank, in the interest of compliance and cooperation, enters into this
Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consents
to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Comptroller, through his authorized
representative, and the Bank, through its duly elected and acting Board of Directors,
stipulate and agree to the following:

ARTICLE I
JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the
Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et*
*seq.*

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)     The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)     For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), this Consent Order shall not be construed to be a "cease and desist order" or "consent order", unless the OCC informs the Bank otherwise.

## ARTICLE II
## AGREEMENT

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Consent Order by the Comptroller.

(2)     The Bank consents and agrees that the Consent Order shall (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), (b) become effective upon its execution by the Comptroller through his authorized representative, and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the banking practices described in the Comptroller's Findings set forth in Article I of the Consent Order, to the extent known to the OCC as of the effective date of the Consent Order. However, the banking practices alleged in Article I of the Consent Order may be utilized by the OCC in other future enforcement actions against the Bank or its institution-affiliated parties, including, without limitation, to assess civil money penalties or to establish a pattern or practice of violations or the continuation of a pattern or practice of violations. This release shall not preclude or affect any right of the OCC to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

(7)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest. Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

3

benefit or any legal or equitable right, remedy or claim under this Stipulation or the Consent Order.

## ARTICLE III
## WAIVERS

(1)     The Bank, by consenting to this Stipulation, waives:

(a)     the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

(b)     any and all procedural rights available in connection with the issuance of the Consent Order;

(c)     all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

(d)     all rights to seek any type of administrative or judicial review of the Consent Order;

(e)     any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or this Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

(f)     any and all rights to challenge or contest the validity of the Consent Order.

4

ARTICLE IV
OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise
prevent the Comptroller from taking any other action affecting the Bank if, at any time, it
deems it appropriate to do so to fulfill the responsibilities placed upon it
by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the
Comptroller to enforce the terms of this Consent Order, and nothing in this Stipulation
constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or
authority of any other representative of the United States or an agency thereof, including,
without limitation, the United States Department of Justice, to bring other actions deemed
appropriate.

(3)     The terms of the Stipulation and the Consent Order are not subject to
amendment or modification by any extraneous expression, prior agreements or prior
arrangements between the parties, whether oral or written.


        IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as
his representative, has hereunto set his hand on behalf of the Comptroller.


/s/                                                              April 13, 2011
_____      _____
Vance S. Price                                                  Date
Deputy Comptroller
Large Bank Supervision

5

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


____/s/_____          ____3.31.11_____
David A. Hoyt                   Date


____/s/_____          ____3.31.11_____
Michael J. Loughlin             Date


____/s/_____          ____3/31/11_____
Mark C. Oman                    Date


____/s/_____          _____
John G. Stumpf                  Date


____/s/_____          ____3.31.11_____
Carrie L. Tolstedt              Date


6

# 2013 CONSENT ORDER

**#2013-132**
*Amends* **#2011-051**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | **AMENDS AA-EC-11-19** |
| Wells Fargo Bank, N.A. ) | **#2011-051** |
| Sioux Falls, South Dakota ) | |
| ) | |
| ) | |

**AMENDMENT TO APRIL 13, 2011 CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller") and Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank") hereby agree to the following modifications to Consent Order AA-EC-11-19 dated April 13, 2011 ("2011 Consent Order"). The Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a Stipulation and Consent to the Issuance of an Amendment to 2011 Consent Order ("Amendment to the Consent Order"), dated February 28, 2013 ("Stipulation"), which is accepted by the Comptroller and incorporated by reference herein. Article VII of the 2011 Consent Order is hereby superseded by this Amendment to the Consent Order. This Amendment to the Consent Order, however, does not replace the other remaining Articles of the 2011 Consent Order or the agreement by and between the Bank and the Office of the Comptroller of the Currency ("OCC") dated February 27, 2012, both of which shall remain in effect without modification.

WHEREAS, Article VII of the 2011 Consent Order required the Bank, among other things, to retain an independent consultant (the "IC") to conduct an independent review of certain residential mortgage loan foreclosure actions or proceedings for borrowers who had a

pending or completed foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010 (the "In-Scope Borrower Population"), the purposes of which were set forth in paragraph 3 of Article VII of the 2011 Consent Order (the "Independent Foreclosure Review");

WHEREAS, the Bank has taken steps to comply with its obligations under Article VII of the 2011 Consent Order;

WHEREAS, in the interest of providing the greatest benefit to borrowers potentially affected by the practices at the Bank addressed in the 2011 Consent Order in a more timely manner than would have occurred under the Independent Foreclosure Review, the Office of the Comptroller of the Currency (the "OCC"), the Board of Governors of the Federal Reserve System (the "Board of Governors"), the Bank, and several other financial institutions with mortgage loan servicing operations (collectively referred to as the "Participating Servicers") have agreed to amend their respective 2011 Consent Orders;

WHEREAS, the OCC and the Bank intend that the Bank's obligations under Article VII of the 2011 Consent Order be replaced with the obligations specified in this Amendment to the Consent Order, and ordered pursuant to 12 U.S.C. § 1818(b), which include the Bank: (i) making a cash payment in the amount specified herein to a Qualified Settlement Fund for distribution to the In-Scope Borrower Population in accordance with a distribution plan developed by the OCC and Board of Governors in their discretion; and (ii) taking other loss mitigation or other foreclosure prevention actions in the amount specified herein;

WHEREAS, the amount of any payments to borrowers made pursuant to this Amendment to the Consent Order do not in any manner reflect specific financial injury or harm that may have been suffered by borrowers receiving payments, except as expressly provided for

in this Amendment to the Consent Order, nor do the payments constitute either an admission or a denial by the Bank of wrongdoing or a civil money penalty under 12 U.S.C. § 1818(i);

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

ARTICLE I

QUALIFIED SETTLEMENT FUND AND PAYING AGENT

(1)     Within (15) days of this Amendment to the Consent Order, the Bank (and/or its parent, affiliate, or subsidiary subject to an Amendment to the April 13, 2011 Consent Order of the Board of Governors) will make a cash payment of $765,823,531.00 into a Qualified Settlement Fund (the "Fund") from which payments to the In-Scope Borrower Population, which are borrowers who had a pending or completed foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010, will be made pursuant to a distribution plan developed by the OCC and the Board of Governors (collectively the "Regulators") in their discretion.

(2)     Prior to the Bank's cash payment into the Fund required under Paragraph (1) above, the Bank, in coordination with the other Participating Servicers, shall ensure that the Fund is established.  The Fund shall be established and is intended to be treated at all times as a Qualified Settlement Fund within the meaning of Treas. Reg. § 1.468B-1, 26 C.F.R. § 1.468B-1. Rust Consulting, Inc. (the "Paying Agent") has been retained by the Participating Servicers for the purpose of distributing payments as directed by the Regulators from the Fund to the Participating Servicers' In-Scope Borrower Population and shall serve as the "administrator" at the direction of the Regulators within the meaning of Treas. Reg. § 1.468B-2(k)(3), 26 C.F.R. § 1.468B-2(k)(3).  The agreements pursuant to which the Participating Servicers retain the Paying

Agent shall be subject to prior no objection from the Regulators, and the agreements shall not be amended or modified without obtaining a prior no objection from the Regulators. The Bank will be responsible for its proportionate share, amongst the Participating Servicers, of all administrative costs related to the Fund and the Paying Agent. The Bank may not use any funds from its payment into the Fund or interest accrued on amounts in the Fund for such costs.

ARTICLE II

BORROWER WATERFALL, REGULATOR VERIFICATION
AND DISTRUBUTION PLAN

(1)     Pursuant to this Amendment to the Consent Order, the Bank shall promptly place the In-Scope Borrower Population into categories based upon loan file characteristics as determined by the Regulators (the "Borrower Waterfall").

(2)     The OCC will review and validate the Bank's placement of its In-Scope Borrower Population into the Borrower Waterfall. Upon verification by the OCC, the OCC will instruct the Bank to provide the Paying Agent with the Bank's placement of its In-Scope Borrower Population within the Borrower Waterfall, and at that time the Bank's placement of its In-Scope Borrower Population within the Borrower Waterfall shall be deemed final.

(3)     The Regulators will determine the specific payment amounts applicable to each category of borrower within the Borrower Waterfall in their sole discretion (the "Distribution Plan") and will direct the Paying Agent to distribute payments from the Fund to the In-Scope Borrower Population in accordance with the Distribution Plan established by the Regulators.

(4)     With respect to reviews involving borrowers in the In-Scope Borrower Population who may have been entitled to protection under Sections 521 or 533 of the Servicemembers' Civil Relief Act, (the "SCRA"), 50 U.S.C. App. §§ 521 or 533, and borrowers who may not have been in default during the foreclosure process, the Bank shall either: (a) place the borrower into

the applicable category within the Borrower Waterfall, which will result in the borrower automatically receiving payments made from the Fund in accordance with the Distribution Plan for such category; or (b) instruct the Bank's IC to complete file reviews for such borrowers to determine financial injury related to Sections 521 or 533 or to not being in default. For files reviewed under (b), the borrower will receive payments from the Fund in amounts specified in the June 21, 2012 Financial Remediation Framework where the IC makes a determination of "harm." For files reviewed under (b) where the IC makes a determination of "no harm," the Bank will place the borrower into the next highest Borrower Waterfall category for which such borrower is eligible, which will result in the borrower receiving payment from the Fund in accordance with the Distribution Plan for such category.

   (5)  With respect to the borrowers in the In-Scope Borrower Population who may have been subject to interest rate protections under Section 527 of the SCRA, 50 U.S.C. App. § 527, as part of the Borrower Waterfall placement, the Bank shall either: (a) place the borrower into the highest category within the Borrower Waterfall for which the borrower is eligible, which will result in the borrower automatically receiving payments made from the Fund in accordance with the Distribution Plan for such category; or (b) instruct the IC to complete file reviews for such borrowers to determine financial injury related Section 527. For files reviewed under (b), the borrower will receive payments from the Fund, as calculated pursuant to the methodology outlined in Department of Justice ("DOJ")/Department of Housing and Urban Development ("HUD") National Mortgage Settlement ("NMS") Exhibit H (Consent Judgment entered April 4, 2012), where the IC makes a determination of "harm." For files reviewed under (b) where the IC makes a determination of "no harm," the Bank will place the borrower into the next highest Borrower Waterfall category for which such borrower is eligible, which will result in the

borrower receiving payment from the Fund in accordance with the Distribution Plan for such category.

(6)     If the Bank elects to have the IC continue file review work as described in Paragraphs (4) or (5) above, the IC review work for such files must be completed prior to the OCC's verification of the Borrower Waterfall.  If the IC review work is not complete by such time, the OCC may direct payments from the Fund to such borrowers in accordance with the Distribution Plan for the highest category for which such borrower is eligible.

ARTICLE III

IC REPORTS AND OCC ACCESS TO IFR INFORMATION

(1)     Within three (3) days of the effective date of this Amendment to the Consent Order, the Bank shall confirm that its IC has provided the OCC with the most recent data report(s) previously provided to the Bank's board or appropriate board committee(s).  Within three (3) days of the effective date of this Amendment to the Consent Order, the Bank shall confirm that its IC has completed and provided to the OCC the additional reporting as specified by the OCC with information as of December 31, 2012.  The Bank shall also take all reasonable steps to cause its IC to provide any existing information, as requested by the OCC, to assist the OCC in its analysis and public reporting of Independent Foreclosure Review related activities.

(2)     Consistent with existing examination authority under 12 U.S.C. § 481, the OCC maintains the right to obtain and access all existing material, information, records and/or files used or generated by the Bank, the Bank's IC, and Independent Counsel for the IC, in connection with the 2011 Consent Order Article VII work and this Amendment to the Consent Order.

ARTICLE IV

FORECLOSURE PREVENTION

(1)     By no later than January 7, 2015, the Bank shall provide loss mitigation or other foreclosure prevention actions ("Foreclosure Prevention") in the amount of $1,225,317,650.00. The Bank's Foreclosure Prevention actions shall be in addition to, and shall not be used to fulfill, the Bank's consumer relief obligations under the NMS.

(2)     Well structured loss mitigation actions should focus on foreclosure prevention, which should typically result in benefitting the borrower.  While the Bank's actions may be affected by existing investor requirements, the Bank's foreclosure prevention actions should reflect the following guiding principles:

    (a)     preference should be given to activities designed to keep the borrower in the home;

    (b)     foreclosure prevention actions should emphasize affordable, sustainable, and meaningful home preservation actions for qualified borrowers;

    (c)     foreclosure prevention actions should otherwise provide significant and meaningful relief or assistance to qualified borrowers; and

    (d)     foreclosure prevention actions should not disfavor a specific geography within or among states, nor disfavor low and/or moderate income borrowers, and not discriminate against any protected class of borrowers.

(3)     The Bank shall receive credit for the following Foreclosure Prevention actions set forth in the NMS: (a) first lien modifications; (b) second lien modifications; and (c) short sales/deeds-in-lieu of foreclosure, using the types of creditable activity set forth in the NMS, provided that crediting for purposes of this Amendment to the Consent Order will be based on

7

the unpaid principal balance of the loan.  For purposes of this Amendment to the Consent Order, there are no maximum or minimum restrictions on the amount of any particular activity that is creditable.

(4)     The Bank may also receive credit for other Foreclosure Prevention actions, subject to no objection from the OCC, including:

(a)     interest rate modifications;

(b)     deficiency waivers (measured by the amount of deficiency judgment credited at $.10 for every dollar);

(c)     other Foreclosure Prevention activities (measured by amounts incurred as owing to investors for such activities and including credit on the Bank's or its affiliates' loans held-for-investment calculated using the note rate methodology as used by the Government-Sponsored Enterprises);

(d)     additional Foreclosure Prevention actions that are not expressly specified in this Article;

(e)     the provision of additional cash payments to the Fund (measured as $7 to $10 of credit for each $1 cash commitment); and

(f)     the provision of cash or other resource commitments to borrower counseling or education (measured as $7 to $10 of credit for each $1 cash commitment).

(5)     To the extent practicable, and without prejudice to overall portfolio management, the Bank will attempt to prioritize Foreclosure Prevention actions for the benefit of the In-Scope Borrower Population.  However, all creditable actions benefiting borrowers in the portfolio of the Bank or its affiliates, whether or not in the In-Scope Borrower Population and whether held-

for-investment or serviced-for-others, will be eligible for credit towards the Bank's Foreclosure Prevention actions; provided, that the creditable activity occurs on or after January 7, 2013. Additionally, creditable Foreclosure Prevention actions undertaken by the Bank's parent, affiliate, or subsidiary also subject to an Amendment to the April 13, 2011 Consent Order of the Board Governors shall operate to satisfy the requirements under this Article.

(6)     By May 15, 2013, the Bank shall submit to the OCC a report, in a form and manner acceptable to the OCC, that details the Foreclosure Prevention actions taken by the Bank through April 30, 2013 to fulfill its obligations under this Article and the amount of credit sought towards fulfilling those obligations.  Thereafter, the Bank shall submit such report every forty-five (45) days.  Nothing herein shall require the Bank to report Foreclosure Prevention Actions taken during a particular prior period for which the Bank may in the future seek credit or prohibit the Bank from seeking credit for the Foreclosure Prevention actions taken by the bank during a later reporting period.  Additionally, the Bank shall document its efforts to prioritize the In-Scope Borrower Population when considering creditable Foreclosure Prevention actions.

ARTICLE V

RELEASES

(1)     In recognition of the Bank's cash payments of $765,823,531.00 to the Fund and Foreclosure Prevention commitments made pursuant to this Amendment to the Consent Order, under 12 U.S.C. § 1818(b), the Comptroller will not assess a civil money penalty, under 12 U.S.C. § 1818(i), or initiate any further enforcement actions against the Bank or its subsidiaries or affiliates, including for remedies available pursuant to 12 U.S.C. § 1818(b), with respect to: (a) the findings contained in Article I of the 2011 Consent Order; (b) the matters addressed in Article VII of the 2011 Consent Order (including matters relating to the work or findings of the

IC or IC counsel under the IFR); and (c) any other past mortgage servicing and foreclosure-related practices that are addressed by the 2011 Consent Order through the execution date of this Amendment to the Consent Order, provided that the terms of this Amendment to the Consent Order are satisfied.

(2)     Notwithstanding any other terms of this Amendment to the Consent Order, the Comptroller specifically reserves and does not release the following:

(a)     any right to institute an enforcement action for violations of the Articles contained in the 2011 Consent Order, outside of Article VII of the 2011 Consent Order;

(b)     any and all claims based upon acts or omissions subsequent to the effective date of this Amendment to the Consent Order;

(c)     any and all claims based upon the origination of a residential mortgage loan, or the sale or transfer of a mortgage, security, or whole loan, whether legal or equitable, to, into, or for the benefit of a mortgage-backed security, trust, or special interest entity, including but not limited to mortgage loan securitizations and whole loan sales to such entities, except for any and all claims addressed in Paragraph (1) above;

(d)     any liability arising under the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, or any other statute or law that prohibits discrimination of persons based on race, color, national origin, gender, disability, or any other protected status, including the non-discrimination provisions of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, *et seq.*, or under the Federal Trade Commission Act, 15

10

U.S.C. §§ 41, *et seq.*, or any other statute or law that prohibits unfair or deceptive practices;

(e)     any and all claims against individuals, including current and former employees, agents, officers, directors, or contractors of the Bank; and

(f)     any and all actions to enforce the terms and conditions of this Amendment to the Consent Order.

(3)     In no event shall the Bank request or require any borrower to execute a waiver of any claims against the Bank (including any agent of the Bank) in connection with any payment or Foreclosure Prevention assistance pursuant to this Amendment to the Consent Order. However, nothing herein shall operate to bar the Bank from asserting in the future in any separate litigation, or as part of a settlement related to the Bank's foreclosure and servicing practices, any right that may exist under applicable law to offset the amounts received by a borrower through the distribution process set forth above. Nothing herein shall operate to amend or modify in any respect any preexisting settlement between the Bank or an affiliate thereof and a borrower in the In-Scope Borrower Population.

## ARTICLE VI

### EXTENSIONS AND COMMUNICATIONS

(1)     If the Bank contends that compliance with any provision of this Amendment to the Consent Order requires an exemption or any extension of any timeframe stated within this Amendment to the Consent Order, the Board shall submit a written request to the Deputy Comptroller asking for relief. Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision of this Amendment to the Consent Order, that require the Deputy

11

Comptroller to exempt the Bank from a provision of this Amendment to the Consent Order, or that require an extension of a timeframe within this Amendment to the Consent Order. The Deputy Comptroller's decision concerning a request is final and not subject to further review.

      (2)    All communication regarding this Amendment to the Consent Order shall be sent to:

          (a)    Deputy Comptroller for Large Bank Supervision
                Office of the Comptroller of the Currency
                400 7th Street, SW
                Washington, DC 20219

          (b)    Examiner-in-Charge
                National Bank Examiners
                343 Sansome Street, Suite 1150
                MAC A0163-110
                San Francisco, CA 94163-0101

## ARTICLE VII

## OTHER PROVISIONS

      (1)    Notwithstanding the execution of this Amendment to the Consent Order, the remaining Articles of the 2011 Consent Order aside from Article VII of the 2011 Consent Order and the agreement by and between the Bank and the OCC dated February 27, 2012 remain in full force and effect.

      (2)    If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Amendment to the Consent Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

      (3)    This Amendment to the Consent Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below. This Amendment to the Consent Order shall remain effective and enforceable, except to the

extent that, and until such time as, any provision of this Amendment to the Consent Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(4)     Any time limitations imposed by this Amendment to the Consent Order shall begin to run from the effective date of this Amendment to the Consent Order, as shown below, unless the Amendment to the Consent Order specifies otherwise.

(5)     The terms and provisions of this Amendment to the Consent Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named parties to this Amendment to the Consent Order.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Amendment to the Consent Order.

(6)     This Amendment to the Consent Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States.  Nothing in this Amendment to the Consent Order shall affect any action against the Bank or its institution-affiliated parties by another bank regulatory agency, the United States Department of Justice, or any other law enforcement agency, to the extent permitted under applicable law.

(7)     The terms of this Amendment to the Consent Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(8)     Nothing in the Stipulation or this Amendment to the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation or this Amendment to the Consent Order.

IT IS SO ORDERED, this 28 day of February, 2013.


*/s/Morris R. Morgan*

_____
Morris R. Morgan
Deputy Comptroller
Large Bank Supervision

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| | ) | **AMENDS AA-EC-11-19** |
| Wells Fargo Bank, N.A. | ) | **#2011-051** |
| Sioux Falls, South Dakota | ) | |
| | ) | |
| | ) | |

**STIPULATION AND CONSENT TO THE ISSUANCE OF AN**
**AMENDMENT TO APRIL 13, 2011 CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller")
intends to amend the existing Consent Order, AA-EC-11-19, that was entered into
between the Comptroller and Wells Fargo Bank, N.A., Sioux Falls, South Dakota
("Bank") on April 13, 2011 ("2011 Consent Order"), pursuant to 12 U.S.C. § 1818(b).

The Bank, in the interest of compliance and cooperation, enters into this
Stipulation and Consent to the Issuance of an Amendment to the 2011 Consent Order
("Amendment to the Consent Order"), dated February 28, 2013 ("Stipulation").

In consideration of the above premises, the Comptroller, through his authorized
representative, and the Bank, through its duly elected and acting Board of Directors,
stipulate and agree to the following:

ARTICLE I

JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq*.

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)     The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)     For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), the Amendment to the Consent Order shall not be construed to be a "cease and desist order" or "consent order," unless the OCC informs the Bank otherwise.

ARTICLE II

AGREEMENT

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Amendment to the Consent Order by the Comptroller.

(2)     The Bank consents and agrees that the Amendment to the Consent Order shall:  (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2); (b) become effective upon its execution by the Comptroller through his authorized representative; and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

2

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Amendment to the Consent Order and/or execute the Amendment to the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The terms and provisions of this Stipulation and the Amendment to the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.  Nothing in this Stipulation or the Amendment to the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Stipulation or the Amendment to the Consent Order.

3

ARTICLE III

WAIVERS

(1)     The Bank, by consenting to this Stipulation, waives:

    (a)     any and all procedural rights available in connection with the issuance of the Amendment to the Consent Order;

    (b)     all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

    (c)     all rights to seek any type of administrative or judicial review of the Amendment to the Consent Order;

    (d)     any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or the Amendment to the Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

    (e)     any and all rights to challenge or contest the validity of the Amendment to the Consent Order.

ARTICLE IV

OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

4

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the
Comptroller to enforce the terms of the Amendment to the Consent Order, and nothing in
this Stipulation constitutes, nor shall the Bank contend that it constitutes, a waiver of any
right, power, or authority of any other representative of the United States or an agency
thereof, including, without limitation, the United States Department of Justice, to bring
other actions deemed appropriate.

(3)     The terms of this Stipulation and the Amendment to the Consent Order are
not subject to amendment or modification by any extraneous expression, prior
agreements or prior arrangements between the parties, whether oral or written.


IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as
his representative, has hereunto set his hand on behalf of the Comptroller.


*/s/Morris R. Morgan*                                    *February 28, 2013*

_____                        _____
Morris R. Morgan                                        Date
Deputy Comptroller
Large Bank Supervision

5

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


/s/                                                     2/21/13
_____                    _____
Michael J. Heid                                   Date


/s/                                                     2/25/13
_____                    _____
David A. Hoyt                                     Date


/s/                                                     2/22/13
_____                    _____
Michael J. Loughlin                            Date


/s/                                                     2/21/13
_____                    _____
Avid Modjtabai                                   Date


/s/                                                     2/21/13
_____                    _____
Timothy J. Sloan                                Date


/s/                                                     2/20/13
_____                    _____
John G. Stumpf                                  Date


/s/                                                     2/21/13
_____                    _____
Carrie L. Tolstedt                              Date


/s/                                                     2/20/13
_____                    _____
Nicholas G. Moore                            Date

6

*/s/*

_____

Philip J. Quigley

*2/25/13*

_____

Date

7

# 2015 CONSENT ORDER

**#2015-067**
*Amends* **#2011-051** *and* **#2013-132**

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | AMENDS AA-EC-11-19 |
| Wells Fargo Bank, N.A. ) | and |
| Sioux Falls, South Dakota ) | #2013-132 |

**CONSENT ORDER AMENDING THE
2011 CONSENT ORDER and 2013 AMENDMENT TO THE 2011 CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller") and

Wells Fargo Bank, National Association, Sioux Falls, South Dakota ("Bank") hereby agree to

amendments of Consent Order, AA-EC-11-19, dated April 13, 2011 ("2011 Consent Order"),

and the Amendment to the 2011 Consent Order, dated February 28, 2013 ("2013 ACO"),

(collectively, the "Consent Order").[1] The Bank, by and through its duly elected and acting

Board of Directors ("Board"), has executed a Stipulation and Consent to the Issuance of an

Amendment to the Consent Order ("Amendment"), dated June 16, 2015 ("Stipulation"), which

is accepted by the Comptroller and incorporated by reference herein.

WHEREAS, the Bank has failed to comply with Articles II, III, IV, VIII and IX of the

Consent Order. The fifteen (15) remaining actionable items of the ninety-eight (98) actionable

items in the Consent Order are included in this Amendment;

WHEREAS, the Bank is in continuing noncompliance with and in violation of the

Consent Order, and continues to engage in unsafe and unsound practices;

---

[1] The 2011 Consent Order remains in full force and effect, as amended herein.

1

WHEREAS, upon execution of this Amendment, the OCC is placing the Bank under the following supervisory restrictions: (1) no execution of new contracts or the amendment or renewal of existing contracts beyond current loan volume specified in existing contracts for the acquisition, by the Bank, of residential mortgage servicing, residential mortgage servicing rights, residential mortgage loans with servicing, or residential mortgage origination business entities until termination of the Consent Order (this does not apply to originations or refinancings by the Bank, contracts for new residential mortgage loans through the Bank's broker or correspondent channels, or other contractual relationships where the Bank does not ultimately service the loans, and this is not intended to disrupt any of the Bank's existing residential mortgage servicing related contracts); (2) no execution of new contracts for the Bank to perform residential mortgage servicing for other parties until termination of the Consent Order; (3) no new residential mortgage servicing related activities may be outsourced or sub-serviced to other parties without prior OCC supervisory non-objection until termination of the Consent Order (this is not intended to disrupt any of the Bank's existing residential mortgage servicing related contracts, outsourced activities, or obligations pursuant to legal settlement, nor prohibit new contracts to outsource activities that are currently outsourced); (4) no new off-shoring of residential mortgage servicing related activities until termination of the Consent Order; and (5) no new appointments of senior officers who have responsibility for residential mortgage servicing, residential mortgage servicing operations, residential mortgage servicing risk management, and residential mortgage servicing compliance without prior OCC supervisory non-objection until termination of the Consent Order;

WHEREAS, the OCC will also take additional supervisory and/or enforcement action, including possible civil money penalties, subject to all appropriate procedural processes, in

order to address the Bank's overall noncompliance with the Consent Order, the nature and severity of which will reflect the nature, length and severity of the Bank's continued noncompliance through final termination of the Consent Order;

WHEREAS, notwithstanding this Amendment, the OCC continues to retain oversight and jurisdiction of the Independent Foreclosure Review Qualified Settlement Fund 1 ("IFR QSF1") established by the 2013 ACO for the administration of payments to borrowers of OCC regulated institutions until such time as the paying agent is directed to file a final return with the Internal Revenue Service ("IRS") for IFR QSF1 and IFR QSF1 is thereafter terminated; and

WHEREAS, the OCC has determined that uncashed payments to borrowers of OCC regulated institutions should remain available to such borrowers, or such borrowers' rightful heirs, through the states' escheatment processes, after IFR QSF1 is terminated.

ARTICLE I

COMPTROLLER'S FINDINGS

(1)     The Comptroller's Findings under Article I of the Consent Order are hereby incorporated in full.

(2)     The OCC has determined the Bank has failed to comply with Articles II, III, IV, VIII, and IX of the Consent Order.

(3)     The OCC has determined the Bank is in continuing noncompliance with and in violation of the Consent Order, and continues to engage in unsafe and unsound practices.

(4)     This Amendment includes the fifteen (15) remaining actionable items under the Consent Order and imposes business restrictions upon the Bank through termination of the Consent Order.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

3

ARTICLE II

COMPLIANCE COMMITTEE

The provisions of Article II of the Consent Order are hereby revised as follows:

(1)     The Board shall continue to maintain a Compliance Committee of at least three (3) directors, of which at least two (2) are outside directors who are not executive officers of the Bank or its holding company as defined in 12 C.F.R. § 215.2(e)(1) of Regulation O.    In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge"). The Compliance Committee shall be responsible for monitoring and coordinating the Bank's compliance with the provisions of this Amendment.  The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2)     Within thirty (30) days after the end of each quarter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail actions taken to comply with each remaining article of the Consent Order, and the results and status of those actions.

(3)     The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Examiner-in-Charge within ten (10) days of receiving such report.

ARTICLE III

COMPREHENSIVE ACTION PLAN

The provisions of Article III of the Consent Order are hereby revised as follows:

(1)     The Bank has submitted to the Examiner-in-Charge an update to its action plan containing a complete description of the actions that are necessary and appropriate to achieve

4

compliance with Articles II, III, IV, VIII and IX of the Consent Order (the updated action plan and all previously accepted action plans and updates are collectively referred to as the "Revised Action Plan"). The Bank is required to execute all items contained within the Revised Action Plan. In the event the Deputy Comptroller of Large Bank Supervision ("Deputy Comptroller") or the Examiner-in-Charge asks the Bank to further amend the Revised Action Plan, the Bank shall promptly make the requested revisions and resubmit the Revised Action Plan to the Examiner-in-Charge and the Bank shall not take any action that would constitute a significant deviation from, or material change to, the requirements of the Revised Action Plan, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller or the Examiner-in-Charge.

(2)    The Board shall ensure that the Bank achieves and thereafter maintains compliance with the Consent Order, including, without limitation, successful implementation of the Revised Action Plan. The Board shall further ensure that, upon implementation of the Revised Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and Loss Mitigation activities (as defined in the 2011 Consent Order), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions. In order to comply with these requirements, the Board shall:

(a)  require the timely reporting by Bank management of such actions directed by the Board to be taken under this Amendment;

(b)  follow-up on any noncompliance with such actions in a timely and appropriate manner; and

(c)  require corrective action be taken in a timely manner for any noncompliance with such actions.

(3)     The Revised Action Plan includes:

(a)  all actions required to complete the remedial activities and validation of such actions to ensure compliance with the requirements of this Amendment;

(b)  financial resources to develop and implement an adequate infrastructure to support and execute the Revised Action Plan;

(c)  organizational structure, managerial resources, and staffing to support the remedial activities required by the Revised Action Plan;

(d)  metrics to measure and assess effectiveness of remedial action required by the Revised Action Plan; and

(e)  governance and controls designed to comply with all Legal Requirements (as defined in the 2011 Consent Order), supervisory guidance, and the requirements of this Amendment.

(4)     The Revised Action Plan specifies timelines for completion of each of the requirements of Articles II, III, IV, VIII, and IX of the Consent Order.  The timelines in the Revised Action Plan shall be consistent with any deadlines set forth in this Amendment.

ARTICLE IV

COMPLIANCE PROGRAM

(1)     The Bank has demonstrated compliance with all of the requirements of Article IV of the Consent Order except for the following provisions, which remain in noncompliance:

(a)     the Bank shall implement its Revised Action Plan and ensure its compliance program, at a minimum, includes:

(i)  processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf

6

of the Bank are accurate, complete, timely, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Bank's books and records when the affidavit or declaration so states;

(ii)  processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(iii)  processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and designed to comply with all applicable Legal Requirements and OCC supervisory guidance;

(iv)  ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(v)  measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

(vi)  processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within

the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied; and

(vii) appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

ARTICLE V

THIRD PARTY MANAGEMENT

(1)    The OCC has determined the Bank has demonstrated compliance with Article V of the Consent Order.

ARTICLE VI

MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1)    The OCC has determined the Bank has demonstrated compliance with Article VI of the Consent Order.

ARTICLE VII

FORECLOSURE REVIEW

(1)    Article VII of the 2011 Consent Order was superseded by the 2013 ACO.

(2)    The OCC has determined the Bank has demonstrated compliance with the requirements of the 2013 ACO.

ARTICLE VIII

MANAGEMENT INFORMATION SYSTEMS

(1)    The Bank has demonstrated compliance with all of the requirements of Article

8

VIII of the Consent Order except for the following provisions, which remain in noncompliance:

> (a)  the Bank shall implement its Revised Action Plan and ensure its management information systems ("MIS") for foreclosure and Loss Mitigation (as defined in the 2011 Consent Order) or loan modification activities provide timely delivery of complete and accurate information to permit effective decision-making, and include, at a minimum: testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

ARTICLE IX

MORTGAGE SERVICING

(1)     The Bank has demonstrated compliance with all of the requirements of Article IX of the Consent Order except for the following provisions, which remain in noncompliance:

> (a)  the Bank shall implement its Revised Action Plan and ensure effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities, including, at a minimum:

>> (i)  reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate;

>> (ii)  expansion of the single point of contact program so that each borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes; and

(iii)  a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact.

## ARTICLE X

### RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1)     The OCC has determined the Bank has demonstrated compliance with Article X of the Consent Order.

## ARTICLE XI

### APPROVAL, IMPLEMENTATION AND REPORTS

The provisions of Article XI of the Consent Order are hereby revised as follows:

(1)     The Bank shall submit any revised plans required by this Amendment for review to the Examiner-in-Charge determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge.  The Bank shall adopt and implement the revised plans upon submission to the OCC, and shall immediately modify its plans in accordance with any revisions directed by the Deputy Comptroller or the Examiner-in-Charge.

(2)     Any determination of no supervisory objection to the Revised Action Plan does not constitute an extension of the compliance deadlines for previously approved plans submitted pursuant to the Consent Order.

(3)     Following the issuance of this Amendment, the Bank shall not amend or deviate from the revised plans in any material respect without the prior written approval of the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Amendment).

(4)     Following the issuance of this Amendment, the Bank shall further revise the plans as necessary to incorporate new or changes to applicable Legal Requirements and supervisory guidelines.

(5)     The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the revised plans required by this Amendment.

(6)     Within forty (40) days after the end of each calendar quarter following the issuance of this Amendment, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Amendment and the results thereof.  The progress report shall include information sufficient to validate compliance with the Consent Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC.  The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(7)     All communication regarding the Consent Order shall be sent to:

> Bradley Linskens
> Examiner-in-Charge
> National Bank Examiners
> 343 Sansome Street, Suite 1150
> MAC A0163-110
> San Francisco, CA, 94163-0101

ARTICLE XII

COMPLIANCE AND EXTENSIONS OF TIME

The provisions of Article XII of the Consent Order are hereby revised as follows:

(1)     If the Bank contends that compliance with any provision of the Consent Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Amendment, the Board shall submit a written request to the Deputy Comptroller asking for relief.  Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from

complying with a provision, that require the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Amendment.

(2)     All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies.  The Deputy Comptroller's decision concerning a request is final and not subject to further review.

ARTICLE XIII

OTHER PROVISIONS

The provisions of Article XIII of the Consent Order are hereby revised as follows:

(1)     The Bank is in continuing noncompliance with and in violation of the Consent Order, and continues to engage in unsafe and unsound practices.

(2)     The OCC will take additional supervisory and/or enforcement action, including possible civil money penalties, subject to all appropriate procedural processes, in order to address the Bank's overall noncompliance with the Consent Order, the nature and severity of which will reflect the nature, length and severity of the Bank's continued noncompliance through final termination of the Consent Order.

(3)     By stipulating to the issuance of this Amendment, the Bank has not consented to any enforcement actions beyond those enumerated in this Amendment, and fully retains its right to contest future action.

(4)     Notwithstanding any other terms of this Amendment, the Comptroller specifically reserves and does not release the following:

(a)  any right to institute an enforcement action for violations of the Articles contained in the Consent Order, outside of Article VII of the 2011 Consent

12

Order, including the assessment of civil money penalties;

(b) any and all claims based upon acts or omissions subsequent to the effective date of the 2013 ACO;

(c) any and all claims based upon the origination of a residential mortgage loan, or the sale or transfer of a mortgage, security, or whole loan, whether legal or equitable, to, into, or for the benefit of a mortgage-backed security, trust, or special interest entity, including but not limited to mortgage loan securitizations and whole loan sales to such entities, except for any and all claims addressed in subparagraph (b) above;

(d) any liability arising under the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, or any other statute or law that prohibits discrimination of persons based on race, color, national origin, gender, disability, or any other protected status, including the non-discrimination provisions of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, *et seq.*, or under the Federal Trade Commission Act, 15 U.S.C. §§ 41, *et seq.*, or any other statute or law that prohibits unfair or deceptive practices;

(e) any and all claims against individuals, including current and former employees, agents, officers, directors, or contractors of the Bank; and

(f) any and all actions to enforce the terms and conditions of this Amendment.

(5)     Although this Amendment requires the Bank to submit certain action plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

13

(6)     In each instance in the Consent Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a)  authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of the Consent Order;

(b)  require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of the Consent Order;

(c)  follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

(d)  require corrective action be taken in a timely manner of any material non compliance with such actions.

(7)     If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in the Consent Order or Amendment shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(8)     This Amendment is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below.  The Consent Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of the Consent Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(9)     Any time limitations imposed by this Amendment shall begin to run from the

effective date of this Amendment, as shown below, unless the Amendment specifies otherwise.

(10)     The terms and provisions of the Consent Order and Amendment apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to the Consent Order or Amendment.  The Bank shall integrate any foreclosure or mortgage servicing activities done by a subsidiary into its plans, policies, programs, and processes required by the Consent Order and Amendment.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of the Consent Order and Amendment.

(11)     This Amendment is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States.  Nothing in this Amendment shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency, to the extent permitted under applicable law.

(12)     The terms of this Amendment, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(13)     Nothing in the Stipulation to this Amendment, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation to this Amendment.

(14)     The Bank consents to the issuance of this Amendment before the filing of any notices, or taking of any testimony or adjudication, and solely for the purpose of settling this matter without a formal proceeding being filed.

ARTICLE XIV

<u>BUSINESS RESTRICTIONS</u>

(1)     The Bank shall not execute any new contracts or amend or renew existing

contracts beyond current loan volume specified in existing contracts for the acquisition, by the

Bank, of residential mortgage servicing, residential mortgage servicing rights, residential

mortgage loans with servicing, or residential mortgage origination business entities until

termination of the Consent Order.  This does not apply to originations or refinancings by the

Bank, contracts for new residential mortgage loans through the Bank's broker or correspondent

channels, or other contractual relationships where the Bank does not ultimately service the

loans, and this is not intended to disrupt any of the Bank's existing residential mortgage

servicing related contracts.

(2)     The Bank shall not execute any new contracts for the Bank to perform

residential mortgage servicing for other parties until termination of the Consent Order.

(3)     The Bank shall not outsource or sub-service any new residential mortgage

servicing related activities to other parties without prior OCC supervisory non-objection until

termination of the Consent Order.  This is not intended to disrupt any of the Bank's existing

residential mortgage servicing related contracts, outsourced activities, or obligations pursuant

to legal settlement, nor prohibit new contracts to outsource activities that are currently

outsourced.

(4)     The Bank shall not off-shore new residential mortgage servicing related

activities until termination of the Consent Order.

(5)     The Bank shall not appoint any new senior officers who have responsibility for

residential mortgage servicing, residential mortgage servicing operations, residential mortgage

servicing risk management, and residential mortgage servicing compliance without prior OCC

supervisory non-objection until termination of the Consent Order. Within twenty (20) days, the Bank shall submit a list of applicable employee titles subject to this restriction to the Examiner-In-Charge for OCC supervisory non-objection.

ARTICLE XV

ESCHEATMENT OF UNCASHED PAYMENTS

(1)     The OCC continues to retain oversight and jurisdiction of IFR QSF1 for the administration of payments to borrowers of OCC regulated institutions until such time as the paying agent is directed to file a final return with the IRS for IFR QSF1 and IFR QSF1 is thereafter terminated.

(2)     The OCC directs that any uncashed checks that have passed their stale date issued from IFR QSF1 to borrowers of OCC regulated institutions shall be escheated to the state of the borrower's last known domestic address so that such borrower, or their rightful heirs, will maintain their ability to claim such IFR QSF1 payment pursuant to that state's processes for collecting unclaimed funds.

IT IS SO ORDERED, this 16th day of June, 2015.


_____/s/_____
Morris R. Morgan
Deputy Comptroller
Large Bank Supervision

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

|  |  |  |
|---|---|---|
| | ) | |
| **In the Matter of:** | ) | |
| | ) | AMENDS AA-EC-11-19 |
| Wells Fargo Bank, N.A. | ) | and |
| Sioux Falls, South Dakota | ) | #2013-132 |

**STIPULATION AND CONSENT TO THE ISSUANCE OF A**
**CONSENT ORDER AMENDING THE 2011 CONSENT ORDER and**
**2013 AMENDMENT TO THE 2011 CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller") intends

to amend the April 13, 2011 Consent Order, AA-EC-11-19 ("2011 Consent Order"), and the

Amendment to the 2011 Consent Order, dated February 28, 2013 ("2013 ACO"), entered into

between the Comptroller and Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank"),

(collectively, the "Consent Order"), pursuant to 12 U.S.C. § 1818(b).

The Bank, in the interest of compliance and cooperation, enters into this Stipulation and

Consent to the Issuance of a Consent Order Amending the 2011 Consent Order and 2013 ACO

("Stipulation").

In consideration of the above premises, the Comptroller, through his authorized

representative, and the Bank, through its duly elected and acting Board of Directors, stipulate

and agree to the following:

1

ARTICLE I

JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the

Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq*.

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank

pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)     The Bank is an "insured depository institution" within the meaning of

12 U.S.C. § 1818(b)(1).

(4)     For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and

24.2(e)(4), the Consent Order Amending the 2011 Consent Order and 2013 ACO

("Amendment") shall not be construed to be a "cease and desist order" or "consent order," unless

the OCC informs the Bank otherwise.

ARTICLE II

AGREEMENT

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to

issuance of the Amendment by the Comptroller.

(2)     The Bank consents and agrees that the Amendment shall: (a) be deemed an "order

issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2);

(b) become effective upon its execution by the Comptroller through his authorized

representative; and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of

a contract, the Comptroller may enforce any of the commitments or obligations herein

2

undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as

a matter of contract law. The Bank expressly acknowledges that neither the Bank nor the

Comptroller has any intention to enter into a contract.

(4)     The Bank declares that no separate promise or inducement of any kind has been

made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent

to the issuance of the Amendment and/or execute the Amendment.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller

has statutory or other authority to bind the United States, the United States Treasury Department,

the Comptroller, or any other federal bank regulatory agency or entity, or any officer or

employee of any of those entities to a contract affecting the Comptroller's exercise of his

supervisory responsibilities.

(6)     The terms and provisions of this Stipulation and the Amendment shall be binding

upon, and inure to the benefit of, the parties hereto and their successors in interest. Nothing in

this Stipulation or the Amendment, express or implied, shall give to any person or entity, other

than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right,

remedy or claim under this Stipulation or the Amendment.

ARTICLE III

WAIVERS

(1)     The Bank, by consenting to this Stipulation, waives:

(a)     any and all procedural rights available in connection with the issuance of

the Amendment;

3

(b)     all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

(c)     all rights to seek any type of administrative or judicial review of the Amendment;

(d)     any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or the Amendment, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

(e)     any and all rights to challenge or contest the validity of the Amendment.

ARTICLE IV

<u>OTHER PROVISIONS</u>

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the Comptroller to enforce the terms of the Amendment, and nothing in this Stipulation constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

4

(3)    The terms of this Stipulation and the Amendment are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.


IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set his hand on behalf of the Comptroller.


_____/s/_____            _____June 16, 2015_____
Morris R. Morgan                                            Date
Deputy Comptroller
Large Bank Supervision

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


_____/s/_____            June 8, 2015_____
John G. Stumpf (Chair)            Date


_____/s/_____            June 7, 2015_____
Lloyd H. Dean            Date


_____/s/_____            June 9, 2015_____
Enrique Hernandez, Jr.            Date


_____/s/_____            June 8, 2015_____
Cynthia H. Milligan            Date


_____/s/_____            June 9, 2015_____
James H. Quigley            Date


_____/s/_____            June 8, 2015_____
Judith M. Runstad            Date


_____/s/_____            June 8, 2015_____
Stephen W. Sanger            Date


6

# 2018 CONSENT ORDER

## UNITED STATES OF AMERICA
## BUREAU OF CONSUMER FINANCIAL PROTECTION

**ADMINISTRATIVE PROCEEDING**
**File No. 2018-BCFP-0001**

| | |
|---|---|
| **In the Matter of:** | **CONSENT ORDER** |
| **WELLS FARGO BANK, N.A.** | |

The Bureau of Consumer Financial Protection (Bureau) has reviewed aspects of the following conduct of Wells Fargo Bank, N.A. (Respondent, as defined below): (1) charging fees for rate-lock extensions in connection with residential-mortgage lending; and (2) force-placing collateral-protection insurance (Force-Placed Insurance, as defined below) on consumers' vehicles for auto loans that it originated or acquired. The Bureau has identified the following violations of law: (1) Respondent unfairly failed to follow the mortgage-interest-rate-lock process it explained to some prospective borrowers; and (2) Respondent operated its Force-Placed Insurance program in an unfair manner. The Bureau issues this Consent Order (Consent Order) under authority granted by §§ 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565.

Respondent has previously identified and reported to the Bureau certain information about the deficiencies described in this Consent Order. Respondent has discontinued the practices that led to the deficiencies, including, as of September 30, 2016, the placement of Force-Placed Insurance, as defined below. Further, Respondent

1

GARCIA 01196

has begun voluntarily providing remediation to consumers to address certain of the deficiencies cited in this Consent Order.

## I.

## Jurisdiction

1.     The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## II.

## Stipulation

2.     Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 19, 2018 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## III.

## Definitions

3.     The following definitions apply to this Consent Order:

   a.     "Affected Consumers" means Rate-Lock Affected Consumers and Force-Placed Insurance Affected Consumers.

   b.     "Board" means Respondent's duly elected and acting Board of Directors.

   c.     "Effective Date" means the date on which this Consent Order is issued.

   d.     "Federal Consumer Financial Law" has the same meaning as in 12 U.S.C.

2

GARCIA 01197

§ 5481(14).

e.    "Force-Placed Insurance" means collateral-protection insurance purchased by Respondent for consumers' vehicles serving as collateral for auto loans and financed by adding the cost of the collateral-protection insurance to the balances on consumers' auto loans.

f.    "Force-Placed Insurance Affected Consumers" means any consumer who was subjected to any of the Force-Placed Insurance Specified Acts and Practices during the Force-Placed Insurance Relevant Period.

g.    "Force-Placed Insurance Relevant Period" means October 15, 2005, through September 30, 2016.

h.    "Force-Placed Insurance Specified Acts and Practices" means charging borrowers for Force-Placed Insurance when Respondent knew or should have known that it had ineffective processes that were likely to result in Respondent's unnecessarily placing or maintaining Force-Placed Insurance, either for the entire term of the policy or for a portion of the term of the policy.

i.    "Non-Objection" means written notification to Respondent that the Bureau does not object to a proposal by Respondent for a course of action. With respect to any Non-Objection required by this Consent Order, the Regional Director's Non-Objection will apply only to issues or actions related to compliance with Federal Consumer Financial Law.

j.    "OCC Order" means the Consent Order issued by the Office of the Comptroller of the Currency (OCC) in the administrative adjudication styled *In the Matter of Wells Fargo Bank, N.A.*, No. AA-EC-2018-16,

3

GARCIA 01198

issued on or about April 20, 2018.

k.　　"Plans" means the Compliance Risk Management Plan required under

Paragraph 42, the Staffing Assessment and Program required under

Paragraph 44, the Internal Audit's Compliance Program required under

Paragraph 45, the Remediation Program required under Paragraphs 49–

51, the Consumer Remediation Plans defined in Paragraph 51(a), the Rate-

Lock Remediation Plan required under Paragraph 55, and the Force-

Placed Insurance Remediation Plan required under Paragraph 56.

l.　　"Rate-Lock Affected Consumers" means any prospective borrower who,

during the Rate-Lock Relevant Period, was charged a fee for extending an

interest-rate-lock period for a residential-mortgage loan when the fee

should have been absorbed by Respondent under its established policy.

m.　　"Rate-Lock Relevant Period" means September 16, 2013, through

February 28, 2017.

n.　　"Rate-Lock Specified Acts and Practices" means charging prospective

borrowers a fee for extending an interest-rate-lock period when the fee

should have been absorbed by Respondent under its established policy and

in a manner inconsistent with how it explained the rate-lock process to

prospective borrowers.

o.　　"Regional Director" means the Regional Director for the West Region for

the Office of Supervision for the Bureau of Consumer Financial Protection

or his or her delegate.

p.　　"Related Consumer Action" means a private action by or on behalf of one

or more consumers or an enforcement action by another governmental

4

GARCIA 01199

agency brought against Respondent based on substantially the same facts

as described in Section IV of this Consent Order.

q.     "Respondent" means Wells Fargo Bank, N.A., its subsidiaries, and its

successors and assigns.

r.     "Specified Acts and Practices" means any of the Rate-Lock Specified Acts

and Practices and Force-Placed Insurance Specified Acts and Practices, as

each is defined in this Consent Order.

## IV.

## Bureau Findings and Conclusions

The Bureau finds the following:

4.     Respondent is a national bank headquartered in Sioux Falls, South Dakota.

5.     Respondent is an insured depository institution with assets greater than $10

billion within the meaning of 12 U.S.C. § 5515(a).

6.     Respondent is the largest originator of residential-mortgage loans in the United

States. Additionally, Respondent originates, purchases, and services consumer

loans secured by automobiles. Thus, Respondent is a "covered person" as that

term is defined by the CFPA, 12 U.S.C. § 5481(6).

## A.

## Mortgage-Interest-Rate-Lock Policies and Practices

7.     During the Rate-Lock Relevant Period, it was Respondent's policy that when a

mortgage loan did not close within its initial interest-rate-lock period and the

primary cause of the delay was attributable to Respondent, if the borrower chose

to extend the interest-rate-lock period, the extension fee was to be charged to

Respondent, and not the borrower. But, in certain instances, Respondent

GARCIA 01200

inappropriately charged borrowers rate-lock-extension fees that should have been absorbed by Respondent.

8.  Respondent offers prospective borrowers the ability to "lock in" a fixed interest rate for a certain "rate-lock" period while their mortgage-loan application is pending. Rate locks allow consumers to avoid the effects of interest-rate fluctuations during their rate-lock period.

9.  If an interest rate is not locked, a "floating" rate that fluctuates according to market conditions applies, and the interest rate is set before the loan is funded.

10. Respondent trains its loan officers to explain to prospective borrowers that if it appears that a loan cannot be processed and closed within the initial rate-lock period, then, for a fee (Extension Fee), the rate-lock-period may be extended (by, for example, an additional 15 or 30 days).

11. Respondent also offers borrowers the option to pay an up-front fee that will extend the standard rate-lock period to 90 days (Extended Rate Lock). At the time of submitting an application, consumers may choose this option to protect against delayed closings. The up-front Extended Rate Lock option is typically less expensive than paying multiple Extension Fees when the loan does not close in time and the borrower wishes to maintain the lock.

12. Mortgage loans may fail to close within the initial rate-lock period for many reasons, including delays caused by unforeseen property issues, delays in requesting or receiving necessary information, and delays caused by Respondent's internal processing.

13. In May 2012, in response to processing delays, Respondent stopped charging any Extension Fees to borrowers. Instead, Respondent extended rate-lock periods

6

GARCIA 01201

without charging borrowers a fee.

14.    In September 2013, Respondent enacted a new nationwide policy under which borrowers would pay the Extension Fee in certain circumstances.

15.    Respondent's September 2013 policy change provided that if a rate-lock extension was made necessary by borrower-caused delays, or by certain delays related to the property itself, the borrower could be charged an Extension Fee; if there were lender-caused delays, however, Respondent would extend the rate-lock period without charging borrowers a fee, as it had done since May 2012.

16.    Rate-lock choices may materially affect how much it costs consumers to get a loan. Respondent expected its loan officers to explain to prospective borrowers all of the available rate-lock options, to help borrowers select the option best suited to their needs, and to clearly explain its rate-lock process to prospective borrowers.

17.    During the Rate-Lock Relevant Period, Respondent trained its loan officers to inform prospective borrowers that they would be responsible for paying Extension Fees under circumstances where the delay was caused by the borrower or related to the property itself, including when the borrower does not timely return necessary documentation, the borrower disputes a low appraisal, previously undisclosed liens are uncovered, sellers or builders delay the process, the sale is not timely approved by a condo project or co-op board, or the borrower's credit score changes.

18.    Within days of rolling out the new policy, Respondent acknowledged in internal communications that its guidelines for its loan officers were inadequate. Respondent instructed employees that Extension Fees would be charged based

7

GARCIA 01202

on the factor primarily responsible for the delay, without further guidance as to
what that meant.

19.    Almost three years after a 2013 internal audit first identified the risks for
consumer harm relating to improperly assessed Extension Fees, an October 2016
internal audit found that Respondent inconsistently applied its policy and
charged borrowers Extension Fees in situations where Respondent was
responsible for the delay in the loan's closing.

20.    Following an internal investigation and loan reviews, Respondent determined
that its Extension Fee policy was not consistently applied and that, during the
Rate-Lock Relevant Period, Respondent inappropriately charged certain
borrowers rate-lock-extension fees that should have been absorbed by
Respondent under its policy.

21.    Effective March 1, 2017, Respondent substantially changed its Extension Fee
practices to address the inconsistent allocation of Extension Fees.

## Unfair Acts and Practices Relating to
## Interest-Rate Locks, in Violation of the CFPA

22.    An unfair act or practice is one that causes or is likely to cause substantial injury
to consumers that is not reasonably avoidable and is not outweighed by
countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

23.    During the Rate-Lock Relevant Period, Respondent's loan officers were
instructed to explain Respondent's rate-lock process to borrowers. In fact,
Respondent sometimes charged borrowers Extension Fees in situations where
Respondent should have absorbed the fees.

24.    Respondent's conduct caused and was likely to cause substantial injury to

GARCIA 01203

consumers.

25. This injury was not reasonably avoidable by consumers and was not outweighed by any countervailing benefits to consumers or competition.

26. Respondent engaged in unfair acts or practices during the Rate-Lock Relevant Period, in violation of §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

## B.

## Force-Placed Automobile Insurance Practices

27. Typically, when Respondent's borrowers obtained an auto-secured loan, the borrower signed an agreement that required the borrower to maintain insurance that would cover physical damage to the vehicle, which served as collateral for the loan. Respondent used a vendor to monitor borrowers' insurance coverage. If a borrower did not procure or maintain physical-damage insurance for the vehicle, Respondent could protect its interest in the collateral by acquiring Force-Placed Insurance on the borrower's behalf and charging the borrower for the insurance premium paid, in whole or in part, by Respondent to the insurer, plus interest.

28. If Respondent's vendor was unable to verify that borrowers maintained the required insurance for their vehicles through policy information it obtained directly from insurance companies and from other data aggregators, the vendor was required to communicate with the borrower multiple times before Force-Placed Insurance was acquired. Under Respondent's contract with its vendor, the vendor was required to send written notices to the borrower, as well as attempt to call the borrower and the borrower's previous insurance agent or insurance carrier to request evidence of insurance. If, following this outreach, the vendor

9

GARCIA 01204

was unable to obtain evidence of the required insurance, Respondent caused
Force-Placed Insurance to be issued to the borrowers.

29.    Since 2005, Respondent forcibly placed insurance for the vehicles of about 2
million borrowers who secured auto loans with the bank. According to
Respondent's own analyses, it forcibly placed duplicative or unnecessary
insurance on hundreds of thousands of those borrowers' vehicles. In addition, for
some borrowers, after appropriately placing Force-Placed Insurance policies,
Respondent improperly maintained Force-Placed Insurance policies on the
borrowers' accounts after the borrowers had obtained adequate insurance on
their vehicles and after adequate proof of insurance had been provided. If
borrowers failed to pay the amounts Respondent charged them for the Force-
Placed Insurance, they faced additional fees and, in some instances, experienced
delinquency, loan default, and even repossession.

30.    If the borrower provided evidence that insurance coverage had been in effect,
Respondent had a process to cancel the Force-Placed Insurance and to refund
premiums. But Respondent did not sufficiently monitor its vendor and internal
processes, resulting in control and execution weaknesses, such as within the
insurance-verification and cancellation processes and the protocols for
processing refunds. Additionally, Respondent failed to provide data and
information to its vendor that could have allowed its vendor to more effectively
execute its obligations to Respondent and borrowers. Finally, Respondent did not
maintain a process to evaluate whether fees should have been refunded and failed
to appropriately address and assess customer complaints.

31.    Through quarterly reports from its vendor and its own daily reports, Respondent

GARCIA 01205

was aware of high rates of Force-Placed Insurance cancellations, and Respondent received briefings on the root causes of the cancellations. The high rates of cancellation were also apparent within Respondent's own system of record because it processed the refunds when a Force-Placed Insurance policy was canceled, and it reported that refund information back to the vendor.

32.  The vendor regularly presented to Respondent's management on the Force-Placed Insurance program's performance. These presentations included cancellation rates of Force-Placed Insurance for borrowers who never had a lapse in required insurance coverage, known as "flat cancels," and borrowers who had the required insurance for part of the Force-Placed Insurance policy term, known as "partial cancels."

33.  Respondent was informed by its vendor that, since 2005, roughly 28% of Respondent's Force-Placed Insurance policies were canceled because they were duplicative of insurance maintained by borrowers for the entire term of the Force-Placed Insurance policy. The number of cancellations should have raised concerns that Respondent's and its vendor's processes for determining insurance coverage before and after placement of Force-Placed Insurance were insufficient.

34.  From 2011 to 2016, Respondent caused hundreds of thousands of consumers to be charged substantial premiums—typically just over $1,000 a policy—for unnecessary or duplicative Force-Placed Insurance. Although Respondent caused the premiums to be refunded after receiving proof of adequate insurance during the coverage period, the refunds covered all of the interest charged for only flat cancels. And, in many cases, Respondent did not refund other fees or related charges, such as repossession fees, late fees, deferral fees, and NSF fees.

11

GARCIA 01206

35.    From 2011 to 2016, Respondent acknowledges that for at least 27,000 customers, the additional costs of the Force-Placed Insurance could have contributed to a default that resulted in the repossession of their vehicle.

## Unfair Acts and Practices Relating to
## Force-Placed Insurance, in Violation of the CFPA

36.    An unfair act or practice is one that causes or is likely to cause substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

37.    Respondent's conduct caused or was likely to cause substantial injuries to consumers because it required them to pay for Force-Placed Insurance premiums and interest that they should not have owed, to incur fees, and, in some instances, to be subject to defaults on their auto loans and repossession of their vehicles.

38.    These injuries were not reasonably avoidable by consumers and were not outweighed by countervailing benefits to consumers or to competition.

39.    From July 21, 2011, through September 30, 2016, Respondent engaged in unfair acts or practices, in violation of §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

## ORDER

## V.

## Conduct Provisions

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

40.    Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not engage in any Specified Acts and Practices.

GARCIA 01207

## VI.

## Compliance Committee

**IT IS FURTHER ORDERED** that:

41.  As set forth in Article II, ¶ 1, of the OCC Order, the Board shall appoint and
maintain an active Compliance Committee of at least 3 members, of which a
majority shall be directors who are not employees or officers of Respondent or
any of its subsidiaries or affiliates. The Compliance Committee shall be
responsible for monitoring and overseeing Respondent's compliance with the
provisions of this Consent Order. The Compliance Committee shall meet
quarterly and maintain minutes of its meetings at which compliance with this
Consent Order is discussed.

## VII.

## Compliance Risk Management and Internal Audit

**IT IS FURTHER ORDERED** that:

42.  Consistent with the requirements of Article IV, ¶ 1, of the OCC Order, within 60
days of the Effective Date, Respondent must submit to the Regional Director for
review and determination of Non-Objection an acceptable enterprise-wide
Compliance Risk Management Plan (Compliance Risk Management Plan)
containing a complete description of the actions that are necessary and
appropriate to achieve compliance with Article IV of the OCC Order. The
Compliance Risk Management Plan should also be designed to ensure that
Respondent's acts and practices comply with Federal Consumer Financial Law
and the terms of this Consent Order. In addition to the requirements set forth in
Article IV, ¶ 2, of the OCC Order, the Compliance Risk Management Plan must be

13

GARCIA 01208

commensurate with the size, complexity, and risks of Respondent's operations
and include, at a minimum:

a.      detailed steps to develop, implement, and maintain policies and
        procedures that ensure oversight and commitment to an effective
        compliance management system;

b.      detailed steps to develop, implement, and maintain policies and
        procedures that are designed to ensure comprehension, identification, and
        management of consumer-related risks arising from Respondent's
        products, services, and activities;

c.      detailed steps to develop, implement, and maintain policies and
        procedures that are designed to ensure self-identification and timely self-
        reporting to the Bureau of violations and potential violations of Federal
        Consumer Financial Law as Respondent identifies such issues and develop
        an appropriate Consumer Remediation Plan, as defined in Paragraph
        51(a);

d.      detailed steps to develop, implement, and maintain policies and
        procedures designed to ensure effective third-party vendor oversight;

e.      detailed steps to develop, implement, and maintain policies and
        procedures designed to ensure Respondent's consumer complaint
        resolution process is responsive and effective;

f.      detailed steps to develop, implement, and maintain policies, procedures,
        and other applicable employee guidance to address the acts and practices
        that are the subject of this Consent Order;

g.      detailed steps to develop, implement, and maintain employee training to

14

GARCIA 01209

address the acts and practices that are the subject of this Consent Order;

h.    detailed steps to develop, implement, and maintain monitoring, testing, and other compliance oversight controls to address the acts and practices that are the subject of this Consent Order; and

i.    specific timeframes and deadlines for implementation of the steps described above or discussed in the Compliance Risk Management Plan, consistent with the deadlines set forth in this Consent Order.

43.    After receiving notice that the Regional Director has made a determination of Non-Objection to the Compliance Risk Management Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Risk Management Plan.

44.    Consistent with the requirements of Article V, ¶ 1, of the OCC Order, within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a Staffing Assessment and Program (Staffing Assessment) for Respondent's Compliance Risk Management Program that will provide for the allocation of adequate resources. At a minimum, the Staffing Assessment must satisfy the requirements set forth in Article V, ¶ 1, of the OCC Order. As required by Article V, ¶¶ 2–3, of the OCC Order, the Compliance Committee must ensure that management corrects any deficiencies identified by the Staffing Assessment and implements any plans or recommendations resulting from the Staffing Assessment. Thereafter, the Compliance Committee must ensure that Respondent, at a minimum, annually evaluates the skills and expertise of the independent Compliance Risk Management Program's staff to determine if there are any material deficiencies

GARCIA 01210

in skills or expertise and develop a plan to address any identified gaps or deficiencies.

45.    Consistent with the requirements of Article VI, ¶ 1, of the OCC Order, within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a plan to enhance Internal Audit's program with respect to compliance (Internal Audit's Compliance Program). The Regional Director's Non-Objection will apply only to issues or actions related to compliance with Federal Consumer Financial Law. In addition to the requirements set forth in Article VI, ¶ 1, the Internal Audit's Compliance Program must, at a minimum, provide for a compliance audit of Respondent's acts and practices related to the Specified Acts and Practices to ensure compliance with Federal Consumer Financial Law and the terms of this Consent Order.

## VIII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

46.    The Board (or a Committee of the Board, which may include the Compliance Committee) must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order before submission to the Bureau.

47.    Although this Consent Order requires Respondent to submit certain documents for the review or determination of Non-Objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal Consumer Financial Law and this Consent Order, including successful execution of the

GARCIA 01211

Plans. The Board shall ensure that Respondent has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Consent Order.

48.   In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board must:

    a.   authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

    b.   require timely reporting by management to the Board on the status of compliance obligations and actions directed by the Board to be taken under this Consent Order;

    c.   follow up on non-compliance with such actions in a timely and appropriate manner; and

    d.   require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this section.

## IX.

### Remediation Program and Order to Pay Redress

**IT IS FURTHER ORDERED** that:

49.   Consistent with the requirements of Article VII, ¶ 1, of the OCC Order, within 120 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a comprehensive written plan to develop and implement a program for remediation activities conducted by Respondent (Remediation Program). The Regional Director's Non-Objection will apply only to issues or actions related to compliance with Federal Consumer

GARCIA 01212

Financial Law.

50.    After receiving notification that the Regional Director has made a determination
of Non-Objection to the Remediation Program, Respondent must implement and
adhere to the definitions, steps, recommendations, deadlines, and timeframes
outlined in the Remediation Program.

51.    In addition to the requirements set forth in Article VII, ¶ 2, of the OCC Order, the
Remediation Program must include, at a minimum:

a.    a requirement for the development of remediation plans (Consumer
Remediation Plans) for consumers that Respondent identifies as incurring
an economic or other cognizable harm based on (1) a violation of Federal
Consumer Financial Law or (2) a potential violation that Respondent
elects to include in the Remediation Program; Respondent's development
of a Consumer Remediation Plan will not be deemed an admission that a
violation has occurred;

b.    a definition of Consumer Remediation Plans that may include minimum
thresholds for the number of customers affected, amounts involved, or
other factors before remediation of a violation or potential violation of
Federal Consumer Financial Law is deemed to be a Consumer
Remediation Plan subject to the processes set forth in this paragraph; with
respect to litigated settlements, Respondent will independently evaluate
whether a Consumer Remediation Plan is required;

c.    policies and procedures for conducting a root-cause analysis of any
violations of Federal Consumer Financial Law identified by Respondent or
any acts or practices for which Respondent has developed a Consumer

18

GARCIA 01213

Remediation Plan;

d.     policies and procedures for analyzing: (1) the severity of any economic or other cognizable harm to consumers resulting from any violations of Federal Consumer Financial Law or any acts or practices for which Respondent has developed a Consumer Remediation Plan; (2) the duration of time over which the violations of Federal Consumer Financial Law occurred or any acts or practices for which Respondent has developed a Consumer Remediation Plan; and (3) the pervasiveness of the violations of Federal Consumer Financial Law or any acts or practices for which Respondent has developed a Consumer Remediation Plan;

e.     no conditioning of the payment of any redress to any consumer on that consumer's waiving any right, except that the Remediation Program may include procedures and standards for waivers in litigated settlements, settlements involving parties represented by counsel, settlements with any other governmental regulatory or enforcement agency, or in other circumstances acceptable to the Regional Director; and

f.     reporting procedures for the monthly reporting of any anticipated or ongoing Consumer Remediation Plans developed by Respondent (Remediation Reports) that, at a minimum: (1) meet the requirements set forth in Article VII, ¶ 2(d); (2) identify the type and amount of consumer remediation and other relief provided to consumers; and (3) provide for the provision of each Remediation Report to the Compliance Committee and Regional Director within 10 days of its completion.

52.    Consistent with Article VIII, ¶ 1, of the OCC Order, in connection with any

GARCIA 01214

Consumer Remediation Plan that has been submitted to the Regional Director under Paragraphs 53, 55, or 56 and has received Non-Objection from the Regional Director, an independent unit, third party, or Internal Audit, shall prepare a report validating that Respondent's implementation of the Consumer Remediation Plan complies with the requirements of Respondent's Remediation Program (Remediation Review Report). Upon notification in writing by the Regional Director, the Bureau may require Respondent to engage an independent third party to validate that Respondent's implementation of a Consumer Remediation Plan complies with the requirements of Respondent's Remediation Program, and prepare a Remediation Review Report. Each Remediation Review Report should meet the requirements set forth in Article VIII, ¶ 2. Within 10 days of its completion, each Remediation Review Report shall be submitted to the Compliance Committee and the Regional Director.

53.    Consistent with Article VIII, ¶ 4, of the OCC Order, the Regional Director may require submission for a determination of Non-Objection a validated Consumer Remediation Plan (as defined in Paragraph 51(a)) that meets the following criteria:

    a.    the number of customers or customer accounts likely to require remediation exceeds 50,000; or

    b.    the anticipated amount of the total remediation to be paid, refunded, or remitted to customers exceeds $10 million.

54.    Consistent with Article VIII, ¶ 5, of the OCC Order, Respondent, at least 30 days (or as soon as practicable per the terms of the controlling legal document) before the implementation of any Consumer Remediation Plan pursuant to a legal

GARCIA 01215

judgment, court order, or negotiated settlement of any legal proceeding as specified in the Remediation Program that relates to a violation or a potential violation of Federal Consumer Financial Law must provide the Regional Director the proposed Consumer Remediation Plan.

55.    Consistent with the requirements of Article VIII, ¶ 6, of the OCC Order, within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a comprehensive remediation plan to address the findings set forth in this Consent Order with respect to Rate-Lock Specified Acts and Practices and to provide redress to all persons who paid rate-lock-extension fees and who claim to be Rate-Lock Affected Consumers (Rate-Lock Remediation Plan). The Rate-Lock Remediation Plan must, at a minimum:

a.    provide for completion of such remediation, including internal audit validation, within 180 days of the Regional Director's Non-Objection; and

b.    not condition the payment of any redress on the claimant's waiving any right.

56.    Consistent with the requirements of Article VIII, ¶ 6, of the OCC Order, within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a comprehensive remediation plan to address the findings set forth in this Consent Order with respect to Force-Placed Insurance Specified Acts and Practices and to provide redress to Force-Placed Insurance Affected Consumers (Force-Placed Insurance Remediation Plan). The Force-Placed Insurance Remediation Plan must, at a minimum:

a.    identify all Force-Placed Insurance Affected Consumers, as well as the types and amounts of economic or other cognizable harm suffered by

GARCIA 01216

Force-Placed Insurance Affected Consumers as a result of the Force-Placed Insurance Specified Acts and Practices, and state the means by which Force-Placed Insurance Affected Consumers have been identified;

b.      describe the methodology for effectively identifying Force-Placed Insurance Affected Consumers;

c.      describe the methodology for determining the appropriate type of redress for economic or other cognizable harm caused by the Force-Placed Insurance Specified Acts and Practices;

d.      describe the process for providing redress to Force-Placed Affected Consumers and identifying the dollar amount of redress for each category of Affected Consumers;

e.      describe procedures by which Respondent will notify Force-Placed Insurance Affected Consumers who were subject to any of the Force-Placed Insurance Specified Acts and Practices described in Paragraph 3(h) of this Consent Order, including the form of the notification such consumers will receive;

f.      describe how Respondent will locate Force-Placed Insurance Affected Consumers for the provision of all forms of redress, the steps Respondent will take with respect to Force-Placed Insurance Affected Consumers whose mail has been returned to Respondent as undeliverable, including the reasonable steps to obtain a current address using standard address-search methodologies, and the steps Respondent will take with respect to redress payments that are not cashed after a reasonable period of time;

g.      provide the form of the letter or notice and the envelope that will be sent

GARCIA 01217

to such Force-Placed Insurance Affected Consumers notifying them of the redress;

h.   provide for completion of such remediation, including internal audit validation, within 180 days of the Regional Director's Non-Objection; and

i.   not condition the payment of any redress to any Force-Placed Insurance Affected Consumers under this Consent Order on Force-Placed Insurance Affected Consumers' waiving any right.

57.   In the interest of expediting relief to affected consumers, Respondent may proceed with providing remediation to consumers under any Consumer Remediation Plan, whether or not it has been submitted for, or received, a determination of Non-Objection. The Bureau, before providing Non-Objection for any Consumer Remediation Plan, may require Respondent to provide additional remediation to consumers and to remediate other consumers, consistent with requirements of Federal Consumer Financial Law.

58.   Respondent shall not be considered to be in compliance with Paragraphs 52–57, and Paragraphs 52–57 remain effective, until such time that the Regional Director has determined that Respondent has complied with Section XII and Paragraphs 41–51.

## X.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

59.   Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of

GARCIA 01218

$1 billion to the Bureau. Under 12 U.S.C. § 5565(c)(4), the amount Respondent must pay will be remitted by $500 million upon Respondent's satisfaction of its obligation to pay that amount in penalties to the OCC for related conduct.

60.    Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

61.    The civil money penalty will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

62.    Respondent must treat the civil money penalty as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

    a.    claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

    b.    seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

63.    To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit from, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within 30 days

24

GARCIA 01219

of entry of a final order granting the Penalty Offset, notify the Bureau and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## XI.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

64. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment and will immediately become due and payable.

65. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law, and no part of the funds may be returned to Respondent.

66. Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer-identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

67. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

GARCIA 01220

## XII.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

68.     Respondent must notify the Bureau of any development that may affect
compliance obligations arising under this Consent Order, including but not
limited to a dissolution, assignment, sale, merger, or other action that would
result in the emergence of a successor company; the creation or dissolution of a
subsidiary, parent, or affiliate that engages in any acts or practices subject to this
Consent Order; the filing of any bankruptcy or insolvency proceeding by or
against Respondent; or a change in Respondent's name or address. Respondent
must provide this notice, if practicable, at least 30 days before the development,
but in any case no later than 14 days of the development.

69.     Within 120 days of the Effective Date, and thereafter within 45 days of the end of
each calendar quarter, the Compliance Committee shall submit a written
progress report (Compliance Report) to the Board that, at a minimum:

a.     lists each applicable paragraph and subparagraph of the Consent Order
and describes in detail the manner and form in which Respondent has
complied with each such paragraph and subparagraph of the Consent
Order and the results and status of those actions;

b.     describes in detail the manner and form in which Respondent has
complied with the Plans; and

c.     attaches a copy of each Order Acknowledgment obtained under Section
XIII, unless previously submitted to the Bureau.

GARCIA 01221

70.     The Board shall approve and forward a copy of the Compliance Report, with any additional comments by the Board, to the Regional Director within 15 days of the first Board meeting following receipt of such report, unless additional time is granted by the Regional Director through a determination of Non-Objection.

71.     Consistent with the requirements of Article III, ¶ 5, of the OCC Order, within 120 days of receipt of the Regional Director's determination of Non-Objection to the Plans, Respondent's Internal Audit department shall complete an assessment of Respondent's progress toward implementing the Plans (other than Consumer Remediation Plans, as defined in Paragraph 51(a)). In addition, upon the Regional Director's written request, Respondent's Internal Audit will complete the same such assessment within 45 days of the end of every calendar quarter thereafter until the completion of the Plans. The findings shall be memorialized in writing and, within 30 days of completing the assessment, Internal Audit shall provide its written findings to the Compliance Committee and the Regional Director. Upon notification in writing by the Regional Director, the Bureau may require Respondent to engage an independent third party to reassess Respondent's progress toward implementing the Plans (other than Consumer Remediation Plans, as defined in Paragraph 51(a)). The independent third party's findings must be memorialized in writing and, within 30 days of completing the assessment, the independent third party must provide its written findings to the Compliance Committee and the Regional Director.

GARCIA 01222

# XIII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

72. Within 7 days of the Effective Date, Respondent must submit to the Regional Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

73. Within 60 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, or other agents and representatives who have responsibilities related to the subject matter of this Consent Order.

74. Respondent must deliver a copy of this Consent Order and accompanying Compliance and Redress plans to any business entity resulting from any change in structure referred to in Section XII, any future board members and executive officers, as well as to any managers, employees, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

75. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. §§ 7001–7006, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this section.

GARCIA 01223

## XIV.

### Recordkeeping

**IT IS FURTHER ORDERED** that:

76. Respondent must create, or if already created, must retain for the duration of this Consent Order, the following business records:

    a.    all documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

    b.    all documents and records pertaining to the Plans required in this Consent Order; and

    c.    to the extent they are relevant to this Consent Order, copies of all sales scripts, training materials, advertisements, websites, and other marketing materials, including any such materials used by a third party on behalf of Respondent.

77. Respondent must retain the documents identified in Paragraph 76 for the duration of the Consent Order.

78. Respondent must make the documents identified in Paragraph 76 available to the Bureau upon the Bureau's request.

## XV.

### Notices

**IT IS FURTHER ORDERED** that:

79. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "In re Wells Fargo Bank, N.A.,

GARCIA 01224

File No. 2018-BCFP-0001," and send them by overnight courier or first-class mail

to the below addresses and contemporaneously by email to

Enforcement_Compliance@cfpb.gov:

> Regional Director
> Bureau of Consumer Financial Protection
> West Region
> 301 Howard Street, Suite 1200
> San Francisco, CA 94105
>
> Assistant Director for Enforcement
> Bureau of Consumer Financial Protection
> ATTENTION: Office of Enforcement
> 1700 G Street, NW
> Washington DC 20552.

## XVI.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

80.    Respondent must cooperate fully to help the Bureau determine the identity and

location of, and the amount of injury sustained by, each Affected Consumer.

Respondent must provide such information in its or its agents' possession or

control within 14 days of receiving a written request from the Bureau.

81.    Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section IV.

Respondent must provide truthful and complete information, evidence, and

testimony. Respondent must cause Respondent's officers, employees,

representatives, and agents to appear for interviews, discovery, hearings, trials,

and any other proceedings that the Bureau may reasonably request upon 10 days'

written notice, or other reasonable notice, at such places and times as the Bureau

may designate, without the service of compulsory process.

GARCIA 01225

## XVII.

### Compliance Monitoring

**IT IS FURTHER ORDERED** that:

82.    Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

83.    Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

84.    Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVIII.

### Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

85.    Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

86.    The Regional Director may, in his or her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he or she determines that good cause justifies the modification. Any such modification by the Regional Director must be in writing.

31

GARCIA 01226

## XIX.

### Administrative and Other Provisions

87.    With respect to any determination of Non-Objection required in this Consent Order, if the Regional Director objects to any proposed, or lack of proposed, action by Respondent, the Regional Director shall direct Respondent to make such revisions, and Respondent shall make the revisions and resubmit the proposed action within 14 days. Upon notification to Respondent of any determination of Non-Objection required by this Consent Order, Respondent must implement the course of action within 30 days unless otherwise specified, and the Board shall ensure that Respondent executes and thereafter adheres to the course of action. During the term of this Consent Order, Respondent shall revise the required plans, programs, policies, and procedures as necessary to incorporate new, or changes to, applicable legal requirements and supervisory guidelines. Respondent cannot make any changes to the course of action without obtaining a determination of Non-Objection from the Regional Director.

88.    The Plans required under this Consent Order must contain a complete description of the actions necessary to achieve compliance with their stated requirements in this Consent Order and the components of each Plan shall be completed within the timeframes set forth in this Consent Order.

89.    The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 90.

90.    The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the acts and

GARCIA 01227

practices described in Section IV of this Consent Order, to the extent such acts and practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau expressly reserves its right to take future supervisory and enforcement actions, in it is discretion and as appropriate, and to assess a civil money penalty (bound by statutory maximum penalty amounts) in the future based on other violations of law and practices even though they may be addressed by required remedial actions in this Consent Order. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order or to seek penalties for any violations of the Consent Order.

91.    This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

92.    The Consent Order will remain effective and enforceable, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

93.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

94.    Should Respondent seek to transfer or assign all or part of its operations that are

GARCIA 01228

subject to this Consent Order, Respondent must, as a condition of sale, obtain the
written agreement of the transferee or assignee to comply with all applicable
provisions of this Consent Order.

95.    The provisions of this Consent Order will be enforceable by the Bureau. For any
violation of this Consent Order, the Bureau may impose the maximum amount of
civil money penalties allowed under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In
connection with any attempt by the Bureau to enforce this Consent Order in
federal district court, the Bureau may serve Respondent wherever Respondent
may be found, and Respondent may not contest that court's personal jurisdiction
over Respondent.

96.    This Consent Order and the accompanying Stipulation contain the complete
agreement between the parties. The parties have made no promises,
representations, or warranties other than what is contained in this Consent Order
and the accompanying Stipulation. This Consent Order and the accompanying
Stipulation supersede any prior oral or written communications, discussions, or
understandings.

97.    Nothing in this Consent Order or the accompanying Stipulation may be
construed as allowing Respondent, its Board, officers, or employees to violate any
law, rule, or regulation.

34

GARCIA 01229

98.    Except as expressly stated herein, to the extent that a specific action by

Respondent is required both by this Consent Order and by the OCC Order, action

by Respondent that satisfies a requirement of the OCC Order will satisfy that

same requirement under this Consent Order.

**IT IS SO ORDERED**, this 20th day of April, 2018.

_____
Mick Mulvaney, Acting Director
Bureau of Consumer Financial Protection

35

GARCIA 01230

Exhibit 99.3

**#2018-025**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | |
| ) | |
| Wells Fargo Bank, N.A. ) | AA-EC-2018-15 |
| Sioux Falls, South Dakota ) | |
| ) | |

## CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"), through his national bank examiners and other staff of the Office of the Comptroller of the Currency ("OCC"), has conducted examinations of Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank"). The OCC has identified deficiencies in the Bank's enterprise-wide compliance risk management program that constituted reckless unsafe or unsound practices and resulted in violations of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). The OCC has informed the Bank of the findings resulting from the examinations.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a Stipulation and Consent to the Issuance of a Consent Order, dated April 20, 2018, that is accepted by the Comptroller ("Stipulation"). By the Stipulation, which is incorporated herein by reference, the Bank has consented to the issuance of this Consent Cease and Desist Order ("Order") by the Comptroller.

-1-

GARCIA 01231

# ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1) Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile. The Bank's failure to implement and maintain a satisfactory compliance risk management program has caused the Bank to engage in reckless unsafe or unsound practices and violations of law.

(2) In the course of its ongoing supervision of the Bank, the OCC has identified the following deficiencies and reckless unsafe or unsound practices with respect to the Bank's compliance risk management program:

(a) Failure to establish effective first and second lines of defense as required by 12 C.F.R. Part 30, Appendix D and insufficient compliance audit;

(b) Inability to execute on a comprehensive plan to address compliance risk management deficiencies;

(c) Failure to fill mission-critical staffing positions for Wells Fargo Compliance, formerly known as the Regulatory Compliance Risk Management unit, with individuals who possess the requisite knowledge, skills, and abilities to perform assigned duties;

(d) Failure to implement a reliable compliance risk assessment and testing program;

(e) Inadequate reporting to the Board regarding compliance concerns, the regulatory landscape, and the Bank's efforts to correct its compliance problems and address regulatory changes; and

GARCIA 01232

(f)   Failure to adequately develop and implement key elements of its compliance risk management program designed to ensure that the Bank addressed risks related to potential unfair or deceptive acts or practices since 2014.

(3)   With respect to its enterprise-wide compliance risk management program, the Bank has previously identified and reported to the OCC certain of the deficiencies that are described in this Order. The Bank has begun corrective action, and has committed to taking all necessary and appropriate steps to remedy the deficiencies identified by the OCC and to establish an effective compliance risk management program.

(4)   In addition to the reckless unsafe or unsound compliance risk management practices outlined in Paragraph (2) above, prior to June 2012, and continuing through October 2016, the Bank's Dealer Services unit, and its vendor, caused the improper placement and/or maintenance of collateral protection insurance ("CPI") policies on automobile loan accounts, and charged premiums, interest, and other fees on borrowers' accounts where the borrowers had demonstrated adequate insurance under the terms of their automobile loan note/contract. The Bank, after appropriately placing CPI policies on some borrowers' accounts, improperly maintained CPI policies on borrowers' accounts after the borrowers had demonstrated that they had obtained adequate insurance on their vehicles.

(5)   As a result of the Bank's improper CPI placement practices, borrowers were improperly charged CPI premiums, interest, and fees, and suffered loan delinquencies due to increased loan payment amounts. In some cases, the Bank improperly repossessed vehicles from borrowers who had defaulted on their loans due to improperly placed or maintained CPI policies.

(6)   The Bank's aforementioned practices with respect to CPI constituted unfair acts or practices in or affecting commerce in violation of the unfair acts or practices provision of

GARCIA 01233

Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound.

(7)     Beginning in at least September 2013 and continuing through March 2017, it was the Bank's policy that if (a) a mortgage loan application did not close within its initial interest rate lock period in circumstances where the Bank was responsible for the failure of the loan to close and (b) the customer chose to extend the interest rate lock period, the extension fee was to be charged to the Bank, and not the customer. However, in a number of instances, the Bank charged customers mortgage interest rate lock extension fees even though the Bank had caused the loan closing to fail to occur within the mortgage interest rate lock period.

(8)     As a result of the Bank's mortgage interest rate lock extension fee practices, customers were improperly charged mortgage interest rate extension fees when the Bank should have borne those costs. The Bank's mortgage interest rate lock extension fee practices constituted unfair acts or practices in or affecting commerce in violation of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound.

(9)     By reason of the foregoing conduct, the Bank engaged in reckless unsafe or unsound practices and violations of law that were part of a pattern of misconduct, and was unjustly enriched.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby ORDERS that:

GARCIA 01234

## ARTICLE II

## COMPLIANCE COMMITTEE

(1)     The Board shall appoint and maintain an active Compliance Committee of at least

three (3) members, of which a majority shall be directors who are not employees or officers of

the Bank or any of its subsidiaries or affiliates. The Compliance Committee shall be responsible

for monitoring and overseeing the Bank's compliance with the provisions of this Order. The

Compliance Committee shall meet quarterly and maintain minutes of its meetings at which

compliance with this is Order is discussed.

(2)     Within one hundred twenty (120) days of the effective date of this Order, and

thereafter within forty-five (45) days after the end of each calendar quarter, the Compliance

Committee shall submit a written progress report to the Board setting forth in detail the actions

taken to comply with each Article of this Order, and the results and status of those actions.

(3)     The Board shall forward a copy of the progress report, with any additional

comments by the Board, to the Examiner-in-Charge within fifteen (15) days of the first Board

meeting following receipt of such report, unless additional time is granted by the Examiner-in-

Charge through a written determination of no supervisory objection.

## ARTICLE III

## ACTION PLANS

(1)     Pursuant to the timeframe for completion and other requirements set forth in

Article IV of this Order, the Bank shall develop a Compliance Risk Management Plan

("CRMP") containing a complete description of the actions necessary to achieve compliance

with Article IV of this Order. Separately, the Bank shall develop a Consent Order Action Plan

("COAP") containing a complete description of the actions necessary to achieve compliance with

Articles V through VIII of this Order. The components of the COAP shall be completed within

GARCIA 01235

the timeframes set forth in Articles VI through VIII of this Order. Collectively, the CRMP and COAP are referred to collectively in this Order as the "Plans."

(2)     The Plans shall specify timelines for completion of the remedial actions required by the Articles of this Order. The timelines in the Plans shall be consistent with any deadlines set forth in this Order, unless modified by written agreement with the Examiner-in-Charge.

(3)     Upon receiving a written determination of no supervisory objection from the Examiner-in-Charge, the Board shall ensure the Bank executes and thereafter adheres to the Plans. In the course of executing the Plans, the Bank shall not take any action that will cause a significant deviation from, or material change to, the Plans, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller.

(4)     The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful execution of the Plans. In each instance in this Order in which the Board is required to ensure adherence to or perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a)     Require timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b)     Follow-up on noncompliance with such actions in a timely and appropriate manner; and

(c)     Require corrective action be taken in a timely manner for any noncompliance with such actions.

(5)     Within one hundred twenty (120) days of receipt of a prior written determination of no supervisory objection to the Plans, the Bank's Internal Audit department shall complete an assessment of the Bank's progress towards implementing the Plans. The findings shall be

GARCIA 01236

memorialized in writing and, within thirty (30) days of completing the assessment, Internal Audit shall provide its written findings to the Compliance Committee and the Examiner-in-Charge.

**ARTICLE IV**

**ENTERPRISE-WIDE COMPLIANCE RISK MANAGEMENT PROGRAM**

(1)     Within sixty (60) days of the effective date of this Order, the Bank shall submit to the OCC, for review and prior written determination of no supervisory objection by the Examiner-in-Charge, an acceptable CRMP containing a complete description of the actions that are necessary and appropriate to achieve compliance with this Article. In the event the Examiner-in-Charge directs the Bank to revise the CRMP, the Bank shall promptly make the necessary and appropriate revisions and submit the revised Action Plan to the Examiner-in- Charge for review and written determination of no supervisory objection.

(2)     The Compliance Risk Management Program, addressed through the CRMP, shall, at a minimum, include:

(a)     An effective compliance risk framework that establishes the responsibility and accountability for respective front line units and independent compliance risk management;

(b)     A program to measure, aggregate, and limit regulatory compliance exposures on an ongoing basis independent from front line units commensurate with the risk profile of the Bank;

(c)     Establishment of and adherence to procedures and processes that define clear roles and responsibilities for respective front line units and independent compliance risk management staff, and also ensures compliance with enterprise-wide corporate policies, and laws and regulations (including, but not limited to, state consumer protection laws, "Federal consumer financial law" as defined at 12

-7-

U.S.C. § 5481, Section 5 of the Federal Trade Commission Act, 12 U.S.C. § 45, and the Servicemembers Civil Relief Act, 50 U.S.C. § 3901, et seq.);

(d)     A program to develop, attract, and retain talent and maintain appropriate staffing levels to fulfill respective roles in the Bank's compliance risk management framework;

(e)     An effective, independent monitoring and testing function that is sufficiently and competently staffed and provides risk-based scope and coverage to provide credible challenge and escalation of issues identified by front line units;

(f)     A program that establishes enterprise-wide policies and processes to ensure effective compliance governance and oversight for new products and services;

(g)     Procedures for reporting and escalating significant compliance concerns to senior management and the Board; and

(h)     A comprehensive training program for front line, independent compliance risk, and audit staff that addresses relevant state and federal laws and regulations and impending publicly-announced changes to state and federal laws and regulations.

(3)     Upon receipt of a written determination of no supervisory objection to the CRMP, the Board shall ensure that the Bank implements and adheres to the CRMP.

GARCIA 01238

## ARTICLE V

## STAFFING ASSESSMENT

(1)     Within sixty (60) days of the effective date of this Order, the Bank shall develop

and submit to the OCC, for review and prior written determination of no supervisory objection

by the Examiner-in-Charge, a Staffing Assessment and Program ("Staffing Assessment") for the

Bank's independent Compliance Risk Management Program that will provide for the allocation

of adequate resources. At a minimum, the Staffing Assessment will:

> (a)     Identify the skills and expertise needed to execute and sustain a safe and
>
> sound system of internal controls and risk management for the independent
>
> Compliance Risk Management Program and identify any gaps in those skills
>
> and/or expertise within the Bank's current staff;
>
> (b)     Develop a plan detailing how the Bank will address any gaps or
>
> deficiencies identified pursuant to Subparagraph (1)(a) of this Article; and
>
> (c)     Ensure a robust staffing model that provides for ongoing monitoring of the
>
> Bank's independent Compliance Risk Management Program's staffing, including
>
> addressing skill and expertise gaps as identified.

(2)     The Compliance Committee shall ensure that management corrects any

deficiencies identified by the Staffing Assessment and implements any plans or

recommendations resulting from the Staffing Assessment.

(3)     Thereafter, the Compliance Committee will ensure that the Bank, at least as

frequently as annually, evaluates the skills and expertise of the independent Compliance Risk

Management Program's staff to determine if there are any material deficiencies in skills or

expertise and develop a plan to address any identified gaps or deficiencies.

GARCIA 01239

## ARTICLE VI

## __INTERNAL AUDIT__

(1)     Within sixty (60) days of the effective date of this Order, the Bank shall submit to the OCC, for review and prior written determination of no supervisory objection by the Examiner-in-Charge, a plan to enhance Internal Audit's program with respect to compliance ("Internal Audit's Compliance Program"). At a minimum, Internal Audit's Compliance Program shall include:

(a)     An annual assessment conducted by Internal Audit of the Bank's implementation and adherence to the Compliance Risk Management Program. The findings shall be memorialized in writing and, within thirty (30) days of completing the assessment, the findings shall be provided to the Compliance Committee and the Examiner-in-Charge;

(b)     Policies and procedures for conducting audits of the Bank's compliance with all relevant state and federal laws and regulations;

(c)     Clearly defined roles and responsibilities of Internal Audit's staff to ensure there is comprehensive coverage and coordination with the Bank's Compliance Risk Management Program;

(d)     Procedures for expanding Internal Audit's sampling when exceptions based on potential violations of laws and regulations are detected; and

(e)     An annual assessment of the effectiveness of Internal Audit's Compliance Program's staff to ensure the sufficiency of staffing levels and expertise for an effective and sustainable compliance audit function.

-10-

GARCIA 01240

## ARTICLE VII

## REMEDIATION PROGRAM

(1)     Within one hundred twenty (120) days of the effective date of this Order, the Bank shall develop and submit to the OCC, for review and prior written determination of no supervisory objection by the Examiner-in-Charge, a plan to develop and implement a Remediation Program ("Remediation Program") that is applicable to remediation activities conducted by the Bank, as defined in the Remediation Program.

(2)     The Bank shall develop and implement a Remediation Program that, at a minimum, shall include:

(a)     Policies and procedures that define the Bank's methodology for identifying harmed or otherwise affected customers ("affected customers"), calculating the economic or other adverse impact on affected customers (which, for the purposes of this Order, does not include emotional harm or distress), communicating with affected customers, and providing remediation to affected customers. These policies and procedures shall ensure that, at a minimum, the Bank:

i.     Clearly defines the methodology for identifying affected customers and calculating economic or other adverse impact, including but not limited to the parameters used in establishing the affected customer population, the type of economic or other adverse impact, and the appropriate form(s) of remediation;

ii.     Engages in a holistic assessment of the economic or other adverse impact on the affected customers when developing individual remediation plans required by the Remediation Program (each such plan, a

-11-

"Remediation Plan"). The factors to be considered include, but are not limited to, the total dollar amount of economic or other adverse impact on the affected population, the amount of additional fees or interest collected or charged in connection with the issue, any negative effects to a customer's credit report, and the period of time during which customers were affected;

iii.     Establishes criteria and standards for Remediation Plans, including:

a.     Evaluating the parameters used to determine the affected customer population, the economic or other adverse impact, and the form of remediation;

b.     Locating and contacting affected customers;

c.     Developing effective disclosures and communications used to inform affected customers of any actual or potential harm and apprise customers of their remediation options;

d.     The issuance and tracking of remediation payments disbursed to affected customers;

e.     The crediting or adjustment of affected customers' accounts;

f.     Procedures to request amendments to affected customers' credit reports from the credit reporting agencies;

-12-

g.      Procedures to validate that requested amendments to affected customers' credit reports have been accepted and applied by the credit reporting agencies; and

h.      Ensuring effective oversight of independent consultants, including criteria and standards around evaluation of the independent consultant's work product associated with the implementation of a Remediation Plan.

(b)     Governance processes that provide for:

i.      Review and credible challenge of Remediation Plans by a senior management risk committee, and approval by the Board or a Board committee; and

ii.     A process for employees in the relevant business line or who are responsible for developing, executing or validating Remediation Plans to escalate concerns about decisions with which they disagree to appropriate senior management.

(c)     A mechanism through which directors on the Compliance Committee receive sufficient information about Remediation Plans to assess whether the Remediation Program is being complied with, and to provide credible challenge.

(d)     Reporting procedures that, at a minimum, require:

i.      Monthly reporting of the status of any anticipated or ongoing Remediation Plans developed by the Bank ("Remediation Report");

ii.     The Remediation Report shall list all anticipated and ongoing Remediation Plans, detailing, at a minimum:

-13-

        a.       Issue(s) to be or being remediated;

        b.       Number of customers affected;

        c.       Anticipated amount of total reimbursement to be paid;

        d.       Period of time during which customers were affected; and

        e.       Current status of remediation.

    iii.   Within ten (10) days of its completion, the Remediation Report shall be transmitted to the Compliance Committee and the Examiner-in-Charge.

(e)     Processes that require the relevant line(s) of business or other unit of the Bank to perform an analysis to diagnose the root cause(s) of the underlying issue(s) that led to the customer remediation, development of action plans to remediate the root cause(s), and implementation of internal controls and oversight, where necessary, to prevent further customer harm.

## ARTICLE VIII

## ASSESSMENT OF REMEDIATION

(1)     In connection with any Remediation Plan that has been submitted to the OCC under the provisions of Paragraphs (4) or (6) of this Article and has received no supervisory objection, an independent unit, third party, or Internal Audit shall prepare a report validating that the Bank's implementation of the Remediation Plan is in compliance with the requirements of the Bank's Remediation Program ("Remediation Review Report"). Upon notification in writing by the Examiner-in-Charge, the OCC may require the Bank to engage an independent third party to validate that the Bank's implementation of a Remediation Plan is in compliance with the requirements of the Bank's Remediation Program, and prepare a Remediation Review Report.

(2)     The Remediation Review Report shall include, at a minimum, an assessment of:

GARCIA 01244

(a)    The effectiveness of the methodology and assumptions used to identify and determine the population of affected customers;

(b)    The rationale for any changes or adjustments to the underlying facts or assumptions relied upon in determining the population of affected customers, the amount of remediation, and the type of remediation;

(c)    The effectiveness of procedures used to locate and contact affected customers;

(d)    The Bank's success in contacting affected customers;

(e)    The procedures to issue and track reimbursement payments and other forms of remediation;

(f)    The procedures used for requesting amendments to affected customers' credit reports from the credit reporting agencies;

(g)    Complaints received from affected customers receiving remediation or customers that believe they were affected but were not eligible for remediation under the Remediation Plan; and

(h)    The work of any independent consultants that the Bank engaged to assist with the implementation or execution of the Remediation Plan.

(3)    Within ten (10) days of its completion, the Remediation Review Report shall be submitted to the Compliance Committee and the Examiner-in-Charge.

(4)    While this Order is effective, the Examiner-in-Charge may require submission of a validated Remediation Plan (as defined in Article VII of this Order) for a written determination of no supervisory objection if the related remediation meets the following criteria:

GARCIA 01245

(a)     The number of customers or customer accounts likely to require

remediation exceeds 50,000;

(b)     The anticipated amount of the total remediation to be paid, refunded, or

remitted to customers exceeds $10 million; or

(c)     The customer harm being remediated poses or has resulted in significant

reputational risk to the Bank, or creates other supervisory concern.

(5)     The Bank, at least thirty (30) days (or as soon as practicable per the terms of the

controlling legal document) prior to the implementation of any Remediation Plan pursuant to a

legal judgment, court order, or negotiated settlement of any legal proceeding, as specified in the

Remediation Program, which relates to a violation or a potential violation of a consumer

compliance law including, but not limited to, state consumer protection laws, "Federal consumer

financial law" as defined at 12 U.S.C. § 5481, and the Servicemembers Civil Relief Act, 50

U.S.C. § 3901, et seq., must provide the Examiner-in-Charge with a copy of the proposed

Remediation Plan.

(6)     Within sixty (60) days of the effective date of this Order, the Bank shall submit to

the OCC, for written determination of no supervisory objection by the Examiner-in-Charge, two

comprehensive Remediation Plans, one covering CPI and the second addressing mortgage

interest rate lock extension fees. Both Plans should address how the bank will remediate

customers affected by the Bank's unfair or unsafe or unsound practices. Within one hundred

eighty (180) days from the determination of no supervisory objection, such remediation to

affected customers shall be completed, including internal audit validation, and the Bank shall

provide Remediation Review Reports (as defined in Paragraph (1) of this Article) pertaining to

-16-

CPI and mortgage interest rate lock extension fees Remediation Plans to the Examiner-in-Charge.

(7)     In the interest of expediting relief to affected consumers, the Bank may proceed with providing remediation to consumers under any Remediation Plan, whether or not it has been submitted for, or received, a written determination of no supervisory objection pursuant to Paragraphs (4) or (6) of this Article. However, the OCC, prior to providing no supervisory objection for any Remediation Plan, may require the Bank to provide additional remediation to consumers and/or remediate other consumers.

(8)     The Bank shall not be considered to be in compliance with this Article, and this Article remains effective, until such time that the OCC has determined that the Bank is in compliance with Articles II through VII of this Order.

## ARTICLE IX

## COMPENSATION MATTERS

(1)     Upon execution of this Order, unless the OCC informs the Bank otherwise in writing, the Bank is not subject to the restrictions in 12 C.F.R. § 5.51 requiring prior notice to the OCC of changes in directors and senior executive officers or the limitation on golden parachute payments set forth in 12 C.F.R. Part 359. This provision informs the Bank in writing for purposes of 12 C.F.R. § 5.51(c)(7)(ii) and also applies to all other consent orders between the Bank and the OCC outstanding as of the effective date of this Order (*see* OCC Orders AA-EC-2015- 06; AA-EC-2015-79; AA-EC-2016-68; and AA-EC-2016-66).

(2)     Notwithstanding Paragraph (1) of this Article, the Bank shall comply with the provisions of this Article for any "covered payment" to a "covered individual."

(3)     For purposes of this Article, "covered payment" shall include any payment by the Bank, or its holding company ("Company"), to a covered individual that provides compensation

-17-

that is contingent on, or is payable on or after, a termination of employment that occurs on or after the effective date of this Order. Covered payment shall not include:

(a)     Any payment made pursuant to a pension or retirement plan, a health or insurance benefit plan or payments made as a result of death or disability;

(b)     Any payment made pursuant to the Bank's Salary Continuation Plan, effective April 1, 2017;

(c)     Any severance payment required to be made pursuant to foreign law;

(d)     Any payment made pursuant to a stock option or equity award that vested prior to the termination of that person's employment; or

(e)     Any payment or class of payments the OCC designates in writing as not being a covered payment.

(4)     For purposes of this Article, "covered individual" shall include:

(a)      Any current or former member of the Company's Operating Committee who occupied that position at any time between June 3, 2015, and the effective date of this Order;

(b)     Any current or former Bank employee who served as a member of the Company's Management Committee Review Group who occupied that position any time between June 3, 2015, and the effective date of this Order;

(c)     Any current or former Bank employee who served as a Regional Bank President or in a more senior position in the Community Bank at any time between June 3, 2015, and the effective date of this Order; and

(d)     Any current or former Bank employee the OCC designates in writing as a covered individual.

-18-

GARCIA 01248

(5)     The Bank shall submit a request to the Deputy Comptroller for prior written determination of no supervisory objection to a covered payment to a covered individual before such covered payment is made. Such request shall include a certification, made after the Bank has conducted an appropriate payment review process, that the covered individual was not substantially responsible for conduct related to Article I of this Order or OCC Consent Order AA-EE-2016-66 dated September 6, 2016 ("Sales Practices Order").

(6)     Within thirty (30) days of the date of this Order, the Bank shall submit to the OCC, for prior written determination of no supervisory objection by the Examiner-In-Charge, a plan detailing a proposed payment review process. Once the Bank receives prior written determination of no supervisory objection from the OCC to the payment review process, the Bank shall adopt, implement, and thereafter adhere to the payment review process in submitting any request under Paragraph (5) of this Article.

(7)     After the Bank has submitted a request with respect to any covered payment, the covered payment may not be made until:

> (a)     In the case of any current or former member of the Company's Operating Committee or Management Committee Review Group who occupied that position at any time between June 3, 2015, and the effective date of this Order, the Bank receives prior written determination of no supervisory objection from the Deputy Comptroller; or
>
> (b)     In the case of any other covered individual, the earlier of:
>
> > i.     The date the Bank receives prior written determination of no supervisory objection from the OCC; or

-19-

      ii.     Thirty (30) days after the Bank submitted a request, unless the OCC has objected to the proposed covered payment or the Deputy Comptroller advises the Bank that the OCC, at its sole discretion, is extending the review period.

(8)     Upon the effective date of this Order, the Bank shall have entered into a written agreement with the Company, a copy of which shall be provided to the Examiner-in-Charge, stating, among other things, that the Company will not make any covered payment unless:

      (a)     The Bank has received a prior written determination of no supervisory objection from the OCC with respect to the covered payment; or

      (b)     The period within which the OCC may object to a covered payment has elapsed (including any extension of the initial period) without the OCC's objection to the payment.

(9)     The Bank shall ensure that any agreement not in existence as of the date of this Order that may provide for a covered payment conditions the covered payment on the Bank's compliance with the provisions of this Article.

(10)     Upon a finding by the OCC that the Bank has failed to abide by the restrictions contained in this Article or that the Bank or Company has violated the written agreement between the parties referenced in Paragraph (8) of this Article, the OCC may subject the Bank to the restrictions in 12 C.F.R. § 5.51 requiring prior notice to the OCC of changes in directors and senior executive officers and the limitation on golden parachute payments set forth in 12 C.F.R. Part 359, or assess civil money penalties against the Bank pursuant to the provisions of 12 U.S.C. § 1818(i) and\or take other enforcement and\or supervisory action.

GARCIA 01250

(11)    For purposes of this Article, the term "Bank Employee" shall include any institution-affiliated party as defined in 12 U.S.C. § 1813(u).

<strong>ARTICLE X</strong>

<strong><u>CHANGES IN DIRECTORS AND SENIOR EXECUTIVE OFFICERS</u></strong>

(1)    The Bank shall obtain a prior written determination of no supervisory objection from the Deputy Comptroller with respect to the appointment of any individual to a position of "senior executive officer," or to the appointment of Chairman of the Board or any other individual to the Board. In connection therewith, the Bank shall comply with the requirements of the "Changes in Directors and Senior Executive Officers" booklet of the Comptroller's Licensing Manual (February 2017). The OCC may provide additional guidance with respect to such aspects of the process as it may deem appropriate. The OCC shall not be required to review or act upon any request within any specific time period.

(2)    For purposes of this Article, "senior executive officer" shall have the meaning specified in 12 C.F.R. § 5.51(c)(4) and shall include the following individuals because they exercise significant influence over, or participate in, major policy making decisions of the Bank:

> (a)    Bank employees in all titled positions that presently comprise the Company's Operating Committee, and their functional equivalents; and
>
> (b)    Bank employees in all future titled positions that the Bank adds to the Company's Operating Committee.

(3)    For purposes of this Article, the term "Bank Employee" shall include any institution affiliated party as defined in 12 U.S.C. § 1813(u).

-21-

GARCIA 01251

**ARTICLE XI**

**APPROVAL, IMPLEMENTATION, AND REPORTS**

(1)      The Bank shall submit the written plans, programs, policies, and procedures required by this Order to the Examiner-in-Charge, or as otherwise specified by this Order, for review and prior written determination of no supervisory objection within the applicable time periods set forth in Articles III through X. The Board shall ensure that the Bank submits the plans, programs, policies, and procedures to the Examiner-in-Charge for prior written determination of no supervisory objection. In the event the Examiner-in-Charge asks the Bank to revise the plans, programs, policies, or procedures, the Bank shall promptly make the necessary and appropriate revisions and resubmit the materials to the Examiner-in-Charge for review and written determination of no supervisory objection. Unless otherwise specified, following implementation of the plans, programs, policies, and procedures, the Bank shall not take any action that will cause a significant deviation from, or material change to the plans, programs, policies, and procedures, unless and until the Bank has received prior written determination of no supervisory objection from the Deputy Comptroller.

(2)      During the term of this Order, the Bank shall revise the required plans, programs, policies, and procedures as necessary to incorporate new, or changes to, applicable legal requirements and supervisory guidelines.

(3)      The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Order.

GARCIA 01252

(4)     All communication regarding this Order shall be sent to:

> Tanya K. Smith
> Examiner-in-Charge
> Wells Fargo Bank, N.A.
> LB-OCC-National Bank Examiners
> 343 Sansome Street, Suite 1150
> San Francisco, CA 94163

or such other individuals or addresses as directed by the OCC.

## ARTICLE XII

## OTHER PROVISIONS

(1)     Although this Order requires the Bank to submit certain actions, plans, programs, and policies for the review or prior written determination of no supervisory objection by the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2)     If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(3)     This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the practices and violations of law described in the Comptroller's Findings set forth in Article I of this Order. The Comptroller releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the Comptroller based on the practices and violations described in Article I of this Order, to the extent known to the Comptroller as of the effective date of this Order. Notwithstanding this release, the OCC expects the Bank to expeditiously undertake all necessary and appropriate actions to achieve compliance with this Order and to avoid future

GARCIA 01253

violations of law and harm to consumers. The OCC expressly reserves its right to assess future

civil money penalties, or take other supervisory and/or enforcement actions, including in

circumstances where the OCC determines that the Bank is not making sufficient and sustainable

progress towards implementation of an effective and sustainable enterprise-wide compliance risk

management program. Such actions could include issuing a cease and desist order pursuant to

12 U.S.C. § 1818(b)(6) that imposes business restrictions and/or requires the Bank to make

changes to its senior executive officers or any and/or all members of the Board. Moreover,

nothing in the Stipulation or this Order shall prevent the Comptroller from:

      (a)    Instituting enforcement actions other than a cease and desist order against the Bank based on the findings set forth in Article I of this Order;

      (b)    Instituting enforcement actions against the Bank based on any other findings;

      (c)    Instituting enforcement actions against the Bank's institution-affiliated parties based on the findings set forth in Article I of this Order, or any other findings; or

      (d)    Utilizing the findings set forth in Article I of this Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

Further, nothing in the Stipulation or this Order shall affect any right of the Comptroller to

determine and ensure compliance with the terms and provisions of the Stipulation or this Order.

      (4)    This Order is and shall become effective upon its execution by the Comptroller,

through his authorized representative whose hand appears below. This Order shall remain

effective and enforceable, except to the extent that, and until such time as, any provision of this

-24-

Order shall be amended, suspended, waived, or terminated in writing by the Comptroller or his authorized representative.

(5)     Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless this Order specifies otherwise. The time limitations may be extended in writing by the Deputy Comptroller for good cause upon written application by the Board. Any request to extend any time limitation shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with the time limitation, and shall be accompanied by relevant supporting documentation. The Deputy Comptroller's decision regarding the request is final and not subject to further review.

(6)     The terms and provisions of this Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to this Order. The Bank shall integrate any activities done by a subsidiary into its plans, policies, programs, and processes required by this Order. The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

(7)     This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States. Without limiting the foregoing, nothing in this Order shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency.

(8)     The terms of this Order, including this Paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

GARCIA 01255

**IT IS SO ORDERED**, this 20th day of April, 2018.


  /s/Greg J. Coleman     
Greg J. Coleman
Deputy Comptroller
Large Bank Supervision

**GARCIA 01256**

# UNITED STATES OF AMERICA
# DEPARTMENT OF THE TREASURY
# COMPTROLLER OF THE CURRENCY

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| | ) | |
| Wells Fargo Bank, N.A. | ) | AA-EC-2018-15 |
| Sioux Falls, South Dakota | ) | |
| | ) | |

## STIPULATION AND CONSENT TO THE ISSUANCE
## OF A CONSENT ORDER

**WHEREAS**, the Comptroller of the Currency of the United States of America

("Comptroller"), based upon information derived from the exercise of his regulatory and

supervisory responsibilities, intends to issue a cease and desist order to Wells Fargo Bank, N.A.,

Sioux Falls, South Dakota ("Bank"), pursuant to 12 U.S.C. § 1818(b), for deficiencies in the

Bank's enterprise-wide compliance risk management program that constituted reckless unsafe or

unsound practices and resulted in violations of the unfair acts or practices provision of Section 5

of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1);

**WHEREAS**, in the interest of cooperation and to avoid additional costs associated with

administrative and judicial proceedings with respect to the above matter, the Bank, through its

duly elected and acting Board of Directors ("Board"), has agreed to execute this Stipulation and

Consent to the Issuance of a Consent Order ("Stipulation"), that is accepted by the Comptroller,

through his duly authorized representative;

**NOW, THEREFORE**, in consideration of the above premises, it is stipulated by the

Bank that:

1

GARCIA 01257

# ARTICLE I

## JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq.*

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)     The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

# ARTICLE II

## CONSENT

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the accompanying Consent Order by the Comptroller.

(2)     The terms and provisions of the Consent Order apply to the Bank and all of its subsidiaries, even though those subsidiaries are not named as parties to the Consent Order.

(3)     The Bank consents and agrees that the Consent Order shall be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), and consents and agrees that the Consent Order shall become effective upon its execution by the Comptroller through his authorized representative, and shall be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(4)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(b), and not as

GARCIA 01258

a matter of contract law. The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(5)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute this Stipulation.

(6)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(7)     The Consent Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the practices and violations of law described in the Comptroller's Findings set forth in Article I of the Consent Order. The Comptroller releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the Comptroller based on the practices and violations described in Article I of the Consent Order, to the extent known to the Comptroller as of the effective date of the Consent Order. Notwithstanding this release, the OCC expects the Bank to expeditiously undertake all necessary and appropriate actions to achieve compliance with the Consent Order and to avoid future violations of law and harm to consumers. The OCC expressly reserves its right to assess future civil money penalties, or take other supervisory and/or enforcement actions, including in circumstances where the OCC determines that the Bank is not making sufficient and sustainable progress towards implementation of an effective and sustainable enterprise-wide compliance risk management program. Such actions could include

3

GARCIA 01259

issuing a cease and desist order pursuant to 12 U.S.C. § 1818(b)(6) that imposes business restrictions and/or requires the Bank to make changes to its senior executive officers or any and/or all members of the Board. Moreover, nothing in this Stipulation or the Consent Order shall prevent the Comptroller from:

      (a)    Instituting enforcement actions other than a cease and desist order against the Bank based on the findings set forth in Article I of the Consent Order;

      (b)    Instituting enforcement actions against the Bank based on any other findings;

      (c)    Instituting enforcement actions against the Bank's institution-affiliated parties based on the findings set forth in Article I of the Consent Order, or any other findings; or

      (d)    Utilizing the findings set forth in Article I of the Consent Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

Further, nothing in this Stipulation or the Consent Order shall affect any right of the Comptroller to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

## ARTICLE III

## <u>WAIVERS</u>

(1)    The Bank, by executing this Stipulation and consenting to the Consent Order, waives:

      (a)    Any and all rights to the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

GARCIA 01260

(b)     Any and all procedural rights available in connection with the issuance of the Consent Order;

(c)     Any and all rights to a hearing and a final agency decision pursuant to 12 U.S.C. § 1818(b) and (h), 12 C.F.R. Part 19;

(d)     Any and all rights to seek any type of administrative or judicial review of the Consent Order;

(e)     Any and all claims for fees, costs, or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or the Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412;

(f)     Any and all rights to assert this proceeding, this Stipulation, consent to the issuance of the Consent Order, and/or the issuance of the Consent Order, as the basis for a claim of double jeopardy in any pending or future proceeding brought by the United States Department of Justice or any other governmental entity; and

(g)     Any and all rights to challenge or contest the validity of the Consent Order.

## ARTICLE IV

## OTHER PROVISIONS

(1)     Regarding the effect of the Consent Order, and unless the OCC informs the Bank otherwise in writing with respect to any or all of the subparts below:

(a)     The Bank is treated as an "eligible bank" pursuant to 12 C.F.R. § 5.3(g)(5) for the purposes of 12 C.F.R. Part 5;

GARCIA 01261

(b)    The Bank is not subject to the restrictions in 12 C.F.R. § 5.51 requiring

prior notice to the OCC of changes in directors and senior executive officers or

the limitation on golden parachute payments set forth in 12 C.F.R. Part 359, but is

subject to the restrictions of Articles IX and X of the Consent Order; and

(c)    The Bank is treated as an "eligible bank" pursuant to 12 C.F.R.

§ 24.2(e)(4) for the purposes of 12 C.F.R. Part 24 regarding community and

economic development.

(2)    Notwithstanding Paragraph (1) of this Article, the Bank's status under

12 C.F.R. §§ 5.3(g), 24.1(e), and 5.51(c)(7) is contingent upon the Bank's satisfaction of the

requirements of 12 C.F.R. §§ 5.3(g)(1)-(4), 24(e)(1)-(3), and 5.51(c)(7)(i), (iii).

(3)    The Stipulation supersedes all prior OCC communications informing the Bank

whether it will be treated as an "eligible bank" for the purposes of 12 C.F.R. Parts 5 and 24 as a

result of an enforcement action.

## ARTICLE V

## CLOSING

(1)    The provisions of this Stipulation and the Consent Order shall not inhibit, estop,

bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at

any time, he deems it appropriate to do so to fulfill the responsibilities placed upon him by the

several laws of the United States of America.

(2)    Nothing in this Stipulation or the Consent Order shall preclude any proceedings

brought by the Comptroller to enforce the terms of the Consent Order, and nothing in this

Stipulation or the Consent Order constitutes, nor shall the Bank contend that it constitutes, a

release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way

6

affects any actions that may be or have been brought by any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice.

(3)     The terms of this Stipulation, including this paragraph, and of the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

GARCIA 01263

**IN TESTIMONY WHEREOF**, the undersigned, as the duly elected and acting Board of Directors of Wells Fargo Bank, N.A., Sioux Falls, South Dakota, have hereunto set their hands on behalf of the Bank.


_/s/ Timothy J. Sloan_____  __April 20, 2018___
Timothy J. Sloan               Date


_/s/ Theodore F. Craver, Jr._____ _____  __April 20, 2018___
Theodore F. Craver, Jr.            Date


_/s/ Maria R. Morris_____ _____  __April 20, 2018___
Maria R. Morris               Date


_/s/ Karen B. Peetz_____  __April 20, 2018___
Karen B. Peetz                Date


_/s/ James H. Quigley_____  __April 20, 2018___
James H. Quigley              Date

GARCIA 01264

Accepted by:

THE COMPTROLLER OF THE CURRENCY


By: ___/s/Greg J. Coleman___                    __April 20, 2018___
    Greg J. Coleman                                        Date
    Deputy Comptroller
    Large Bank Supervision

GARCIA 01265

**#2018-026**

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Wells Fargo Bank, N.A. | ) | AA-EC-2018-16 |
| Sioux Falls, South Dakota | ) | |
| | ) | |

## CONSENT ORDER FOR A CIVIL MONEY PENALTY

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), has conducted examinations of Wells Fargo Bank, N.A., Sioux Falls, South

Dakota ("Bank"). The OCC has identified deficiencies in the Bank's enterprise-wide

compliance risk management program that constituted reckless unsafe or unsound practices and

resulted in violations of the unfair acts or practices provision of Section 5 of the Federal Trade

Commission Act, 15 U.S.C. § 45(a)(1). The OCC has informed the Bank of the findings

resulting from the examinations.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a Stipulation and Consent to the Issuance of an Order for a Civil Money Penalty, dated

April 20, 2018, that is accepted by the Comptroller ("Stipulation"). By this Stipulation, which is

incorporated herein by reference, the Bank has consented to the issuance of this Consent Order

for a Civil Money Penalty ("Order") by the Comptroller.

1

GARCIA 01266

# ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)     Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile. The Bank's failure to implement and maintain a satisfactory compliance risk management program has caused the Bank to engage in reckless unsafe or unsound practices and violations of law.

(2)     In the course of its ongoing supervision of the Bank, the OCC has identified the following deficiencies and reckless unsafe or unsound practices with respect to the Bank's compliance risk management program:

(a)     Failure to establish effective first and second lines of defense as required by 12 C.F.R. Part 30, Appendix D and insufficient compliance audit;

(b)     Inability to execute on a comprehensive plan to address compliance risk management deficiencies;

(c)     Failure to fill mission-critical staffing positions for Wells Fargo Compliance, formerly known as the Regulatory Compliance Risk Management unit, with individuals who possess the requisite knowledge, skills, and abilities to perform assigned duties;

(d)     Failure to implement a reliable compliance risk assessment and testing program;

(e)     Inadequate reporting to the Board regarding compliance concerns, the regulatory landscape, and the Bank's efforts to correct its compliance problems and address regulatory changes; and

2

GARCIA 01267

(f)    Failure to adequately develop and implement key elements of its

compliance risk management program designed to ensure that the Bank addressed

risks related to potential unfair or deceptive acts or practices since 2014.

(3)    With respect to its enterprise-wide compliance risk management program, the

Bank has previously identified and reported to the OCC certain of the deficiencies that are

described in this Order. The Bank has begun corrective action, and has committed to taking all

necessary and appropriate steps to remedy the deficiencies identified by the OCC and to establish

an effective compliance risk management program.

(4)    In addition to the reckless unsafe or unsound compliance risk management

practices outlined in Paragraph (2) above, prior to June 2012, and continuing through October

2016, the Bank's Dealer Services unit, and its vendor, caused the improper placement and/or

maintenance of collateral protection insurance ("CPI") policies on automobile loan accounts, and

charged premiums, interest, and other fees on borrowers' accounts where the borrowers had

demonstrated adequate insurance under the terms of their automobile loan note/contract. The

Bank, after appropriately placing CPI policies on some borrowers' accounts, improperly

maintained CPI policies on borrowers' accounts after the borrowers had demonstrated that they

had obtained adequate insurance on their vehicles.

(5)    As a result of the Bank's improper CPI placement practices, borrowers were

improperly charged CPI premiums, interest, and fees, and suffered loan delinquencies due to

increased loan payment amounts. In some cases, the Bank improperly repossessed vehicles from

borrowers who had defaulted on their loans due to improperly placed or maintained CPI policies.

(6)    The Bank's aforementioned practices with respect to CPI constituted unfair acts

or practices in or affecting commerce in violation of the unfair acts or practices provision of

GARCIA 01268

Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound.

(7)     Beginning in at least September 2013 and continuing through March 2017, it was the Bank's policy that if (a) a mortgage loan application did not close within its initial interest rate lock period in circumstances where the Bank was responsible for the failure of the loan to close and (b) the customer chose to extend the interest rate lock period, the extension fee was to be charged to the Bank, and not the customer. However, in a number of instances, the Bank charged customers mortgage interest rate lock extension fees even though the Bank had caused the loan closing to fail to occur within the mortgage interest rate lock period.

(8)     As a result of the Bank's mortgage interest rate lock extension fee practices, customers were improperly charged mortgage interest rate extension fees when the Bank should have borne those costs. The Bank's mortgage interest rate lock extension fee practices constituted unfair acts or practices in or affecting commerce in violation of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound.

(9)     By reason of the foregoing conduct, the Bank engaged in reckless unsafe or unsound practices and violations of law that were part of a pattern of misconduct, and was unjustly enriched.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby ORDERS that:

GARCIA 01269

## ARTICLE II

## <u>ORDER FOR A CIVIL MONEY PENALTY</u>

Pursuant to the authority vested in him by the Federal Deposit Insurance Act,

12 U.S.C. § 1818(i), the Comptroller orders, and the Bank consents to the following:

(1)     The Bank shall make payment of a civil money penalty in the total amount of

$500,000,000, which shall be paid upon the execution of this Order:

       (a)     If a check is the selected method of payment, the check shall be made

       payable to the Treasurer of the United States and shall be delivered to:

       Comptroller of the Currency, P.O. Box 979012, St. Louis, Missouri 63197-9000.

       (b)     If a wire transfer is the selected method of payment, it shall be sent in

       accordance with instructions provided by the Comptroller.

       (c)     The docket number of this case (AA-EC-2018-16) shall be entered on the

       payment document or wire confirmation and a photocopy of the payment

       document or confirmation of the wire transfer shall be sent immediately, by

       overnight delivery, to the Director of Enforcement and Compliance, Office of the

       Comptroller of the Currency, 400 7th Street, S.W., Washington, D.C. 20219.

(2)     This Order shall be enforceable to the same extent and in the same manner as an

effective and outstanding order that has been issued and has become final pursuant to

12 U.S.C. § 1818(h) and (i).

5

GARCIA 01270

## ARTICLE III

## OTHER PROVISIONS

(1)     This Order is intended to be, and shall be construed to be, a final order issued

pursuant to 12 U.S.C. § 1818(i)(2), and expressly does not form, and may not be construed to

form, a contract binding on the Comptroller or the United States.

(2)     This Order constitutes a settlement of the civil money penalty proceeding against

the Bank contemplated by the Comptroller, based on the practices and violations of law

described in the Comptroller's Findings set forth in Article I of this Order. The Comptroller

releases and discharges the Bank from all potential liability for a civil money penalty that has

been or might have been asserted by the Comptroller based on the practices and violations

described in Article I of this Order, to the extent known to the Comptroller as of the effective

date of this Order. Notwithstanding this release, the OCC expects the Bank to expeditiously

undertake all necessary and appropriate actions to achieve compliance with the Consent Order

issued by the OCC pursuant to 12 U.S.C. § 1818(b) (OCC Order AA-EC-2018-15), and to avoid

future violations of law and harm to consumers. The OCC expressly reserves its right to assess

future civil money penalties, or take other supervisory and/or enforcement actions, including in

circumstances where the OCC determines that the Bank is not making sufficient and sustainable

progress towards implementation of an effective and sustainable enterprise-wide compliance risk

management program. Such actions could include issuing a cease and desist order pursuant to

12 U.S.C. § 1818(b)(6) that imposes business restrictions and/or requires the Bank to make

changes to its senior executive officers or any and/or all members of the Board. Moreover,

nothing in this Order shall prevent the Comptroller from:

6

GARCIA 01271

(a)     Instituting enforcement actions, other than a civil money penalty, against the Bank based on the findings set forth in Article I of this Order;

(b)     Instituting enforcement actions against the Bank based on any other findings;

(c)     Instituting enforcement actions against the Bank's institution-affiliated parties based on the findings set forth in Article I of this Order, or any other findings; or

(d)     Utilizing the findings set forth in Article I of this Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

Further, nothing in this Order shall affect any right of the Comptroller to determine and ensure compliance with the terms and provisions of this Order.

(3)     The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

7

**IT IS SO ORDERED**, this 20th day of April, 2018.


/s/Greg J. Coleman
Greg J. Coleman
Deputy Comptroller
Large Bank Supervision

8

**GARCIA 01273**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

|  |  |  |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Wells Fargo Bank, N.A. | ) | AA-EC-2018-16 |
| Sioux Falls, South Dakota | ) | |
| | ) | |

**STIPULATION AND CONSENT TO THE ISSUANCE**
**OF AN ORDER FOR A CIVIL MONEY PENALTY**

**WHEREAS**, the Comptroller of the Currency of the United States of America

("Comptroller"), based upon information derived from the exercise of his regulatory and

supervisory responsibilities, intends to initiate a civil money penalty proceeding against

Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank"), pursuant to 12 U.S.C. § 1818(i),

for deficiencies in the Bank's enterprise-wide compliance risk management program that

constituted reckless unsafe or unsound practices and resulted in violations of the unfair acts or

practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1);

**WHEREAS**, in the interest of cooperation and to avoid additional costs associated with

administrative and judicial proceedings with respect to the above matter, the Bank, through its

duly elected and acting Board of Directors ("Board"), has agreed to execute this Stipulation and

Consent to the Issuance of a Civil Money Penalty ("Stipulation"), that is accepted by the

Comptroller, through his duly authorized representative;

**NOW, THEREFORE**, in consideration of the above premises, it is stipulated by the

Bank that:

1

GARCIA 01274

## ARTICLE I

## <u>JURISDICTION</u>

(1)     The Bank is a national banking association chartered and examined by the

Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq.*

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank

pursuant to 12 U.S.C. §§ 1813(q) and 1818(i).

(3)     The Bank is an "insured depository institution" within the meaning of

12 U.S.C. § 1818(i).

## ARTICLE II

## <u>CONSENT</u>

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to

issuance of the accompanying Consent Order for a Civil Money Penalty ("Order") by the

Comptroller.

(2)     The terms and provisions of the Order apply to the Bank and all of its

subsidiaries, even though those subsidiaries are not named as parties to the Order.

(3)     The Bank consents and agrees that the Order shall be deemed an "order issued

with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), and consents

and agrees that the Order shall become effective upon its execution by the Comptroller through

his authorized representative, and shall be fully enforceable by the Comptroller pursuant to

12 U.S.C. § 1818(i).

(4)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of

a contract, the Comptroller may enforce any of the commitments or obligations herein

undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as

2

a matter of contract law. The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(5)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Order and/or execute this Stipulation.

(6)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(7)     The Order constitutes a settlement of the civil money penalty proceeding against the Bank contemplated by the Comptroller, based on the practices and violations of law described in the Comptroller's Findings set forth in Article I of the Order. The Comptroller releases and discharges the Bank from all potential liability for a civil money penalty that has been or might have been asserted by the Comptroller based on the practices and violations described in Article I of the Order, to the extent known to the Comptroller as of the effective date of the Order. Notwithstanding this release, the OCC expects the Bank to expeditiously undertake all necessary and appropriate actions to achieve compliance with the Consent Order issued by the OCC pursuant to 12 U.S.C. § 1818(b) (OCC Order AA-EC-2018-15), and to avoid future violations of law and harm to consumers. The OCC expressly reserves its right to assess future civil money penalties, or take other supervisory and/or enforcement actions, including in circumstances where the OCC determines that the Bank is not making sufficient and sustainable

3

progress towards implementation of an effective and sustainable enterprise-wide compliance risk management program. Such actions could include issuing a cease and desist order pursuant to 12 U.S.C. § 1818(b)(6) that imposes business restrictions and/or requires the Bank to make changes to its senior executive officers or any and/or all members of the Board. Moreover, nothing in this Stipulation or the Order shall prevent the Comptroller from:

(a)      Instituting enforcement actions, other than a civil money penalty, against the Bank based on the findings set forth in Article I of the Order;

(b)      Instituting enforcement actions against the Bank based on any other findings;

(c)      Instituting enforcement actions against the Bank's institution-affiliated parties based on the findings set forth in Article I of the Order, or any other findings; or

(d)      Utilizing the findings set forth in Article I of the Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

Further, nothing in this Stipulation or the Order shall affect any right of the Comptroller to determine and ensure compliance with the terms and provisions of this Stipulation or the Order.

GARCIA 01277

**ARTICLE III**

**WAIVERS**

(1)    The Bank, by executing this Stipulation and consenting to the Order, waives:

(a)    Any and all rights to the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(i);

(b)    Any and all procedural rights available in connection with the issuance of the Order;

(c)    Any and all rights to a hearing and a final agency decision pursuant to 12 U.S.C. § 1818(i), 12 C.F.R. Part 19;

(d)    Any and all rights to seek any type of administrative or judicial review of the Order;

(e)    Any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or the Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412;

(f)    Any and all rights to assert this proceeding, this Stipulation, consent to the issuance of the Order, and/or the issuance of the Order, as the basis for a claim of double jeopardy in any pending or future proceeding brought by the United States Department of Justice or any other governmental entity; and

(g)    Any and all rights to challenge or contest the validity of the Order.

5

GARCIA 01278

## ARTICLE IV

## CLOSING

(1)     The provisions of this Stipulation and the Order shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, he deems it appropriate to do so to fulfill the responsibilities placed upon him by the several laws of the United States of America.

(2)     Nothing in this Stipulation or the Order shall preclude any proceedings brought by the Comptroller to enforce the terms of the Order, and nothing in this Stipulation or the Order constitutes, nor shall the Bank contend that it constitutes, a release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way affects any actions that may be or have been brought by any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice.

(3)     The terms of this Stipulation, including this paragraph, and of the Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

GARCIA 01279

**IN TESTIMONY WHEREOF**, the undersigned, as the duly elected and acting Board of Directors of Wells Fargo Bank, N.A., Sioux Falls, South Dakota, have hereunto set their hands on behalf of the Bank.

 _/s/Timothy J. Sloan_____    __April 20, 2018_
Timothy J. Sloan                                       Date

 _/s/Theodore F. Craver, Jr._____    __April 20, 2018_
Theodore F. Craver, Jr.                            Date

 _/s/Karen B. Peetz_____    __April 20, 2018_
Karen B. Peetz                                      Date

 _/s/Maria R. Morris_____    __April 20, 2018_
Maria R. Morris                                   Date

 _/s/James H. Quigley_____    __April 20, 2018_
James H. Quigley                                  Date

GARCIA 01280

Accepted by:

THE COMPTROLLER OF THE CURRENCY

By: __/s/Greg J. Coleman_____            __April 20, 2018__
    Greg J. Coleman                                            Date
    Deputy Comptroller
    Large Bank Supervision

8

GARCIA 01281

# 2021 CONSENT ORDER

#2021-035

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | |
| Wells Fargo Bank, N.A. ) | AA-ENF-2021-29 |
| Sioux Falls, South Dakota ) | |
| ) | |

**CONSENT ORDER**

 **WHEREAS**, the Office of the Comptroller of the Currency ("OCC") has supervisory authority over Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank");

 **WHEREAS**, the OCC intends to initiate cease and desist proceedings against the Bank pursuant to 12 U.S.C. § 1818(b), through the issuance of a Notice of Charges, for engaging in unsafe or unsound practice(s) related to material deficiencies regarding the Bank's loss mitigation activities, including loan modification decisions and operational practices, and inadequate Independent Risk Management and Internal Audit of the Bank's loss mitigation activities.

 **WHEREAS**, in the interest of cooperation and to avoid additional costs associated with administrative and judicial proceedings with respect to the above matter, the Bank, by and through its duly elected and acting Board of Directors ("Board"), consents to the issuance of this Consent Order ("Order"), by the OCC through the duly authorized representative of the Comptroller of the Currency ("Comptroller"); and

 **NOW, THEREFORE**, pursuant to the authority vested in the OCC by Section 8(b) of the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818(b), the OCC hereby orders that:

1

## ARTICLE I

## JURISDICTION

(1)     The Bank is an "insured depository institution" as that term is defined in

12 U.S.C. § 1813(c)(2).

(2)     The Bank is a national banking association within the meaning of

12 U.S.C. § 1813(q)(1)(A), and is chartered and examined by the OCC.

*See* 12 U.S.C. § 1 *et seq.*

(3)     The OCC is the "appropriate Federal banking agency" as that term is defined in

12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain this cease and desist

action against the Bank pursuant to 12 U.S.C. § 1818(b).

## ARTICLE II

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)     The Bank has significant deficiencies related to its loss mitigation activities.

(2)     The OCC has identified and previously communicated to the Bank the following

deficiencies and unsafe or unsound practices with respect to loss mitigation:

(a) The Bank has failed to fully implement and maintain adequate loss mitigation

practices and related Independent Risk Management practices commensurate

with the Bank's size, complexity, and risk profile.

(b) The Bank's loss mitigation decisioning tools (applications and end-user

computing tools) and operational deficiencies have caused errors in the

Bank's loss mitigation processes and controls that negatively affected

borrowers.

(c) The Bank's inadequate controls, insufficient independent oversight, and ineffective governance related to loss mitigation activities have caused the Bank's failure to timely detect, prevent, and quantify inaccurate loan modification decisions and impaired the Bank's ability to fully and timely remediate harmed customers.

(d) The Bank's Internal Audit coverage of loss mitigation activities are deficient and have failed to include all aspects of previously identified loan modification decision issues.

(3)     By reason of the foregoing conduct, the Bank has engaged in unsafe or unsound practices with respect to its loss mitigation activities, along with inadequate Independent Risk Management and Internal Audit coverage of its loss mitigation program.

## ARTICLE III

## COMPLIANCE COMMITTEE

(1)     The Board shall appoint and maintain an active Compliance Committee of at least three (3) members, of which a majority shall be directors who are not employees or officers of the Bank or any of its subsidiaries or affiliates. The Compliance Committee shall be responsible for approving the action plan required under Article IV of this Order, along with monitoring and overseeing the Bank's compliance with the provisions of this Order. The Compliance Committee shall meet quarterly and maintain minutes of its meetings at which compliance with this Order is discussed.

(2)     Within forty-five (45) days after the end of the first full quarter after the effective date of this Order, and within forty-five (45) days after the end of each subsequent calendar quarter, the Compliance Committee shall submit a written progress report to the Board setting

forth in detail the actions taken to comply with each Article of this Order, and the results and status of those actions.

(3)    The Board shall forward a copy of the progress report, with any additional comments by the Board, to the Examiner-in-Charge within fifteen (15) days of the first Board meeting following receipt of such report or within such time period as required by the OCC in writing by communication from the Examiner-in-Charge, unless additional time is granted by the Examiner-in-Charge through a prior written determination of no supervisory objection.

## ARTICLE IV

## ACTION PLAN

(1)    Within one hundred fifty (150) days of the effective date of this Order, the Bank shall submit to the Examiner-in-Charge for review and prior written determination of no supervisory objection an acceptable written action plan containing a complete description of the remedial actions required by this Order and the specific actions necessary to achieve compliance with Articles V through VIII of this Order ("Action Plan"), timelines for completion of those actions, and timelines for Internal Audit validation.

(2)    Upon receiving a prior written determination of no supervisory objection from the Examiner-in-Charge, the Board shall ensure the Bank executes and thereafter adheres to the Action Plan, including the timelines included therein. In the course of executing the Action Plan, the Bank shall not take any action that will cause a significant deviation from, or material change to, the Action Plan and the timelines included therein, unless and until the Bank has received a prior written determination of no supervisory objection from the Examiner-in-Charge.

(3)     Within one hundred twenty (120) days of receipt of a prior written determination of no supervisory objection to the Action Plan, the Bank's Internal Audit department shall complete an assessment of the Bank's progress towards implementing the Action Plan. On a quarterly basis, Internal Audit should review and communicate that Bank management's Action Plan progress report is accurate, including the assessment if any material changes have occurred that require no supervisory objection. The findings shall be memorialized in writing and, within thirty (30) days of completing the assessment, Internal Audit shall provide its written findings to the Compliance Committee and the Examiner-in-Charge.

**ARTICLE V**

**LOSS MITIGATION PROGRAM**

(1)     Within the timeframes set forth in the Action Plan to which the Examiner-in-Charge has provided prior written determination of no supervisory objection, the Bank shall implement and thereafter maintain an effective Loss Mitigation Program with respect to loss mitigation activities in the Bank's Home Lending business.

(2)     The Bank's Loss Mitigation Program shall, at a minimum, include:

(a)  policies, procedures, and processes that:

(i) ensure the Bank conducts loss mitigation activities in accordance with applicable state and federal laws and regulations, and investor requirements;

(ii) ensure the Bank conducts effective and sustainable loss mitigation activities, including loan modification decisions;

(iii) ensure the Bank performs quarterly evaluation of the effectiveness of loss mitigation systems and tools with a focus on manual processes

5

and controls;

(iv) ensure the Bank adheres to its Complaints Management Policy and implementing procedures, including standards for resolution, reporting, aggregation, and analysis of customer complaints specifically related to the Bank's Loss Mitigation Program; and

(v) ensure the Bank clearly delineates roles, responsibilities, and decision-making authorities with respect to its Loss Mitigation Program.

(b) requirements that accurate books and systems of record are maintained to ensure all loss mitigation activities and loan modification decisions are identified and documented, including customer communications;

(c) adequate staffing and training of staff responsible for loss mitigation activities, including loan modification decisions; and

(d) disaster playbooks that clarify delegated authorities and escalation protocols, anticipate a variety of scenarios that could cause customers to experience financial stress or hardship, and account for the size and complexity of the Bank's mortgage servicing portfolio, including providing for appropriate levels of trained staff to address the unanticipated event or scenario.

(3) The Bank's Loss Mitigation Program shall also, at a minimum, include:

(a) Line of Business reviews of all loss mitigation activities;

(b) identification of areas that need improvement based on the results of all loss mitigation decision reviews, which are then incorporated into and addressed by the Bank's Loss Mitigation Program;

(c) measures to verify that loss mitigation decisioning assumptions and inputs are updated on an ongoing and timely manner and incorporate applicable changes in state and federal laws and regulations, and investor requirements;

(d) analysis of potential risks of error arising from pre-implementation changes to loss mitigation tools; and

(e) post-implementation testing and review processes to ensure that loss mitigation tool changes have been made as intended.

(4) In connection with the Bank's Loss Mitigation Program, the Bank shall develop and produce timely, complete, and accurate reporting metrics that provide Bank management and the Board committee required by Article III of this Order an aggregated view of risk arising from loss mitigation change management activities, including metrics demonstrating the effectiveness of a loss mitigation tool's ability to produce correct loss mitigation or loan modification decisions, in accordance with applicable state and federal laws and regulations, and investor requirements.

(5) The Board shall ensure that the Bank implements and adheres to the Loss Mitigation Program required by this Article.

## ARTICLE VI

## CUSTOMER IMPACT ASSESSMENTS AND PORTFOLIO GOVERNANCE

(1) The Bank must ensure that any remediation due to customers as a result of errors, deficiencies, or omissions in the Bank's Loss Mitigation Program, including any loan modification decisions that resulted in borrower impact or financial harm, is processed in accordance with Consent Order, AA-EC-2018-15, issued by the OCC against the Bank on April 20, 2018 (the "2018 Order").

(2)    In addition to complying with the requirements of the 2018 Order, the Bank shall ensure that:

(a)  Bank management determines potential borrower impact, which includes but is not limited to potential financial harm from errors related to loss mitigation activities as well as potential borrower impact resulting from the aggregation of multiple errors related to loss mitigation, and determines whether there is a need to establish and maintain foreclosure holds for impacted borrowers until remediation is provided;

(b)  Bank management provides independent oversight of the individuals and teams responsible for the determination of borrower impact from identified errors relating to loss mitigation activities;

(c)  Bank management establishes effective controls to ensure loans to borrowers impacted by identified errors related to loss mitigation activities are not transferred out of the Bank's loan servicing portfolio until remediation is provided, except as required by an investor pursuant to a contractual right;

(d)  the Bank remains responsible for the remediation of any errors related to the Bank's loss mitigation activities while the loan was serviced by the Bank notwithstanding the transfer of the loan out of the Bank's loan servicing portfolio; and

(e)  the Bank shall not acquire bulk residential mortgage servicing, residential mortgage servicing rights, and residential mortgage business entities. This restriction does not apply to retail or other Bank origination channels, refinancings by the Bank, contracts for new residential mortgage loans though

8

the Bank's broker or correspondent channels, or contractual relationships where the Bank does not ultimately service the loans. The restrictions of this sub-paragraph are not intended to disrupt the Bank's existing residential mortgage servicing contracts.

(3)    The restrictions set forth in Paragraph (2)(e) of this Article remain in effect until the termination of this Order, unless otherwise modified or terminated upon written communication to the Bank by the Deputy Comptroller.

## ARTICLE VII

## INDEPENDENT RISK MANAGEMENT – LOSS MITIGATION PROGRAM

(1)    Within the timeframes set forth in the Action Plan to which the Examiner-in-Charge has provided prior written determination of no supervisory objection, the Bank shall ensure that it has an acceptable Loss Mitigation Independent Risk Management Program designed to ensure that the Bank has effective and independent monitoring and testing of its Loss Mitigation Program.

(2)    The Bank's Loss Mitigation Independent Risk Management Program shall, at a minimum, provide adequate scope and coverage to provide credible challenge and escalation of loss mitigation decisioning issues, and include:

(a) policies, procedures, and processes that:

(i) ensure the Bank is able to measure, aggregate, and limit exposures related to all loss mitigation and loan modification decision practices;

(ii) define clear and delineated roles and responsibilities for Independent Risk Management oversight of loss mitigation activities; including independent model and loss mitigation tool governance oversight;

(iii) ensure compliance with the Bank's Loss Mitigation Program policies, procedures, and processes, and applicable laws and regulations and investor requirements;

(iv) ensure effective Loss Mitigation Program change management governance and oversight of all loss mitigation tool development and implementation; and

(v) delineate clear steps for reporting and escalating significant Loss Mitigation Program governance concerns to senior management and the Board Risk Committee.

(b) an effective risk framework that establishes the responsibility and accountability for respective front-line units and loss mitigation Independent Risk Management;

(c) maintenance of appropriate staffing levels and sufficiently experienced and trained staff to fulfill their roles in the Loss Mitigation Independent Risk Management Program, along with quarterly reviews of staffing adequacy; and

(d) appropriate risk-based independent testing of loss mitigation and loan modification decisioning accuracy and the effectiveness and sustainability of loss mitigation and loan modification decision validation practices.

(3) The Board shall ensure that the Bank implements and adheres to the Loss Mitigation Independent Risk Management Program required by this Article.

## ARTICLE VIII

## INTERNAL AUDIT – LOSS MITIGATION PROGRAM

(1) Within the timeframes set forth in the Action Plan to which the Examiner-in-Charge has provided prior written determination of no supervisory objection, the Bank shall

10

update and the Board shall adopt a comprehensive, written internal audit program that adequately assesses controls and operations with respect to the Bank's loss mitigation activities to allow the Board and management to understand the sufficiency of the Bank's internal controls system ("Loss Mitigation Internal Audit Program"). Upon adoption, Bank management, subject to Board review and ongoing monitoring, shall promptly implement and adhere to the Loss Mitigation Internal Audit Program and any amendments or revisions thereto.

(2)     Management shall ensure the Bank's Loss Mitigation Internal Audit Program's compliance with the standards for internal audit systems set forth in Section II.B of the Interagency Guidelines Establishing Standards for Safety and Soundness, Appendix A to 12 C.F.R. Part 30. Refer to the "Internal and External Audits" booklet of the *Comptroller's Handbook* for related safety and soundness principles. The Loss Mitigation Internal Audit Program shall incorporate standards of safety and soundness that are commensurate with the Bank's size, complexity, scope of activities, and risk profile and shall, at a minimum:

(a)  require Internal Audit plan(s) that are risk-based and provide adequate audit scope, coverage, and frequency and effectively and holistically cover all areas of loss mitigation activities of the Bank, including change delivery function, and change management activities, with annual documented Audit Committee approval of the plan(s) and Audit Committee notification of any material variance from the plan(s);

(b)  evaluate the reliability, adequacy, and effectiveness of the Bank's internal controls system, including whether the Bank has implemented sustainable controls for all loss mitigation and loan modification decision processes, including incorporation of change management process practices;

11

(c)  evaluate whether the Bank's internal controls system results in prompt, accurate, and transparent documentation of all loss mitigation activities;

(d)  evaluate whether the Bank's loss mitigation compliance controls are sufficient with respect to applicable laws and regulations and investor requirements and otherwise adhere to established policies, procedures, and processes with respect to all loss mitigation activities;

(e)  determine whether management is taking appropriate and timely steps to address control deficiencies and audit report recommendations, that the progress of such steps is adequately validated, documented, and tracked, and that such progress is reported to the Audit Committee on at least a quarterly basis; and

(f)  require audit work papers and documentation that provides a meaningful audit trail and validation for audit findings, conclusions, and recommendations.

(3)  The Bank's Loss Mitigation Internal Audit Program shall also, at a minimum, include:

(a)  adequate staffing and training for the Bank's Loss Mitigation Internal Audit Program; and

(b)  review of processes for the resolution, reporting, aggregation, and analysis of customer complaints related to loss mitigation activities, including trends and root cause of those trends  raised in such complaints.

(4)  The Board shall review the effectiveness of the Loss Mitigation Internal Audit Program at least annually, and more frequently if necessary or if required by the OCC in writing, and amend the Loss Mitigation Internal Audit Program as needed or directed by the OCC. Any

material amendment to the Loss Mitigation Internal Audit Program must be submitted to the Examiner-In-Charge for review and prior written determination of no supervisory objection.

**ARTICLE IX**

**GENERAL BOARD RESPONSIBILITIES**

(1)    The Board shall ensure that the Bank has timely adopted and implemented all corrective actions required by this Order, and shall verify that the Bank adheres to the corrective actions and they are effective in addressing the Bank's deficiencies that resulted in this Order.

(2)    In each instance in which this Order imposes responsibilities upon the Board, it is intended to mean that the Board shall:

> (a)  authorize, direct, and adopt corrective actions on behalf of the Bank as may be necessary to perform the obligations and undertakings imposed on the Board by this Order and the Action Plan required by Article IV;

> (b)  ensure the Bank has sufficient processes, management, personnel, control systems, and corporate and risk governance to implement and adhere to all provisions of this Order and the Action Plan required by Article IV;

> (c)  require that Bank management and personnel have sufficient training and authority to execute their duties and responsibilities pertaining to or resulting from this Order and the Action Plan required by Article IV;

> (d)  hold Bank management and personnel accountable for executing their duties and responsibilities pertaining to or resulting from this Order and the Action Plan required by Article IV;

13

(e)  require appropriate, adequate, and timely reporting to the Board by Bank management of corrective actions directed by the Board to be taken under the terms of this Order and the Action Plan required by Article IV; and

(f)  address any noncompliance with corrective actions directed by the Board to be taken under the terms of this Order and by the Action Plan required by Article IV in a timely and appropriate manner.

## ARTICLE X

## WAIVERS

(1)  The Bank, by executing and consenting to this Order, waives:

(a)  any and all rights to the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818;

(b)  any and all procedural rights available in connection with the issuance of this Order;

(c)  any and all rights to a hearing and a final agency decision pursuant to 12 U.S.C. § 1818 and 12 C.F.R. Part 19;

(d)  any and all rights to seek any type of administrative or judicial review of this Order;

(e)  any and all claims for fees, costs, or expenses against the OCC, or any of its officers, employees, or agents related in any way to this enforcement matter or this Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412;

14

(f)  any and all rights to assert these proceedings, the consent to and/or the issuance of this Order, as the basis for a claim of double jeopardy in any pending or future proceedings brought by the United States Department of Justice or any other governmental entity; and

(g)  any and all rights to challenge or contest the validity of this Order.

## ARTICLE XI

## OTHER PROVISIONS

(1)  As a result of this Order, the Bank is not:

(a)  precluded from being treated as an "eligible bank" for the purposes of 12 C.F.R. Part 5, unless the Bank fails to meet any of the requirements contained in subparagraphs (1) – (4) of 12 C.F.R. § 5.3, Definitions, *Eligible bank or eligible savings association,* or is otherwise informed in writing by the OCC;

(b)  subject to the restrictions in 12 C.F.R. § 5.51 requiring prior notice to the OCC of changes in directors and senior executive officers or the limitations on golden parachute payments set forth in 12 C.F.R. Part 359, unless the Bank is otherwise subject to such requirements pursuant to 12 C.F.R. § 5.51(c)(7)(i), (iii); and

(c)  precluded from being treated as an "eligible bank" for the purposes of 12 C.F.R. Part 24, unless the Bank fails to meet any of the requirements contained in 12 C.F.R. § 24.2(e)(1)-(3) or is otherwise informed in writing by the OCC.

(2)  This Order supersedes all prior OCC communications issued pursuant to 12 C.F.R. §§ 5.3, 5.51(c)(7)(ii), and 24.2(e)(4).

15

# ARTICLE XII

## CLOSING

(1)     This Order is a settlement of the cease and desist proceedings against the Bank

contemplated by the OCC, based on the unsafe or unsound practices described in the

Comptroller's Findings set forth in Article II of this Order. The OCC releases and discharges the

Bank from all potential liability for a cease and desist order that has been or might have been

asserted by the OCC based on the practices described in Article II of this Order, to the extent

known to the OCC as of the effective date of this Order. Nothing in this Order, however, shall

prevent the OCC from:

> (a)  instituting enforcement actions other than a cease and desist order against the
>      Bank based on the Comptroller's Findings set forth in Article II of this Order;
>
> (b)  instituting enforcement actions against the Bank based on any other findings;
>
> (c)  instituting enforcement actions against institution-affiliated parties (as defined
>      by 12 U.S.C. § 1813(u)) based on the Comptroller's Findings set forth in
>      Article II of this Order, or any other findings; or
>
> (d)  utilizing the Comptroller's Findings set forth in Article II of this Order in
>      future enforcement actions against the Bank or its institution-affiliated parties
>      to establish a pattern or the continuation of a pattern.

(2)     Nothing in this Order is a release, discharge, compromise, settlement, dismissal,

or resolution of any actions, or in any way affects any actions that may be or have been brought

by any other representative of the United States or an agency thereof, including, without

limitation, the United States Department of Justice. This Order is:

> (a)  a "cease-and-desist order issued upon consent" within the meaning of
>      12 U.S.C. § 1818(b);

16

(b) a "cease-and-desist order which has become final" within the meaning of 12 U.S.C. § 1818(e);

(c) an "order issued with the consent of the depository institution" within the meaning of 12 U.S.C. § 1818(h)(2);

(d) an "effective and outstanding . . . order" within the meaning of 12 U.S.C. § 1818(i)(1); and

(e) a "final order" within the meaning of 12 U.S.C. § 1818(i)(2) and (u).

(3)     This Order is effective upon its issuance by the OCC, through the Comptroller's duly authorized representative. Except as otherwise expressly provided herein, all references to "days" in this Order shall mean calendar days and the computation of any period of time imposed by this Order shall not include the date of the act or event that commences the period of time.

(4)     The provisions of this Order shall remain effective except to the extent that, and until such time as, such provisions are amended, suspended, waived, or terminated in writing by the OCC, through the Comptroller's duly authorized representative. If the Bank seeks an extension, amendment, suspension, waiver, or termination of any provision of this Order, the Board or a Board-designee shall submit a written request to the Deputy Comptroller asking for the desired relief. Any request submitted pursuant to this paragraph shall include a statement setting forth in detail the circumstances that warrant the desired relief or prevent the Bank from complying with the relevant provision(s) of the Order and shall be accompanied by relevant supporting documentation. The OCC's decision concerning a request submitted pursuant to this paragraph, which will be communicated to the Board in writing, is final and not subject to further review.

(5)     The Bank will not be deemed to be in compliance with this Order until it has adopted, implemented, and adhered to all of the corrective actions set forth in each Article of this Order; the corrective actions are effective in addressing the Bank's deficiencies; and the OCC has verified and validated the corrective actions. An assessment of the effectiveness of the corrective actions requires sufficient passage of time for the Bank to demonstrate the sustained effectiveness of the corrective actions.

(6)     This Order is not a contract binding on the United States, the United States Treasury Department, the OCC, or any officer, employee, or agent of the OCC and neither the Bank nor the OCC intends this Order to be a contract.

(7)     Each citation, issuance, or guidance referenced in this Order includes any subsequent citation, issuance, or guidance that replaces, supersedes, amends, or revises the referenced cited citation, issuance, or guidance.

(8)     This Order applies to the Bank and all its subsidiaries, even though those subsidiaries are not named as parties to this Order. The Bank shall integrate any activities done by a subsidiary into its plans, policies, programs, and processes required by this Order. The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

(9)     No separate promise or inducement of any kind has been made by the OCC, or by its officers, employees, or agents, to cause or induce the Bank to consent to the issuance of this Order.

(10)     All reports, plans, or programs submitted to the OCC pursuant to this Order shall be forwarded, by overnight mail or via email, to Jennifer Crosthwaite, Examiner-in-Charge.

(11)    The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his duly authorized representative, has hereunto set his signature on behalf of the Comptroller.

/s/                                   September 9, 2021
_____
Mark D. Richardson
Deputy Comptroller
Large Bank Supervision

19

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of Wells Fargo Bank, N.A., Sioux Falls, South Dakota, have hereunto set their signatures on behalf of the Bank.

| /s/ | September 7, 2021 |
|---|---|
| Mark A. Chancy | Date |

| /s/ | September 7, 2021 |
|---|---|
| Theodore F. Craver, Jr. | Date |

| /s/ | September 7, 2021 |
|---|---|
| Maria R. Morris | Date |

| /s/ | September 7, 2021 |
|---|---|
| Richard B. Payne, Jr. | Date |

| /s/ | September 7, 2021 |
|---|---|
| Juan A. Pujadas | Date |

| /s/ | September 7, 2021 |
|---|---|
| Charles W. Scharf | Date |