# Exhibit C

# Hernandez Third Amended Notice of 30(b)(6) Depo

Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs and Proposed Class*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HERNANDEZ et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY, and WELLS FARGO BANK, N.A.,<br><br>Defendants. | Case No. 3:18-cv-07354-WHA<br><br>**PLAINTIFFS' THIRD AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION** |



EXHIBIT NO. 389
ANDREA M. IGNACIO
RPR, CRR, CCRR, CSR # 9830

Please take notice that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiffs will take the video-taped deposition of defendant Wells Fargo Bank, N.A. ("Wells Fargo Bank" or "Bank") by a person or persons designated by Wells Fargo Bank before a court reporter authorized by law to administer oaths and a videographer, with instant visual display of the deposition testimony. The deposition will begin at 9:30 a.m. on August 2, 2019, at the law offices of Winston & Strawn LLP, located at 101 California St., 35th Floor, San Francisco, CA 94111, and continue from day to day until completed.

Wells Fargo Bank shall designate one or more officers, directors, managing agents, or other persons to testify on its behalf, and shall set forth, for each person, the matters on which the person will testify. The person(s) so designated shall testify on matters known or reasonably available to Wells Fargo Bank concerning the following subjects:

**DEPOSITION TOPICS**

1. Wells Fargo Bank's decision to design and use its own proprietary software tool to calculate Net Present Value of a loan modification rather than use Fannie Mae's Net Present Value calculator, as well as Wells Fargo's testing and auditing of that software from when it was created to the present.

2. Wells Fargo Bank's discovery of the software error disclosed in August and November 2018 in its Net Present Value software that Wells Fargo Bank used with respect to class members that caused the faulty calculations of class members' eligibility for a loan modification pursuant to the requirements of government-sponsored enterprises, the Federal Housing Administration (FHA), and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP).

3. Wells Fargo Bank's decision about whether, when, and how to disclose the errors in its software that caused the faulty calculations of class members' eligibility for a loan modification pursuant to the requirements of government-sponsored enterprises, FHA, and HAMP, including but not limited to those glitches disclosed in both August and November 2018.

4. How Wells Fargo Bank identified the customers affected by each of the errors identified in response to Topic 2, and the documents that Wells Fargo Bank relied on to identify each affected customer.

5. The internal prerequisites for Wells Fargo to institute foreclosure proceedings.

PLAINTIFFS' THIRD AMENDED NOTICE OF
RULE 30(b)(6) DEPOSITION
Case No. 3:18-cv-07354

6.  Actions Wells Fargo took to ensure compliance with the two 2011 consent orders only to the extent it relates to loan modifications and to whether an error existed in Wells Fargo's loan modification software.

7.  Wells Fargo's wrongful denial of approximately 184 modifications in 2013 and 2014 due to an error in the escrow account software, including how the error occurred and what was discovered, and what systems, testing, or compliance changes Wells Fargo made to fix the error.

8.  Wells Fargo Bank's investigation of and search for a solution regarding the software error disclosed in August and November 2018 in its Net Present Value software that Wells Fargo Bank used with respect to class members that caused the faulty calculations of class members' eligibility for a loan modification pursuant to the requirements of government-sponsored enterprises, the Federal Housing Administration (FHA), and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP).

Dated: July 29, 2019                    Respectfully submitted,

/s/ Michael L. Schrag
**GIBBS LAW GROUP LLP**
Michael L. Schrag (SBN 185832)
Joshua J. Bloomfield (SBN 212172)
Linda P. Lam (SBN 301461)
505 14th Street, Ste. 1110
Oakland, California 94612
Telephone: 510-350-9700
Facsimile: 510-350-9701
mls@classlawgroup.com
jjb@classlawgroup.com
lpl@classlawgroup.com

Richard M. Paul III
Ashlea G. Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: 816-984-8100
Facsimile: 816-984-8101
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2019, I electronically mailed the foregoing to counsel of record for Defendants.

*/s/ Joshua J. Bloomfield*

PLAINTIFFS' THIRD AMENDED NOTICE OF
RULE 30(b)(6) DEPOSITION
Case No. 3:18-cv-07354

# Excerpts from 30(b)(6) Deposition of Carmen Bell

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4                 ---oOo---

5

6   ALICIA HERNANDEZ, et al.,

    individually and on

7   behalf of all others

    similarly situated,

8

                  Plaintiffs,

9

    vs.                        No. 3:18-cv-07354-WHA

10

    WELLS FARGO & COMPANY, and

11  WELLS FARGO BANK, N.A.,

12            Defendants.

    _____/

13

14

15

16      30(b)(6) VIDEOTAPED DEPOSITION OF CARMEN BELL

17           SAN FRANCISCO, CALIFORNIA

18            FRIDAY, AUGUST 2, 2019

19

20

21  Stenographically reported by:

22  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

23  California CSR No. 9830

24  Job No. 3476159

25  Pages 1- 266

                                    Page 1

CONFIDENTIAL                                 WF_GARCIA_00001853

| | | |
|---|---|---|
| 1 | until the decision date. | 10:00 |
| 2 | The actuals were all reconciled to all State | 10:00 |
| 3 | allowables.  The control that was missed in the loss | 10:01 |
| 4 | mitigation process for the decision was, we did not | 10:01 |
| 5 | confirm that what the attorney gave us did not put a | 10:01 |
| 6 | particular customer over the State allowable. | 10:01 |
| 7 | MR. PAUL:  Okay. | 10:01 |
| 8 | Q   So let me see if I can simplify that. | 10:01 |
| 9 | So the first error is, the State maximum from | 10:01 |
| 10 | the table would be added to whatever fees had been | 10:01 |
| 11 | incurred as of that date, which allowed it to be | 10:01 |
| 12 | higher than -- if there were incurred fees, when they | 10:01 |
| 13 | were added to the maximum, that put them over the | 10:01 |
| 14 | maximum; is that right? | 10:01 |
| 15 | MS. KNIGHT:  Ob- -- object to form. | 10:01 |
| 16 | THE WITNESS:  I would describe that slightly | 10:01 |
| 17 | differently by saying billed -- incurred and paid, | 10:01 |
| 18 | plus the State fee matrix, versus just incurred. | 10:01 |
| 19 | MR. PAUL:  Oh, okay. | 10:01 |
| 20 | THE WITNESS:  So paid, and then added the | 10:01 |
| 21 | State fee matrix. | 10:02 |
| 22 | MR. PAUL:  Okay. | 10:02 |
| 23 | Q   And then the second error was -- that was | 10:02 |
| 24 | used, the fees that were incurred and paid, just there | 10:02 |
| 25 | wasn't a check to see that they didn't exceed the | 10:02 |

Page 31

CONFIDENTIAL                                    WF_GARCIA_00001883

| | | |
|---|---|---|
| 1 | of how he describes his role above the Jennifer Vaughn | 10:08 |
| 2 | year-end comments -- | 10:08 |
| 3 | A   Okay. | 10:08 |
| 4 | Q   -- where he says: | 10:08 |
| 5 | "I was tasked as being the lead IC to manage | 10:08 |
| 6 | the corporate advanced attorney fee project." | 10:08 |
| 7 | Do you see that? | 10:08 |
| 8 | A   I do see that. | 10:08 |
| 9 | Q   What is IC? | 10:08 |
| 10 | A   Individual contributor. | 10:08 |
| 11 | Q   Okay.  And the corporate advanced attorney | 10:08 |
| 12 | fee project, is -- is that a description of the first | 10:08 |
| 13 | error? | 10:08 |
| 14 | MS. KNIGHT:  I'll object to form. | 10:08 |
| 15 | THE WITNESS:  I cannot say if it's | 10:08 |
| 16 | specifically related to the calculation error or | 10:09 |
| 17 | something different. | 10:09 |
| 18 | MR. PAUL:  All right. | 10:09 |
| 19 | Q   In terms of process within the bank, when | 10:09 |
| 20 | a -- an error like this is discovered, what is the -- | 10:09 |
| 21 | the general process for diving into it and figuring it | 10:09 |
| 22 | out? | 10:09 |
| 23 | MS. KNIGHT:  Object to form. | 10:09 |
| 24 | THE WITNESS:  Is there a time period you'd | 10:09 |
| 25 | like me to describe, or just a general -- it's | 10:10 |

Page 36

CONFIDENTIAL

WF_GARCIA_00001888

| | | |
|---|---|---|
| 1 | obviously a long time period, and a lot has changed. | 10:10 |
| 2 | Can you -- | 10:10 |
| 3 |    MR. PAUL:  Sure.  That's fair. | 10:10 |
| 4 |  Q   So let's -- let's start with this second half | 10:10 |
| 5 | of 2013 -- | 10:10 |
| 6 |  A   Okay. | 10:10 |
| 7 |  Q   -- first half of 2014 time period. | 10:10 |
| 8 |  A   From what we've been able to look at from all | 10:10 |
| 9 | of the documentation from historical, and still today, | 10:10 |
| 10 | as soon as someone raises their hand and identifies an | 10:10 |
| 11 | issue or -- you know, there's various ways you can | 10:10 |
| 12 | find potential issues. | 10:10 |
| 13 |    Typically, it's assigned to either a person | 10:10 |
| 14 | or team collectively to do the research.  And that | 10:10 |
| 15 | usually includes people from various disciplines -- | 10:10 |
| 16 | technology team, the line of business, our control | 10:10 |
| 17 | team, and compliance -- to first understand what | 10:10 |
| 18 | occurred, and determine the root cause. | 10:10 |
| 19 |    Next, once we understand that piece, then it | 10:11 |
| 20 | would be to identify if there was any customer impact. | 10:11 |
| 21 | Identify if there's -- what type of solution would be | 10:11 |
| 22 | able to be put in place to -- if it was, in fact, an | 10:11 |
| 23 | issue.  And then, if there is any remediation that | 10:11 |
| 24 | needs to take place, complete the remediation. | 10:11 |
| 25 |  Q   All right. | 10:11 |

Page 37

CONFIDENTIAL              WF_GARCIA_00001889

| | | |
|---|---|---|
| 1 | gave to me this morning. | 10:41 |
| 2 | Can you describe for me what this is, please? | 10:41 |
| 3 | A   This would be all the loans that we've | 10:41 |
| 4 | currently identified as either impacted, or in the | 10:41 |
| 5 | 12 cases, you'll note on here where they were later | 10:41 |
| 6 | determined to be not impacted. | 10:41 |
| 7 | And it has various columns, including the | 10:41 |
| 8 | product type and remediation amount and the status of | 10:41 |
| 9 | the loan that -- the incorrect decision date. | 10:41 |
| 10 | Q   All right. | 10:42 |
| 11 | Let me walk through the -- some of the -- | 10:42 |
| 12 | some of the columns -- | 10:42 |
| 13 | A   Okay. | 10:42 |
| 14 | Q   -- just to be sure I know what we're looking | 10:42 |
| 15 | at. | 10:42 |
| 16 | So the -- the loan number is going to be | 10:42 |
| 17 | there on their mortgage loan documents.  So that's | 10:42 |
| 18 | unique to a borrower; correct? | 10:42 |
| 19 | A   That's correct. | 10:42 |
| 20 | Q   All right. | 10:42 |
| 21 | And so I -- I understand where that was | 10:42 |
| 22 | removed. | 10:42 |
| 23 | But you could tie each of these to a name -- | 10:42 |
| 24 | A   Yes. | 10:42 |
| 25 | Q   -- or names? | 10:42 |

Page 50

CONFIDENTIAL                                                            WF_GARCIA_00001902

| | | |
|---|---|---|
| 1 | All right. | 10:42 |
| 2 | And then -- let's see.  The category of | 10:42 |
| 3 | "Remediation" column, would you describe that for us, | 10:42 |
| 4 | please. | 10:42 |
| 5 | A   At the time, when we identified the impact | 10:42 |
| 6 | and -- we classified the -- each loan into | 10:42 |
| 7 | five categories in order to determine which | 10:43 |
| 8 | remediation category they were -- would be remediated | 10:43 |
| 9 | under. | 10:43 |
| 10 | And that status is as of the date that we | 10:43 |
| 11 | identified and started the remediation for that | 10:43 |
| 12 | customer. | 10:43 |
| 13 | Q   All right. | 10:43 |
| 14 | Would you walk me through what each of the | 10:43 |
| 15 | categories are, please. | 10:43 |
| 16 | A   Sure. | 10:43 |
| 17 | In order would probably be the easiest, | 10:43 |
| 18 | No. 1 -- | 10:43 |
| 19 | Q   Yes. | 10:43 |
| 20 | A   -- even though they're not in order on the | 10:43 |
| 21 | spreadsheet. | 10:43 |
| 22 | The ones numbered No. 1 would be active.  And | 10:43 |
| 23 | active would mean they still have a Wells Fargo | 10:43 |
| 24 | mortgage -- that Wells Fargo mortgage with Wells Fargo | 10:43 |
| 25 | as the servicer. | 10:43 |

Page 51

CONFIDENTIAL  WF_GARCIA_00001903

| | | |
|---|---|---|
| 1 | (Document marked Exhibit 397 | 11:19 |
| 2 | for identification.) | 11:19 |
| 3 | MR. PAUL: All right. | 11:19 |
| 4 | Q Ma'am, I've handed you what we've marked as | 11:19 |
| 5 | Exhibit 397, which is an e-mail chain that you're not | 11:19 |
| 6 | copied on. I wouldn't expect you to have any | 11:19 |
| 7 | knowledge of. | 11:19 |
| 8 | But there is -- if you'll turn to the page | 11:19 |
| 9 | that is Bates numbered '10407. | 11:19 |
| 10 | A (Witness complies.) | 11:19 |
| 11 | Okay. | 11:19 |
| 12 | Q There is a listing of the State fee matrix. | 11:19 |
| 13 | And what I want to confirm is that this is | 11:19 |
| 14 | the -- essentially, the -- the data from the table | 11:19 |
| 15 | that was pulled in as part of the HPA process? | 11:19 |
| 16 | A If I could just look at it -- | 11:19 |
| 17 | Q Sure. | 11:20 |
| 18 | A -- for a moment. | 11:20 |
| 19 | (Witness reading document.) | 11:20 |
| 20 | Without having knowledge of the e-mail, it | 11:20 |
| 21 | does appear that's the case. | 11:20 |
| 22 | Q Okay. And I'm not going to tie you down to | 11:20 |
| 23 | the numbers specifically. | 11:20 |
| 24 | A Yeah. | 11:20 |
| 25 | Q But I -- I -- I do want to get some | 11:20 |

Page 73

CONFIDENTIAL                                                    WF_GARCIA_00001925

| | | |
|---|---|---|
| 1 | So by September, you're aware of both the | 11:40 |
| 2 | first and second errors? | 11:40 |
| 3 | MS. KNIGHT: Object to form. | 11:40 |
| 4 | THE WITNESS: Yes. | 11:40 |
| 5 | MR. PAUL: All right. | 11:40 |
| 6 | Q And on the third page of Exhibit 400, there | 11:40 |
| 7 | is -- there are several pages of -- of what is | 11:40 |
| 8 | described as HPA tool issue chronology. | 11:40 |
| 9 | Do you see that? | 11:40 |
| 10 | A I do. | 11:40 |
| 11 | Q All right. | 11:40 |
| 12 | And I'd like to walk through that chronology | 11:40 |
| 13 | with you. It says -- the first bullet point says: | 11:40 |
| 14 | "In March 2011, Wells Fargo began | 11:40 |
| 15 | implementing an enhanced process related to change | 11:41 |
| 16 | control per consent order requirements." | 11:41 |
| 17 | What is that a reference to? | 11:41 |
| 18 | A As part of the consent order we were under, | 11:41 |
| 19 | one of the requirements was to enhance our change | 11:41 |
| 20 | control process. And that would be the date, as I | 11:41 |
| 21 | know it, that those enhancements begun. | 11:41 |
| 22 | Q Okay. And did these enhancements have some | 11:41 |
| 23 | bearing on the errors that occurred? | 11:41 |
| 24 | MS. KNIGHT: Object to the form. | 11:41 |
| 25 | THE WITNESS: I don't understand the | 11:41 |

Page 87

CONFIDENTIAL                                                    WF_GARCIA_00001939

| | | |
|---|---|---|
| 1 | A    I do see that. | 12:07 |
| 2 | Q    And what was the change control process | 12:07 |
| 3 | referenced here in July of 2014? | 12:07 |
| 4 | Let me -- let me ask it differently. | 12:07 |
| 5 | What were the new change drivers added as | 12:07 |
| 6 | part of the change control process in July of 2014? | 12:07 |
| 7 | A    That when you initiated a change, going | 12:08 |
| 8 | through the process of change control, the person who | 12:08 |
| 9 | opened that change request was able to select if it | 12:08 |
| 10 | was related to an event that impacted the customer | 12:08 |
| 11 | and/or was part of a remediation effort that impacted | 12:08 |
| 12 | the customer. | 12:08 |
| 13 | Q    So prior to July of 2014, there was no | 12:08 |
| 14 | selection of whether it impacted a customer? | 12:08 |
| 15 | MS. KNIGHT:  Object -- | 12:08 |
| 16 | MR. PAUL:  And prior -- after July 2014, | 12:08 |
| 17 | there was. | 12:08 |
| 18 | Q    Is that what you're saying? | 12:08 |
| 19 | MS. KNIGHT:  Object to form. | 12:08 |
| 20 | THE WITNESS:  Yes, as it relates to the | 12:08 |
| 21 | actual change control process being opened. | 12:09 |
| 22 | MR. PAUL:  Okay. | 12:09 |
| 23 | Q    And so, in the context of the HPA tool that | 12:09 |
| 24 | we're talking about, when the CR and the -- well, is | 12:09 |
| 25 | the change control process reflected from the CR? | 12:09 |

Page 98

CONFIDENTIAL                                                    WF_GARCIA_00001950

| | | |
|---|---|---|
| 1 | MS. KNIGHT: Object to form. | 12:10 |
| 2 | THE WITNESS: That is correct. | 12:10 |
| 3 | MR. PAUL: Okay. | 12:10 |
| 4 | Q   And were those new change drivers also | 12:10 |
| 5 | related to one of the consent orders or amendments | 12:11 |
| 6 | thereto? | 12:11 |
| 7 | MS. KNIGHT: Object to form. | 12:11 |
| 8 | THE WITNESS: The enhancements, that we put | 12:11 |
| 9 | in place to change control, were related to meet our | 12:11 |
| 10 | consent order requirements. | 12:11 |
| 11 | MR. PAUL: All right. | 12:11 |
| 12 | Q   Next bullet point: | 12:11 |
| 13 | "On April 2, 2015, commitment to customer | 12:11 |
| 14 | policy was published. Home lending provided training | 12:11 |
| 15 | on the policy requirements implemented July 31, 2015." | 12:11 |
| 16 | What -- what is the commitment to customer | 12:11 |
| 17 | policy? | 12:11 |
| 18 | A   Would it be okay if I flip back to -- I | 12:11 |
| 19 | believe it's in -- included in this document -- | 12:11 |
| 20 | Q   Sure. | 12:11 |
| 21 | A   -- so I can make sure I reference the right | 12:11 |
| 22 | information? | 12:11 |
| 23 | (Witness reading document.) | 12:12 |
| 24 | So the -- again, it's -- as part of the | 12:12 |
| 25 | consent order, there were requirements in regards to | 12:12 |

Page 100

CONFIDENTIAL                                    WF_GARCIA_00001952

| | | |
|---|---|---|
| 1 | issues management and compliance management. | 12:12 |
| 2 | And the commitment to customer policy that | 12:12 |
| 3 | was rolled out on those dates, that were on the other | 12:12 |
| 4 | page, referenced -- | 12:12 |
| 5 | Q   April 2nd -- | 12:12 |
| 6 | A   -- April -- April 2nd of 2015 and home | 12:12 |
| 7 | lending training provided in July, that commitment to | 12:12 |
| 8 | customer policy was the corporate policy for how we | 12:12 |
| 9 | handled customer remediation events. | 12:12 |
| 10 | Q   All right. | 12:12 |
| 11 | And the document that's reflected here | 12:12 |
| 12 | that's -- that you referenced, that is entitled | 12:13 |
| 13 | "Wells Fargo Commitment to Customer Policy" on Bates | 12:13 |
| 14 | No. '87927, is this the actual policy? | 12:13 |
| 15 | MS. KNIGHT:  Object to form. | 12:13 |
| 16 | THE WITNESS:  I would say this is the | 12:13 |
| 17 | overview of the policy.  There likely is another | 12:13 |
| 18 | actual official non-PowerPoint version of the | 12:13 |
| 19 | corporate policy. | 12:13 |
| 20 | MR. PAUL:  All right. | 12:13 |
| 21 | Q   And in a broad overview, what was the intent | 12:13 |
| 22 | or purpose that the commitment to customer policy was | 12:13 |
| 23 | designed to -- to affect? | 12:13 |
| 24 | A   I would say to ensure and demonstrate that, | 12:13 |
| 25 | when an issue was -- a potential issue was identified, | 12:13 |

Page 101

CONFIDENTIAL                                         WF_GARCIA_00001953

| 1 | third one I was going to reference. But a very | 12:20 |
| 2 | rigorous release testing, release related to | 12:20 |
| 3 | technology releases. And there's absolutely a | 12:20 |
| 4 | documented issues management policy. | 12:20 |
| 5 | Q   Okay. So you said that, after being released | 12:21 |
| 6 | from the consent order in May of 2016. | 12:21 |
| 7 | But were each of those three components put | 12:21 |
| 8 | in place in 2016, or was it just at some point after | 12:21 |
| 9 | 2016? | 12:21 |
| 10 | MS. KNIGHT:  Object to form. | 12:21 |
| 11 | THE WITNESS:  Within the consent order, all | 12:21 |
| 12 | three of those that I referenced -- release testing, | 12:21 |
| 13 | change control, and issues management -- all were part | 12:21 |
| 14 | of the consent order. So we did have enhanced | 12:21 |
| 15 | practices in place, that were in place in May of 2016. | 12:21 |
| 16 | There were additional enhancements after | 12:22 |
| 17 | that, that were not required per the consent order. | 12:22 |
| 18 | MR. PAUL:  Q.  Do you recall what the date of | 12:22 |
| 19 | the consent order was? | 12:22 |
| 20 | A   When we received it? | 12:22 |
| 21 | Q   Yes. | 12:22 |
| 22 | A   I know it's in that binder. I don't have the | 12:22 |
| 23 | exact date. There was -- I don't have the exact date. | 12:22 |
| 24 | Q   Okay. And -- and there's more than one, so I | 12:22 |
| 25 | want to make sure we're talk -- we're talking about | 12:22 |

Page 106

CONFIDENTIAL                                                        WF_GARCIA_00001958

```
1    the -- it's 2011 -- sometime in 2011; right?        12:22

2        A    Yeah.  There was one in 2011, and then we    12:22

3    received an amended consent order.  I believe it was  12:22

4    in 2000 --                                            12:22

5        Q    '13?                                         12:22

6        A    -- '13.                                      12:22

7        Q    Okay.  And were any of these three components 12:22

8    put in place before the 2013 amendment?              12:22

9            MS. KNIGHT:  Object to form.                  12:22

10           THE WITNESS:  I don't know the exact dates.   12:22

11           MR. PAUL:  Okay.                              12:23

12           THE WITNESS:  I can reference the timeline we  12:23

13   were looking at, because I believe that --            12:23

14           MR. PAUL:  Sure.                              12:23

15           THE WITNESS:  -- gives the dates of --         12:23

16           MR. PAUL:  Yeah, yeah.                         12:23

17       Q    That's not -- it's not a memory test.  If     12:23

18   you've got a document that can answer the question --  12:23

19       A    Well, the document you were --                12:23

20           THE REPORTER:  One at a time.                 12:23

21           THE WITNESS:  It's the document you were       12:23

22   walking me through, the timeline.                      12:23

23           MR. PAUL:  Sure.                              12:23

24           THE WITNESS:  So I'm on Document 400, and      12:23

25   back to page 2.  It appears, based on this document,   12:23
```

Page 107

CONFIDENTIAL                                           WF_GARCIA_00001959

```
 1              It appears, from reading all the e-mails,      12:33
 2     that that -- you could see the thread that said, We    12:33
 3     can't close this until the system is resolved,          12:33
 4     regardless if there's customer impact.                  12:33
 5          So I believe that to be true, but I can't be       12:34
 6     definitive.                                             12:34
 7              MR. PAUL:  Okay.  Let me try it a different     12:34
 8     way.                                                    12:34
 9       Q    The -- the RID 200 would have remained open,     12:34
10     had there been a correct determination that customers  12:34
11     had been improperly denied loan modifications?          12:34
12       A    Yes.                                             12:34
13              MS. KNIGHT:  Object to form.                    12:34
14              MR. PAUL:  Q.  And is the -- the remediation    12:34
15     required by the investors?                              12:34
16              MS. KNIGHT:  Object to form.                    12:34
17              THE WITNESS:  No.                               12:34
18              MR. PAUL:  All right.                           12:34
19       Q    Is there any requirement, external to the        12:35
20     bank, that dictates that remediation occur?             12:35
21              MS. KNIGHT:  I'll object to form.               12:35
22              And I also will caution the witness not to     12:35
23     answer, to the extent it requires her to reveal         12:35
24     communications with regulators.                         12:35
25              THE WITNESS:  I'm not aware of any              12:35
```

Page 115

CONFIDENTIAL                                        WF_GARCIA_00001967

```
 1    requirement externally that you must remediate.        12:35
 2          MR. PAUL:  Q.  So to your knowledge, that's a     12:35
 3    decision being made independently by Wells Fargo?       12:35
 4          MS. KNIGHT:  And I'll -- also, Counsel, this      12:35
 5    is getting beyond the scope of the notice for the       12:35
 6    remediation.                                            12:35
 7          You're free to ask her at the end with            12:35
 8    respect to what she knows personally, but remediation   12:35
 9    is not one of the topics that she's been designated     12:35
10    for.  Yeah, I'll just leave it at that.                 12:35
11          MR. PAUL:  All right.                             12:36
12      Q   Back to the chronology.  The October of 2015      12:36
13    change was not required to go through service           12:36
14    regulatory program office, as it was not an investor    12:36
15    regulatory guideline change.  It was a correction in    12:36
16    the actual tool.                                        12:36
17          What does that mean?                              12:36
18      A   The --                                            12:36
19      Q   Let me ask a different question.                  12:36
20          What is the service regulatory program            12:36
21    office?                                                 12:36
22      A   So any time we receive guideline changes,         12:36
23    handbook changes from the investor, we had a program    12:36
24    office that facilitated those changes.  And since this  12:36
25    wasn't related to an investor making a change in the    12:37
```

Page 116

CONFIDENTIAL                                          WF_GARCIA_00001968

```
 1       Q    What -- what's the fix that makes that        12:56

 2   happen?                                                12:56

 3            MS. KNIGHT:  Object to form.                  12:56

 4            THE WITNESS:  I don't agree that that's       12:56

 5   always what was supposed to happen.                    12:56

 6            MR. PAUL:  Okay.                               12:56

 7       Q    In -- let's say in 2011, what -- what's your  12:57

 8   understanding of what the process was, with respect to 12:57

 9   using attorneys' fees in the -- the capitalization     12:57

10   process?                                               12:57

11            MS. KNIGHT:  Object to form.                  12:57

12            THE WITNESS:  There's two steps in the        12:57

13   attorneys' fees.  There is what's been paid, which has 12:57

14   been already reconciled to the State fee caps, and     12:57

15   then there is incurred but not yet paid, that has --   12:57

16   at the date of the decision for the modification       12:57

17   trial.                                                 12:57

18            In 2011, there were two practices in place.   12:57

19            The first issue, we used actuals billed and   12:57

20   paid, and it inaccurately added a State fee matrix     12:58

21   instead of comparing to a State fee when you took      12:58

22   actuals plus pending.                                  12:58

23            The second issue was a control issue in which 12:58

24   we took actuals, received that pending from the        12:58

25   attorney, but those pending, when added to actuals,    12:58
```

Page 130

CONFIDENTIAL                                              WF_GARCIA_00001982

```
 1    did not have a control to reconcile.              12:58
 2           So that's my understanding and knowledge of  12:58
 3    2011.                                             12:58
 4           MR. PAUL:  Q.  So is there an additional   12:58
 5    reconciliation process in place now to make sure that  12:58
 6    the State caps are not exceeded?                  12:58
 7           MS. KNIGHT:  Object to form.               12:58
 8           THE WITNESS:  In today's process, starting  12:58
 9    June 1st of 2019, for the trial modification, we only  12:58
10    use what has been billed and paid, which is reconciled  12:59
11    to all State fee allowables.                      12:59
12           MR. PAUL:  Okay.  All right.               12:59
13     Q    Back to our chronology.  CCR 82506 was opened  12:59
14    on June 14, 2018, to update the procedure, recoverable  12:59
15    fees, and cost reconciliation.                    12:59
16           What is CCR 82506?                         12:59
17     A    That would have been specific to the change  12:59
18    that we implemented on May 1st.  We rolled it out in a  12:59
19    manual fashion, meaning two team members.  And this  12:59
20    was to formalize to get the procedure updated on our  13:00
21    procedures website, is how I would describe it best.  13:00
22     Q    June 11, 2018, the issue risk rating was     13:00
23    changed to critical.                             13:00
24           What had been learned between March of 2018  13:00
25    and June of 2018 to cause it to be -- the risk level  13:00
```

Page 131

CONFIDENTIAL                                                      WF_GARCIA_00001983

```
  1        Q    All right.                                  13:05

  2             And "verbally," you mean phone calls were   13:05

  3     made?                                               13:05

  4        A    That's correct.                             13:05

  5        Q    All right.                                  13:05

  6             The next bullet point:                      13:05

  7             "WFAS and independent risk management will  13:05

  8     begin their validation activities on November 11,  13:05

  9     2018."                                              13:05

 10             What is that a reference to?                13:05

 11        A    WFAS stands for Wells Fargo Audit Services, 13:06

 12     the independent risk management arm of Wells Fargo for 13:06

 13     audit.  They started their validation of the effort in 13:06

 14     November.                                           13:06

 15        Q    And were they validate -- validating the   13:06

 16     remediation effort or the corrective action?       13:06

 17             MS. KNIGHT:  Object to form.                13:06

 18             THE WITNESS:  They are validating the impact, 13:06

 19     the remediation, and the corrective action that took 13:06

 20     place.                                              13:06

 21             MR. PAUL:  All right.                       13:06

 22        Q    And here, it notes it was to be -- to be    13:06

 23     completed -- scheduled to be completed by September -- 13:07

 24     February 7th, 2019.  But it's still ongoing today;  13:07

 25     correct?                                            13:07
```

                                                   Page 136

CONFIDENTIAL                                        WF_GARCIA_00001988

| | | |
|---|---|---|
| 1 | MR. PAUL:  Okay. | 14:35 |
| 2 | Q    So -- so what about either of those changes | 14:35 |
| 3 | would have precluded the second error from happening? | 14:35 |
| 4 | A    In the first -- | 14:35 |
| 5 | MS. KNIGHT:  Object to form. | 14:35 |
| 6 | THE WITNESS:  -- one, setting the table to 0, | 14:35 |
| 7 | which is what was, in fact, implemented in October -- | 14:35 |
| 8 | by setting it to 0, it only used paid, which is | 14:35 |
| 9 | reconciled to the State fee amount. | 14:35 |
| 10 | And so, in that case, because those are | 14:35 |
| 11 | already reconciled, and there's no pending or State | 14:35 |
| 12 | fee additional matrix in, that could not result in the | 14:35 |
| 13 | error that was caused by issue two we've been | 14:36 |
| 14 | discussing. | 14:36 |
| 15 | MR. PAUL:  Q.  But the -- the error did still | 14:36 |
| 16 | occur with the HPA tool after the table was set to 0 | 14:36 |
| 17 | in October of 2015? | 14:36 |
| 18 | MS. KNIGHT:  Object to form. | 14:36 |
| 19 | THE WITNESS:  Not where the tool was | 14:36 |
| 20 | corrected and set to 0. | 14:36 |
| 21 | MR. PAUL:  All right. | 14:36 |
| 22 | Q    So help me with that.  How could the tool | 14:36 |
| 23 | have not been set to 0 after October of 2015? | 14:36 |
| 24 | A    This morning, I mentioned that the HPA tool | 14:36 |
| 25 | had multiple investors and multiple programs within | 14:36 |

Page 164

CONFIDENTIAL                                    WF_GARCIA_00002016

| | | |
|---|---|---|
| 1 | the tool.  There was only a certain group of investors | 14:37 |
| 2 | and programs in which the calculation error was | 14:37 |
| 3 | present. | 14:37 |
| 4 | And because of that, when we set those GSE | 14:37 |
| 5 | programs, bank and private, and owned HAMP to 0 for | 14:37 |
| 6 | the State fee matrix, that meant it was only using | 14:37 |
| 7 | what was paid, which is reconciled to the State fee | 14:37 |
| 8 | matrix, State allowables.  And there's no error that | 14:37 |
| 9 | was present in those after October 2nd of 2015. | 14:37 |
| 10 | Q   What's the category of loan that is not | 14:37 |
| 11 | within those groups for which the tool was set to 0, | 14:38 |
| 12 | but still used HPA as opposed to SLOAD? | 14:38 |
| 13 | A   If I could reference the spreadsheet. | 14:38 |
| 14 | Q   Sure. | 14:38 |
| 15 | A   I don't know what number that is. | 14:38 |
| 16 | Q   395. | 14:38 |
| 17 | MS. KNIGHT:  Yeah, here it is. | 14:38 |
| 18 | THE WITNESS:  I think I gave an example | 14:38 |
| 19 | earlier.  It was the repayment plan, so not FHA.  So | 14:38 |
| 20 | it would have been -- I've got to find one again on | 14:38 |
| 21 | here. | 14:38 |
| 22 | MR. PAUL:  Q.  Page 14, I think, is the | 14:38 |
| 23 | example -- | 14:38 |
| 24 | A   It was 14 that I was talking -- | 14:38 |
| 25 | Q   Yeah. | 14:39 |

Page 165

CONFIDENTIAL                                                    WF_GARCIA_00002017

| | | |
|---|---|---|
| 1 | were the employees within Wells Fargo who were | 17:20 |
| 2 | involved in making that decision? | 17:20 |
| 3 | A   Allen Parker, general counsel; Tim Sloan, | 17:20 |
| 4 | CEO; SEC attorneys, and counsel. | 17:20 |
| 5 | Q   Okay.  Did you have any role in that | 17:20 |
| 6 | yourself? | 17:20 |
| 7 | A   I did not. | 17:20 |
| 8 | Q   Okay.  All right. | 17:20 |
| 9 | Let's turn to the consent order and -- | 17:20 |
| 10 | A   420? | 17:21 |
| 11 | Q   Exhibit 420. | 17:21 |
| 12 | And I think for this, let's go back to -- | 17:21 |
| 13 | I'll just reorient us. | 17:21 |
| 14 | Exhibit 389 was the deposition topic on -- | 17:21 |
| 15 | topics on which you've been designated. | 17:21 |
| 16 | A    (Witness complies.) | 17:21 |
| 17 | I've got them. | 17:21 |
| 18 | Q   And Topic 6 is actions Wells Fargo took to | 17:21 |
| 19 | ensure compliance with the two 2011 consent orders, | 17:21 |
| 20 | only to the extent it relates to loan modifications | 17:21 |
| 21 | and to whether an error existed in Wells Fargo's loan | 17:21 |
| 22 | modification software. | 17:21 |
| 23 | Do you see that? | 17:21 |
| 24 | A   I do see that. | 17:21 |
| 25 | Q   All right. | 17:21 |

Page 244

CONFIDENTIAL                                        WF_GARCIA_00002096

1          And what we've marked as Exhibit 420 is one          17:21
2     of the consent orders referenced here.                    17:21
3          And other than preparing to testify, given           17:21
4     you're the corporate representative on this topic, did     17:22
5     you have involvement with respect to your job             17:22
6     responsibilities, prior to being designated as its        17:22
7     corporate representative, to carry out compliance         17:22
8     issues related to the consent orders?                     17:22
9          MS. KNIGHT:  Object to form.                         17:22
10          THE WITNESS:  Can you ask the question again,        17:22
11     please?                                                   17:22
12          MR. PAUL:  I can.  And let me make it more           17:22
13     simple.                                                   17:22
14     Q    With respect to Topic 6, is that -- is the          17:22
15     items that you're prepared to testify to today, are      17:22
16     those things that you knew because you lived them and    17:22
17     did them, or is it something that you went and           17:22
18     prepared for today's deposition, or both?                17:22
19     A    Both.                                                17:23
20     Q    Okay.  With respect to changes that Wells           17:23
21     Fargo made after receiving this consent order in 2011,   17:23
22     what -- and let's -- let's block it -- break it up in    17:23
23     time.                                                     17:23
24          Before the 2013 amendment, between 2011 and         17:23
25     2013, what did Wells Fargo do to enhance or change or    17:23

                                                 Page 245

CONFIDENTIAL                                          WF_GARCIA_00002097

| | | |
|---|---|---|
| 1 | modify its processes and practices with respect to | 17:23 |
| 2 | loan modifications? | 17:23 |
| 3 | MS. KNIGHT:  Object to form. | 17:23 |
| 4 | THE WITNESS:  Would it be okay if I referred | 17:23 |
| 5 | to the documents? | 17:23 |
| 6 | MR. PAUL:  Of course. | 17:23 |
| 7 | THE WITNESS:  Okay.  I'm going to -- you also | 17:23 |
| 8 | gave me the amended consent order, which in there, I | 17:23 |
| 9 | believe it does reference some of the things that -- | 17:23 |
| 10 | that we did do.  So I may -- I may use this if I | 17:23 |
| 11 | can't -- my -- my memory isn't as good at this time of | 17:24 |
| 12 | the day. | 17:24 |
| 13 | MR. PAUL:  Q.  Let -- ma'am, let me -- I | 17:24 |
| 14 | don't mean to interrupt you. | 17:24 |
| 15 | A   Yeah. | 17:24 |
| 16 | Q   But let me -- I'll say, if you need your | 17:24 |
| 17 | notebook back, if there's something in there -- | 17:24 |
| 18 | A   Yeah. | 17:24 |
| 19 | Q   -- that would refresh your memory; whatever | 17:24 |
| 20 | you need. | 17:24 |
| 21 | A   Yeah.  These same documents are in there. | 17:24 |
| 22 | It's -- | 17:24 |
| 23 | Q   Okay. | 17:24 |
| 24 | A   -- a lot of information. | 17:24 |
| 25 | We enhanced our -- one of the requirements | 17:24 |

Page 246

CONFIDENTIAL                                                    WF_GARCIA_00002098

```
 1    was around staffing and staffing models, and        17:24
 2    specifically related to loss mitigation and other    17:24
 3    processes that included loss mitigation.  And so we  17:24
 4    built out enhanced staffing models, including back   17:24
 5    testing of those models.                             17:24
 6            We also built out the single point of        17:24
 7    contact.  I think in the documents, it's referred to 17:24
 8    as SPOC, or single point of contact, to ensure that  17:24
 9    customers were able to get ahold of and have a person, 17:25
10    where possible, contact them.                        17:25
11            We also, as it relates to loan modifications, 17:25
12    improved our communications and timeliness,          17:25
13    specifically related to getting back to borrowers,   17:25
14    customers, when they -- there was a need to gain     17:25
15    additional documentation from them and/or clarity in 17:25
16    our communications related to declines.              17:25
17            Those -- that would be the ones that are top  17:25
18    of mind for the -- the initial 2011.                 17:25
19            And then I can go into things that we had to  17:25
20    improve, as identified by the consent order, that we 17:25
21    did in order to come out of the consent order in May 17:25
22    of 2016.                                             17:26
23       Q    All right.                                   17:26
24            So let's, I guess, start with the -- the     17:26
25    consent order in Exhibit 420.                        17:26
```

Page 247

CONFIDENTIAL                                         WF_GARCIA_00002099

```
 1        A    Okay.                                    17:26

 2        Q    The second sentence there in the first   17:26

 3   paragraph:                                         17:26

 4             "The OCC has identified certain deficiencies  17:26

 5   and unsafe or unsound practices in residential     17:26

 6   mortgage servicing, and in the bank's initiation and  17:26

 7   handling of foreclosure proceedings."              17:26

 8             Do you see that?                          17:26

 9        A    I'm just trying to figure out where the first  17:26

10   sentence ends to get to the second sentence.       17:26

11        Q    It's '401.                                17:26

12        A    Oh, I'm -- you know what?  I'm sorry.  I was  17:26

13   on 421.  No wonder I couldn't find it.             17:26

14             Yes, I do see that now.                   17:26

15        Q    Okay.  And part of the consent order with the  17:26

16   OCC was to correct those deficiencies; correct?    17:26

17             MS. KNIGHT:  Object to form.              17:27

18             THE WITNESS:  I'll say address the        17:27

19   deficiencies.  I don't know that everything needed a  17:27

20   correction, because it may have not had anything in  17:27

21   place.  So correcting something you don't have in  17:27

22   place isn't possible.                              17:27

23             MR. PAUL:  Fair enough.                   17:27

24        Q    The -- go to the -- well, let's -- let's kind  17:27

25   of walk through this.                              17:27
```

Page 248

CONFIDENTIAL

WF_GARCIA_00002100

```
 1          The second page, "Comptroller's Findings,"     17:27
 2   notes that the bank is among the largest of mortgagers  17:27
 3   of residential mortgages in the United States.          17:27
 4          Does that remain true today?                     17:27
 5     A   It does.                                          17:27
 6     Q   Okay.  And -- and then it notes, which we         17:28
 7   probably all know, there was a housing recession,       17:28
 8   which greatly increased the number of foreclosures;     17:28
 9   true?                                                   17:28
10     A   That's --                                         17:28
11          MS. KNIGHT:  Yeah.  And I'm just going to --     17:28
12   I'm going to give you a little leeway here, because     17:28
13   it's getting close to the end of the day.  But this is  17:28
14   beyond the scope of the notice, as far as these         17:28
15   findings.                                               17:28
16          So she can testify as to her personal            17:28
17   knowledge.  But she's not designated, on behalf of the  17:28
18   bank, for the findings in the consent order.            17:28
19          THE WITNESS:  This statement that the housing    17:28
20   crisis caused that was -- that resulted in              17:28
21   foreclosures increasing, is an accurate statement.      17:28
22          MR. PAUL:  Thank you.                            17:28
23     Q   And that also resulted, again, just in            17:28
24   background, in the creation of the HAMP program and     17:28
25   other programs to modify loans to keep people in their  17:28
```

Page 249

CONFIDENTIAL

WF_GARCIA_00002101

| | | |
|---|---|---|
| 1 | homes; correct? | 17:28 |
| 2 | MS. KNIGHT:  She can answer in her personal | 17:28 |
| 3 | knowledge. | 17:28 |
| 4 | THE WITNESS:  Yes. | 17:28 |
| 5 | MR. PAUL:  Q.  One of the things that the | 17:28 |
| 6 | bank committed to do, if you look on Article 2, | 17:28 |
| 7 | page 3, is to maintain a compliance committee; | 17:29 |
| 8 | correct? | 17:29 |
| 9 | A   Yes. | 17:29 |
| 10 | Q   To your knowledge, did the compliance | 17:29 |
| 11 | committee -- well, let me state it this way. | 17:29 |
| 12 | To your knowledge, when was the first time | 17:29 |
| 13 | that the issues described in CITs 1552 or 6214 were | 17:29 |
| 14 | brought to the attention of the bank's compliance | 17:29 |
| 15 | committee? | 17:29 |
| 16 | MS. KNIGHT:  Object to the form; also, beyond | 17:29 |
| 17 | the scope of the topics for which she's been | 17:29 |
| 18 | designated. | 17:29 |
| 19 | She can testify in her personal knowledge. | 17:29 |
| 20 | MR. PAUL:  No, I -- this is the actions the | 17:29 |
| 21 | bank took to ensure compliance.  So this is exactly | 17:29 |
| 22 | what I want the corporate representative -- | 17:29 |
| 23 | MS. KNIGHT:  It says shall maintain a | 17:29 |
| 24 | compliance committee, and the compliance committee | 17:30 |
| 25 | shall be responsi- -- responsible for monitoring and | 17:30 |

Page 250

CONFIDENTIAL                                    WF_GARCIA_00002102

| | | |
|---|---|---|
| 1 | coordinating the bank's compliance. | 17:30 |
| 2 | But you're asking about a specific | 17:30 |
| 3 | communication. I don't view that as being covered | 17:30 |
| 4 | within the bank's efforts to comply with the consent | 17:30 |
| 5 | order, as it relates to loan modifications or the | 17:30 |
| 6 | software. | 17:30 |
| 7 | MR. SCHRAG: That's not a reasonable | 17:30 |
| 8 | reason -- | 17:30 |
| 9 | MR. PAUL: We -- we can take that up with the | 17:30 |
| 10 | Court -- | 17:30 |
| 11 | MS. KNIGHT: Okay. | 17:30 |
| 12 | MR. PAUL: -- whether this is personal or | 17:30 |
| 13 | corporate rep. | 17:30 |
| 14 | THE WITNESS: The -- there was no reason to | 17:30 |
| 15 | bring the issue the first time in 2014, because it was | 17:30 |
| 16 | identified as -- inaccurately as an issue. | 17:30 |
| 17 | The first time that this issue would have | 17:30 |
| 18 | been brought to a compliance committee was in this | 17:30 |
| 19 | recent re-review of the issue. | 17:30 |
| 20 | MR. PAUL: All right. | 17:30 |
| 21 | Q And can you be more specific as to the date | 17:30 |
| 22 | that was brought to the attention of the compliance | 17:30 |
| 23 | committee? | 17:30 |
| 24 | MS. KNIGHT: I -- this is definitely outside | 17:30 |
| 25 | the scope, because the bank was released from the | 17:31 |

Page 251

CONFIDENTIAL WF_GARCIA_00002103

```
 1    consent order well prior to this time frame.        17:31

 2         So she can answer in her personal knowledge,   17:31

 3    if she knows.  But this -- yeah.                     17:31

 4         THE WITNESS:  I don't know the exact date       17:31

 5    and -- of the issue being brought to a compliance    17:31

 6    committee.                                           17:31

 7         I know the one document we reviewed today was   17:31

 8    July of '18.  But I can't say that that was the first 17:31

 9    time -- I know it wasn't the first time that it was  17:31

10    reviewed with a compliance committee.                17:31

11         MR. PAUL:  You mentioned the implementation     17:31

12    of the single point of contact.                      17:31

13    Q    Did the OCC later find that Wells Fargo had     17:31

14    too many customers assigned to the single point -- to 17:31

15    a single point of contact?                           17:31

16         MS. KNIGHT:  Object to the form.                17:31

17         THE WITNESS:  I would have to read through to   17:31

18    answer your question specifically.  I do not believe 17:32

19    they found too many as a number versus a suggestion to 17:32

20    enhance our model.                                   17:32

21         MR. PAUL:  All right.  That's fair enough.      17:32

22         THE WITNESS:  I would have to read their        17:32

23    exact language to be able to tell you what they found. 17:32

24         MR. PAUL:  Let's do it this way.                17:32

25    Q    In terms of Exhibit 421, so we -- the bank      17:32
```

Page 252

CONFIDENTIAL                                                    WF_GARCIA_00002104

| | | |
|---|---|---|
| 1 | agrees to the consent order in 2011.  And then there | 17:32 |
| 2 | is an amendment to it in 2013, which is reflected in | 17:32 |
| 3 | Exhibit 421; correct? | 17:32 |
| 4 | A   That is correct. | 17:32 |
| 5 | Q   All right. | 17:32 |
| 6 | And to your understanding, what is it that -- | 17:32 |
| 7 | that led to the 2011 consent order being amended in | 17:32 |
| 8 | 2013? | 17:32 |
| 9 | MS. KNIGHT:  And I'm going to object to the | 17:32 |
| 10 | form.  Also, it's beyond the scope. | 17:33 |
| 11 | She's here to testify about what steps it | 17:33 |
| 12 | took to comply.  But she can answer, if she has | 17:33 |
| 13 | personal knowledge. | 17:33 |
| 14 | THE WITNESS:  Just give me one moment so I | 17:33 |
| 15 | make sure I get the amendments right for my answer. | 17:33 |
| 16 | This amendment to the plan was part of the | 17:34 |
| 17 | independent foreclosure settlement that was done as | 17:34 |
| 18 | referenced in -- on page 2 to the -- the independent | 17:34 |
| 19 | foreclosure monitor or consultant to conduct an | 17:34 |
| 20 | independent review of the foreclosure process. | 17:34 |
| 21 | MR. PAUL:  Q.  And part of the purpose of | 17:35 |
| 22 | that was to prevent foreclosures; correct? | 17:35 |
| 23 | A   That's correct. | 17:35 |
| 24 | Q   And you would agree that is the purpose of | 17:35 |
| 25 | Wells Fargo's loss mitigation department; correct? | 17:35 |

Page 253

CONFIDENTIAL                                          WF_GARCIA_00002105

```
 1       A    That's correct.                          17:35

 2       Q    And part of the reason why the -- the -- the   17:35

 3   tool that we're talking about, HPA, is the home    17:35

 4   preservation.  It's to preserve people in their homes;   17:35

 5   correct?                                           17:35

 6       A    That's correct.                          17:35

 7       Q    Let's go to Exhibit 422.                 17:35

 8       A    (Witness complies.)                      17:35

 9       Q    Two years later, 2015, there's another   17:35

10   consent order, amending both the 2011 consent order   17:35

11   and the 2013 amendment to the consent order; correct?   17:36

12       A    That is correct.                         17:36

13       Q    And the bottom "whereas" clause in the bottom   17:36

14   first page of Exhibit 422:                         17:36

15            "Whereas the bank is in continuing        17:36

16   noncompliance with and in violation of the consent   17:36

17   order, and continues to engage in unsafe and unsound   17:36

18   practices."                                        17:36

19            Do you believe that the errors or the     17:36

20   deficiency in the HPA tool, that led to the Phase 1   17:36

21   errors, was a -- an unsound and unsafe banking     17:36

22   practice?                                          17:36

23            MS. KNIGHT:  Object to the form; also, beyond   17:37

24   the scope of the notice.                           17:37

25            She can testify in her personal capacity.   17:37
```

Page 254

CONFIDENTIAL

WF_GARCIA_00002106

| | | |
|---|---|---|
| 1 | THE WITNESS: Can you ask me the question | 17:37 |
| 2 | again, please? | 17:37 |
| 3 | MR. PAUL: Yeah. | 17:37 |
| 4 | Q Do you believe that the defect in the HPA | 17:37 |
| 5 | tool, that resulted in the Phase 1 errors, was an | 17:37 |
| 6 | unsafe and unsound banking practice? | 17:37 |
| 7 | MS. KNIGHT: Same objections. | 17:37 |
| 8 | THE WITNESS: Any time we have an impact that | 17:37 |
| 9 | impacts a borrower, it -- I would consider it to be | 17:37 |
| 10 | unsafe. | 17:37 |
| 11 | MR. PAUL: Q. Is there anything specific in | 17:37 |
| 12 | any of these three consent orders, that we've marked | 17:37 |
| 13 | as Exhibits 420, 421, and 422, that you believe | 17:37 |
| 14 | addresses the -- the issues encompassed by the Phase 1 | 17:38 |
| 15 | or Phase 2 errors? | 17:38 |
| 16 | MS. KNIGHT: Object to the form. | 17:38 |
| 17 | THE WITNESS: 422, is the amended consent | 17:38 |
| 18 | order in the OCC's findings of what we needed to | 17:38 |
| 19 | continue to work on, based on what they identified | 17:38 |
| 20 | that we did not have to meet their expectations. | 17:38 |
| 21 | I believe what we did to be released from the | 17:38 |
| 22 | consent order in May of 2016, all of the actions | 17:38 |
| 23 | leading up until that point of release, are things | 17:39 |
| 24 | that I would point directly to that would prevent this | 17:39 |
| 25 | from happening. | 17:39 |

Page 255

CONFIDENTIAL WF_GARCIA_00002107

| | | |
|---|---|---|
| 1 | MR. PAUL:  Q.  But at the time that Wells | 17:39 |
| 2 | Fargo was released from this consent order, it was | 17:39 |
| 3 | still improperly denying loan modifications because of | 17:39 |
| 4 | both the Phase 1 and Phase 2 errors; correct? | 17:39 |
| 5 | MS. KNIGHT:  Object to form. | 17:39 |
| 6 | THE WITNESS:  Yes. | 17:39 |
| 7 | MR. PAUL:  Q.  Do you agree that additional | 17:39 |
| 8 | auditing of the HPA tool could have uncovered the | 17:39 |
| 9 | Phase 1 and Phase 2 errors earlier -- let me -- let me | 17:40 |
| 10 | rephrase that. | 17:40 |
| 11 | Do you believe that additional auditing of | 17:40 |
| 12 | the HPA tool could have revealed the customer impact | 17:40 |
| 13 | of the Phase 1 and Phase 2 errors earlier? | 17:40 |
| 14 | MS. KNIGHT:  Object to form; also, beyond the | 17:40 |
| 15 | scope. | 17:40 |
| 16 | She can answer in her personal capacity. | 17:40 |
| 17 | THE WITNESS:  "Earlier" is a broad -- I don't | 17:40 |
| 18 | know what "earlier" means. | 17:40 |
| 19 | MR. PAUL:  Well, earlier than 2018. | 17:40 |
| 20 | MS. KNIGHT:  Same objections. | 17:40 |
| 21 | THE WITNESS:  We fixed it for Phase 1 in | 17:40 |
| 22 | 2015, so -- for the Phase 1. | 17:40 |
| 23 | So that -- I'm -- I don't know how to answer | 17:40 |
| 24 | the question, based on a broad date of "earlier." | 17:40 |
| 25 | MR. PAUL:  Q.  Well, let's -- let's break | 17:40 |

Page 256

CONFIDENTIAL                                                        WF_GARCIA_00002108

| | | |
|---|---|---|
| 1 | them up then. | 17:41 |
| 2 |     A   Okay. | 17:41 |
| 3 |     Q   So do you believe -- well, while the problem | 17:41 |
| 4 | may have been fixed, the customer impact wasn't | 17:41 |
| 5 | uncovered until 2018; correct? | 17:41 |
| 6 |     A   That's correct. | 17:41 |
| 7 |     Q   So do you believe that additional auditing of | 17:41 |
| 8 | the tool could have uncovered the impact on Wells | 17:41 |
| 9 | Fargo's customers prior to 2018? | 17:41 |
| 10 |       MS. KNIGHT:  Same objections. | 17:41 |
| 11 |       THE WITNESS:  The tool was not the root cause | 17:41 |
| 12 | of the calculation.  It was the BRD.  So I -- I don't | 17:41 |
| 13 | know. | 17:41 |
| 14 |       The review of the tool took place, and we | 17:41 |
| 15 | inaccurately determined that there was harm.  So -- | 17:41 |
| 16 |       MR. PAUL:  Q.  But there was no harm? | 17:41 |
| 17 |     A  -- I believe the an- -- that there was no | 17:41 |
| 18 | harm.  I believe the answer is no, because that's the | 17:41 |
| 19 | root cause of why we had to come back in 2018, was | 17:42 |
| 20 | because we made an inaccurate assessment of the harm. | 17:42 |
| 21 |     Q   But you -- you've already said that the | 17:42 |
| 22 | enhanced processes that you put in place post that | 17:42 |
| 23 | inaccurate determination wouldn't have allowed that | 17:42 |
| 24 | process to have been shut down without corrective | 17:42 |
| 25 | action being taken place; right? | 17:42 |

Page 257

CONFIDENTIAL

WF_GARCIA_00002109

| | | |
|---|---|---|
| 1 | MS. KNIGHT:  Object to form. | 17:42 |
| 2 | THE WITNESS:  Yes. | 17:42 |
| 3 | MR. PAUL:  Okay. | 17:42 |
| 4 | Q   And so had more strict procedures or | 17:42 |
| 5 | practices been in place in 2014, there wouldn't have | 17:42 |
| 6 | been allowed to continue this risk of customers' homes | 17:42 |
| 7 | being foreclosed on, based on improper denial of a | 17:42 |
| 8 | trial loan modification; right? | 17:42 |
| 9 | MS. KNIGHT:  Object to form; beyond the | 17:42 |
| 10 | scope. | 17:42 |
| 11 | She can answer in her personal capacity. | 17:42 |
| 12 | THE WITNESS:  I don't agree with the | 17:42 |
| 13 | statement. | 17:42 |
| 14 | MR. PAUL:  Okay. | 17:42 |
| 15 | Q   Is it your position that there is -- once | 17:43 |
| 16 | this mistake in the business requirements was made, | 17:43 |
| 17 | that there isn't much that could have been done to | 17:43 |
| 18 | uncover that error? | 17:43 |
| 19 | MS. KNIGHT:  Object to form; also, beyond the | 17:43 |
| 20 | scope. | 17:43 |
| 21 | She can answer in her personal capacity. | 17:43 |
| 22 | THE WITNESS:  I absolutely believe that | 17:43 |
| 23 | there's things that we could have done differently, as | 17:43 |
| 24 | proven by the things that we enhanced, as I | 17:43 |
| 25 | referenced, the change control processes, the issue | 17:43 |

Page 258

CONFIDENTIAL                                            WF_GARCIA_00002110

| | | |
|---|---|---|
| 1 | management practices, the testing and releasing -- | 17:43 |
| 2 | release, all of which were part of the consent orders | 17:43 |
| 3 | which we were released from in -- in 2016. | 17:43 |
| 4 | MR. PAUL:  Q.  And do you believe that Wells | 17:43 |
| 5 | Fargo would have been released from the consent order, | 17:44 |
| 6 | had it disclosed to the OCC that it had allowed this | 17:44 |
| 7 | error to continue, where loan modifications were | 17:44 |
| 8 | being -- or at least were at risk of being improperly | 17:44 |
| 9 | denied because of excessive capitalized fees? | 17:44 |
| 10 | MS. KNIGHT:  Object to form; beyond the scope | 17:44 |
| 11 | of the designation. | 17:44 |
| 12 | She can answer in her personal capacity. | 17:44 |
| 13 | THE WITNESS:  I do not know that answer. | 17:44 |
| 14 | MR. PAUL:  Okay.  All right. | 17:44 |
| 15 | Let's go off the record. | 17:44 |
| 16 | THE VIDEOGRAPHER:  Going off the record.  The | 17:44 |
| 17 | time is 5:44. | 17:44 |
| 18 | (Recess taken.) | 17:44 |
| 19 | THE VIDEOGRAPHER:  We are back on the record. | 17:50 |
| 20 | The time is 5:50. | 17:50 |
| 21 | MR. PAUL:  Q.  Ma'am, back on Exhibit 420, | 17:50 |
| 22 | one of the things that Wells Fargo committed to do was | 17:50 |
| 23 | to conduct a foreclosure review; correct? | 17:50 |
| 24 | A   Yes. | 17:50 |
| 25 | Q   And do you have an understanding as to why | 17:50 |

CONFIDENTIAL                                             WF_GARCIA_00002111

| | | |
|---|---|---|
| 1 | the foreclosure review did not uncover the errors that | 17:50 |
| 2 | we've been talking about? | 17:51 |
| 3 | MS. KNIGHT: Object to form. | 17:51 |
| 4 | THE WITNESS: The foreclosure review that was | 17:51 |
| 5 | agreed upon, in the independent foreclosure review | 17:51 |
| 6 | settlement, moved from an individual file review to a | 17:51 |
| 7 | settlement based on a category of a loan. | 17:51 |
| 8 | MR. PAUL: Q. So looking at page 17 of | 17:51 |
| 9 | Exhibit 420, one of the purposes of the foreclosure | 17:51 |
| 10 | review was to determine, in looking at Subsection G, | 17:51 |
| 11 | whether loss mitigation activities, with respect to | 17:51 |
| 12 | foreclosed loans, were handled in accordance with the | 17:51 |
| 13 | requirements of the HAMP, and consistent with the | 17:51 |
| 14 | policies and procedures applicable to the bank's | 17:52 |
| 15 | proprietary loan modifications or other loss | 17:52 |
| 16 | mitigation programs. | 17:52 |
| 17 | Do you see that? | 17:52 |
| 18 | A   I do. | 17:52 |
| 19 | Q   And with respect to instances where borrowers | 17:52 |
| 20 | impacted by the Phase 1 and Phase 2 errors resulted in | 17:52 |
| 21 | a foreclosure, that was done not in accordance with | 17:52 |
| 22 | the requirements of HAMP or the other loan | 17:52 |
| 23 | modification programs; correct? | 17:52 |
| 24 | MS. KNIGHT: Object to form. | 17:52 |
| 25 | THE WITNESS: Can you -- | 17:52 |

Page 260

CONFIDENTIAL                                                          WF_GARCIA_00002112

| | | |
|---|---|---|
| 1 | MS. KNIGHT:  It's beyond the scope. | 17:52 |
| 2 | THE WITNESS:  -- can you re-ask the question? | 17:52 |
| 3 | I was on page 17, but then -- on G, and then | 17:52 |
| 4 | I kind of got lost. | 17:53 |
| 5 | MR. PAUL:  Sure. | 17:53 |
| 6 | Q   The -- the foreclosure review -- well, the -- | 17:53 |
| 7 | the errors that we've been talking about today | 17:53 |
| 8 | resulted in foreclosures that were not conducted in | 17:53 |
| 9 | accordance with the requirements of HAMP, because | 17:53 |
| 10 | those borrowers, at least with respect to the HAMP | 17:53 |
| 11 | loan modification denials, should have been offered a | 17:53 |
| 12 | trial loan modification; right? | 17:53 |
| 13 | MS. KNIGHT:  Object to the form; beyond the | 17:53 |
| 14 | scope. | 17:53 |
| 15 | THE WITNESS:  I disagree that it resulted in | 17:53 |
| 16 | a foreclosure. | 17:53 |
| 17 | MR. PAUL:  Okay. | 17:53 |
| 18 | Q   And the foreclosure review that was done, did | 17:53 |
| 19 | it ever go back and look at the waterfalls for the | 17:53 |
| 20 | denials of trial modifications? | 17:53 |
| 21 | MS. KNIGHT:  Object to form. | 17:53 |
| 22 | THE WITNESS:  No. | 17:53 |
| 23 | MR. PAUL:  Q.  If you'll go back to -- well, | 17:54 |
| 24 | so for context, page 7, the Article 4 is the | 17:54 |
| 25 | compliance program that the bank agreed to implement; | 17:54 |

Page 261

CONFIDENTIAL

WF_GARCIA_00002113

| | | |
|---|---|---|
| 1 | correct? | 17:54 |
| 2 | A   Did you say page 4? | 17:54 |
| 3 | Q   I'm sorry.  Page 7, Article 4. | 17:54 |
| 4 | A   (Witness complies.) | 17:54 |
| 5 |      Yes. | 17:54 |
| 6 | Q   Okay.  And at the bottom of Section 1, it | 17:54 |
| 7 | says: | 17:54 |
| 8 |      "The compliance program shall include, at a | 17:54 |
| 9 | minimum" -- | 17:54 |
| 10 |      And there's a whole bunch of sub-points. | 17:54 |
| 11 |      And if you'll flip over to page 9. | 17:54 |
| 12 | A   (Witness complies.) | 17:54 |
| 13 | Q   Subparagraph 0 says: | 17:54 |
| 14 |      "Processes to ensure that the risk | 17:54 |
| 15 | management, quality control, audit, and compliance | 17:55 |
| 16 | programs have the requisite authority and status | 17:55 |
| 17 | within the organization so that appropriate reviews of | 17:55 |
| 18 | the bank's mortgage servicing, loss mitigation, and | 17:55 |
| 19 | foreclosure activities and operations may occur, and | 17:55 |
| 20 | deficiencies are identified and promptly remedied." | 17:55 |
| 21 |      Do you see that? | 17:55 |
| 22 | A   I do see that. | 17:55 |
| 23 | Q   And the compliance program -- well, was this | 17:55 |
| 24 | compliance program in place at the time that the | 17:55 |
| 25 | errors -- Phase 1 and Phase II errors were identified | 17:55 |

Page 262

CONFIDENTIAL                                                  WF_GARCIA_00002114

| | | |
|---|---|---|
| 1 | in late 2013? | 17:55 |
| 2 | MS. KNIGHT:  Object to the form. | 17:55 |
| 3 | THE WITNESS:  No. | 17:55 |
| 4 | MR. PAUL:  Q.  When did -- | 17:55 |
| 5 | A   I do not believe so, no. | 17:55 |
| 6 | Q   Okay.  So the -- the consent order required | 17:55 |
| 7 | this compliance program to be put in place within | 17:55 |
| 8 | 60 days of the date of this order. | 17:55 |
| 9 | Is -- did the bank not, in fact, do that? | 17:55 |
| 10 | MS. KNIGHT:  Object to the form. | 17:55 |
| 11 | THE WITNESS:  You have to tie all of the | 17:56 |
| 12 | consent orders together to get to the answer.  And | 17:56 |
| 13 | that's why it's challenging when you're picking out | 17:56 |
| 14 | one document from a 60-day, because if you tie the | 17:56 |
| 15 | 2015 amended consent order to it, you'll see in there | 17:56 |
| 16 | that the controller's -- comp controller's findings | 17:56 |
| 17 | were that we did not comply appropriately to all of | 17:56 |
| 18 | the orders, including this one, as referenced on page | 17:56 |
| 19 | 3 of the amended -- amended consent order. | 17:56 |
| 20 | MR. PAUL:  Q.  Just because I marked them, | 17:56 |
| 21 | would you -- I think we handed you Exhibits 423 and | 17:56 |
| 22 | 424 as well.  Can you tell us what those -- each of | 17:56 |
| 23 | those are? | 17:57 |
| 24 | A   Mine goes to 422. | 17:57 |
| 25 | Q   Do you have -- | 17:57 |

Page 263

CONFIDENTIAL                    WF_GARCIA_00002115

| | | |
|---|---|---|
| 1 | A    I -- oh, you know what?  I'm sorry. | 17:57 |
| 2 | They're -- I found them. | 17:57 |
| 3 | Q    Okay.  What is Exhibit 423? | 17:57 |
| 4 | A    Let me review it. | 17:57 |
| 5 | (Witness reading document.) | 17:57 |
| 6 | The OCC's civil money penalty -- | 17:57 |
| 7 | Q    All right. | 17:58 |
| 8 | A    -- for the -- I mean, for -- for, I believe, | 17:58 |
| 9 | the consent orders we were referring to. | 17:58 |
| 10 | I'd need to confirm that, that they were | 17:58 |
| 11 | directly tied to the consent orders that we were just | 17:58 |
| 12 | referring to. | 17:58 |
| 13 | Q    All right. | 17:58 |
| 14 | What about Exhibit 424? | 17:58 |
| 15 | A    I haven't seen this document in my prep | 17:58 |
| 16 | materials, so I'll need a minute to review this. | 17:58 |
| 17 | Q    Okay. | 17:58 |
| 18 | A    (Witness reading document.) | 17:58 |
| 19 | So this -- can you ask me the question again, | 17:59 |
| 20 | please? | 17:59 |
| 21 | Q    Yeah. | 17:59 |
| 22 | What is it? | 17:59 |
| 23 | A    This is a procedures policy document, related | 17:59 |
| 24 | to customer impact processes.  I don't know what time | 17:59 |
| 25 | frame, unless I could find a date on here somewhere | 17:59 |

Page 264

CONFIDENTIAL                                        WF_GARCIA_00002116

```
 1              CERTIFICATE OF REPORTER
 2           I, ANDREA M. IGNACIO, hereby certify that the
 3    witness in the foregoing deposition was by me duly
 4    sworn to tell the truth, the whole truth, and nothing
 5    but the truth in the within-entitled cause;
 6           That said deposition was taken in shorthand
 7    by me, a disinterested person, at the time and place
 8    therein stated, and that the testimony of the said
 9    witness was thereafter reduced to typewriting, by
10    computer, under my direction and supervision;
11           That before completion of the deposition,
12    review of the transcript [ ] was [x] was not
13    requested.  If requested, any changes made by the
14    deponent (and provided to the reporter) during the
15    period allowed are appended hereto.
16           I further certify that I am not of counsel or
17    attorney for either or any of the parties to the said
18    deposition, nor in any way interested in the event of
19    this cause, and that I am not related to any of the
20    parties thereto.
21    Dated: August 6, 2019
22
23
24
25    ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830
```

Page 266

CONFIDENTIAL                                WF_GARCIA_00002118