# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| **Andrew J Maxwell, not individually**, but as Trustee for the estate of Eduardo Garcia and Julia Escamilla (Julia Garcia); **Eduardo Garcia, Julia Garcia; Byron Garcia and Miriahm Garcia,** individually**,** Plaintiffs, v. WELLS FARGO BANK, N.A., Defendant. | Case No. 1:20-cv-02402 |

EXPERT REPORT OF PETER M. ROSS

June 10, 2022 CONFIDENTIAL

# Table of Contents

I.    Qualifications.................................................................................................3

II.   Background...................................................................................................6

    A.    Summary of Allegations and Scope of Assignment................................6

    B.    Summary of Opinions.........................................................................7

III.  Overview of the Economic Circumstances and Industry Practices During the Relevant Time Period...............................................................................................9

    A.    The Financial Crisis..........................................................................9

    B.    The Response to the Financial Crisis and Resulting Impact on Mortgage Servicers10

IV.   HAMP Loan Modifications .......................................................................12

    A.    HAMP Modifications Balanced the Competing Interests of the Borrower and the Investor ...................................................................................12

    B.    The Application Process for HAMP....................................................12

    C.    HAMP's Evolving Regulatory and Program Requirements Caused Additional Challenges for Servicers, Including Wells Fargo ................................16

V.    Wells Fargo's Process for Detecting and Remediating the HPA Tool Error in its HAMP Approval Calculation Met Industry Standards ...................................................19

    A.    The HPA Tool Error Impacted Very Few Mortgagors.........................19

    B.    Wells Fargo Acted Reasonably to Detect the Error .............................20

    C.    Wells Fargo's Correction Process was Diligent and Met Industry Standards.......22

    D.    Wells Fargo Acted Reasonably in Its Re-Discovery and Review of the HPA Tool Calculation Error ...........................................................................23

VI.   Wells Fargo's Interactions with the Garcias were Consistent with Industry Best Practices25

VII.  Obtaining a Trial HAMP Modification Would Not Have Ensured the Garcias Would Have Avoided Default or Foreclosure .........................................................................30

I.      **Qualifications**

1.      I have over thirty-five years of experience in virtually all aspects of mortgage banking.  I have been the senior servicing officer for three firms which, at the time, were among the largest servicing operations in the industry.  I have overseen mortgage origination operations with full senior officer authority.  For the last nineteen years, in my role as Partner of Performance Mastery Institute and Founder and President of PMR Consulting Group, I have gained in-depth knowledge of the operations of more than thirty mortgage banking firms and mortgage industry vendor firms.  Many of my servicing assignments involved operating and direct management of my clients' default functions in the context of mortgage servicing.

2.      Prior to consulting, I managed three of the then-largest mortgage loan servicing operations in a career spanning more than fifteen years.

   a.   From 1983 to 1989, I oversaw the commercial and residential mortgage loan servicing operations for Goldome Realty Credit Corp.,[1] which serviced 235,000 mortgage loans with more than 500 employees under my supervision. During my tenure, the residential servicing operation grew more than 500 percent, transforming a New York State servicer into a nationwide servicer with loans serviced in almost every state.  I also acted as the senior administrator of the Goldome Bank-owned commercial and residential portfolio.

   b.   From 1989 to 1996, I managed several divisions of Mellon Bank's mortgage subsidiary.  In that capacity, the servicing division reported to me and grew to service more than 660,000 loans nationwide.  In response to a growing demand to refinance existing mortgages, I created and managed the centralized mortgage refinance operation, employing over thirty staff members.

   c.   From 1996 to 1999, I served as the Executive Vice President of PNC Bank's mortgage banking operations.  I managed the nationwide servicing operation which, during my tenure, grew into the 10th largest mortgage servicer, one of the highest volume servicing acquisitions areas in the industry, and the corporate-wide information and technology division.  My group was responsible for a balance sheet

---

[1] Buffalo Savings Bank became Goldome and created a subsidiary Goldome Realty Credit.  For simplicity, I refer to these entities as "Goldome"

of more than $1.3 billion. At PNC, I also oversaw the PNC master servicing, a role in which I gained in-depth knowledge of all aspects of master servicing.

d. In all three positions, I acted as an executive officer for the entire corporation, which entailed discussions and decision-making concerning nearly all aspects of mortgage banking operations. I made the final decision authorizing the company to contractually commit to service new or acquired mortgage servicing portfolios. In all three positions, I managed all default functions, including loss mitigation activities.[2]

e. In all three positions, I also worked with our compliance and legal areas to understand any regulatory or investor driven new directives. With my staff, and in concert with those same two areas, I oversaw the procedural development and installation of any necessary revised operating procedures together with appropriate quality control checks.

3.      During my 19 years of consulting work, I have assumed – on an interim basis – line responsibilities for two clients' default operations. In one case, I was responsible for the entire operation and acted as Senior Default Manager. As part of those responsibilities, I oversaw collections, loss mitigation, foreclosure referral, foreclosure, bankruptcy, claims, and real estate owned ("REO") sales operations for that financial institution. In the second case, I assumed multiple positions managing several default operations for, at that time, the nation's eighth largest mortgage servicing operation.[3] The line positions that I held included Foreclosure Manager, Bankruptcy Manager, Property Inspections and Property Preservation Manager, Investor Claims Manager, and REO Manager.

4.      I have twice been part of a senior team which created a new servicing operation. In the first case, I was the third person to join the effort and took the lead in hiring the remaining servicing staff as well as creating the Foreclosure, Bankruptcy and REO operations. In the second case, I led the effort and acted as the senior servicing officer for nine months. When the permanent senior servicing officer was hired, I then co-managed the operation for another year.

---

[2] The Home Affordable Modification Program ("HAMP") was a new concept to servicing operations and personnel. It required an origination-like application, assembling support documents, and "underwriting" functions that servicing personnel had never been exposed to before. *See* "Supplemental Directive 09-05 Revised: Update to the Second Lien Modification Program (2MP)," *Making Home Affordable*, March 26, 2010, ("Supplemental Directive 09-05R").

[3] This assignment was within the default operations of ABN AMRO's mortgage servicing division.

5.      During the financial crisis, acting as a member of a senior default team at MetLife Mortgage,[4] I led the efforts of a top-ten mortgage servicer to develop new procedures to handle the substantial increase in borrowers' requests for assistance to avoid foreclosure.  I assessed the nature of the financial distress being experienced by MetLife's customers and developed a triage process to streamline borrower requests and identify the loss mitigation options most appropriate for each borrower.[5]  When the Federal Government announced the HAMP program, I created and implemented the new process flows necessary to accept, process, and approve the substantial volume of HAMP applications we received.  I also redesigned the loss mitigation processes for short sales and deeds-in-lieu of foreclosure.  To handle the tremendous volume increase, I investigated, negotiated, and then oversaw an outsourcing relationship that increased HAMP processing capacity.  As part of the senior default team, I regularly attended division-wide meetings and brainstormed solutions for other default areas such as collections, foreclosure and bankruptcy.

6.      Throughout my career, I have held several industry-wide positions.  In the early 1990's, I was selected to chair the Mortgage Bankers Association of America's Loan Administration Committee (the "MBA"), where I led industry-wide initiatives for our national trade organization, testified before two congressional committees, and created MBA's first servicing standards of practice.

7.      From 1994 to 2000, I served on the Federal Home Loan Mortgage Corporation's ("Freddie Mac") National Servicing Advisory Board which met with the top FreddieMac servicing executives multiple times a year to discuss and amend proposed servicer operating requirements and generally counsel this government-sponsored enterprise ("GSE") on servicing related matters.

8.      I was also elected President of the Empire State Mortgage Bankers Association – New York's statewide mortgage banking association. During my tenure, I led the mortgage industry in partnering with the New York Banking Department to develop New York State's first extensive mortgage banking regulations.

9.      Based on my firsthand experience, I am familiar with the best practices of leading mortgage servicers within the industry, particularly as it pertains to loss mitigation operations.

---

[4] I remained an outside consultant and not an employee of MetLife Mortgage.
[5] The term "loss mitigation" describes various assistance programs or options that may be available to a homeowner, including loan modification, formal forbearance plans, deed-in-lieu of foreclosure, and short sales.  *See* 12 C.F.R. § 1024.31 (defining "loss mitigation option"); 12 C.F.R. § 1024.38 (general servicing policies, procedures, and requirements); 12 C.F.R. § 1024.41 (addressing loss mitigation procedures).  I developed the decision-making process to pursue liquidation of the property through foreclosure in circumstances where none of these options are feasible.

10.     Since 2015, I have testified as an expert witness in 34 cases and am currently retained in five additional cases. Relevant here, I have issued six expert reports and opined on loss mitigation operations in the mortgage servicing and commercial banking industries in six separate cases.

11.     To date, I have never been excluded as an expert witness or otherwise deemed unqualified in any legal proceeding to which I have been asked to offer expert testimony.

## II.     Background

### A.     Summary of Allegations and Scope of Assignment

12.     Plaintiffs Eduardo and Julia Garcia ("Plaintiffs") allege that Defendant Wells Fargo Bank, N.A. ("Wells Fargo") improperly denied the Garcias' application for a loan modification under the Home Affordable Modification Program ("HAMP").[6]  In particular, Plaintiffs allege that a "computer glitch" caused Wells Fargo to deny the Garcias' loan application and that, ultimately, Wells Fargo "needlessly foreclosed on [the Garcias'] Family Home, sold it at judicial sale, evicted them and obtained a deficiency judgment of nearly $200,000 against Eduardo and Julia Garcia, personally."[7]

13.     I have been retained by Winston & Strawn LLP on behalf of Wells Fargo to review Wells Fargo's actions concerning the Garcias' loan modification requests in the context of the broader financial crisis and changes to loan modification processes during that time.  In particular, I have been asked to:

  a.  Discuss the servicing loss mitigation environment of the financial crisis during which HAMP was introduced;

  b.  Discuss the requirements of HAMP, including the criteria for approving HAMP loan modifications;

  c.  Explain the error that caused Wells Fargo to decline the Garcias' HAMP loan modification application ("HPA Tool Error");

  d.  Assess Wells Fargo's efforts to detect and remediate the HPA Tool Error in the context of industry standard practices;

  e.  Evaluate Wells Fargo's efforts to ensure the Garcias kept their home;

---

[6] Complaint, *Andrew J. Maxwell et al. v. Wells Fargo Bank, N.A.*, April 18, 2020 ("Complaint"), ¶¶ 1–3.

[7] Complaint ¶ 28.

     f.   Discuss, based on my experience, the general likelihood that borrowers who obtained trial HAMP modifications were able to avoid eventual foreclosure.

**B.    Summary of Opinions**

14.    Based on my industry knowledge combined with my review and analysis of the discovery materials, I have concluded that:

    a.   The HAMP modification process was not a simple process. It required that both parties (i.e., both the applicant and the servicer) completed certain actions. The applicant's responsibilities included completing the initial application package and supplying the supporting documents requested by the servicer. If approved for the modification, the applicant was obligated to pay the new HAMP payment amount for a three-month trial modification period ("Trial Payment Period") on time and continue to make the new payments after receiving a permanent modification for the life of the loan. The servicer's responsibilities included advising the applicant of the various loss mitigation alternatives.[8] If HAMP was selected, the servicer's responsibilities also included sending the initial application package; examining the information returned to determine if the applicant initially meets the requirements to secure a HAMP modification; processing the application, including requesting supporting documentation as required; evaluating using NPV analysis which option is more economically advantageous for the loan's Investor: a HAMP modification or liquidation of the property.[9] If approved, the servicer prepared the modification documents and oversaw the three-month Trial Payment Period. This application and modification process was very complex, and processing errors did occur across the industry.

    b.   The complexities of the mortgage servicing business and the demands of the economic crisis further exacerbated servicers' performance difficulties related to the processing of HAMP. Default rates on loans like the Garcias' doubled, and foreclosure rates tripled. Servicers were required to hire and train substantial new

---

[8] This action is fulfilled by soliciting the borrower to apply after the loan reaches the sixtieth day of default and/or if approached by the borrower prior to the sixtieth day of default, the servicer would advise the borrower on their loss mitigation options.

[9] In the mortgage industry, the term investor refers to the entity or entities who have an ownership interest in a loan or group of loans.

staff to handle both the increased volume of non-HAMP problem loans but also to hire and train staff for new loss mitigation options such as HAMP.

c.  While many servicers had great difficulties during this time period, I find that Wells Fargo's HAMP performance was well organized and, in fact, was evaluated as such by the HAMP federal administrator.

d.  The HPA error impacted very few mortgagors.

e.  Wells Fargo's process for detecting and remediating the HPA Tool Error met industry standards.

f.  Based on my review, Wells Fargo followed industry best practices in its interactions with the Garcias, providing several loss mitigation solutions—under which the Garcias generally failed to make the required payments.

g.  Receiving a HAMP modification was not the cure-all for struggling borrowers like the Garcias.  In fact, historical data indicates that even if a borrower obtains a HAMP modification, the borrower is still more likely to default than be successful. Considering the financial difficulties faced by the Garcias, HAMP was even less likely to be successful.

h.  In summary, although Wells Fargo made a calculation error, their overall HAMP performance was excellent, and there is no guarantee that the Garcias would have kept their home but-for the error.

15.     My curriculum vitae is attached as Appendix A, and a list of cases in which I have testified as an expert with the preceding four years is attached as Appendix B.  A list of documents that I have relied upon in forming my opinions in this case is attached as Appendix C.  I am compensated at my standard rate of $1,150 per hour.  My compensation is not contingent or based on the content of my opinions or the outcome of this or any other matters.  I have been assisted by a team at Cornerstone Research who worked under my direction.  The final work product and opinions expressed herein are mine alone.  I may amend or supplement my opinions and report, if appropriate, based on any additional discovery, or in response to opinions or reports of other experts in this matter.

### III. Overview of the Economic Circumstances and Industry Practices During the Relevant Time Period

16.     In order to understand the issues in this case, one needs to understand the background of the global financial crisis precipitated by events in 2007 and 2008 ("Financial Crisis"), including its effect on mortgages and the mortgage servicing industry.

### A.     The Financial Crisis

17.     The Financial Crisis was the worst economic downturn since the Great Depression of the 1930's.[10]  With sustained long-term unemployment and severe declines in property values, the impact of the Financial Crisis was especially severe for mortgage lenders, mortgage investors, mortgage servicers and borrowers.[11]

18.     National unemployment rates nearly doubled from 5.0% to 9.3%.[12]  As a result, delinquency rates for subprime loans increased from just over 10% at the end of 2006 to a peak of 25% during the first quarter of 2010.[13]  Bankruptcy and foreclosure rates followed.  Bankruptcy filings nearly doubled from 0.82 million in 2007 to a peak in 2010 of 1.54 million,[14] which concomitantly lengthened and complicated foreclosure processes. Foreclosure rates also more than tripled during this time[15] from just over 0.5% in 2007 to a peak of 1.47% in the second quarter of 2009.[16]

19.     Initially, the mortgage servicing industry had no viable solution for borrowers faced with such a severe economic downturn who wished to retain their homes.  Traditional loss mitigation plans did not provide realistic solutions.  Moreover, increased foreclosure and bankruptcy volumes also placed tremendous operational strain on the default operations of virtually all mortgage

---

[10] "The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States," *The Financial Crisis Inquiry Commission*, Official Government Edition, January 2011, p. 3.

[11] Investors are generally those own the loans secured by a lien on the property. Fannie Mae and Freddie Mac are just two examples of such GSE investors for whom lenders such as Wells Fargo service loans.

[12] 5.0% is the average annual unemployment rate for 2004, 2005, 2006 & 2007. 9.3% is the average unemployment rate for 2009, 2010 and 2011.  *See Unemployment Rate [UNRATE]*, FRED: Federal Reserve Bank of St. Louis.

[13] *See* "Comparison of Default Rates for U.S. Subprime and U.S. Prime Loans", *STATISTA*, 2015, https://www.statista.com/statistics/205970/delinquency-rates-on-us-subprime-conventional-loans-since-2000/ (showing mortgage delinquency rates for prime conventional loans in the United States from 2000 to 2015).

[14] Table F-2, U.S. Bankruptcy Courts—Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending December 31, 2007; Table F-2, U.S. Bankruptcy Courts—Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending December 31, 2010.  Figures are for nonbusiness cases.

[15] Increase in delinquency rate occurs before bankruptcy and foreclosure volumes increase. *See* Christopher J. Mayer et al., "Federal Reserve Board, The Rise in Mortgage Defaults," *Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board*, November 2008, pp. 1–36.

[16] "How Many Mortgage Foreclosures is Forbearance Preventing?," *Federal Reserve Bank of St. Louis*, December 18, 2020, Figure 1, available at https://www.stlouisfed.org/on-the-economy/2020/december/mortgage-foreclosures-forbearance-preventing, accessed on May 26, 2022

servicers who were forced to double or triple staff to manage the increased volume and complexity of default servicing operations.

**B.    The Response to the Financial Crisis and Resulting Impact on Mortgage Servicers**

20.    In response to the Financial Crisis, and specifically the large increase in defaulted mortgage loans headed toward foreclosure, President Obama announced the unprecedented HAMP program on February 18, 2009.[17]  The Treasury Department then provided guidance on HAMP in Supplemental Directive 09-01 issued on April 6, 2009.[18]  As discussed later in my report, this initial announcement was followed by dozens of additional directives, which continually changed the program requirements.

21.    HAMP was different from past loan modification programs.  HAMP was designed for the severe and long-lasting effects of the Financial Crisis.  Modification programs prior to HAMP were customarily designed to assist the borrower in temporary situations such as short-term unemployment or illness.  A successful HAMP application, on the other hand, could result in permanent modification.[19]

22.    HAMP was intended to strike a balance between the conflicting interests of borrowers and investors when a mortgage loan defaulted.  The U.S. Treasury created a program aimed at lowering borrowers' monthly mortgage payments while also providing investors with a better financial outcome than foreclosure.[20]  The HAMP program was developed to strike that necessary balance. I have direct and personal knowledge regarding the theory upon which HAMP was constructed and the impact of HAMP on mortgage servicers.  In my capacity as part of MetLife Mortgage's senior default team, I participated in telephone conference calls with the U.S. Treasury during the

---

[17] "Remarks by the President on the Mortgage Crisis," *The White House*, February 18, 2009, https://obamawhitehouse.archives.gov/the-press-office/remarks-president-mortgage-crisis, accessed on May 23, 2022.
[18] The bulletin cited here was issued by the U.S. Treasury, but virtually verbatim bulletins were issued by Fannie Mae and Freddie Mac.  *See* "Update to Default Guidance for Mortgage Loans Evaluated for the Home Affordable Modification Program," *Fannie Mae*, February 1, 2010.
[19] *See* "Supplemental Directive 09-01, Introduction of the Home Affordable Modification Program," *Making Home Affordable*, April 6, 2009 ("Supplemental Directive 09-01"), p. 17.  ("Servicers may use recent verbal financial information to prepare and offer a Trial Period Plan.  Servicers are not required to verify financial information prior to the effective date of the trial period.  The servicer must service the mortgage loan during the trial period in the same manner as it would service a loan in forbearance.  The trial period is three months in duration (or longer if necessary to comply with applicable contractual obligations).  The borrower must be current under the terms of the Trial Period Plan at the end of the trial period to receive a permanent loan modification. Current in this context is defined as the borrower having made all required trial period payments no later than 30 days from the date the final payment is due.")
[20] *See* Supplemental Directive 09-05R (a 36-page document summarizing HAMP's basic tenets and operating and process requirements).

development of HAMP.[21]  I also led the drafting of MetLife Mortgage's new processes and created
the functional area at MetLife Mortgage to handle the volume and intricacy of HAMP.

23.     Shortly after the announcement of HAMP, GSEs such as Fannie Mae issued their first set of
operating guidelines for HAMP on March 4, 2009, and significantly revised them in Announcement
09-05R, which was issued on April 21, 2009.[22]  The U.S. Treasury followed shortly thereafter by
issuing Supplemental Directive 09-01 on April 6, 2009.[23]  As the Garcias' mortgage loan was part of
a residential mortgage-backed security, their HAMP application was processed under the US
Treasury's HAMP program.  Servicers were given just months to create an operational area from
scratch designed to handle a modification program like no other before they began accepting HAMP
loan modification applications.[24]

24.     Although HAMP was conceptually sound, this non-traditional process initially led to an
industry-wide deterioration in the effectiveness of loss mitigation operations.[25]  For many, if not all,
mortgage servicers, HAMP was far more complex than existing loss mitigation options and unlike
any solution servicers had used before.  As discussed in further detail below, HAMP involved the
taking of an application, securing acceptable documentation to verify the applicant's
representations, an underwriting process, and finally a two-step closing process.[26]  In fact,
processing a HAMP loan modification application was more like taking an application for a new
mortgage than for a traditional loss mitigation modification.  The program's complexity coupled
with the compressed time frame in which servicers were required to implement the program created
an arduous situation for servicers.[27]

---

[21] At the request of MetLife's servicing manager, I joined her in a series of industry conference calls with U.S. Treasury officials
seeking industry input and reaction as HAMP was being developed.

[22] "Regulatory Capital Standards Final Rule for Mortgages Modified Under the Making Home Affordable Program," *Federal Deposit
Insurance Corporation*, November 27, 2009, https://www.fdic.gov/news/financial-institution-letters/2009/fil09067.html, accessed on
May 23, 2022; Supplemental Directive 09-05R.

[23] Supplemental Directive 09-01.

[24] Servicers could opt out participating in HAMP, but given the public and governmental pressure, most servicers felt they had little
choice but participate.

[25] Loss mitigation areas oversaw the processing and closing of loss mitigation solutions allowed by investors. Prior to the Financial
Crisis, many servicers included loss mitigation operations within collections rather than as a standalone area.

[26] As described later in this Report, HAMP involves a closing process for the three-month trial modification, and another closing with
a title search, and sometimes investor approval for the final modification.

[27] *See* "Factors Affecting Implementation of the Home Affordable Modification Program," *SIGTARP: Office of the Special Inspector
General for the Troubled Asset Relief Program,* SIGTARP-10-005, March 25, 2010 ("Factors Affecting HAMP"); *see also,* Karina C.
Hernandez, "How Long does a Loan Modification Take When Using Obama's Making Homes Affordable Plan?," SF GATE,
https://homeguides.sfgate.com/long-loan-modification-using-obamas- making-homes-affordable-plan-98669 html, accessed January
2, 2020 (HAMP required lenders to evaluate applications within 30 days).

25.     Wells Fargo's processes and procedures must be evaluated in light of the unprecedented increase in foreclosure and bankruptcy volumes, the urgency of HAMP implementation, and the necessary reinvention of loss mitigation practices to respond to the HAMP requirements.

## IV.     HAMP Loan Modifications

### A.     HAMP Modifications Balanced the Competing Interests of the Borrower and the Investor

26.     It is critical to understand that HAMP was not implemented solely to help borrowers obtain payments they could afford.  Investors' financial interests were also given equal weight.  To that end, HAMP developed an NPV[28] calculation that could be used to determine whether the financial return for investors from a modification was superior to the anticipated financial outcome of foreclosure proceedings.[29]  If it was not, the application was declined.  In my experience, a significant number of HAMP applications did not meet the NPV test and were therefore declined.

27.     Further, servicers were not required to offer HAMP to their borrowers.  Indeed, despite Plaintiffs' claim that, "HAMP required mortgage servicers to offer loan modification to borrowers who met certain threshold requirements,"[30] HAMP was offered only by servicers who *opted* into HAMP by signing a participation agreement.[31]  Even if the servicer did decide to participate, HAMP could not be offered to all borrowers.  Some residential mortgage-backed securities' pooling and servicing agreements did not allow participation in a HAMP-like program and some private investors also elected not to participate.

### B.     The Application Process for HAMP

28.     The process to qualify for HAMP was complex.  The mortgage loan and the property had to meet certain criteria to even be considered for HAMP eligibility.  Second, the borrower was required to supply sufficient documentation for the servicer to evaluate the loan modification.  Third, the proposed loan modification needed to pass certain financial tests.  After these

---

[28] "Net present value" (NPV) is an indicator of how much an investment is worth today taking into account events projected to occur in the future. In the context of a loan modification, lenders and servicers calculate the NPV to evaluate whether it is more cost effective to modify a loan or foreclose. *See* "Home Affordable Modification Program: Base Net Present Value Model V7.0 Model Documentation 3," *Making Home Affordable*, October 26, 2015.

[29] Supplemental Directive 09-01, p. 4–5.

[30] Complaint ¶ 24.

[31] Supplemental Directive 09-01, p. 1.

requirements were met, borrowers were granted a trial modification and were required to make all payments during this period ("Trial Payment Period") in order to receive a permanent modification.[32]

29.     To be considered for HAMP eligibility a mortgage had to meet at least the following criteria:

   a.   The mortgage had to be a first lien mortgage loan on a 1-to-4-unit property originated on or before January 1, 2009.

   b.   The amount of that mortgage could not exceed a certain threshold.

   c.   The loan was either in default or was about to be in default.[33]

   d.   The borrower must be able to document a financial hardship and did not have the means to cure the default.

   e.   The pre-modification monthly housing payment[34] exceeded 31% of the borrower's income.

30.     To initiate the HAMP application process, a borrower could contact the servicer for assistance or send the servicer an initial HAMP application package.  Later in the program's history the servicer was required to solicit the borrower to participate in HAMP after two or more loan payments became past due.[35]  The initial application package included:

   a.   A Request for Mortgage Assistance (RMA), "which asked the applicant to describe the financial hardship, provide financial information such as earnings and expenses together with a snapshot of their liquid asset position";[36]

   b.   The borrower's most recent tax return or an IRS form 4506, which was used to request the same from the IRS;

   c.   A verification of income sources; and

   d.   A certification that the borrower as an individual was not excluded from applying under the Dodd-Frank Act.[37]

---

[32] Supplemental Directive 09-01.

[33] Risk of imminent default is defined as a borrower who is current on his or her mortgage payments, or less than 60 days delinquent, but faces the possibility of default because of a change in financial circumstances, such as through an interest rate reset, unemployment, or some other reason that has made it difficult for the homeowner to continue meeting his or her monthly payments at the existing level.  *See* Supplemental Directive 09-01, p.3.

[34] Housing payments included not only the monthly mortgage payment loan's interest and scheduled principal payment but also items such as required escrow payments to cover expenses such as property taxes and insurance and mortgage insurance.

[35] "Handbook for Servicers of Non-GSE Mortgages," *Making Home Affordable,* Version 4.4, March 3, 2014, p. 80.

[36] *See, e.g.*, Making Home Affordable, Hardship Affidavit; Fannie Servicing Guide, Announcement 09-05R Amends These Guides: Servicing, April 21, 2009.

[37] "Handbook for Servicers of Non-GSE Mortgages," *Making Home Affordable,* Version 4.4, March 3, 2014, p. 92.

31.     To support the borrower's statements on the RMA, the borrower was required to submit a copy of their two most recent paystubs, which were to include year-to-date earnings, the most recently filed tax return, and in some cases, a letter from their employer verifying how the income and bonus system might result in a variance from the paystubs.[38]  If sources such as alimony are used, then supporting court papers had to be submitted.[39]

32.     Once the appropriate documentation was collected, the package was sent to a home preservation underwriter who reviewed the RMA and the supporting documentation to determine whether the borrower met the HAMP requirements.[40]

33.     In addition to reviewing the documents noted above, the servicer performed a number of financial tests to determine whether the borrower met the criteria for HAMP eligibility:

    a.  The monthly mortgage payment ratio, or the ratio of the borrower's monthly mortgage payment to the borrower's monthly gross income is greater than 31 percent;[41]

    b.  The borrower's cash reserves had to be less than three mortgage payments;[42] and

    c.  A comparison of the borrower's credit report and the borrower's listed financial obligations as listed on the RMA had to be the same or reconciled with the borrower.[43]

34.     If borrowers met all of the requirements listed above, the following "waterfall" of reductions was applied to the borrower's pre-modification mortgage payment until the payment was equal to or less than 31% of the borrower's gross income.

    a.  <u>Step 1</u>: Capitalize past due interest, any escrow advance balance and any additional escrow disbursements that were scheduled to occur during the trial period.  If the loan was in foreclosure, also capitalize associated foreclosure fees and costs.  If the loan was not escrowed for tax and insurance, an escrow account monthly deposit was added to the existing payment.

---

[38] "Handbook for Servicers of Non-GSE Mortgages," *Making Home Affordable,* Version 4.4, March 3, 2014, pp. 83, 102.

[39] "Handbook for Servicers of Non-GSE Mortgages," *Making Home Affordable,* Version 4.4, March 3, 2014, p. 104.

[40] *See* "Handbook for Servicers of Non-GSE Mortgages," *Making Home Affordable,* Version 4.4, March 3, 2014, Section 6.

[41] "The borrower's 'monthly gross income' is the borrower's income amount before any payroll deductions and includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payments, including Social Security received by adults on behalf of minors or by minors intended for their own support, and monthly income from annuities, insurance policies, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income.  Supplemental Directive 09-01, p. 6.

[42] Supplemental Directive 09-01, p. 3.

[43] Supplemental Directive 09-01, pp. 8, 10.

    b. <u>Step 2</u>: Reduce the mortgage loan interest rate by increments of 0.125% to as low as 2%.

    c. <u>Step 3</u>: Extend the loan's present remaining term to as long as 480 months.

    d. <u>Step 4</u>: Reduce and/or defer the loan's principal balance to achieve the 31% goal.[44]

35.    After the modifications described in Steps 1 through 4, the proposed modification was required to pass two financial tests. First, the adjusted payment resulting from the waterfall described above was then evaluated using HAMP's net present value ("NPV") model to determine whether the proposed modified payment plan was more advantageous to the investor than pursuing foreclosure. Second, for all loans evaluated on or after January 28, 2010, servicers were not required to approve loan modifications that would require forbearance in excess of 30% of the total loan (after capitalizing expenses as described above in Step 1) in order to meet a debt-to-income ratio of 31%.[45]

36.    If the waterfall calculation resulted in proposed terms that met HAMP and investor requirements, payments were provisionally modified for the three-month Trial Payment Period. If the borrower was able to make those trial payments in full and on time, the servicer evaluated the loan for a permanent modification. There are three issues that had to be considered before modifications were made permanent.

    a. First, during the early stages of HAMP, servicers were allowed to start the TPP before supporting documentation was received and analyzed.[46] As a result, the final payment amount or other mortgage terms could change if and when additional required documentation was provided.[47]

    b. Second, some private investors required their own final review of the proposed modification financial terms before the loan could be permanently modified.

    c. Finally, in all cases, a title search was conducted to ensure there were no intervening liens. If an intervening lien was discovered, a permanent modification could be

---

[44] Supplemental Directive 09-01, pp. 8–10.
[45] "Supplemental Directive 10-01: Home Affordable Modification Program – Program Update and Resolution of Active Trial Modifications," *Making Home Affordable*, January 28, 2010, p. 6.
[46] *See, e.g.*, Supplemental Directive 09-01.
[47] *See* Supplemental Directive 09-01.

declined[48] in situations where an intervening lienholder declined to subordinate their interest(s) to the modified loan.

37.     In my experience, the HAMP modification process was very tightly defined and did not allow for servicer discretion. Indeed, a primary purpose of HAMP was to offer mortgage relief to as many people as possible as quickly as possible while balancing investor interests. Accordingly, the HAMP application and approval process was tightly defined and did not involve back-and-forth negotiations between borrowers and servicers.

## C.     HAMP's Evolving Regulatory and Program Requirements Caused Additional Challenges for Servicers, Including Wells Fargo

38.     After HAMP was announced in 2009, it was revised numerous times during the program's lifetime, and such changes required mortgage servicers to amend their procedures rapidly in the midst of the tremendous volume of loss mitigation applications. In addition, although substantially similar, there were separate announcements for GSE conventional, non-GSE conventional, and FHA/VA mortgage loans, which only made the changes more difficult to install. The U.S. Treasury's HAMP's iterations for just the first two years are referenced below.

39.     Specifically, in 2009 alone, eight directives were issued regarding HAMP:

- Supplemental Directive 09-01: Introduction of the Home Affordable Program

- Supplemental Directive 09-02: Fair Housing Obligations under the Home Affordable Modification Program, April 21, 2009

- Supplemental Directive 09-03: Home Affordable Modification Program-Trial Period Guidance, July 6, 2009

- Supplemental Directive 09-04: Home Affordable Modification Program-Home Price Decline Protection Incentives, July 31, 2009

- Supplemental Directive 09-05R: Update to the Second Lien Modification Program (2MP), March 26, 2009

- Supplemental Directive 09-06: HAMP-Data Collection and Reporting Requirements Guidance, September 11, 2009

---

[48] Even if the borrower made all trial payments.

- Supplemental Directive 09-07: HAMP- Streamlined Borrower Evaluation Process, October 8, 2009

- Supplemental Directive 09-08: HAMP- Borrower Notices, November 3, 2009

40.    And, in 2010, four more directives were published:

- Supplemental Directive 10-01: HAMP- Program Update and Resolution of Active Trial Modifications, January 28, 2010

- Supplemental Directive 10-02: HAMP-Borrower Outreach and Communication, March 24, 2010

- Supplemental Directive 10-04: Home Affordable Unemployment Program, May 11, 2010

- Supplemental Directive 10-06: HAMP-Guidance on Annual Servicer Certification Required by the Servicer Participation Agreement, June 29, 2010.

41.    These directives were operationally disruptive.  They materially changed servicers' responsibilities, processing steps, and the scope of the HAMP program.  For example, in 2010, additional requirements were promulgated that increased the complexity of HAMP.  First, servicers were now required to attempt to contact all borrowers whose first mortgage loans were potentially eligible for HAMP and who had two or more payments that were due and unpaid.  The new solicitation process required servicers to make a minimum of four telephone calls, send two written notices and, upon contact, communicate the necessary documentation to be provided for a HAMP application.[49]  A second example occurred in the last quarter of 2010.  Servicers, including Wells Fargo, were required at that point to begin considering whether applicants qualified for the Principal Reduction Alternative ("PRA")[50] when their principal balances exceeded 115% of the value of their homes.  Then, in 2012, HAMP was expanded to include even larger populations of potentially eligible borrowers.  In particular, the HAMP Tier 2 program was created for rental properties and certain borrowers with prior HAMP payment defaults.[51]

---

[49] "Supplemental Directive 10-02: Home Affordable Modification Program – Borrower Outreach and Communication," *Making Home Affordable,* March 24, 2010, p. 2.

[50] The Principal Reduction Alternative Program provided for an interest free deferral and eventual forgiveness for any loan amount in excess of 115% the value of the collateral.  "Supplemental Directive 10-14: Making Home Affordable Program – Principal Reduction Alternative Update," *Making Home Affordable,* October 15, 2010.

[51] *See e.g.,* "Supplemental Directive 12-02: Making Home Affordable - MHA Extension and Expansion," *Making Home Affordable*, March 9, 2012.

42.    One final example: with HAMP participation rates at just over 20% of loans heading toward foreclosure,[52] on March 27, 2013,[53] Treasury announced a streamlined modification program,[54] which allowed borrowers to qualify without submitting all of the HAMP paperwork described above.

43.    As with the other HAMP iterations, the streamlined modification required servicers to update their software systems (e.g., Wells Fargo's HPA tool) to respond in real time to the changes in HAMP.  However, this streamlined process did not eliminate the pitfalls of the original program. For example, the streamlined modification program placed additional outreach requirements on servicers: certain borrowers were sent application packages at 90 days past due and then re-solicited at 150 days past due in addition to the four outreaches that began to be required in 2010.

44.    Although these three examples were among the largest changes, as mentioned above, in just the first two years of the program there were 12 supplemental directives, all of which required material operational changes.

45.    As a result of these continual changes and its labor-intensive complexity, HAMP was not a significant source of income for a servicer.  Under the Troubled Asset Relief Program ("TARP"), which was the umbrella program for HAMP, servicers received $1,000 for successfully modified loans and $1,000 per year if that customer remained current under the modification for up to five years.[55]  This revenue was offset by the substantial personnel costs necessary to process a HAMP application, the fact that nearly half of trial modifications were not made permanent, and that many of the borrowers granted a HAMP modification re-defaulted.[56]  For example, in the case of the Garcias' August 2010 HAMP application denial, Wells Fargo received no compensation.

---

[52] Laurie Goodman, et al., *How Beneficial Are Streamlined Modifications?,* Housing Finance Policy Center, July 2018, ("Goodman, et. al."), https://www.urban.org/sites/default/files/publication/98784/how_beneficial_are_streamlined_modifications_1.pdf.
[53] Federal Housing Finance Agency Press Release, "FHFA Announces New Streamlined Modification Initiative," March 27, 2013.
[54] This program actually began before 2013 with a series of pilots using an unannounced Alt Mod 3.0 program. *See* Goodman, et al., p. 6.
[55] "Handbook for Servicers of Non-GSE Mortgages," *Making Home Affordable,* Version 4.4, March 3, 2014, p. 209.
[56] *See* Section VII.

**V.** **Wells Fargo's Process for Detecting and Remediating the HPA Tool Error in its HAMP Approval Calculation Met Industry Standards**

46.     My review of Wells Fargo's conduct related to the HPA Tool Error demonstrates that (1) the error impacted very few mortgagors, (2) Wells Fargo acted reasonably to detect it, and (3) Wells Fargo promptly and thoroughly corrected it.

**A.** **The HPA Tool Error Impacted Very Few Mortgagors**

47.     In its SEC Form 10-Q for the quarter ended June 30, 2018, Wells Fargo described an error it discovered in its processes for calculating HAMP eligibility:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010, and October 20, 2015, when the error was corrected. This error in the modification tool caused an automated miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified.[57]

48.     Internal Wells Fargo documents explained the nature of the error as follows:

> The Home Preservation Application (HPA) tool, which is used for loan modification decisions, incorporated a state-fee matrix for maximum allowable foreclosure attorney fees and costs. The HPA logic was intended to compare the attorney fee calculation (actual plus estimated) to the maximum allowable amount to ensure the attorney fees didn't exceed the maximum allowable. Instead, the HPA tool calculation added the maximum allowable amount to the attorney fee calculation.
>
> The HPA logic overstated the amount of fees which was then used in the calculation to determine the customer's ability to qualify for a modification.[58]

---

[57] Wells Fargo & Company Form 10-Q for the Quarterly Period Ended June 30, 2018, filed on August 3, 2018, p. 5.
[58] WF_HERNANDEZ_00106478–85 at 80.

49.     Based on my review of the Garcias' loan files, their August 24, 2010 HAMP loan modification application was denied because, according to a calculation performed by Wells Fargo's HPA tool, the proposed modification would have resulted in "Excessive Forbearance."[59]  In particular, the HPA tool estimated that, in order to meet a debt-to-income ratio of 31%, Wells Fargo would have been required to forbear $86,500 of the loan's total proposed balance of $285,738.07.[60]  As calculated, this amount of forbearance (30.27% of the total proposed debt) would have exceeded the 30% threshold for approval.  I understand that, by adding maximum attorney fees to the Garcias' proposed HAMP modified loan, rather than using the lesser of maximum attorney fees and actual attorney fees, Wells Fargo's HPA tool erroneously declined the Garcias' HAMP modification application when it otherwise would have been approved for a trial modification.

50.     Based on my review and my experience in the mortgage servicing industry, the dollar amount of the attorney fees was small relative to the other factors used to evaluate a loan for HAMP (e.g., the total value of the borrowers' mortgage debt).  For example, as noted, the Garcias' loan was only 0.27 percentage points in excess of the 30% forbearance threshold.  At most, attorney fees for an Illinois loan would be overstated by $4,145.[61]  Moreover, consistent with the small magnitude of the error, only a narrow set of borrowers were ultimately determined to have been even potentially impacted by the HPA Tool Error.  For example, Wells Fargo determined that no more than 3,082 of the 698,852 total denials it made based on the HPA tools prior to November 1, 2015 were impacted by the error.[62]  This comprises 0.44% of all denials.

### B.     Wells Fargo Acted Reasonably to Detect the Error

51.     Wells Fargo followed industry standard program testing procedures in detecting any errors in its HPA system.  This procedure requires that any time software is updated or changed, the IT operation conducts end-user testing to determine that the update or change was programed and implemented correctly.[63]  In my experience, servicers' IT operations typically rely on the users to report any suspected errors once software has undergone this thorough testing and has been implemented.

---

[59] WF_GARCIA_00001463–6.

[60] WF_GARCIA_00001463–6.

[61] Bell Deposition Exhibit 397 at WF_HERNANDEZ_00010407.

[62] Bell 30(b)(6) Deposition, pp. 46:22–47:3; Bell Deposition Exhibit 417 at p. 1.

[63] *See generally* "How to Improve the Test Release Process for Successful Bug Free Software to Production," *Software Testing Help*, May 5, 2022, https://www.softwaretestinghelp.com/how-to-improve-the-test-release-process/, accessed on January 2, 2020.  Bell 30(b)(6) Deposition, pp. 155:20–156:16.

52.     In my experience, the HPA Tool Error is the type of error that was understandably hard to detect.  The error was both small in magnitude and in scope.  Loss mitigation underwriters handle modifications for several states, and attorney fees are a small part of the HAMP NPV calculations.  Given both of those factors, it would be understandable that it would take some time for a user to discover the error.

53.     Further underscoring that the error was difficult to detect, audits conducted by the federal government did not detect any problems in Wells Fargo's HAMP approvals.  The federal government created the Making Home Affordable program ("MHA")[64] to oversee HAMP.[65] As one of the largest providers of HAMP loss mitigation options, Wells Fargo was audited periodically by an outside audit team under license from MHA.  Any issues discovered by these periodic audits were minor and none related to the attorneys' fee matrix or HPA tool.  For example:

- During the first quarter of 2013, MHA conducted an audit to determine whether Wells Fargo's NPV calculation matched the government's standard NPV model.  An email issued at the time[66] showed that issues were minor and did not include either of these issues.  Those other minor issues were quickly addressed by Wells Fargo.

- During a 2011 review, MHA's audit resulted in its objection to a quality control step Wells Fargo had added to the HAMP process.  This step involved running the HAMP model a second time before finalizing the HAMP modification.  MHA took the position that the step was not necessary.[67]

- During a 2010 review, MHA found the disclosure of HAMP data inputs placed within the HAMP denial letters was not in the form MHA prescribed.[68]

54.     These audits and the minor findings show that the Wells Fargo HAMP program generally met the regulatory standards.  Indeed, Wells Fargo's quick responses and prompt satisfaction to any

---

[64] Make Home Affordable ("MHA") was a program of the U.S. Department of the Treasury & the U.S. Department of Housing and Urban Development

[65] See, e.g., "Troubled Assets Relief Program (TARP)," U.S. Department of the Treasury, https://home.treasury.gov/data/troubled-assets-relief-program, accessed on June 8, 2022.

[66] FW: Q4 2012 NPV Testing Notification and Schedule, WELLS FARGO BANK, N.A., January 7, 2013, WF_HERNANDEZ_00153518–22.

[67] Making Home Affordable Program Compliance Review, WELLS FARGO BANK, N.A., October 24, 2011, WF_HERNANDEZ_00152564–6 at 4–6.

[68] *SURF Worksheet*, WELLS FARGO BANK, N.A. (Oct.9, 2012), WF_HERNANDEZ_00157982.

audit objections further support my findings that Wells Fargo's loss mitigation was appropriately controlled and met industry standards.

## C. Wells Fargo's Correction Process was Diligent and Met Industry Standards

55.     Wells Fargo identified the at-issue error in late 2013, which led to the opening of Customer Impact Ticket ("CIT") 1552 on December 11, 2013.[69]  The CIT process is one of Wells Fargo's routine review processes to determine if an error could affect customers, and if so, what remediation would be appropriate.  Here, CIT 1552 was assigned to a risk consultant and a designated team for further review of the potential impact of the attorneys' fee issues on borrowers.[70]

56.     Carmen Bell testified that Wells Fargo's approach entailed a "rigorous process with many layers of controls [and] of groups that are involved to . . . identify if there is any customer impact."[71] My review of Wells Fargo's actions in connection with CIT 1552 supports her statements.  For example, on January 8, 2014, Thomas Wayne, who had reported CIT 1552's issue, presented the issue to a Customer Impact Team made up of individuals from a cross-section of the business.[72]  As reflected in the meeting minutes, Wells Fargo had already conducted an extensive review of 7,000 loans within one month of opening CIT 1552, which resulted in identifying fifty loans that warranted additional review.[73]  After conducting further analysis and review of these fifty loans, Wells Fargo found on February 11, 2014 (three months after the examination began), "that there was no negative impact or disparate treatment to the customer so there is no remediation [necessary]."[74]

57.     Whether there was a customer impact or not, Bell testified that Wells Fargo set up a defined process that ensured the issue was "documented and reviewed, to determine when it is able to be fixed."[75]  Consistent with this, in early 2014, the CIT team continued to work on a solution to the

---

[69] *Activity Statement*, WELLS FARGO BANK, N.A. (June 2015), WF_HERNANDEZ_00141851–4 at 2.
[70] *See* Deposition of Kara Reimers, November 20, 2019, 138:17–139:10. In December 2013, emails documenting discussion regarding the second, emerging issue – the HPA Tool Error. In these emails, the problem is clearly described. These emails also offer several potential responses including implementing a manual workaround until a broader solution was developed and implemented. *See Re: 12/6 Meeting Minutes- Corporate Advance Attorney Fee Workaround for HPA*, WELLS FARGO BANK, N.A., December 2013, WF_HERNANDEZ_00156619–21.
[71] Bell Deposition, Tr. 103:20-104:22.
[72] WF_HERNANDEZ_0145385–88.
[73] WF_HERNANDEZ_0145385–88.
[74] *CIT Tracker: HPA Decision Tool Overstating Recoverable Fees*, WELLS FARGO BANK, N.A. (2014), WF_HERNANDEZ_00107555–60 at 57.
[75] Deposition of Carmen Bell ("Bell Deposition"), August 2, 2019, 103:20–104:22.

issues despite finding no customer impact. The team opened Change Control Request ("CCR") 16548 to investigate and recommend "a change to improve the customer experience[.]"[76]

58.     The team worked on CCR 16548 for several months to determine the appropriate fix for the issue, including determining whether simultaneous efforts could incorporate such a fix. For example, calls were held throughout November 2014 concerning a potential technology update to the HPA tool.[77] And in April 2015, the team considered whether the CCR objectives could be incorporated into another effort.[78]

59.     In September 2015, the review team determined that the best course of action to address the outdated matrix was to shut off the automated process by retiring the fee matrix within the HPA tool.[79] Accordingly, on October 20, 2015, that function was disabled.[80] At the time, Wells Fargo believed that the October 20, 2015 fix had solved both the Updated Matrix Issue and the HPA Tool Error.[81]

60.     Based on my experience, I find that Wells Fargo created and followed an effective quality control process under which the errors were assigned a unique CIT number, and a dedicated team reviewed the potential impact.

### D.     Wells Fargo Acted Reasonably in Its Re-Discovery and Review of the HPA Tool Calculation Error

61.     In early 2018, "through a review of a completely separate and unrelated issue," Wells Fargo determined that a re-review of potential borrower impact was warranted to determine whether there was "a chance based on the facts [Wells Fargo] looked at, if a modification could have been denied due to the attorneys' fees [issues]."[82] This re-review ultimately resulted in the finding that the HPA Tool Error had potentially caused borrowers to be denied trial HAMP modifications.[83]

62.     Within a week of its determination that there could potentially be an issue, on March 7, 2018, Wells Fargo opened CIT 6214.[84] As a result, Wells Fargo immediately began a rigorous review, which identified the root cause of the HPA Tool Error as well as potentially impacted

---

[76] Deposition of Beena Menon, August 21, 2019, 126:17–127:8.
[77] Young Deposition Exhibits 364–366.
[78] Young Deposition Exhibits 370, 373.
[79] Bell Exhibit 400, at WF_HERNANDEZ_00087910.
[80] WF_HERNANDEZ_00071929–47 at 31.
[81] Bell Deposition Exhibit 409, at WF_HERNANDEZ_00011932.
[82] Bell Deposition, 20:19–21:1.
[83] *See* WF_HERNANDEZ_00106478–85 at 80.
[84] Bell Deposition, 125:1-12.

borrowers.[85]  Wells Fargo began its review by considering the largest possible population: "[a]ll committed decisions from the HPA Tool prior to 11/1/2015 and the final decision in the occurrence of the committed review was a denial."[86]  That population was very large at 698,852 modification records, or 194,195 accounts.[87]  The initial analysis indicated this small issue would affect only a small number of customers.[88]

63.     To ascertain which customers in this large population were actually impacted, Wells Fargo designed a two-step evaluative process.  First, Wells Fargo programmed thirty filters to identify which applications had been denied for reasons unrelated to the HPA Tool Error.[89]  As a result, Wells Fargo determined that only 6,355 of the 194,195 potentially impacted accounts initially identified required "a manual review of _all_ at-risk loans to determine if any of these customers were denied in error."[90]

64.     In my experience, Wells Fargo's actions, wherein it engaged in a time consuming, labor intensive and costly manual individual loan review to identify the impacted population, are consistent with industry best practices since, after it conducted the initial filtering.  As noted above, at the end of this exhaustive review process, Wells Fargo determined that 3,082 denials (or 0.44 percent of all denials) may have been impacted.

65.     Wells Fargo voluntarily offered remediation to the customers impacted by these denials.  Wells Fargo's approach and actions described above were consistent with my understanding of best practices within the mortgage servicing industry.

66.     Documents provided by Wells Fargo detail the amount provided to each potentially impacted borrower.  My review showed that the amounts remitted to borrowers were customized to each individual.  Further, the remediation plan also provided a mediation process for borrowers who felt Wells Fargo's proactively offered and remitted amounts had not compensated them adequately.  These mediations were conducted by a neutral third party who could award additional compensation on top of the amount already provided by Wells Fargo.  Monies sent as proactive remediation amounts did not have to be repaid regardless of the outcome of the third-party mediation.  To date, I

---

[85] _Draft CIT 6214 Attorney Fees for the HPA Tool PowerPoint Presentation_, WELLS FARGO BANK, N.A., March 15, 2018, WF_HERNANDEZ_00071326–32 at 26–32.
[86] _Draft Home Preservation Application Tool and State Fee_ Matrix, WELLS FARGO BANK, N.A., April 4, 2018, WF_HERNANDEZ_00129716–31 at 22.
[87] Bell Deposition Exhibit 417 at p. 1.
[88] See Bell Deposition, 46:18–47:3.
[89] Bell Deposition Exhibit 417.
[90] Bell Deposition Exhibit 417 at pp. 1, 6; WF_HERNANDEZ_00129716–31 at 21.

understand from counsel that Wells Fargo has compensated approximately 3,075 borrowers over $52 million dollars total and that this settlement amount is in addition to remediation borrowers have received from Wells Fargo.[91]

## VI.    Wells Fargo's Interactions with the Garcias were Consistent with Industry Best Practices

67.     Based on my review of the Garcias' loan files, Wells Fargo's interactions with the Garcias followed industry best practices.  The loan records indicate that (1) Wells Fargo continually reached out to the Garcias, (2) frequently contacted the Garcias to discuss options for forbearance and/or loan modifications, and (3) as detailed below offered the Garcias many loss mitigation solutions. While the Garcias successfully completed the first forbearance plan offered to them, in each subsequent case a loss mitigation solution was offered, it was unsuccessful because the Garcias failed to fulfill their responsibilities and allowed their loan to fall farther and farther behind.

68.     In particular, as I describe below, between the Garcias' loan origination in January 2006 and foreclosure in February 2011, Wells Fargo:

   a.    Made 396 unanswered calls to the Garcias.  In addition to these calls, Wells Fargo sent at least two letters to the Garcias noting that Wells Fargo was unable to reach them by telephone and alerting them that their loan was past due;[92]

   b.    Began the process for 9 potential modifications, including 1 trial modification and 3 forbearance plans; and

   c.    Approved the Garcias for 4 modifications (1 trial modification and 3 forbearance plans) that the Garcias did not fulfill.

69.     Wells Fargo's interactions with the Garcias followed the following detailed timeline:

   •    January 31, 2006:  The Garcias' mortgage was funded, with a first payment due March 1, 2006.[93]

   •    December 1, 2006:  Less than one year later, the Garcias missed their mortgage payment for the first time.[94]

---

[91] I note that a representation of this amount has been provided to me by counsel.
[92] WF_GARCIA_00001325–93; WF_GARCIA_00000001–1324 at 659, 666.
[93] WF_GARCIA_00000001–1324 at 372.
[94] WF_GARCIA_00001325–93 at 91.

- February 20, 2007:  The Garcias were offered and accepted a temporary forbearance agreement in which they agreed to make seven scheduled payments starting on March 12, 2007 through September 11, 2007 to bring their loan current.[95]  The temporary forbearance agreement stated, "Pursuant to your recent conversation with us, you have promised to pay the amounts shown below by the date indicated."[96]  It warned the Garcias that "[f]ailure to remit funds in accordance with the due date(s) and amount(s) indicated may result in the acceleration of the loan pursuant to the terms of your note and security instrument."[97]

- March 13, 2007:  The Garcias made a payment of $6,057.77[98] even though the temporary forbearance agreement required a payment of only $1,020 by March 12, 2007.[99]  This brought the loan current.  The Garcias continued to make monthly payments until May 2008.[100]

- Based on the documentation provided in Wells Fargo's collection/customer service loan activity archive, over the course of 2007, Wells Fargo made 126 outbound calls to the Garcias.[101]

- March 27, 2008:  The Garcias were denied a loan modification because "Based on the information provided your monthly income totaled $3545.29 and your expenses totaled $4017.9[0] which indicates you do not have the ability to afford a modified payment plan."[102]

- September 21, 2008:  Wells Fargo notified the Garcias that they were in default with past-due payments amounting to $6,275 and that, to become current on their loan, they would be required to make a payment of $9,719.95 (including for payments due in the next 30 days).[103]

---

[95] WF_GARCIA_00002975–6.
[96] WF_GARCIA_00002975–6.  Deposition of Julia Garcia, May 5, 2022 ("J. Garcia Deposition"), p. 118:3–10.
[97] WF_GARCIA_00002975–6.
[98] WF_GARCIA_00001325–93 at 86.
[99] WF_GARCIA_00002975–6.
[100] WF_GARCIA_00001325–93 at 73–86.
[101] WF_GARCIA_00001325–93.
[102] WF_GARCIA_00002977.
[103] WF_GARCIA_00000001–1324 at 248.

- September 30, 2008:  Wells Fargo sent a letter to the Garcias, reminding them that their loan was due for two installments from August 1, 2008 through September 1, 2008, and offering them a Special Forbearance Plan with the first payment due on October 15, 2008.[104]

- October 15, 2008: Wells Fargo received a payment of $3,160 from the Garcias.[105]  I see no evidence in the record of any other mortgage payments made by the Garcias to Wells Fargo between this date and the Garcias' foreclosure.

- November 20, 2008:  The Garcias' request for a Repayment Agreement was denied because they "failed to adhere to the agreed upon terms of the [September 30th] forbearance plan" and "did not pay the scheduled repayment plan payment."[106]

- November 23, 2008:  The Garcias were notified they were in default with past-due payments amounting to $8,703, requiring a payment of $11,908 (including for payments due in the next 30 days).[107]

- Based on the documentation provided in Wells Fargo's collection/customer service loan activity archive, over the course of 2008, Wells Fargo made 47 outbound calls to the Garcias.[108]

- After several discussions on August 26, 2009, the Garcias were offered a Special Forbearance Agreement with four payments scheduled to occur between September 10, 2009 and December 10, 2009.  These four payments were designed to repay the 12 past due payments and to avoid foreclosure.  The agreement was very clear about the consequences of non-payment, stating, "[i]f the Agreement is terminated, the lender may institute foreclosure proceeding according to the terms of the Note and Security Agreement."[109]

- September 23, 2009:  By formal correspondence, the Garcias were informed that the Special Forbearance Agreement had become "null and void" because they did not make

---

[104] WF_GARCIA_00002978–9.
[105] WF_GARCIA_00001325–93 at 68.
[106] WF_GARCIA_00002982.
[107] WF_GARCIA_00000001–1324 at 250.
[108] WF_GARCIA_00001325–93.
[109] WF_GARCIA_00002983–5.

their first scheduled payment and thus "failed to adhere to the agreed upon terms of the forbearance plan."[110]

- December 14, 2009:  Once again, the Garcias spoke to Wells Fargo about a loan modification, and Wells Fargo requested documents from the Garcias in connection with this request.[111]  That request stated that "If ALL of this information or a request for an extension is not received within ten (10) days, we will consider this request cancelled."[112]

- Based on the documentation provided in Wells Fargo's collection/customer service loan activity archive, over the course of 2009, Wells Fargo made 132 outbound calls to the Garcias.[113]

- January 6, 2010:  The Garcias' did not supply the information related to the December 14, 2009 modification request or ask for an extension.  Following industry standard procedures, Wells Fargo denied the Garcias' loan modification request because the Garcias failed to provide required documentation.[114]

- The Garcias requested another modification just a few months later.  To process that request, on February 11, 2010, Wells Fargo requested documents from the Garcias.[115]  On March 27, 2010, Wells Fargo approved the modification and sent the Garcias an agreement and the other closing documents.[116]

- April 8, 2010:  The loan modification was cancelled at the Garcias' request.[117]

- April 22, 2010:  Just two weeks later, the Garcias submitted a request for another loan modification along with required financial documents.[118]

- August 24, 2010:  The Garcias were denied a trial HAMP loan modification.[119]  Wells Fargo later determined that this denial was impacted by the HPA Tool Error.

---

[110] WF_GARCIA_00002985–6; WF_GARCIA_00001325–93 at 61.
[111] WF_GARCIA_00002987–8.
[112] WF_GARCIA_00002987–8; WF_GARCIA_00000001–1324 at 639
[113] WF_GARCIA_00001325–93.
[114] WF_GARCIA_00002989–90.
[115] WF_GARCIA_00002991–2; WF_GARCIA_00000001–1324 at 925. Letter log notes that Wells Fargo "STARTED LOSS MIT" on February 11, 2010.  As only proof of income was requested, it appears that the prior modification request's documents may have been used for this request as well.
[116] WF_GARCIA_00002993–3001 at 94.
[117] WF_GARCIA_00000001–1324 at 641.
[118] WF_GARCIA_00003002–12.
[119] WF_GARCIA_00001463–6.

- October 22, 2010:  There appears to be another modification requested by the Garcias.  Wells Fargo informed the Garcias that the loan was in review.[120]  On November 1, 2010, Wells Fargo requested the necessary documents.[121]

- November 12, 2010:  The Garcias received a letter informing them that they could not be offered a HAMP loan modification.  The letter noted that Wells Fargo was "unable to create an affordable payment equal to 31% of [their] reported monthly gross income without changing the terms of [their] loan beyond the requirements of the program."  The letter also noted that Wells Fargo would "review [the Garcias'] loan for alternative loss mitigation options."[122]

- December 1, 2010:  Wells Fargo denied the Garcias' loan modification request because the Garcias failed to provide the required documentation.[123]

- Based on the documentation provided in Wells Fargo's collection/customer service loan activity archive, over the course of 2010, Wells Fargo made 82 outbound calls to the Garcias.[124]

- January 10, 2011:  A letter from America's Servicing Company to the Garcias noted that the Garcias' loan was under review for a modification.[125]

- February 7, 2011:  Wells Fargo denied the Garcias' loan modification request because Wells Fargo was "unable to get [the Garcias] a modified payment amount that [they] could afford based on [their] monthly income of $2,759.64 and [their] monthly expenses of $4,565.92."[126]

- February 18, 2011:  A foreclosure sale was held for the Garcias' property.[127]

70.     My review of the Garcias' loan file and my experience with HAMP servicing contradicts many assertions made by Mrs. Julia Garcia in her deposition.  For example, Mrs. Garcia stated that Wells Fargo did not communicate how serious her situation was, noting, "[i]f only Wells Fargo

---

[120] WF_GARCIA_00001325–93 at 41.
[121] WF_GARCIA_00001325–93 at 41.
[122] WF_GARCIA_00000001–1324 at 660.
[123] WF_GARCIA_00000001–1324 at 664.
[124] WF_GARCIA_00001325–93.
[125] WF_GARCIA_00000001–1324 at 668.
[126] WF_GARCIA_00000001–1324 at 669.
[127] WF_GARCIA_00001325–93 at 28–29.

would explain to us, this is your last chance. If you don't take this modification, you will lose your house."[128] In fact, Wells Fargo did warn the Garcias that it would institute foreclosure proceedings if the Garcias did not adhere to the terms of the loan modification.

71.     Similarly, Mrs. Garcia stated that she expected servicers would accept a negotiated lower payment if the borrower decides the modified payments are too high.[129] However, as noted above, HAMP specifically did not allow for such negotiations. As described in its guide, HAMP is driven by a very specific process to determine the allowable payment reduction.[130] The GSE's servicing guides also have very specific instructions covering modifications which do not allow the proposed renegotiation.[131] Furthermore, based on the Garcias' loan repayment and loss mitigation history, I see no evidence that a reduction of the modified payment by a few hundred dollars would have allowed the Garcias to repay their loan. In fact, for the last several years of the Garcias' loan, they did not pay any amount toward their past due balance.[132] As a reference, the Garcias had past-due payments amounting to $51,459 as of March 1, 2010.[133]

72.     Finally, Mrs. Garcia also alleged that Wells Fargo knew about the HPA Tool Error prior to the foreclosure sale on their home.[134] However, Mrs. Garcia's allegation is unsupported by the factual record. The foreclosure sale occurred in 2011 but the HPA Tool Error was not discovered until years later.

## VII.    Obtaining a Trial HAMP Modification Would Not Have Ensured the Garcias Would Have Avoided Default or Foreclosure

73.     Even if the Garcias had been approved for a trial HAMP modification on August 24, 2010, it is not likely that such a modification would have enabled the Garcias to have remained in their home.

74.     Many borrowers who received trial HAMP modifications did not avoid foreclosure. For example, academic literature estimates that only 53% of trial HAMP modifications ultimately

---

[128] J. Garcia Deposition, 125:14–16.
[129] J. Garcia Deposition, 84:7–85:4; 86:5–16.
[130] *See, e.g.,* Supplemental Directive 09-01.
[131] *See, e.g.,* Making Home Affordable, Hardship Affidavit; Fannie Servicing Guide, Announcement 09-05R Amends These Guides: Servicing, April 21, 2009.
[132] The Garcias made their last mortgage payment on May 1, 2008 and did not make any mortgage payments thereafter. *See* WF_GARCIA_00001325–93 at 73.
[133] WF_GARCIA_00000001–1324 at 220.
[134] J. Garcia Deposition, 143:6–9.

resulted in permanent loan modifications as of June 2012 (a little more than a year after the Garcias' foreclosure).[135] Trial HAMP modifications failed to convert to permanent modifications for several reasons, including missing documentation (34%), payment default during the Trial Payment Period (22%), and borrowers withdrawing their requests for modifications (8%).[136] Thus even if they had been approved for a HAMP trial, there is no reasonable basis to conclude the Garcias would have automatically received a permanent modification.

75.     Indeed, based on my review of the Garcias' loan file and other materials in this case, the Garcias demonstrated conduct that is consistent with the reasons many borrowers were unable to convert trial HAMP modifications into permanent modifications. For example, as discussed above, on two separate occasions (January 6, 2010 and December 1, 2010) the Garcias were denied loan modifications because they "did not provide [Wells Fargo] with all of the information needed within the time frame required per [their] trial modification period workout plan."[137] Similarly, the Garcias cancelled a loan modification on April 8, 2010.[138] In my experience, this type of behavior is consistent with a borrower who cannot sustain a trial modification.

76.     Mrs. Garcia testified that the Garcias failed to make payments on their loan in part because they wanted to "negotiate" with Wells Fargo and because they did not expect Wells Fargo to "drop the hammer," but that the Garcias would have done "anything" to keep their home.[139] Such a statement is inconsistent with the Garcias' 30-month failure to make mortgage payments.[140] Withholding payment in order to improve the likelihood of receiving a favorable loan outcome is what is referred to as "strategic default." Borrowers undertake strategic defaults when they "walk away" from their homes for which their indebtedness exceeds the value of the home or when they are seeking to qualify for loan modifications that are unavailable to borrowers who are current on their mortgages. However, in my experience, as noted above, mortgage servicers had very limited ability to "negotiate" with borrowers in the context of HAMP modifications.

---

135 Sumit Agarwal et al., "Policy Intervention in Debt Renegotiation: Evidence from the Home Affordable Modification Program," *Journal of Political Economy* 125, no. 3 (2017), pp. 654–712, FN 4.

136 John A. Karikari, "Why Homeowners' Documentation Went Missing under the Home Affordable Mortgage Program (HAMP)?: An Analysis of Strategic Behavior of Homeowners and Servicers," *Journal of Housing Economics* 22, no. 2 (2013), pp. 146–162, at p. 152.

137 WF_GARCIA_00002989–90; WF_GARCIA_00000001–1324 at 625.

138 WF_GARCIA_00000001–1324 at 641.

139 J. Garcia Deposition, pp. 122, 124–126.

140 The last payment made by the Garcias prior to the foreclosure sale on February 18, 2011 was on October 15, 2008 for the August 1, 2008 payment. *See* WF_GARCIA_00001325–93 at 68.

77.     Even if the Garcias had obtained a permanent HAMP modification, such a modification would not prevent them from re-default and foreclosure.  Even borrowers who were able to complete the Trial Payment Period and received a permanent modification, many times re-defaulted.  Academic studies have found that "modified loans tend to have much higher re-default risk than otherwise identical never-defaulted loans."[141]  Indeed, the Treasury reported that approximately 24% to 29% of loans receiving a permanent modification under HAMP re-defaulted within two years of the date the modification was deemed permanent, and approximately 36% to 42% re-defaulted within four years of that same date.[142]

78.     Another reason for this higher default rate is that the HAMP target payment of 31% of the borrower's gross income is still a very high payment.  It has been my experience that when a new loan is granted, the underwriters generally do not want the payment to be over 28%.[143]  This high payment would have been particularly difficult for a family of four (with two teenage children) living in an urban area.

79.     Academic research indicates that borrowers like the Garcias were particularly likely to re-default.  The study found that borrowers who are 90 days delinquent when they apply for modification have a higher likelihood of becoming delinquent again than those who were only 30 to 60 days delinquent.[144]  By August 24, 2010, the date on which the Garcias' HAMP application was denied, they were already 678 days delinquent.[145]

80.     Thus, to summarize, roughly half of borrowers who entered into trial HAMP modifications were unable to obtain permanent modifications and, of those who were, more than a third ended up re-defaulting within four years.  Put differently, only a minority of borrowers who obtained trial modifications avoided re-defaulting on their HAMP-modified loans.  Finally, given the repayment history of the Garcias' loan, there is a substantial chance that the Garcias would have defaulted even if approved for HAMP.

---

[141] Jian Chen et al., "Re-Default Risk of Modified Mortgages," *International Real Estate Review* 21, no. 1, 2018, pp. 1–40, at p. 1.
[142] "Home Affordable Modification Program (HAMP) Performance Summary – Updated Through December 31, 2021," *Making Home Affordable*, available at https://fraser.stlouisfed.org/files/docs/historical/fct/treasury/treasury_hamp_report_2021_4.pdf. Treasury considers a modified loan to be in re-default if it has been delinquent for over 90 days.  *See* Treasury 4Q17 HAMP Report, p. 8.
[143] When considering a new loan, an underwriter would look for mitigating factors which may allow the mortgage payment to be slightly higher but still 31% is a very high and difficult to pay mortgage payment.
[144] Maximilian D. Schmeiser and Matthew B. Gross, "The Determinants of Subprime Mortgage Performance Following a Loan Modification," *Journal of Real Estate Finance and Economics* 52, no. 1 (2016), pp. 1–27, Table 2.
[145] The last payment made by the Garcias was on October 15, 2008.  *See* WF_GARCIA_00001325–93 at 68.

Executed this 10th of June, 2022

_____

Peter M. Ross

APPENDIX A

# PETER M. ROSS
**317 East Center Ave.**
**Lake Bluff, Illinois 60044**
**Phone: (847) 615-9217**

## SUMMARY OF EXPERIENCE

As an expert witness, has provided reports and been deposed on many aspects of mortgage servicing and on the roles of a servicer and/or trustee in a residential mortgage-backed security.

As principal of a consulting firm specializing in mortgage banking and financial institutions, has worked with some of the largest mortgage banking firms in the industry. Assignments have yielded substantial saving for clients.

As an executive with three of the largest mortgage banking companies, has demonstrated the ability to turn high cost and/or operationally troubled organizations into premier national mortgage servicers. Successfully controlled operations, sustaining up to 60% growth per year. Managed centers in multiple cities, overseeing not only residential and commercial mortgage servicing operations, but also corporate-wide functions such as acquisitions, information and technology, telemarketing originations and facilities.

## WORK EXPERIENCE

### Expert Witness Services 2015-Present

Have provided 32 expert reports and have been deposed 21 times. The cases involved:
- Determining whether the servicer met the requirements of the PSA.
- The trustee's responsibilities in an RMBS.
- The trustee's responsibilities regarding defective or missing documents.
- The master servicer's role in overseeing servicers.
- The servicer's role in processing a defaulted loan.
- The servicer's duties to provide loss mitigation options.
- The servicer's prudent oversight and disposal of REO.
- Demonstrating to the court that the servicer should be allowed to proceed with foreclosure.
- The proper role of a servicer using lender placed insurance.
- The industry standard practices when mortgage servicing rights are purchased/sold.

Many cases involved creating and overseeing large file auditing projects.

### Principal, Performance Mastery Institute 1999-Present

Provides consulting and operational improvement services to assist mortgage banking companies and financial institutions in attaining their profitability goals:
- Many assignments involve process redesign and the installation of best practice solutions.
- For more than fifteen operations, provided a unique approach which combines course work with intensive individual coaching backed by a proprietary employee performance tool. This combination has always resulted in a greater than 15% productivity improvement.
- Redesigned the operations and processes for the nation's largest originator of Reverse Mortgages.
- Substantially enhanced the efficiency of the post-closing division of a major lending by redesigning processes and installing a break-through OCR software system.
- To accomplish the client's goals, I have temporarily acted with line authority as the senior default officer, the senior escrow manager, and in one assignment assuming fourteen line positions in the client's default operation.

APPENDIX A

- During the Financial Crisis I joined the Metlife Mortgage senior default management team to oversee the loss mitigation operation and its handling of the dramatic increase in volume and complexity.
- I have been involved in creating two new servicing operations designed to efficiently handle servicing volumes up to 200,000 loans. In one case acting as the servicing manager for the first year of operation.
- The consulting practice has developed special expertise in all aspects of originations, post-closing and servicing operations.

## *Executive Vice President, PNC Mortgage Corp. of America 1996-1999*

Oversaw several mortgage banking divisions, including a $64.6 billion residential servicing operation located in Chicago and Louisville, the corporate-wide information and technology division, servicing acquisitions and facilities. Responsible for revenues in excess of $326 million and a balance sheet over $1.3 billion.

- Lowered the cost to service over 9 million dollars per annum and increased fee income over 2 million dollars per annum while controlling portfolio churn as high as 87%.
- Accomplished the above by creating the "Delta Initiative" which fundamentally redesigned workflows, management duties and reorganized the servicing centers.
- Reorganized the loss mitigation and foreclosure processes, raising PNC from a tier 3 to a tier 1 FreddieMac servicer within one year.
- Installed the Alltel Interact system, initiated an extensive rewrite of PNC Security Corp.'s, Unix based, conduit software system and started workflow programming for the servicing division.
- Redesigned an acquisitions operation so it could acquire and absorb 23 billion in servicing in 1998, A 10-fold increase from the year before.

## *Senior Vice President, Mellon Mortgage Company          1989-1996*

Managed a major business line with revenues of over 198 million and balance sheet responsibilities of over 1.5 billion. Supervised three residential servicing centers handling 660,000 loans totaling $48 billion in principal balances. Also, in charge of corporate mergers and acquisitions, telemarketing/affinity lending, and the bank's mortgage portfolio.
- Turned around a failing servicing operation, which was under regulatory sanction. Reduced the cost of service from over $230 per loan to $50 per loan.
- Improved productivity by over 400%
- Managed the operation's growth from 125,000 loans to over 660,000.
- Created a corporate acquisitions area which integrated three major mortgage companies and handled over 15 billion in mortgage servicing acquisitions in 1996.
- Created telemarketing/affinity sales and processing area which originated 400 million in mortgage originations per year.

## *Senior Vice President, Goldome Realty Credit Corp.          1983-1989*

Responsible for servicing and portfolio management of a 235,000 loan, 14 billion mortgage servicing organization through a 500-member staff. Acted as the senior loan administrator for the commercial mortgage operation. Also responsible for administrative service functions company wide.
- Converted a traditional savings bank mortgage department into a mortgage banking servicing operation.
- Grew residential servicing operation from 40,000 to 235,000 loans.
- Installed work productivity system, which became a Harvard Business School case study.
- Doubled productivity.
- Transformed a commercial mortgage operation from a $400 million regional lender to a $2.1 billion national mortgage banking operation.

**APPENDIX A**

**Held Several Retail and Commercial Banking Positions at Buffalo Savings Bank and Marine Midland Bank (Now HSBC) 1972-1983**

# INDUSTRY AND CIVIC ACHIEVEMENTS

Past President, Empire State Mortgage Bankers
Past Chairman, MBA National Servicing Committee
Past Member, Freddie Mac National Servicing Advisory Board
Past Chairman, Fidelity's User Advisory Board
Past Chairman, FiServ Large Users Group

# EDUCATION

PMD, Harvard University Business School
The National School of Savings Banking
B.A., Liberal Arts, Hamilton College

APPENDIX B

# Peter M. Ross

# Prior Expert Witness Experience

1.  <u>United States of America and Andrew Mitchell v. CIT Bank</u>
    o Retained by O'Melveny & Myers LLP (for CIT Bank)
    o Allegation: the CIT Bank was materially non-compliant in conducting HAMP.
    o Report: November 18, 2021
    o Deposition: December 16, 2021
2.  <u>Deutsche Bank National Trust v. Morgan Stanley ABS Capital</u>
    o Retained by Davis Polk & Wardwell LLP (for Morgan Stanley)
    o Allegation: Saxon Mortgage was in a position to discover misrepresentations and fraud by comparing origination documents to servicing records while conducting loss mitigation activities but failed to do so.
    o Report: September 27, 2021
    o Deposition: March 11, 2022

3.  <u>Trustee of the 360 Mortgage Group, LLC Plan Trust vs. New Rez LLC f/k/a New Penn Financial, LLC</u>
    o Retained by Sidley Austin LLP (for New Rez LLC)
    o Allegation: The terms and conditions of two servicing rights acquisitions were interpreted differently by the two parties. My role was to opine on the industry norms practiced in such servicing acquisitions.
    o Report: May 3, 2021
    o Deposition: June 29, 2021

4.  <u>National Credit Union Administration Board v. HSBC Bank USA, N.A.</u>
    o Retrained by Williams & Connolly LLP (for HSBC)
    o Allegation: There were tens of thousands of "material" document exceptions for the loans contained in the Trusts. HSBC should have attempted to seek repurchase of these loans on behalf of Trust and to not do so was "commercially unreasonable"
    o Report: September 8, 2020
    o Deposition: May 7, 2021

5.  <u>Phoenix Light SF Limited, et al v. HSBC USA, N.A.</u>
    o Retained by Williams & Connolly LLP (for HSBC)
    o Allegations: The Servicers of the Trusts engaged in imprudent servicing by not demanding repurchase of loan with "material" document exceptions, by exceeding the GSE established foreclosure timelines causing an increase in losses to the certificateholders. That HSBC as trustee failed to properly oversee the servicers and the master servicer as required by the PSA.
    o Report: September 8, 2020

**APPENDIX B**

- o Deposition: May 5, 2021

6. <u>Natixis Real Estate Holdings v. Wells Fargo Bank, N.A.</u>
   - o Retained by Jones Day (for Wells Fargo)
   - o Allegations: That Saxon as the primary servicer was deficient in performing its actions regarding loans in default. That Saxon was required to investigate material R&W breaches. As the master servicer Wells Fargo had a responsibility to cause the Servicer to fulfill those responsibilities.
   - o Report: July 29, 2020
   - o Deposition: April 4, 2021

7. <u>Nomura Credit & Capital, Inc v. Wells Fargo Bank & Ocwen Loan Servicing, (LLC NHELI 2007-3)</u>
   - o Retained by Jones Day (for Wells Fargo)
   - o Allegations: Wells Fargo and Ocwen Loan Servicing, LLC breached the PSA by not providing Nomura with prompt notice of the Seller's breaches of its Warranties. Wells Fargo did not properly master service the security and oversee the servicers within this security.
   - o Report: January 31, 2020
   - o Deposition: February 17 & 19, 2021

8. <u>Alicia Hernandez et al. v. Wells Fargo Bank</u>
   - o Retained by Winston & Strawn (for Wells Fargo)
   - o Allegations: Wells Fargo failed to fulfill its duties by not approving loss mitigation solutions such as HAMP due to an error in calculating allowable attorney fees and did not diligently seek to correct that error.
   - o Report: January 2, 2020
   - o Deposition: February 6, 2020

9. <u>CitiMortgage v. BBX Capital Corporation and Heartwood 2, LLC</u>
   - o Retained by Bryan Cave Leighton Paisner (for CitiMortgage)
   - o Allegations: CitiMortgage as servicer failed to review the origination file at referral to foreclosure to ascertain if there were grounds to demand repurchase of loans not underwritten according to the underwriting guidelines, not foreclosing within GSE timelines, and further when loans were repurchased not fully reimbursing the trust.
   - o Report: December 24, 2019

10. <u>Nomura Credit & Capital, Inc. v. Wells Fargo and Ocwen Loan Servicing, LLC (NHILI 2006-FM2)</u>
    - o Retained by Jones Day (for Wells Fargo)
    - o Allegations: Wells Fargo as master servicer breached the PSA by failing to provide Nomura with prompt notice of alleged breaches by the servicer by failing to review the origination file at referral to foreclosure to ascertain if there were

**APPENDIX B**

grounds to demand repurchase, by failing to foreclosure within GSE foreclosure timelines, by creating loss severities over 100%, and by the improper use of subsidiary vendors.
   o Report: December 20, 2019
   o Deposition: February 17 & 19, 2021

11. <u>Nomura Credit & Capital, Inc. v. Wells Fargo and Ocwen Loan Servicing, LLC (NAAC 2006-S3) & NAAC (2006-S4)</u>
   o Retained by Jones Day (for Wells Fargo)
   o Allegations: Wells Fargo as master servicer breached the PSA by failing to provide Nomura with prompt notice of alleged breaches by the servicer such as failing to review the origination file at referral to foreclosure to ascertain whether there were grounds to demand repurchase and creating loss severities over 100%.
   o Report: December 2, 2019
   o Deposition: February 17 & 19, 2021

12. <u>Nomura Credit & Capital, Inc v. Wells Fargo (NAAC 2006-AF2) &</u>
13. <u>Nomura Credit & Capital, Inc v. Wells Fargo (NAAC 2007-2)</u>
   o Retained by Jones Day (for Wells Fargo)
   o Allegations: Master Servicer and the Servicers accused of not performing duties as proscribed in the PSA by not making prudent servicing decisions regarding losses over 100%, by not processing foreclosures within the GSE foreclosure timelines, and by improperly placing lender placed insurance. Given these alleged servicing deficiencies, Wells Fargo should have taken corrective action.
   o Report: November 15, 2019
   o Deposition: February 17 & 19, 2021

14. <u>Commerzbank AG v. Wells Fargo</u>
   o Retained by Jones Day (for Wells Fargo)
   o Allegations: Servicers accused of not fulfilling their duties within the RMBS in allowing incomplete documentation and exceeding the GSE foreclosure timelines.
   o Report: July 25, 2019
   o Deposition: October 11, 2019

15. <u>Phoenix Light SF Limited, et al v. Wells Fargo</u>
   o Retained by Jones Day (for Wells Fargo)
   o Allegations: Opposing Expert argued that under the PSA, the Trustee should have taken action against the servicer for not fulfilling the FNMA servicing requirements, for disclosures made under Reg A/B, and for not obtaining mortgage documents. As that was case, the trustee should have taken corrective action such as demanding loan repurchases.
   o Report: July 25, 2019
   o Deposition: October 9, 2019

**APPENDIX B**

16. <u>National Credit Union Administration Board, et al vs Well Fargo Bank</u>
    - Retained by Jones Day (for Wells Fargo)
    - Allegation: Trustee was accused of failing to pursue mass repurchases for "tens of thousands" document defective loans.
    - Report: June 20, 2019
    - Deposition: September 17, 2019

17. <u>Phoenix Light SF Limited, et al v. Bank of New York Mellon</u>
    - Retained by Mayer Brown LLP (for BONY)
    - Allegations: Trustee was accused of allowing servicers to continue as the RMBS's servicers when those servicers were foreclosing using defective or missing documents and not demanding repurchase of those loans or replacing the deficient servicers. Further that GSE foreclosure timelines were not met.
    - Report: August 16, 2018
    - Supplemental Report: November 19, 2018
    - Deposition: November 29, 2018

18. <u>Lionel Lima, Barbara-Ann Delizo Lima and Calvin Jon Kirby vs Deutsche Bank National Trust</u>
19. <u>Evelyn Jane Gibo (Individually and those similarly situated) v. U.S. Bank, N.A.</u>
20. <u>Nancy Manchester v. US Bank, N.A.</u>
    - Retained by Morgan Lewis & Bockius LLP (for Deutsche and US Banks)
    - Allegations: Three similar legal actions and expert reports alleging that the Trustee should have taken action against the servicer for conducting foreclosures improperly, and by issuing quitclaim deeds or postponing foreclosure sales without publishing notices of such postponement. Further that the trustee (the defendants) sets the foreclosure policies and practices for foreclosure actions.
    - Reports:
        - Deutsche - May 16, 2018
        - Gibo v. US Bank - May 31, 2018
        - Manchester v. US Bank - June 21, 2019

21. <u>Image Masters, Inc v. ABN AMRO Mortgage Group, Inc. et al</u>
    - Retained by Goodwin Procter LLP & other firms for Bank of America, Wells Fargo, SunTrust, FNMA & FreddieMac and others. (Joseph Yenouskas lead at Goodwin)
    - Allegation: The defendants were accused of making transfers of funds (mortgage payments to investors such as the GSEs when they should have known that the source of those funds were cash out refinances originated as part of a Ponzi scheme conducted by Image Masters, Inc.
    - Report: April 3, 2018

**APPENDIX B**

22. <u>Wells v. PHH Mortgage Corporation</u>
    - Retained by Moulton Bellingham PC (for PHH)
    - Allegations: Defendant PHH Mortgage Corporation's processed multiple loss mitigation applications for Eric Wells which were not consistent with generally accepted servicing procedures. This was a long-term delinquency/foreclosure situation.
    - Report: August 28, 2017

23. <u>Munoz v. Bank of America, Wells Fargo and Wells Fargo Home Mortgage</u>
    - Retained by Moulton Bellingham (for PHH)
    - Allegations: Defendant Wells Fargo did not offer loss mitigation opportunities and when unsuccessful pursued a foreclosure action which is inconsistent with generally accepted servicing procedures and obligations.
    - Report: December 28, 2016
    - Summary Judgement issued in favor of BOA et al: May 2017

24. <u>Commerce Bank, ET AL. vs. U.S. Bank National Association</u>
    - Retained by Morgan, Lewis & Bockius LLP (for U.S. Bank)
    - Allegations: this legal action was brought by two certificateholders who stated the servicers did not pursue foreclosure actions in conformity with the PSA's standards. I found that foreclosure "delays" were the result of HAMP and further the allegations were based on a review of an insufficient sized sample of loans with large losses.
    - Report: November 23, 2016
    - Deposition: January 6, 2017

25. <u>Law Debenture Trust Company of New York vs. WMC Mortgage LLC</u>
    - Retained by Ropes and Gray (for Law Debenture Trust)
    - Allegations: That the security's servicers did not meet the PSA's servicing standard. This allegation was refuted by comparing the Servicer's performance to that average Freddie Mac servicer for default and loss mitigation performance.
    - Report: August 19, 2016
    - Deposition: November 8, 2016
    - Trial Testimony: January 15, 2018

26. <u>People of State of California vs. U.S. Bank, et al. and Related Cross Action involving several financial institutions</u>
    - Retained by Goodwin Procter LLP (for Bank of America and during this action I also became retained by 7 other financial institutions)
    - Allegations: State of California alleged that the Servicers did not fix up REO properties. This allegation was refuted by showing that these properties were not typical REOs: they are neglected, abandoned and in substantial disrepair. The servicer contractual role is to manage these assets for the best return to the certificateholders.
    - Report: June 20, 2016

PRIVILEGED AND CONFIDENTIAL – ATTORNEY WORK PRODUCT

**APPENDIX B**

- o Deposition: July 15, 2016

27. Lakisha Rochelle Griffin f/k/a Lakisha Rochelle Griffin Sorrels vs. HSBC Mortgage Services, Inc., HSBC Financial Corporation and others
    - o Retained by Burr Forman LLP (for HSBC Mortgage Services, Inc. and HSBC Financial Corporation).
    - o Allegation: HSBC's actions concerning the payment of insurance and the placement of lender placed insurance were not consistent with industry practice.
    - o Rebuttal Report:  May 20, 2016

28. Pierces vs. Wells Fargo Bank, N.A. and Northwest Trustees Services, Inc.
    - o Retained by Crowley Fleck PLLP (for Wells Fargo Bank)
    - o Allegations: Wells Fargo Bank provided inadequate loan servicing to the Pierces, in regard to processing a HAMP modification and dual tracking during the foreclosure action.
    - o Report: November 16, 2015
    - o Deposition: March 16, 2016

29. Knight vs. First American Title, Wells Fargo Bank N.A. and HSBC
    - o Retained by Moulton Bellingham PC (for the defendants)
    - o Allegations: Wells Fargo DBA America's Servicing Company did not act as a prudent servicer in offering loss mitigation options and processing numerous HAMP applications.
    - o Report: April 1, 2016
    - o Amended Report: April 28, 2016

30. Stitt, et al. v. Citibank, N.A.
    - o Retained by Meyer Brown LLP for defendant
    - o Allegations: CitiMortgage's mortgage servicing practices with respect to monthly inspections were unwarranted and a major source of servicing income. Also, servicing transfers were not a normal servicing business activity.
    - o Report: February 2015
    - o Rebuttal Report: March 2015
    - o Deposition: May 2015

31. The Bank of New York Mellon v. WMC Mortgage LLC and GE Mortgage Holding, LLC
    - o Retained by Boies, Schiller & Flexner LLP (for BNY Mellon)
    - o Allegation: The Trustee should have taken action against the security's servicers (WMC Mortgage and Litton) as they did not meet the PSA's servicing standard to mitigate losses, eliminate unnecessary advances, and conducting foreclose actions in compliance with FreddieMac foreclosure guidelines.
    - o Report: May 2015
    - o Deposition: July 2015

32. Kissane v. Bank of America Corp. et al
    - o Retained by Goodwin Procter LLP for defendant

**APPENDIX B**

- o Allegation: BOA's foreclosure practices in regard to this loan were not consistent with industry standards.
- o Report: May 2015


33. <u>Hicks v. Bank of America Corp.</u>
- o Retained by Goodwin Procter LLP for defendant
- o Allegation: Bank of America did not act as a prudent servicer during their default and did not offer the Hicks several loss mitigation alternatives.
- o Expert Disclosure: September, 2015
- o Interrogatory Response: November 2015
34. <u>Roybol v. Bank of America Corp</u>
- o Retained by Browning, Kaleczyc, Berry & Hoven, PC (for Bank of America)
- o Allegation: Bank of America did not act in a commercially reasonable way when offering the Roybol a loss mitigation option.
- o Report: December 7, 2015

# Appendix C: Documents Relied Upon

**Academic Sources**

- Jian Chen et al., "Re-Default Risk of Modified Mortgages," *International Real Estate Review* 21, no. 1, 2018, pp. 1–40.

- John A. Karikari, "Why Homeowners' Documentation Went Missing under the Home Affordable Mortgage Program (HAMP)?: An Analysis of Strategic Behavior of Homeowners and Servicers," *Journal of Housing Economics* 22, no. 2, 2013, pp. 146–162.

- Maximilian D. Schmeiser and Matthew B. Gross, "The Determinants of Subprime Mortgage Performance Following a Loan Modification," *Journal of Real Estate Finance and Economics* 52, no. 1, 2016, pp. 1–27.

- Sumit Agarwal et al., "Policy Intervention in Debt Renegotiation: Evidence from the Home Affordable Modification Program," *Journal of Political Economy* 125, no. 3, 2017, pp. 654–712.

- Christopher J. Mayer et al., "Federal Reserve Board, The Rise in Mortgage Defaults," *Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board*, November 2008, pp. 1–36.

**Pleadings**

- Complaint, Andrew J. Maxwell et al. v. Wells Fargo Bank, N.A., April 18, 2020.

**Depositions**

- Deposition of Beena Menon, August 21, 2019.

- Deposition of Carmen Bell, August 2, 2019 with exhibits.

- Deposition of Kara Reimers, November 20, 2019.

- Deposition of Julia Garcia, May 5, 2022 with exhibits.

**Rules & Regulations**

- 12 C.F.R. § 1024.31

- 12 C.F.R. § 1024.38

- 12 C.F.R. § 1024.41

**Produced Documents**

- WF_GARCIA_00000001–1324
- WF_GARCIA_00001325–93
- WF_GARCIA_00001463–6
- WF_GARCIA_00002975–6
- WF_GARCIA_00002977
- WF_GARCIA_00002978–9
- WF_GARCIA_00002982
- WF_GARCIA_00002983–5
- WF_GARCIA_00002987–8
- WF_GARCIA_00002989–90
- WF_GARCIA_00002991–2
- WF_GARCIA_00002993–3001
- WF_GARCIA_00003002–12
- WF_HERNANDEZ_00000322 (Young Deposition Exhibit 364)
- WF_HERNANDEZ_00000324 (Young Deposition Exhibit 365)
- WF_HERNANDEZ_00000327 (Young Deposition Exhibit 370)
- WF_HERNANDEZ_00001352–3 (Young Deposition Exhibit 366)
- WF_HERNANDEZ_00071326–32
- WF_HERNANDEZ_00071929–47
- WF_HERNANDEZ_00106478–85
- WF_HERNANDEZ_00107555–60
- WF_HERNANDEZ_00129716–31
- WF_HERNANDEZ_00141851–4
- WF_HERNANDEZ_00152564–6
- WF_HERNANDEZ_00153518–22
- WF_HERNANDEZ_00156619–21
- WF_HERNANDEZ_00157982

- WF_HERNANDEZ_00107839 (Young Deposition Exhibit 373)

**Financial Filings**

- Wells Fargo & Company, Form 10-Q for the Quarterly Period Ended June 30, 2018, filed on August 3, 2018.

**Industry & Public Reports**

- "Factors Affecting Implementation of the Home Affordable Modification Program," *SIGTARP: Office of the Special Inspector General for the Troubled Asset Relief Program,* SIGTARP-10-005, March 25, 2010.

- "Home Affordable Modification Program (HAMP) Performance Summary – Updated Through December 31, 2021," *Making Home Affordable*, available at https://fraser.stlouisfed.org/files/docs/historical/fct/treasury/treasury_hamp_report_2021_4.pdf.

- "Handbook for Servicers of Non-GSE Mortgages," *Making Home Affordable,* Version 4.4, March 3, 2014.

- "The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States," *The Financial Crisis Inquiry Commission*, Official Government Edition, January 2011.

- Laurie Goodman et al., "How Beneficial Are Streamlined Modifications?," *Housing Finance Policy Center*, July 2018, available at https://www.urban.org/sites/default/files/publication/98784/how_beneficial_are_streamlined_modifications_1.pdf.

**Supplemental Directives**

- "Supplemental Directive 09-01: Introduction of the Home Affordable Modification Program," *Making Home Affordable*, April 6, 2009.

- "Supplemental Directive 10-01: Home Affordable Modification Program – Program Update and Resolution of Active Trial Modifications," *Making Home Affordable*, January 28, 2010.

- "Supplemental Directive 10-02: Home Affordable Modification Program – Borrower Outreach and Communication," *Making Home Affordable*, March 24, 2010.

- "Supplemental Directive 10-14: Making Home Affordable Program – Principal Reduction Alternative Update," *Making Home Affordable,* October 15, 2010.

- "Supplemental Directive 12-02: Making Home Affordable - MHA Extension and Expansion," *Making Home Affordable*, March 9, 2012.

- "Supplemental Directive 09-05 Revised: Update to the Second Lien Modification Program (2MP)," *Making Home Affordable*, March 26, 2010.

**Public Press & News Releases**

- Federal Housing Finance Agency Press Release, "FHFA Announces New Streamlined Modification Initiative," March 27, 2013.

- Karina C. Hernandez, "How Long does a Loan Modification Take When Using Obama's Making Homes Affordable Plan?," *SF GATE,* https://homeguides.sfgate.com/long-loan-modification-using-obamas- making-homes-affordable-plan-98669.html, accessed January 2, 2020.

**Websites & Other Public Sources**

- "Comparison of Default Rates for U.S. Subprime and U.S. Prime Loans", *STATISTA*, 2015, https://www.statista.com/statistics/205970/delinquency-rates-on-us-subprime-conventional-loans-since-2000/.

- "Home Affordable Modification Program: Base Net Present Value Model V7.0 Model Documentation 3," *Making Home Affordable*, October 26, 2015."How to Improve the Test Release Process for Successful Bug Free Software to Production," *Software Testing Help*, May 5, 2022, https://www.softwaretestinghelp.com/how-to-improve-the-test-release-process/, accessed on January 2, 2020.

- "Regulatory Capital Standards Final Rule for Mortgages Modified Under the Making Home Affordable Program," *Federal Deposit Insurance Corporation*, November 27, 2009, https://www.fdic.gov/news/financial-institution-letters/2009/fil09067.html, accessed on May 23, 2022.

- "Remarks by the President on the Mortgage Crisis," *The White House*, February 18, 2009, https://obamawhitehouse.archives.gov/the-press-office/remarks-president-mortgage-crisis, accessed on May 23, 2022.

- "Troubled Assets Relief Program (TARP)," *U.S. Department of the Treasury*, https://home.treasury.gov/data/troubled-assets-relief-program, accessed on June 8, 2022.

- "Update to Default Guidance for Mortgage Loans Evaluated for the Home Affordable Modification Program," *Fannie Mae*, February 1, 2010.

- "What is a subprime mortgage?," *Consumer Financial Protection Bureau*, February 24, 2017, https://www.consumerfinance.gov/ask-cfpb/what-is-a-subprime-mortgage-en-110/, accessed on May 24, 2022.

**Data**

- Table F-2: U.S. Bankruptcy Courts—Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending December 31, 2007

- Table F2: U.S. Bankruptcy Courts—Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending December 31, 2010

- *Unemployment Rate [UNRATE],* FRED: Federal Reserve Bank of St. Louis.