**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **EDUARDO GARCIA** and **JULIA GARCIA**, | |
| Plaintiffs, | Case No. 1:20-cv-02402 |
| v. | Hon. Rebecca R. Pallmeyer |
| **WELLS FARGO BANK, N.A.,** | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

**DEFENDANT'S LOCAL RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or the "Bank"), by its attorneys Winston & Strawn LLP, hereby submits its Local Rule 56.1 statement of material facts as to which there is no genuine issue and which entitles Defendant to judgment as a matter of law as follows:[1]

## I.       PARTIES, JURISDICTION, AND VENUE

1.       Plaintiffs are citizens of Illinois.  (Shawn R. Obi Declaration ("Obi Dec.") at Ex. 1 (Transcript of Plaintiff Eduardo Garcia's Deposition ("E. Garcia Dep."), p. 7 lns. 15-16); Obi Dec. at Ex. 2 (Transcript of Plaintiff Julia Garcia's Deposition ("J. Garcia Dep."), p. 6 lns. 11-12).  Wells Fargo is a national banking association.  Its main office is located in Sioux Falls, South Dakota. Its principal place of business is in San Francisco, California.  (Obi Dec. at Ex. 3 (Dkt. 12, June 29, 2020 Joint Status Report), p. 2).

2.       This Court has jurisdiction pursuant to 28 U.S.C. §1332(a) and 28 U.S.C. §1367.

## II.      WELLS FARGO'S SOFTWARE CALCULATION ERROR

3.       On June 30, 2018, Wells Fargo announced that an internal review had identified a calculation error in its loan modification decision process, which led to the erroneous denials of trial loan modifications for certain borrowers in the foreclosure process.  (Obi Dec. at Ex. 4 (Wells Fargo Form 10-Q for the Quarterly Period Ended June 30, 2018), p. 5).

4.       The calculation error occurred in an underwriting tool called the "Home Preservation Application Tool" or "HPA Tool."  (Obi Dec. at Ex. 5 (Attorney Fee Calculation Error – CIT 6214)).

5.       Following the identification and public disclosure of the error, Wells Fargo began a voluntary remediation program.  (Obi Dec. at Ex. 6 (Transcript of Carmen Bell's 30(b)(6)

---

1. The record support for this Statement of Undisputed Material Facts, cited herein, is attached as exhibits to the Declaration of Shawn R. Obi, Robert Ferguson, Peter M. Ross, and Dr. David Hartman.

Deposition ("Bell Dep."), p. 47 ln 24 – p. 53 ln. 19). Plaintiffs did not participate in the mediation process, but received $24,500. (Obi Dec. at Ex. 7 (Jul. 26, 2019 Remediation Check for $14,500); *see also* Robert Ferguson Declaration ("Ferguson Dec.") at Ex. I (Jul. 26, 2019 Remediation Letter and Remediation Check for $14,500); Obi Dec. at Ex. 8 (Nov. 18, 2019 Remediation Check for $10,000); *see also* Ferguson Dec. at Ex. J (Nov. 18, 2019 Remediation Letter and Remediation Check for $10,000)).

## III.    PLAINTIFFS' EMPLOYMENT AND BUSINESS HISTORY

6.      Eduardo Garcia ("Mr. Garcia") began working independently as a carpenter in the remodeling industry in the mid-1990s. (E. Garcia Dep. p. 25 lns. 13-18; p. 26 lns. 8-16).

7.      Julia Garcia ("Mrs. Garcia") began working at Alivio Medical Center in 2003 as a Chicago Latino Diabetes Coalition Coordinator. (J. Garcia Dep. p. 50 lns. 11-22).

8.      Mrs. Garcia was promoted to program manager at Alivio Medical Center at the end of 2006 or the beginning of 2007. (J. Garcia Dep. p. 52 lns. 21-25).

9.      In 2012, Mrs. Garcia left Alivio Medical Center because her "health got in the way every time" and it became "difficult for [her] to keep up with everything." (J. Garcia Dep. p. 53 lns. 15-17; p. 55 lns. 14-16). Mrs. Garcia's daughter, Miriahm Garcia, believes that Mrs. Garcia left Alivio because her work environment began to shift and Mrs. Garcia no longer liked how things were "playing out at work." (Obi Dec. at Ex. 9 (Transcript of Miriahm Garcia's Deposition ("M. Garcia Dep."), p. 108 lns. 21-25, p. 109 lns. 2-7). Mrs. Garcia's former co-worker, Elena Briseño, confirmed that Mrs. Garcia left Alivio because of disagreements she had with leadership. (Obi Dec. at Ex. 10 (Transcript of Elena Briseño ("Briseño Dep."), p. 48 lns. 18-21, p. 49 lns. 11-17). Another one of Mrs. Garcia's co-workers, Susan Vega, also stated that Mrs. Garcia left Alivio because "she could no longer tolerate the behaviors and the treatment that were brought upon her by [her boss]." (Obi Dec. at Ex. 11 (Transcript of Susan Vega ("Vega Dep"), p. 32 lns. 7-25, p.

33 lns. 2-3). Mrs. Garcia's spiritual advisor, Martha Koehler further stated that a change in leadership at Alivio played a role in Mrs. Garcia leaving Alivio. (Obi Dec. at Ex. 12 (Transcript of Martha Polo Koehler ("Koehler Dep."), p. 108 lns. 18-25, p. 109 lns. 2-7)). Mrs. Garcia returned to Alivio in 2020 briefly for a temporary project. (*Id*. at p. 110 lns. 24-25, p. 111 lns. 2-25, p. 112 lns. 2-3); J. Garcia Dep. p. 70 lns. 19-25, p. 71 lns 2-16; Obi Dec. at Ex. 37 Julia Garcia's Resp. to First Set of Interrog. p. 2.

10.     After starting this new business, Mr. Garcia stopped doing independent remodeling work and told his former clients that he was no longer taking on independent remodeling jobs. (E. Garcia Dep. p. 68 lns. 7-25, p. 69 lns. 2-4).

11.     Woodland Lumber failed not too long after it started, and the business was involuntarily dissolved in November 2006. (E. Garcia Dep. p. 71 lns. 22-25; p. 72 lns. 2-12).

12.     Before Woodland Lumber was involuntarily dissolved, Plaintiffs discovered that the Espinozas had disappeared and taken all of Woodland Lumber's office equipment, business documentation, and all of the money in the Woodland Lumber business account. (E. Garcia Dep. p. 72 lns. 14-25; J. Garcia Dep. p. 96 lns. 16-22).

13.     Plaintiffs estimate the Espinozas took between $20,000 and $40,000 from Woodland Lumber, including all of the money Plaintiffs had invested in the business. (J. Garcia Dep. p. 97 lns. 5-8; E. Garcia Dep. p. 73 lns. 19-21). Plaintiffs made an initial investment of $10,000 from their savings account (roughly two-thirds of their savings), and then made a second investment of $15,000 or $20,000 after refinancing their mortgage with Wells Fargo in 2006. (E. Garcia Dep. p. 87 lns. 19-25, p. 88 lns. 2-5; J. Garcia Dep. p. 91 lns. 3-12).

14.     Mr. Garcia attempted to regain his independent remodeling clients but found that "it was difficult to find work" because of the 2008 Financial Crisis. (E. Garcia Dep. p. 92 lns. 21-25, p. 93 lns. 2-5; J. Garcia Dep. p. 110 lns. 4-13).

## IV.     PLAINTIFFS' LOAN HISTORY AND FINANCIAL DIFFICULTIES

15.     Plaintiffs refinanced their mortgage for 407 Beach Ave. LaGrange Park, Illinois 60526 (the "LaGrange Park Property") with Wells Fargo on January 26, 2006 in order to invest in Woodland Lumber. (E. Garcia Dep. p. 80 lns. 13-25; Obi Dec. at Ex. 13 (Plaintiffs' Note) (WF_GARCIA_00000298-301); *see also* Ferguson Dec. at Ex. A (Plaintiffs' Note)).

16.     Plaintiffs' family Honda CRV was repossessed around this same time because they missed payments on it. (E. Garcia Dep. pg. 88, lns. 6-16)

17.     In December 2006, Plaintiffs missed their first mortgage payment. (Obi Dec. at Ex. 14 (Mortgage Services Microfiche) (WF_GARCIA_00001325-93 at 91)).

18.     Three months after Woodland Lumber failed and the Espinozas disappeared with Plaintiffs' money, Plaintiffs were offered and accepted their first Temporary Forbearance Agreement on February 20, 2007. (Obi Dec. at Ex. 15 (Plaintiffs' Feb. 20, 2007 Temporary Forbearance Agreement); *see also* Ferguson Dec. at Ex. B (Plaintiffs' Feb. 20, 2007 Temporary Forbearance Agreement)).

19.     Plaintiffs made all the necessary payments on the 2007 Temporary Forbearance Agreement and brought their loan current. (*Id*.).

20.     In March 2008, Plaintiffs' monthly mortgage payments increased to approximately $3,000 in accordance with their adjustment rate note. (J. Garcia Dep. p. 151 lns. 9-17). Plaintiffs attempted to refinance again but were unable to because the value of the LaGrange Park Property declined during the Great Recession. (J. Garcia Dep. p. 85 lns. 10-12, p. 137 lns. 11-16). In late March 2008, Plaintiffs were denied a loan modification because their reported monthly expenses

were greater than their reported monthly income. (Obi Dec. at Ex. 16 (Plaintiffs' Mar. 27, 2008 Loan Modification Denial) (WF_GARCIA_00002977)).

21.      In September 2008, Plaintiffs were notified that they were in default. (Obi Dec. at Ex. 17 (Sept. 21, 2008 Notice of Default)).

22.      Wells Fargo offered Plaintiffs two Special Forbearance Plans—one in 2008 and one in 2009—but Plaintiffs failed to make the necessary payments on those plans to bring their mortgage current. (Obi Dec. at Ex. 18 (Plaintiffs' Sept. 30, 2008 Special Forbearance Plan Agreement); *see also* Ferguson Dec. at Ex. C (Plaintiffs' Sept. 30, 2008 Special Forbearance Plan Agreement); Obi Dec. at Ex 19 (Plaintiffs' Aug. 26, 2009 Special Forbearance Plan); *see also* Ferguson Dec. at Ex. D (Plaintiffs' Aug. 26, 2009 Special Forbearance Plan Agreement); Obi. Dec. at Ex. 20 (Collection Notes – Nov. 20, 2008 Special Forbearance Plan Denial/Removal); Obi Dec. at Ex. 21 (Collection Notes – Sept. 23, 2009 Special Forbearance Plan Denial/Removal)).

23.      Mrs. Garcia admits that Plaintiffs may have agreed to the September 2008 Special Forbearance Plan "just to gain time and submit the application for the affordable house modification." (J. Garcia Dep. p. 164 lns. 8-10).

24.      In December 2009, Plaintiffs wrote a letter to Wells Fargo explaining their financial difficulties, including that they had been "victims of fraud" and had been "left with many debts," that Mr. Garcia had lost his construction clients because of the Woodland Lumber business, that Mr. Garcia had not had a regular job since Woodland Lumber failed, and that the economy was affecting his ability to find work. (E. Garcia Dep. p. 134, lns. 20-25, p. 135 lns. 2-10, p. 135 lns. 23-25, p. 136 lns. 2-5; Obi. Dec. at Ex. 22 (Plaintiffs' Dec. 14, 2009 Hardship Letter)).

25.      In March 2010, Plaintiffs were offered a loan modification that would have lowered their monthly mortgage payments from approximately $3,000 to $1,871.60. (Obi Dec. Ex. 23

(Plaintiffs' Mar. 27, 2010 Loan Modification Agreement); *see also* Ferguson Dec. at Ex. E (Plaintiffs' Mar. 27, 2010 Loan Modification Agreement)).

26.     At the time of the offer, Plaintiffs could have afforded to make the $1871 modified monthly payments. (J. Garcia Dep. p. 136 lns. 11-15).

27.     Despite this offer to reduce his monthly mortgage payment by more than $1100, Mr. Garcia called Wells Fargo in April 2010 to decline the March 2010 loan modification. (E. Garcia Dep. p. 138 lns. 12-18; Obi Dec. at Ex. 24 (Plaintiffs' April 8, 2010 Loan Modification Cancellation Notice)). Mr. Garcia did so because he deemed the modified payment amount not a "comfortable sum of money" for them to pay. (E. Garcia Dep. p. 138 lns. 12-18, p. 139 lns. 7-22, p. 264 lns. 17-21).

28.     Mr. Garcia understood that, by declining the March 2010 modification, Plaintiffs remained responsible for paying their $3,000 monthly mortgage payment amount. (E. Garcia Dep. p. 142 lns. 4-8). Mr. Garcia also understood that if they did not pay, Wells Fargo could "take the house away." (E. Garcia Dep. p. 141 lns. 23-25; p. 142 lns. 2-3).

29.     Mrs. Garcia wanted someone from Wells Fargo to "take care of [Plaintiffs]" and lower the modified payment by an additional $200 or $250. (J. Garcia Dep. p. 190 lns. 18-24). Alternatively, Mrs. Garcia wanted someone from Wells Fargo to verbally tell her, "Mrs. Garcia if you don't take this last opportunity, we're going to sell your house." (J. Garcia Dep. p. 190 lns. 19-21, p. 136 lns. 11-13).

30.     Mrs. Garcia stated that Plaintiffs would have made the payments if Wells Fargo had told her it was their last opportunity. (J. Garcia Dep. p. 136 lns. 11-15).

31.     Rather than pay either the $3,000 unmodified mortgage payment or the $1,871 modified mortgage payment, Plaintiffs chose to continue making no payments on the mortgage.

(J. Garcia Dep. p. 135 lns. 18-23). It was Plaintiffs' "intention to negotiate" with Wells Fargo until Plaintiffs were given a "better" and "more comfortable" payment. (J. Garcia Dep. p. 126 lns. 7-21, p. 136 ln. 3).

32.    Mrs. Garcia believed Wells Fargo was obligated to negotiate with Plaintiffs. (J. Garcia Dep. p. 174 lns. 12-15).

33.    Plaintiffs applied for a HAMP trial loan modification in April 2010 but were erroneously denied in August 2010 as a result of the software calculation error. (Obi Dec. at Ex. 25 (Plaintiffs' Apr. 22, 2010 HAMP Loan Modification Application); *see also* Ferguson Dec. at Ex. F (Plaintiffs' Apr. 22, 2010 HAMP Loan Modification Application); Obi Dec. at Ex. 26 (Plaintiffs' Aug. 24, 2010 HAMP Loan Modification Denial)).

34.    Mr. Garcia admitted that Plaintiffs may not have been able to complete the trial loan modification payments and that it is possible they would have declined the trial loan modification. (E. Garcia Dep. P. 143 ln. 25, p. 144 lns. 2-4, p. 175 lns. 9-20, p. 176 lns. 11-22).

35.    Mr. Garcia also acknowledged that the erroneous denial of the trial loan modification and the foreclosure of Plaintiffs' home are not the same thing. (E. Garcia Dep. p. 231 lns. 6-18).

36.    Plaintiffs understand that the trial loan modification they were denied in August 2010 was not a permanent loan modification and that they would have had to complete three trial payments to be eligible for a permanent loan modification. (E. Garcia Dep. p. 173 ln. 25, p. 174 lns. 2 -25, p. 175 lns. 4-8; J. Garcia Dep. p. 223 lns. 16-25, p. 224 lns. 2-4; *see also* Peter M. Ross Dec. at Ex. A (Expert Report of Peter M. Ross ("P. Ross Rep.") p. 12-13 ¶ 28).

37.     At the time of the erroneous denial, Plaintiffs had not made a payment on their mortgage in 24 months.  Obi Dec. at Ex. 27 (Loan History Microfiche, WF_GARCIA_00000929-43)).

38.     In January and December 2010, Plaintiffs were denied loan modifications because they did not provide Wells Fargo with all of the requested information the bank needed to evaluate them for a trial loan modification.  (Obi Dec. at Ex. 28 (Plaintiffs' Jan. 6, 2010 Loan Modification Denial Letter (WF_GARCIA_00002989-90); Obi Dec. at Ex. 29 (Plaintiffs' Dec. 1, 2010 Loan Modification Denial Letter (WF_GARCIA_00000664-665)).

39.     In February 2011, Plaintiffs requested but were denied a loan modification because their reported monthly expenses were greater than their reported monthly income.  (Obi Dec. at Ex. 30 (Plaintiffs' Feb. 7, 2011 Loan Modification Denial Letter)).

40.     In total, Wells Fargo offered to help Plaintiffs by extending nine potential loan modifications and approved Plaintiffs for four of them.  (*See* ¶¶ 18-39, *supra*).

41.     Trial HAMP modifications could fail to convert to permanent modifications for several reasons.  From the beginning of the HAMP program through June 2012, these reasons included missing documentation (34%), payment default during the trial payment period (22%), and borrowers withdrawing their requests for modifications (8%).  Many borrowers who received trial HAMP modifications ultimately did not avoid foreclosure.  (P. Ross Rep. p. 30-31 ¶ 74).  Borrowers who obtained HAMP modifications frequently lost their homes in foreclosure, especially borrowers with long delinquencies and histories of breaking loan modification payment plans and failing to complete modification applications.  (*Id*. at p. 31-32 ¶¶ 75, 79).  In the first three years of the HAMP program (which includes the dates of the erroneous denial and the Garcias' foreclosure), only around half of all borrowers who received a trial modification were

able to convert it into a permanent modification. (*Id*. at p. 32 ¶¶ 74, 80). Of those, approximately a quarter re-defaulted within two years and approximately 35% re-defaulted within four. (*See id*. at ¶¶ 77, 80). Together, these statistics give Plaintiffs, at most, a 40% likelihood of both getting a permanent modification and holding onto their property for a mere two years without re-defaulting. (*See id*.).

42.     A foreclosure complaint was filed against Plaintiffs in January 2009. (Obi Dec. at Ex. 38 (Foreclosure Docket – Cook County Case No. 2009-CH-00855) (GARCIA_00015-27)). Garcia answered the complaint in February 2009 and a Judgment of Foreclosure was entered against Plaintiffs in September 2009. (*Id*.). The LaGrange Park Property was sold at a foreclosure sale on February 18, 2011. (Obi Dec. at Ex. 31 (Report of Foreclosure Sale and Distribution, Case No. 09 CH 00855, WF_GARCIA_00003087); *see also* Ferguson Dec. at Ex. G (Report of Foreclosure Sale and Distribution)).

43.     At the time of foreclosure, Plaintiffs had not made a payment on their mortgage loan for 30 months. (Obi Dec. at Ex. 27 (Loan History Microfiche, WF_GARCIA_00000929-43)). Plaintiffs received two notices of past due payments stating that Wells Fargo had been unable to reach Plaintiffs by telephone and for Plaintiffs to contact Wells Fargo to discuss payment of their past loan installments. (Obi Dec. at Ex. 32 (Letter Log (WF_GARCIA_00000918-928, at 925, 926)). Plaintiffs also received four notices of default and acceleration stating that their loan was in default and that if Plaintiffs did not bring their loan current, it would become necessary to accelerate Plaintiffs' mortgage note and that a foreclosure action may be initiated. (*Id*. at 920, 922, 923).

44.     Three months after the foreclosure, Plaintiffs filed a Chapter 7 bankruptcy petition. (Obi Dec. at Ex. 33 (Chapter 7 Bankruptcy Petition) (WF_GARCIA_00002824-72)); *see also*

Ferguson Dec. at Ex. H (May 26, 2011 Petition for Bankruptcy)). In addition to a deficiency judgment in favor of Deutsche Bank National trust Company (as Trustee for Morgan Stanley IXIS Real Estate Capital Trust, 2006-1), Plaintiffs sought to discharge over $130,000 in debt from 30 unsecured creditors. (Obi Dec. at Ex. 33 (Chapter 7 Bankruptcy Petition) (WF_GARCIA_00002842-48)).

## V. PLAINTIFFS' MEDICAL HISTORY AND ALLEGED EMOTIONAL DAMAGES

45.     Mrs. Garcia has several medical conditions that pre-date the erroneous denial, including fibromyalgia, Major Depressive Disorder, and migraines. (J. Garcia Dep. p. 256 lns. 10-17, p. 280 lns. 2-3).

46.     Mrs. Garcia's primary care physician, Dr. Anita Pillai, traces Mrs. Garcia's fibromyalgia and migraine pain back to a severe car accident that occurred in 1994. (Obi Dec. at 34 (Transcript of Dr. Anita Pillai ("Pillai Dep.")), p. 94 lns. 24-25, p. 95 lns. 2-5).

47.     Dr. Pillai also linked Mrs. Garcia's depression to the chronic physical pain she experienced because of her other conditions. (Pillai Dep. p. 75 lns. 9-25, p. 76 lns. 2-19). Dr. Pillai was unable to conclude how much, if any, of Mrs. Garcia's medical conditions might be attributable to Wells Fargo. (Pillai Dep. p. 94 lns. 9-14). Dr. Pillai only spoke to Plaintiffs a handful of times about losing their home and she observed that they had "the same response that anybody [would] ha[ve]." (Pillai Dep. p. 37 lns. 2-14, p. 63 lns. 14-25).

48.     Two other physicians who treated Mrs. Garcia confirmed that she did not discuss the foreclosure with them. (Obi Dec. at Ex. 35 (Transcript of Dr. Lawrence Frank ("Frank Dep.")), p. 52 lns. 2-25, p. 53 ln. 2; Obi Dec. at Ex. 36 (Transcript of Dr. Mark Loren Fehr ("Fehr Dep.")), p. 59 lns. 15-25, p. 60 lns. 2-16, p. 61 lns. 18-25, p. 62 lns. 2-13). Plaintiffs' medical records contain no diagnoses specifically based on the foreclosure.

49.     Mrs. Garcia was advised to undergo psychotherapy to treat her depression but did not to do so.  (J. Garcia Dep. p. 277 lns. 14-23).

50.     Mrs. Garcia stated that managing Plaintiffs' loan payments became stressful in 2008, when Plaintiffs defaulted and started applying for loan modifications.  (J. Garcia Dep. p. 255 lns. 14-17; E. Garcia Dep. p. 92 ln. 25, p. 93 lns. 2-5; p. 222 lns. 2-25, p. 223 lns. 2-4).  The added stress of having to be the primary wage earner at this time aggravated Mrs. Garcia's medical conditions and took a toll on her health.  (E. Garcia Dep. p. 114 lns. 9-22).

51.     Mrs. Garcia started seeing "a lot of specialists" for pain in 2008 because stress aggravated her fibromyalgia and migraine pain.  (J. Garcia Dep. p. 75 lns. 22-25, p. 75 ln. 2, p. 256 lns. 10-17).

52.     Mrs. Garcia does not believe Wells Fargo caused her fibromyalgia because she was diagnosed before the foreclosure.  (J. Garcia Dep. p. 256 lns. 10-17).

53.     Mrs. Garcia has had migraines since 1994.  (Obi Dec. at Ex. 37 Julia Garcia's Resp. to First Set of Interrog. p. 13).

54.     Filing Plaintiffs' lawsuit against Wells Fargo and collecting documents for the lawsuit has caused Mrs. Garcia stress, which activates her fibromyalgia.  (J. Garcia Dep. p. 259 lns. 8-20).

55.     Dr. David Hartman's independent medical examination of Mrs. Garcia found that she has multiple medical conditions that pre-date the erroneous denial, mismanaged medications and an ineffective treatment strategy.  (Dr. David Hartman Declaration ("Hartman Dec.") at Ex. A (Dr. David Hartman Independent Medical Examination Report of Julia Garcia ("Hartman J. Garcia Rep."), p. 15, 23).  Dr. Hartman stated that these circumstances would predictably predispose Mrs.

Garcia to chronic psychological problems, poor stress tolerance, and a perception of chronic ill-being. (*Id.*).

56.	Dr. Hartman concluded that Mrs. Garcia's current symptoms are neither specific to the foreclosure, nor were they permanently changed by the foreclosure. (*See* Hartman J. Garcia Rep. p. 15). Mrs. Garcia's current symptoms developed before her 2008 financial difficulties, have fluctuated over time, and are associated with her other medical conditions, some of which are untreated. (*Id.* at p. 15-17).

57.	Mrs. Garcia takes medications that individually, and in combination, are likely to extend and worsen her symptoms, and which have risks for potentially dangerous interactions. (*Id.* at 19).

58.	Dr. Hartman found Mrs. Garcia's medication regimen to be "peculiar" because it lacks a formal psychiatric evaluation and treatment for obvious depressive symptoms. (*Id.* at 22).

59.	During her examination, Mrs. Garcia informed Dr. Hartman that she had attempted to prevent her primary care doctor from diagnosing depression. (*Id.* at 22). Mrs. Garcia's medical records indicate that psychiatric referral was considered for Mrs. Garcia but was not acted upon. (*Id.*). Mrs. Garcia herself does not believe in depression. (J. Garcia Dep. p. 253 lns. 3-18). Rather than undergo psychotherapy, Mrs. Garcia sought pastoral and spiritual care while acknowledging that these forms of care cannot replace formal psychotherapy. (J. Garcia Dep. p. 277 lns. 14-23, p. 278 lns. 10-18).

60.	Mrs. Garcia's test results on objective symptom and personality examinations showed evidence of symptom magnification. (Hartman J. Garcia Rep. at 9). Moreover, Dr. Hartman found that Mrs. Garcia may magnify her symptoms for secondary (financial) gain. (*Id.*

at 13).  Dr. Hartman concluded that Mrs. Garcia's self-reporting of her symptoms and their causes "appear to be non-credible as often as credible."  (*Id*.).

62.	Mr. Garcia testified that his feelings of anxiousness, frustration, and being "on edge" started around the 2008 financial crisis (E. Garcia Dep. p. 102 lns. 12-17; p. 104 lns. 4-25, p. 105 lns. 2-24).  Mr. Garcia believes that filing the lawsuit against Wells Fargo has caused him emotional distress.  (E. Garcia Dep. p. 229 lns. 17-20).  He has never seen a doctor about emotional distress because "there is no option for [him] to complain about pains" and because he does not believe in depression.  (E. Garcia Dep. p. 231 lns. 19-25, p. 232 ln. 2, p. 93 lns. 17-25, p. 94 lns. 2-18).  Mr. Garcia's medical records noted a severe sleep disorder in 2009.  (Hartman Dec. at Ex. B (Dr. David Hartman Independent Medical Examination Report of Eduardo Garcia) ("Hartman E. Garcia Rep."), p. 2).  Mr. Garcia testified that there was "no room" for depression in his life and that he is a person with a positive outlook.  (E. Garcia Dep. p. 103 lns. 12-25).  Mr. Garcia denied having marital problems.  (E. Garcia Dep. p. 204 lns. 18-25, p. 205 lns. 2-8, p. 207 lns. 6-25, p. 208 lns. 2-5).

62.	Dr. Hartman's independent medical examination of Mr. Garcia found that "[t]here were no indications of a diagnosable stress disorder specific to bank and mortgage difficulties." (Hartman E. Garcia Rep., p. 10).  Dr. Hartman found that, although Mr. Garcia described the foreclosure as shocking and stressful, he did not describe any diagnosable symptoms at the time of the foreclosure, and he does not describe any continuing emotional conditions.  (*Id*.).  Rather, Mr. Garcia experiences litigation-related stress and a sense of guilt for "losing the family home." (*Id*.).

63.	Dr. Hartman concluded that, "[f]rom a psychological perspective, Mr. Garcia did not show any observational indications of major depression or anxiety disorder."  (*Id*. at 9).  Dr.

Hartman found that, to the extent Mr. Garcia experiences any current "chronic low-level depressive symptoms," his ongoing, untreated sleep apnea and hypertension likely influence his mental state. (*Id*. at 10).

64. Dr. Hartman explained that "[h]ypertension is…associated with depressive disorder, stress-related complaints and somatoform disorders and may contribute to any chronic low level depressive symptoms experienced by Mr. Garcia." (*Id*. at p. 9). He also noted the influence of Mr. Garcia's untreated obstructive sleep apnea, explaining that "[d]aytime sleepiness or fatigue is a frequent concomitant of sleep apnea and even mild sleep apnea may worsen depression and the quality of life." (*Id*.)

65. Mr. Garcia's test results suggested "symptom magnification." (Hartman E. Garcia Rep., p. 8.). Accordingly, Dr. Hartman advised "some caution about uncritically accepting Mr. Garcia's self-report about symptoms and their causes." (*Id*.)

## VI. PLAINTIFFS' ALLEGED MONETARY DAMAGES

66. Mr. Garcia understood that his credit score was negatively affected because he did not make his mortgage payments. (E. Garcia Dep. p. 248 lns. 10-17).

Dated: June 10, 2022        Respectfully submitted,

      */s/ Shawn R. Obi*

Shawn R. Obi (*pro hac vice*)
Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071
Phone: 213-615-1700
Fax: 213-615-1750
Email: SObi@winston.com

Angela A. Smedley (*pro hac vice*)
Winston & Strawn LLP

200 Park Avenue
New York, NY 10166
Phone:  212-294-5348
Fax:  212-294-4700
Email:  asmedley@winston.com

Christopher Parker
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
Phone:  312-558-8085
Fax:  312-558-5700
Email:  cparker@winston.com

*Attorneys for Wells Fargo Bank, N.A.*

# CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on June 10, 2022, she electronically filed the foregoing **DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Rusty A. Payton
Payton Legal Group
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
(773) 682-5210
info@payton.legal

Salvador J. Lopez
Robson & Lopez, LLC
180 W. Washington Street, Suite 700
Chicago, Illinois 60602
(312) 525-2166
lopez@robsonlopez.com

Nicholas H. Wooten
Nick Wooten, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
nick@nickwooten.com

*Attorneys for Plaintiff*


/s/ *Shawn R. Obi*