**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **EDUARDO GARCIA** and **JULIA GARCIA**,<br><br>Plaintiffs,<br>vs.<br><br>**WELLS FARGO BANK, N.A.**,<br><br>Defendant. | Case No. 1:20-cv-02402<br><br>Honorable Rebecca R. Pallmeyer<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' STATEMENT IN RESPONSE TO**
**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1(b)(2) and this Court's Standing Order, Plaintiffs Eduardo Garcia and Julia Garcia, by and through their counsel, submit the following statement in response to Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF") in connection with Defendant's Motion for Summary Judgment in this cause:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs are citizens of Illinois. (Shawn R. Obi Declaration ("Obi Dec.") at Ex. 1 (Transcript of Plaintiff Eduardo Garcia's Deposition ("E. Garcia Dep."), p. 7 lns. 15-16); Obi Dec. at Ex. 2 (Transcript of Plaintiff Julia Garcia's Deposition ("J. Garcia Dep."), p. 6 lns. 11-12). Wells Fargo is a national banking association. Its main office is located in Sioux Falls, South Dakota. Its principal place of business is in San Francisco, California. (Obi Dec. at Ex. 3 (Dkt. 12, June 29, 2020 Joint Status Report), p. 2).

**RESPONSE**: Undisputed.

2. This Court has jurisdiction pursuant to 28 U.S.C. §1332(a) and 28 U.S.C. §1367.

**RESPONSE**: Undisputed.

## II. WELLS FARGO'S SOFTWARE CALCULATION ERROR

3. On June 30, 2018, Wells Fargo announced that an internal review had identified a calculation error in its loan modification decision process, which led to the erroneous denials of trial loan modifications for certain borrowers in the foreclosure process. (Obi Dec. at Ex. 4 (Wells Fargo Form 10-Q for the Quarterly Period Ended June 30, 2018), p. 5).

**RESPONSE**: Undisputed.

4. The calculation error occurred in an underwriting tool called the "Home Preservation Application Tool" or "HPA Tool." (Obi Dec. at Ex. 5 (Attorney Fee Calculation Error – CIT 6214)).

**RESPONSE**: Undisputed.

5. Following the identification and public disclosure of the error, Wells Fargo began a voluntary remediation program. (Obi Dec. at Ex. 6 (Transcript of Carmen Bell's 30(b)(6) Deposition ("Bell Dep."), p. 47 ln 24 – p. 53 ln. 19). Plaintiffs did not participate in the mediation process, but received $24,500. (Obi Dec. at Ex. 7 (Jul. 26, 2019 Remediation Check for $14,500); *see also* Robert Ferguson Declaration ("Ferguson Dec.") at Ex. I (Jul. 26, 2019 Remediation Letter and Remediation Check for $14,500); Obi Dec. at Ex. 8 (Nov. 18, 2019 Remediation Check for $10,000); *see also* Ferguson Dec. at Ex. J (Nov. 18, 2019 Remediation Letter and Remediation Check for $10,000)).

**RESPONSE**: Undisputed.

## III. PLAINTIFFS' EMPLOYMENT AND BUSINESS HISTORY

6. Eduardo Garcia ("Mr. Garcia") began working independently as a carpenter in the remodeling industry in the mid-1990s. (E. Garcia Dep. p. 25 lns. 13-18; p. 26 lns. 8-16).

**RESPONSE**: Undisputed.

7. Julia Garcia ("Mrs. Garcia") began working at Alivio Medical Center in 2003 as a Chicago Latino Diabetes Coalition Coordinator. (J. Garcia Dep. p. 50 lns. 11-22).

**RESPONSE**: Undisputed.

8. Mrs. Garcia was promoted to program manager at Alivio Medical Center at the end of 2006 or the beginning of 2007. (J. Garcia Dep. p. 52 lns. 21-25).

**RESPONSE**: Undisputed.

9. In 2012, Mrs. Garcia left Alivio Medical Center because her "health got in the way every time" and it became "difficult for [her] to keep up with everything." (J. Garcia Dep. p. 53 lns. 15-17; p. 55 lns. 14-16). Mrs. Garcia's daughter, Miriahm Garcia, believes that Mrs. Garcia left Alivio because her work environment began to shift and Mrs. Garcia no longer liked how things were "playing out at work." (Obi Dec. at Ex. 9 (Transcript of Miriahm Garcia's Deposition ("M. Garcia Dep."), p. 108 lns. 21-25, p. 109 lns. 2-7). Mrs. Garcia's former co-worker, Elena Briseño, confirmed that Mrs. Garcia left Alivio because of disagreements she had with leadership. (Obi Dec. at Ex. 10 (Transcript of Elena Briseño ("Briseño Dep."), p. 48 lns. 18-21, p. 49 lns. 11-17). Another one of Mrs. Garcia's co-workers, Susan Vega, also stated that Mrs. Garcia left Alivio because "she could no longer tolerate the behaviors and the treatment that were brought upon her by [her boss]." (Obi Dec. at Ex. 11 (Transcript of Susan Vega ("Vega Dep"), p. 32 lns. 7-25, p. 33 lns. 2-3). Mrs. Garcia's spiritual advisor, Martha Koehler further stated that a change in leadership at Alivio played a role in Mrs. Garcia leaving Alivio. (Obi Dec. at Ex. 12 (Transcript of Martha Polo Koehler ("Koehler Dep."), p. 108 lns. 18-25, p. 109 lns. 2-7)). Mrs. Garcia returned to Alivio in 2020 briefly for a temporary project. (*Id.* at p. 110 lns. 24-25, p. 111 lns. 2-25, p. 112 lns. 2-3); J. Garcia Dep. p. 70 lns. 19-25, p. 71 lns 2-16; Obi Dec. at Ex. 37 Julia Garcia's Resp. to First Set of Interrog. p. 2.

**RESPONSE**: Disputed (except for the last sentence in Paragraph 9). Paragraph 9 mischaracterizes much of the following testimonies:

With respect to Julia Garcia's testimony, Mrs. Garcia testified that "[M]y job was the best job in the world. From being only to myself in the — in that department when I got there, I decided to train – to – to write a curriculum to train promotores, and every year I would do a training to train around 40 promotores." (*Exh. 1*, J. Garcia Dep. 53:18-23). Mrs. Garcia further testified that "[M]y life was a meeting, and my life was traveling for conferences and to be a speaker in different conference. And to be honest, my health got in the way every time – it was most difficult for me to keep up with everything. I started having very bad migraines…." (*Id.* at 55:12-17). Explaining her migraines, Mrs. Garcia testified that on one occasion, "I had this migraine because of the stress of – because – because I – by that time I already started battling with Wells Fargo, and – I mean, for many years I did my job, I enjoy my job a lot….but when I started like really, really preoccupied that we were going to lost my home, and I started, like, I need to go to this meeting, but I also need to fax Wells Fargo these documents – every month I will fax different documents. I always have the pressures of I need to call. I need to send these documents. I already sent them, but they want me to send it again. It was a lot. It was a lot. My kids were getting nervous about moving out or being homeless, or my daughter not being in the same school district and not having the support that she used to have with the IEP in her school, that that was on my shoulders." (*Id.* at 56:19-57:18).

Mrs. Garcia testified that she "had the blessing of having wonderful people around us. Why – that's the only reason why the team grow too fast, because my supervisors and the team always – I support all ideas of people working under me, and at the same time my supervisor supported, you know, the projects that I wanted to start." Mrs. Garcia testified that there were disagreements,

but "not huge disagreements" and explained that she did not leave because of any sort of disagreements; it was the foreclosure, testifying that "[t]hat was the event that caused -- it's like they gave me a hit, like a soccer player, on my back out of my work when they took my home. I was so exhausted and depressed, depressed so deeply, deeply." (*Exh. 1,* J. Garcia Dep. 62:4-65:8).

With respect to Miriahm Garcia's testimony at 108:21-109:7, Miriam testified that she thought her mother stopped working at Alivio, "I think just things at work started changing, shifting, type of work environment or situations that were happening at work, from what I recall. And just things weren't really – like, she just didn't like how things were playing out at work, and she just didn't agree to certain things. It wasn't what she stood for, something like that. So she didn't wish to continue working there." (*Exh. 4*, M. Garcia Dep. 108:23-109:7). Miriahm also testified that she thought her mom was becoming overtaken by work "around that time frame of 2010, yeah, when -- our last probably two years or a year in LaGrange and then also in Brookfield," then Miriahm further adding "[s]he was -- I felt like she was exhausted a lot, tired. I think that was one of the times -- I think one time, I think this was in our home. I remember she had like a -- she had a bathroom in her bedroom, and I had recently came out, and she was just laying there, like laying. That was kind of emotional for me because, I don't know, my mom is really full of energy, upbeat, you know, activities, always, like, having us be involved in something, like just, you know, after, you know, the day at work, having us do stuff. And she was just -- she would lay in bed a lot, and it was just, like, what happened. She just looked tired. And I know she was also struggling with health complications, if I recall. But I just saw that she was drained, and I think at that time I just figured it was because she was working long hours, yeah." (*Id*. at 61:3-62:9). Miriahm further testified "[y]eah, like the changes that they went through, you know, my mom having to work the long hours, you know, moving. We moved to Brookfield, and then we moved over here, you know.

My mom's health, or I really didn't expect her to leave her job, you know, after we moved over here. That I took by surprise. I think just everything, you know, the whole church stuff, I just think it was just the process that we went through of losing the home." (*Id.* at 125:25-126:10)

With respect to Ms. Briseño's testimony, Mrs. Briseno also testified that "sometimes there were happy disagreements and sometimes not so happy disagreements." Further, when asked whether Mrs. Garcia was asked to leave her job, she added, "No, I know that she left because she wanted. She was the one that wanted to leave." And that she knew that Mrs. Garcia left voluntarily because "[Mrs. Garcia] called a meeting where she told us that the time had arrived, that she would leave Alivio and that she was leaving, she was resigning and that, you know, she just -- then afterwards she was no longer there." (*Exh. 5,* Briseño Dep. 49:18-50:25).

Regarding any discussions Mrs. Garcia had related to the Garcias' application for a loan modification, Ms. Briseño testified that she "saw that [Mrs. Garcia] was sick and [Mrs. Garcia] said she was losing her house." (*Id.* at Dep. 65:8-13). Ms. Briseño also testified that she didn't know anything about Mrs. Garcia's health. (*Id. at* 71:16-18). But when Ms. Briseño was asked whether she ever had more personal conversations with Mrs. Garcia, the following exchange occurred "[i]t was only, like, three or four times I spoke with her because she was always a happy person. And then she suddenly became sad and seemed sick and she's always happy and motivated and so we, amongst ourselves, said something is going on. Q: And did you believe it was related to an illness, whatever was going on? A: Yes, I thought she was sick. Q: And what made you think that? A: Yeah, because she -- I remember she would come in and her face was -- like she was sick, like it was very -- It was -- her face was emaciated and, once, she started to cry. So then I took it upon myself to ask, to inquire. Q: And what happened after you inquired? A: Well, yes, she said

in the last several days she has not been well and she's been to see the doctor and plus she had a lot of other problems, including that they were taking away her house." (*Id*. at 25:5-26:10).

With respect to Ms. Vega's testimony quoted in the statement, she "elaborated" on the "treatment and behaviors that were brought upon Mrs. Garcia by [her new manager]" stating, [her new manager] was rude, she was demeaning, she was deceitful." (*Exh. 6*, Vega Dep. 32:7-24). Ms. Vega testified that Mrs. Garcia "did everything with a great deal of enthusiasm. She was very happy with her ability to find support for some of the creative initiatives that she was trying to implement [at Alivio]. She felt working with community members to improve their health and well-being was very, very positive for her. She loved that part of it." (*Id*. at 35:12-18). Ms. Vega testified that she had started to notice a decline in Mrs. Garcia's health, specifying that "[s]he started having episodes of migraines that were very, very severe and fibromyalgia. She had something related to her jawbones that was also related to stress that -- that got worse. She felt anxious all the time. She was depressed. So it affected her health very significantly." Ms. Vega was then asked "[w]hen did Mrs. Garcia tell you that she had migraines that were specific to the loss of their property?" To which she responded "[p]robably sometime before the -- they actually had to move and -- and thereafter." She was then asked if she remembered when these conversations took place, and she responded "I -- I remember sometime before they had to move that [Mrs. Garcia] called me to tell me that they were going to be moving and that they were going to be selling or giving away a number of things from the house and in that conversation she told me she felt terrible most of the time, that she was exhausted, she was anxious, that she had body aches, barely able to make it through the day and the migraines were getting worse." When asked if she recalled Mrs. Garcia suffering fibromyalgia issues with her jawbone related to stress and

anxiousness prior to the loss of the house, Ms. Vega responded “no.” (*Id.* at 57:23-59:7; 59:22-60:5).

Ms. Vega also testified that she noticed a difference in Mrs. Garcia after the loss of the house, stating “[y]ou know, Julia is generally very bubbly, outgoing, kind of -- I don't want to say larger than life, but you know she's in the room and after they lost their house you could see that, you know, she lost a great deal of confidence. She was anxious and her health suffered. And she was really, really worried about her family. She was worried about her husband, her son and her daughter.” She further added that “[Mrs. Garcia] was much more subdued, less animated, didn't have quite the same energy. She was -- she was very optimistic, she was full of energy, full of creativity, lots of great ideas and after the loss of her house it was much more difficult for her to maintain that positivity.” Finally, when asked whether she thought Mrs. Garcia’s work was impacted, Ms. Vega responded “I think her -- her contributions were not what they could have been if -- if this hadn't happened. It took away so much of her energy. It took away so much of her positive outlook. It caused her lots of sleepless nights. It really did affect her health, all of those things I believe contributed to the severity of the symptoms that she was feeling.” (*Id.* at 72:8-75:16). Ms. Vega also testified that she had “maybe one or two” conversations with Mrs. Garcia regarding filing a loan modification application and that she was aware of one specific financial difficulty the Garcias experienced: “[T]he loss of their house.” Ms. Vega was unaware of any financial difficulties the Garcias had prior to the loss of their house. (*Id.* at 49:13-50:3).

With respect to Ms. Koehler’s testimony, Ms. Koehler knew of no issues that Mrs. Garcia had at Alivio. She testified that Mrs. Garcia “was having some health problems also, like when she had to really focus – it was a lot of pressure on her…I understand there was also a change of executive director of Alivio…some position change was going on at Alivio and [Mrs. Garcia]

resigned and also she had health – some health issues and a lot of stress.” Ms. Koehler further testified that before the Garcias lost their house, Mrs. Garcia was “outgoing, extroverted, happy and generous with her time”, but after they lost the home to Wells Fargo, Ms. Koehler “became very worried about [Mrs. Garcia’s] family and her future. Because the way [Mrs. Garcia] really was concerned for Miriahm’s welfare, was concerned to find a decent place where to live and for – for her husband to regain self-esteem.” Ms. Koehler further testified that after the loss of their home, Mrs. Garcia’s headaches were more frequent, her level of energy was less, and her level of stress was higher when the Garcias were trying to save their home and after they lost their home to Wells Fargo. After the Garcias lost their home, Ms. Koehler “saw that [Mrs. Garcia] was under a lot of stress” and clarified that “[F]or Latinos, it is very important to own your own house and we do our best to pay right away our own house because it’s the main expense that we will do – make in life and I felt that – I observed her that she felt that that was some kind of honor and shame that she experienced, something like my honor is low, my shame is great. She didn’t use those words, but as a mentor I was able to see that she was going through that because it's' something cultural.” Ms. Koehler stated it was stressful for Mrs. Garcia to fall behind on mortgage payments and it affected her health. (*Exh. 7*, Koehler Dep. 108:17-109:6; 125:4-128:3; 128:14-25).

Undisputed as to Mrs. Koehler’s testimony that Mrs. Garcia returned to Alivio in 2020 briefly for a temporary project, but requires further clarification. Mrs. Garcia testified that the job was for a specific Grant that would last three to four months and that the people at Alivio sought her out specifically for it, telling her that if she was not willing to take it, they wouldn’t accept the grant. She testified that she was hesitant to take it because of her health, but ultimately decided to take it because of the needs of the community. However, she added that it was contract work, on her own schedule, and that she was able to do everything from home. She added “[w]ell, some

days I just had to stop, because I will have good days, bad days. Bad day I just can't do anything and wait to feel better and -- and catch up. (*Exh. 1*, J. Garcia Dep. 70:17-73:3). She further testified that she believes no full time job would give her the flexibility of working at her own pace and schedule like this temporary project did. (*Id.* at 294:10-15).

10. After starting this new business, Mr. Garcia stopped doing independent remodeling work and told his former clients that he was no longer taking on independent remodeling jobs. (E. Garcia Dep. p. 68 lns. 7-25, p. 69 lns. 2-4).

**RESPONSE**: Undisputed, but irrelevant.

11. Woodland Lumber failed not too long after it started, and the business was involuntarily dissolved in November 2006. (E. Garcia Dep. p. 71 lns. 22-25; p. 72 lns. 2-12).

**RESPONSE**: Undisputed, but irrelevant.

12. Before Woodland Lumber was involuntarily dissolved, Plaintiffs discovered that the Espinozas had disappeared and taken all of Woodland Lumber's office equipment, business documentation, and all of the money in the Woodland Lumber business account. (E. Garcia Dep. p. 72 lns. 14-25; J. Garcia Dep. p. 96 lns. 16-22).

**RESPONSE**: Undisputed, but irrelevant.

13. Plaintiffs estimate the Espinozas took between $20,000 and $40,000 from Woodland Lumber, including all of the money Plaintiffs had invested in the business. (J. Garcia Dep. p. 97 lns. 5-8; E. Garcia Dep. p. 73 lns. 19-21). Plaintiffs made an initial investment of $10,000 from their savings account (roughly two-thirds of their savings), and then made a second investment of $15,000 or $20,000 after refinancing their mortgage with Wells Fargo in 2006. (E. Garcia Dep. p. 87 lns. 19-25, p. 88 lns. 2-5; J. Garcia Dep. p. 91 lns. 3-12).

**RESPONSE**: Irrelevant and Disputed. Plaintiffs refinanced their mortgage with First NLC

Financial Services, LLC and not with Wells Fargo on January 26, 2006. Plaintiffs' mortgage loan was assigned to Ocwen Loan Servicing, LLC for servicing on January 26, 2006. America's Servicing Company, a division of Wells Fargo, took over the loan servicing in May 2006. (D.E. 101-13, Obi Dec. at Ex. 13 (Plaintiffs' Note) (WF_GARCIA_00000298-301)); *see also, Exh. 13*, WF_GARCIA_00000376; WF_GARCIA_00001462.

14. Mr. Garcia attempted to regain his independent remodeling clients but found that "it was difficult to find work" because of the 2008 Financial Crisis. (E. Garcia Dep. p. 92 lns. 21-25, p. 93 lns. 2-5; J. Garcia Dep. p. 110 lns. 4-13).

**RESPONSE**: Undisputed.

## IV. PLAINTIFFS' LOAN HISTORY AND FINANCIAL DIFFICULTIES

15. Plaintiffs refinanced their mortgage for 407 Beach Ave. LaGrange Park, Illinois 60526 (the "LaGrange Park Property") with Wells Fargo on January 26, 2006 in order to invest in Woodland Lumber. (E. Garcia Dep. p. 80 lns. 13-25; Obi Dec. at Ex. 13 (Plaintiffs' Note) (WF_GARCIA_00000298-301); *see also* Ferguson Dec. at Ex. A (Plaintiffs' Note)).

**RESPONSE**: Disputed. Plaintiffs did not refinance their mortgage with Wells Fargo on January 26, 2006 (*see Response to paragraph 13).* Mr. Garcia's cited testimony does not support this statement as he does not state the reason for the refinance. Plaintiffs' Note does not support this statement, as the Note does not indicate the reason for the refinance. *Id.* When asked if he remembered approximately how much the refinancing was for, Mr. Garcia testified "for about $50,000." Mr. Garcia further testified that "a part of [the money invested in the business] in refinancing" but did not remember what refinancing. Mr. Garcia did not testify that the purpose of refinancing their mortgage of the LaGrange Park Property with First NLC Financial Services, LLC on January 26, 2006 was to invest in Woodland Lumber. (D.E. 101-13, Obi Dec. at Ex. 13

(Plaintiffs' Note - WF_GARCIA_00000298-301); (*Exh. 2*, E. Garcia Dep. 81:4-20). Mrs. Garcia testified that they used "part of the refinance" to invest in the business "and also made some remodeling around the house." (*Exh. 1,* J. Garcia Dep. 91:25-92:2).

16. Plaintiffs' family Honda CRV was repossessed around this same time because they missed payments on it. (E. Garcia Dep. pg. 88, lns. 6-16).

**RESPONSE**: Disputed. This misstates Mr. Garcia's testimony. Mr. Garcia testified that "[A]t that time, we decided not to continue with the [Honda CRV] in order to save more money for the mortgage" and he believed they stopped making one or two payments on the vehicle. "[T]hen [the bank] came to the house and I surrendered the keys." Mr. Garcia further testified that Mrs. Garcia spoke with the bank "to come and pick it up because we weren't planning on making any more payments. So they came to the house and I gave them the keys." (D.E. 101-1, p. 13 of 50, E. Garcia Dep. 88:6-25).

17. In December 2006, Plaintiffs missed their first mortgage payment. (Obi Dec. at Ex. 14 (Mortgage Services Microfiche) (WF_GARCIA_00001325-93 at 91)).

**RESPONSE**: Disputed. The 01/02/07 entry at WF_GARCIA-00001391 (D.E. 101-14) states that the homeowner called and stated that the December payment was sent out "2 days ago." The February 20, 2007, Temporary Forbearance Agreement states the due date of 01-01-07. (D.E. 101-15: Obi Dec. at Ex. 15, Plaintiffs' Feb. 20, 2007 Temporary Forbearance Agreement). When the foreclosure was filed on 01/08/2009, the loan was due for September 1, 2008. (*Exh. 14*, WF_GARCIA_00003101-00003104 - Complaint to Foreclose Mortgage).

18. Three months after Woodland Lumber failed and the Espinozas disappeared with Plaintiffs' money, Plaintiffs were offered and accepted their first Temporary Forbearance Agreement on February 20, 2007. (Obi Dec. at Ex. 15 (Plaintiffs' Feb. 20, 2007 Temporary

Forbearance Agreement); *see also* Ferguson Dec. at Ex. B (Plaintiffs' Feb. 20, 2007 Temporary Forbearance Agreement)).

**RESPONSE**: Undisputed that the Plaintiffs were offered and accepted their first Temporary Forbearance Agreement on February 20, 2007; disputed as to the relevance that the Temporary Forbearance Agreement was offered "three months after Woodland Lumber failed and the Espinozas disappeared with Plaintiffs' money."

19. Plaintiffs made all the necessary payments on the 2007 Temporary Forbearance Agreement and brought their loan current. (*Id*.)

**RESPONSE**: Undisputed.

20. In March 2008, Plaintiffs' monthly mortgage payments increased to approximately $3,000 in accordance with their adjustment rate note. (J. Garcia Dep. p. 151 lns. 9-17). Plaintiffs attempted to refinance again but were unable to because the value of the LaGrange Park Property declined during the Great Recession. (J. Garcia Dep. p. 85 lns. 10-12, p. 137 lns. 11-16). In late March 2008, Plaintiffs were denied a loan modification because their reported monthly expenses were greater than their reported monthly income. (Obi Dec. at Ex. 16 (Plaintiffs' Mar. 27, 2008 Loan Modification Denial) (WF_GARCIA_00002977)).

**RESPONSE:** Disputed for mischaracterization. When the Garcias refinanced in January 2006, the economy was stable. (*Exh. 1,* J. Garcia Dep. 86:11-12). The Garcias were put into an adjustable rate mortgage loan with the lender, First NLC Financial Services, LLC. *See* D.E. 101-13 (Obi Dec. at Ex. 13, Plaintiffs' Note, WF_GARCIA_00000298-301). The Garcias understood that the monthly payment may increase, but the "financial institution" told them, "Don't worry, because you're going to be able to refinance in – again and fix that payment again to lower the payment." The Garcias were told that in two years, they were going to be able to lower the payment

if it increases. When the payment went up to around $3,000, they attempted to refinance but "couldn't refinance because of the value of our home was low, or something like that, that we couldn't." The "only option [the Garcias] had was to apply for the affordable house program, and that's what [they] did." In 2008, the economy crashed, and the Garcias could not refinance because of the dropping prices on houses. (*Exh. 1,* J. Garcia Dep. 84:12-23; 85:2-4, 85:10-14; 86:25). The Garcias believed that if Wells Fargo did the right thing and talk to them, "for sure [they] will do something, because [the Garcias] didn't want to lost [their] home." Mrs. Garcia called and called Wells Fargo. Even though he does not speak English, Mr. Garcia was not afraid to call Wells Fargo. He called and asked for someone who spoke Spanish. Nobody at Wells Fargo would talk to them. The Garcias knew that "President Obama [was] doing something for people to keep their houses." (*Id.* at 83:4-16, 22-24). Because they could not refinance, the Garcias wanted to talk to Wells Fargo about the affordable housing program that was already in place by President Obama. Mrs. Garcia "knew of some families that took advantage of that, and they saved their houses, but us. Why? Because we had Wells Fargo Bank." (*Id.* at 88:3-13). The Garcias applied for what they believed to be a modification under the affordable housing program. Wells Fargo did not evaluate the Garcias under the HAMP program and on March 27, 2008, denied the Garcias for a loan modification. The denial informed the Garcias that there were no workout options available to them based on their current financial information provided. *See* D.E. 101-16 (Obi Dec. at Ex. 16, Plaintiffs' Mar. 27, 2008 Loan Modification Denial, WF_GARCIA_00002977). Wells Fargo never offered the Garcias a HAMP trial modification plan. *(Exh. 12,* C. Bell Dep. 160:5-14). Instead, Wells Fargo was dual tracking their foreclosure and offering the Garcias' predatory repayment plans that Wells Fargo knew were unaffordable while ignoring their obligation to consider the Garcias for HAMP, falsely certifying the Garcias as ineligible for HAMP, and

institutionally failing to properly handle loss mitigation for all consumers with the misfortune of having Wells Fargo as their mortgage servicer. See Plaintiffs' SOAF at ¶¶6,7, 10-17, 25-27, 29, 37-40.

21. In September 2008, Plaintiffs were notified that they were in default. (Obi Dec. at Ex. 17 (Sept. 21, 2008 Notice of Default)).

**RESPONSE**: Undisputed.

22. Wells Fargo offered Plaintiffs two Special Forbearance Plans—one in 2008 and one in 2009—but Plaintiffs failed to make the necessary payments on those plans to bring their mortgage current. (Obi Dec. at Ex. 18 (Plaintiffs' Sept. 30, 2008 Special Forbearance Plan Agreement); *see also* Ferguson Dec. at Ex. C (Plaintiffs' Sept. 30, 2008 Special Forbearance Plan Agreement); Obi Dec. at Ex 19 (Plaintiffs' Aug. 26, 2009 Special Forbearance Plan); *see also* Ferguson Dec. at Ex. D (Plaintiffs' Aug. 26, 2009 Special Forbearance Plan Agreement); Obi. Dec. at Ex. 20 (Collection Notes – Nov. 20, 2008 Special Forbearance Plan Denial/Removal); Obi Dec. at Ex. 21 (Collection Notes – Sept. 23, 2009 Special Forbearance Plan Denial/Removal)).

**RESPONSE**: Disputed. The September 30, 2008 Special Forbearance Plan required 5 monthly payments: (1) $3,140 by 10/15/2008; (2) $3,207.54 by 11/15/2008; (3) $3,207.54 by 12/15/2008; (4) $3,207.54 by 01/15/2009; and (5) $8,087.14 by 02/15/2009. (D.E. 101-18, Obi Dec. at Ex. 18).

The August 26, 2009 Special Forbearance Plan required 4 monthly payments: (1) $4,130.92 by 09/10/2009; (2) $3,152.38 by 10/10/2009; (3) $3,152.38 by 11/10/2009; and (4) $3,152.38 by 12/10/2009. These "Special Forbearance Plans" were not HAMP modifications and did not offer the Garcias the HAMP relief needed by offering plans with monthly payments exceeding the current unaffordable monthly payments under their adjustable rate note. *See* D.E.

101-19, Obi Dec. at Ex. 19; paragraph 20 above; *see also Exh. 12*, C. Bell Dep. 160:5-7.

23. Mrs. Garcia admits that Plaintiffs may have agreed to the September 2008 Special Forbearance Plan "just to gain time and submit the application for the affordable house modification." (J. Garcia Dep. p. 164 lns. 8-10).

**RESPONSE**: Disputed. Wells Fargo's counsel failed to allow Julia Garcia to answer the question and then misrepresented her testimony in this fact statement. Julia Garcia's full testimony was "I'm – we might agree just – just to gain time and – and submit again the application for the affordable house modification, which – (Obi interjected) – never got." (Emphasis added). Obi asked if it was "your intention when you entered the agreement on September 30th, 2008, not to make that payment?" Mrs. Garcia answered, "No, that wasn't my intention. I don't remember accepting this, but –" Obi said "*Your husband does remember accepting it, though*." (Emphasis added). Mrs. Garcia responded, "Okay. He does. I don't." When Obi asked if Mrs. Garcia believed that "you did not enter into this agreement?" Mrs. Garcia answered, "I don't believe anything, because I don't remember the document." (*Exh. 1,* J. Garcia Dep. 164:8-25). Obi badgered Mrs. Garcia about this September 2008 forbearance plan and that they entered into the contract and agreed to the terms. Mrs. Garcia said she didn't remember, but Obi continued. (*Id*. at 164:8-168:2).

Eduardo Garcia's testimony at *Exh. 2*, E. Garcia Dep. 125:13-17: Q. "Later – later that year in 2008, September 2008, do you recall reaching an agreement for a special forbearance plan with Wells Fargo?" A. "I think so." Mr. Garcia did not state that he "remember[ed] accepting it"; he stated "I think so." There was no document shown to him. Mr. Garcia answered "I think so" to most of the questions. Mr. Garcia's testimony could be impacted by English being his second language, requiring an interpreter for his deposition.

Nevertheless, Mrs. Garcia did not agree with this statement and controverted this statement

despite Obi's efforts to badger her into an agreement. (*Exh. 1*, J. Garcia Dep. 164:8-168:2).

24. In December 2009, Plaintiffs wrote a letter to Wells Fargo explaining their financial difficulties, including that they had been "victims of fraud" and had been "left with many debts," that Mr. Garcia had lost his construction clients because of the Woodland Lumber business, that Mr. Garcia had not had a regular job since Woodland Lumber failed, and that the economy was affecting his ability to find work. (E. Garcia Dep. p. 134, lns. 20-25, p. 135 lns. 2-10, p. 135 lns. 23-25, p. 136 lns. 2-5; Obi. Dec. at Ex. 22 (Plaintiffs' Dec. 14, 2009 Hardship Letter)).

**RESPONSE**: Undisputed.

25. In March 2010, Plaintiffs were offered a loan modification that would have lowered their monthly mortgage payments from approximately $3,000 to $1,871.60. (Obi Dec. Ex. (Plaintiffs' Mar. 27, 2010 Loan Modification Agreement); *see also* Ferguson Dec. at Ex. E (Plaintiffs' Mar. 27, 2010 Loan Modification Agreement)).

**RESPONSE**: Disputed as to terms of the March 27, 2010 Loan Modification Agreement. The Agreement required an *immediate upfront payment* from the Garcias in the amount *of $3,029.75*, due within ten (10) business days from the date of the Agreement. (D.E. 101-23, Obi Dec. Ex. 23, Plaintiffs' Mar. 27, 2010 Loan Modification Agreement). This offer was not made pursuant to the HAMP program even though Wells Fargo was already participating and could have offered the Garcias' a HAMP Modification at this time which would have lowered their payments further. (*Exh. 12*, C. Bell Dep. 155:13-20; 160:5-7).

26. At the time of the offer, Plaintiffs could have afforded to make the $1871 modified monthly payments. (J. Garcia Dep. p. 136 lns. 11-15).

**RESPONSE**: Disputed. Mrs. Garcia's actual testimony was "[t]hat's all we wanted. But -- but if you would tell me, 'Mrs. Garcia, if you don't take this last opportunity, we're going to sell

your house,' I will pay the 1,900. I will. I will. We will find a way. We will. The same way we work hard to make it happen that we found a house for -- for our kids in LaGrange Park, the same way we will work and do anything. We will, I don't know, wash cars in the church, sell baking goods, asking family, whatever, if you would have explained to me that it was the last one." (*Exh. 1*, J. Garcia Dep. 136:11-22). This modification also required an upfront payment of $3,029.75 within ten business days. (D.E. 101-23, Obi Dec. Ex. 23, Plaintiffs' Mar. 27, 2010 Loan Modification Agreement). The Garcias expressed concerns about their ability to make the $3,029.75 upfront payment. Additionally, both Mr. and Mrs. Garcia testified that they believed that approximately $1600 would have been an affordable payment for them. *See Exh. 2*, E. Garcia Dep. 144:5-12; *Exh. 1*, J. Garcia dep. 189:18-190:13. Furthermore, this was not a HAMP modification and, in fact, the Garcias were never offered a HAMP modification, which would have provided significantly better terms than this offer. This offer also predates the bungled HAMP modification that is the subject of this action. *See Exh. 13*, WF_GARCIA_00001350-00001353; *Exh. 11*, Ferguson Dep. 123:24-137:20; 146:5-147:8; and *Exh. 12*, C. Bell Dep. 160:5-14.

27. Despite this offer to reduce his monthly mortgage payment by more than $1100, Mr. Garcia called Wells Fargo in April 2010 to decline the March 2010 loan modification. (E. Garcia Dep. p. 138 lns. 12-18; Obi Dec. at Ex. 24 (Plaintiffs' April 8, 2010 Loan Modification Cancellation Notice)). Mr. Garcia did so because he deemed the modified payment amount not a "comfortable sum of money" for them to pay. (E. Garcia Dep. p. 138 lns. 12-18, p. 139 lns. 7-22, p. 264 lns. 17-21).

**RESPONSE**: Disputed. The Garcias did not decline the March 2010 loan modification. (*Exh. 1,* J. Garcia Dep. 189:22-190:24; 231:12-234:6). Mr. Garcia stated they had a phone call with [Wells Fargo] where they asked for a payment that would have been lower to be certain they

could continue on with it. (*Exh. 2*, E. Garcia Dep. 138:14-20). The March 27, 2010 loan modification was a waterfall plan that was available for the investor and used by Wells Fargo (*Exh. 11*, Ferguson Dep. 120:1-22). The loan modification was mailed to the Garcias on April 3, 2010 and required an upfront payment of $3,029.75 within ten (10) business days from the date of the letter (March 27, 2010), which would have been April 9, 2010, but Wells Fargo removed the loan from loss mitigation a day early on April 8, 2010. (D.E. 101-23, Obi Dec. at Ex. 23, March 27, 2010 letter and loan modification agreement); *Exh. 13*, WF_GARCIA_00001350-00001353); *Exh. 11*, Ferguson Dep. 116:12-117:19; 118:3-119:19; 121:12-14; 122:24-125:22; 126:12-128:3; 128:17-131:24; 132:5-19.

28. Mr. Garcia understood that, by declining the March 2010 modification, Plaintiffs remained responsible for paying their $3,000 monthly mortgage payment amount. (E. Garcia Dep. p. 142 lns. 4-8). Mr. Garcia also understood that if they did not pay, Wells Fargo could "take the house away." (E. Garcia Dep. p. 141 lns. 23-25; p. 142 lns. 2-3).

**RESPONSE**: Disputed and Irrelevant. The Plaintiffs did not decline the March 2010 modification. (*Exh. 1,* J. Garcia 189:22-190:24; 231:12-234:6). Further disputed as Mr. Garcia's testimony is misstated. When asked "[D]id you believe that you would still – that you would continue to pay the amount you had been responsible for before the modification[?]", Mr. Garcia responded "I think so." (*Exh. 2*, E. Garcia Dep. 142:4-8). In response to "[W]hat was your understanding of what would happen if you declined to accept the modified payment amount[?]", Mr. Garcia stated, "I think they would take the house away." (*Id.* at 141:23-142:3). *See also* Response to paragraph 27.

29. Mrs. Garcia wanted someone from Wells Fargo to "take care of [Plaintiffs]" and lower the modified payment by an additional $200 or $250. (J. Garcia Dep. p. 190 lns. 18-24).

Alternatively, Mrs. Garcia wanted someone from Wells Fargo to verbally tell her, "Mrs. Garcia if you don't take this last opportunity, we're going to sell your house." (J. Garcia Dep. p. 190 lns. 19-21, p. 136 lns. 11-13).

**RESPONSE**: Disputed. Mrs. Garcia's testimony is misstated and mischaracterized. When asked "...why [she] declined this mortgage modification", Mrs. Garcia testified "[a]gain, for the fourth or fifth time today, I repeat we didn't decline. We wanted to talk to someone in Wells Fargo and discuss about the possibility of having the payment of at least 200/250 less than that so we can have better chance of making the payments on time in a long term and not only making sure that – if I would accept this, I will probably make the payments a few months, and then probably I will get late. We wanted to avoid any possibilities of started making payments late. So that's why we were very interested in to talk to someone, so we can negotiate, so we can have at least 200/250 less than that. I didn't decline. I look for the opportunity to talk to someone, which we couldn't get the chance of talking to anyone from Wells Fargo." (*Exh. 1,* J. Garcia Dep. 189:22-190:17). Defense Counsel then asked her "but you didn't accept this?" To which Mrs. Garlic replied, "I didn't accept this, because I was waiting for someone to take care of us and talk to someone about it." (*Id*. at 190:18-21).

Mrs. Garcia further testified, "[W]ith all the programs around, with all the media talking about this – this program, affordable house from President Obama, we believed that Wells Fargo was working – or will work with us in good faith to make that program possible to us, which we qualified. You already accepted we qualified for that program, and you continued to deny, to deny, to deny every month. I would send everything. Deny, deny, deny. How many times you made the same mistake, denying us an opportunity to keep the house? How many times?" (*Exh. 1*, J. Garcia Dep. 135:6-17). Mrs. Garcia was then asked if she had an understanding "that [they] were obligated

under the terms of [their] mortgage to – to pay them unmodified?" Mrs. Garcia responded "all we wanted is to talk to someone so we can have a more comfortable payment so we will not be paying three, four, or five months, and then get behind again. We will be better if the payment wasn't 1,900, but 1600. That's going to make a big difference for us." "That's all we wanted. But - but if you would tell me, "Mrs. Garcia, if you don't take this last opportunity, we're going to sell your house," I will pay the 1,900. I will. I will. We will find a way. We will." (*Id*. at 135:18-136:15) (*See also* Response to ¶26, *supra*). Wells Fargo's defective loss mitigation practices were the subject of the 2011 Consent Decree with the OCC which plainly states that Wells Fargo's loss mitigation practices were ineffective and consumers were losing their homes due to Wells Fargo's actions and inactions. *See* Plaintiffs' SOAF at ¶¶16-18, 26-29.

30. Mrs. Garcia stated that Plaintiffs would have made the payments if Wells Fargo had told her it was their last opportunity. (J. Garcia Dep. p. 136 lns. 11-15).

**RESPONSE**: Disputed. This mischaracterizes Julia Garcia's complete testimony. *See* Responses to paragraphs 26 and 29 above for Mrs. Garcia's complete testimony in context.

31. Rather than pay either the $3,000 unmodified mortgage payment or the $1,871 modified mortgage payment, Plaintiffs chose to continue making no payments on the mortgage. (J. Garcia Dep. p. 135 lns. 18-23). It was Plaintiffs' "intention to negotiate" with Wells Fargo until Plaintiffs were given a "better" and "more comfortable" payment. (J. Garcia Dep. p. 126 lns. 7-21, p. 136 ln. 3).

**RESPONSE**: Disputed, in part, as to the misstatement of Mrs. Garcia's testimony at (*Exh. 1*, J. Garcia Dep. 135:18-23). *See* Response to paragraphs 26 and 29 for Mrs. Garcia's complete testimony in context. This statement is also in the nature of argument and comment on the evidence rather than a statement of fact and is improper. See *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th

Cir. 2006) (Local Rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" do not comply with the Local Rules).

32. Mrs. Garcia believed Wells Fargo was obligated to negotiate with Plaintiffs. (J. Garcia Dep. p. 174 lns. 12-15).

**RESPONSE**: Disputed as a mischaracterization of the actual testimony. Mrs. Garcia elaborated further by testifying she believed the banks were "obligated by the government, by the program that the President implemented by that time for a reason, for the banks to help us to keep our home, and [Wells Fargo] didn't. [Wells Fargo was] obligated to help as many people as [it] could…." (*Exh. 1,* J. Garcia Dep. 174:12-23). "Wells Fargo failed to negotiate with us since the beginning appropriately." (*Id.* at 175:17-18).

33. Plaintiffs applied for a HAMP trial loan modification in April 2010 but were erroneously denied in August 2010 as a result of the software calculation error. (Obi Dec. at Ex. 25 (Plaintiffs' Apr. 22, 2010 HAMP Loan Modification Application); *see also* Ferguson Dec. at Ex. F (Plaintiffs' Apr. 22, 2010 HAMP Loan Modification Application); Obi Dec. at Ex. 26 (Plaintiffs' Aug. 24, 2010 HAMP Loan Modification Denial)).

**RESPONSE**: Undisputed that Plaintiffs applied for a HAMP loan modification and were improperly denied. Disputed that Ex. 26 to Obi Dec. is the August 24, 2010 HAMP Loan Modification Denial. Ex. 26 is page 1, only, of the November 12, 2010 HAMP Loan Modification Denial and does not state that the Garcias' had the right to dispute the Denial. The Garcias had submitted all of the required documents with their April 2010 HAMP application, but were denied on August 24, 2010. Wells Fargo never sent an August 24, 2010 HAMP Loan Modification Denial to the Garcias, although "HAMP options [were] exhausted as of August of 2010" (*Exh. 11*, Ferguson Dep. 57:4-7; 137:21-138:1). In fact, the Garcias were never offered a HAMP

Modification at any time (*Exh. 12*, C. Bell Dep. 160:5-7). Furthermore, the Garcias' loan was in an active foreclosure during the active loss mitigation (*Exh. 11*, Ferguson Dep. 59:7-60:10). This violated Wells Fargo's obligations under HAMP and was impermissible dual-tracking. *See* Plaintiffs' SOAF at ¶¶11-15, 18-19.

34. Mr. Garcia admitted that Plaintiffs may not have been able to complete the trial loan modification payments and that it is possible they would have declined the trial loan modification. (E. Garcia Dep. P. 143 ln. 25, p. 144 lns. 2-4, p. 175 lns. 9-20, p. 176 lns. 11-22).

**RESPONSE**: Disputed. Stating that "it is possible [the Garcias] may not have been able to complete the trial loan modification payments and that it is possible [the Garcias] would have declined the trial loan modification" is completely hypothetical. Wells Fargo's statement implies that a HAMP trial loan modification was offered to the Garcias with a stated monthly payment amount. There was no trial loan modification offered to the Garcias. Wells Fargo never offered a HAMP loan modification to the Garcias *at any time* (*Exh. 12*, C. Bell Dep. 160:5-7). The Garcias were denied for a trial loan modification on August 24, 2010; therefore, a monthly payment amount was never stated. *See* Response to paragraph 33. Wells Fargo's statement mischaracterizes Mr. Garcia's testimony. Mr. Garcia's testimony cited at *Exh. 2,* E. Garcia Dep. 143:25-144:4, refers to the November 12, 2010 denial letter, which Mr. Garcia testified that he did not remember receiving. *Id.* As to the references to Mr. Garcia's testimony at *Exh. 2,* E. Garcia Dep. 175:9-20, Wells Fargo asked, "[A]nd in the past, you had reached agreements with Wells Fargo to try a different payment plan, and you weren't able to complete those payment plans, right?" Mr. Garcia responded, "I think so, yes." Wells Fargo then "questioned" Mr. Garcia: "So there is a possibility you would not have been able to complete this trial modification; is that right?" Again, Mr. Garcia responded, "I think so, yes." Wells Fargo's reference to E. Garcia Dep. 176:11-22 refers to the

March 2010 loan modification offer. Wells Fargo asked Mr. Garcia "[H]ow do you know you wouldn't have declined this one as well?" to which Mr. Garcia responded, "*I don't know. I didn't see it. It never arrived.*" (Emphasis added). (*Exh. 2*, E. Garcia Dep. 176:11-18).

35. Mr. Garcia also acknowledged that the erroneous denial of the trial loan modification and the foreclosure of Plaintiffs' home are not the same thing. (E. Garcia Dep. p. 231 lns. 6-18).

**RESPONSE**: Disputed. Wells Fargo asked if Mr. Garcia "agree[s] that the denial of the trial modification and the foreclosure are two different things." Mr. Garcia's counsel objected for clarification to the translation because the translator was using "loss of the house in place of foreclosure." (*Exh. 2*, E. Garcia Dep. 230:5-23). Wells Fargo repeated the question, to which Mr. Garcia responded "[I]n legal terms, I do not know the difference, but I believe yes." (*Id.* at 231:6-14).

36. Plaintiffs understand that the trial loan modification they were denied in August 2010 was not a permanent loan modification and that they would have had to complete three trial payments to be eligible for a permanent loan modification. (E. Garcia Dep. p. 173 ln. 25, p. 174 lns. 2 -25, p. 175 lns. 4-8; J. Garcia Dep. p. 223 lns. 16-25, p. 224 lns. 2-4; *see also* Peter M. Ross Dec. at Ex. A (Expert Report of Peter M. Ross ("P. Ross Rep.") p. 12-13 ¶ 28).

**RESPONSE**: Disputed as to the reference to Peter M. Ross Dec. at Ex. A (Expert Report of Peter M. Ross ("P. Ross Rep.") p. 12-13 ¶ 28, which has no relevance as to the Plaintiffs' understanding of the trial loan modification. The HAMP trial modification that the Garcias should have been given was more than $500 per month less expensive than the March 2010 non-HAMP modification that was offered. *See Exh. 13*, WF_GARCIA_00001463-1464; *see also Exh. 16*, Defendant Wells Fargo Bank, N.A.'s Third Supplemental Objections and Responses to Plaintiffs'

First Set of Interrogatories, dated June 3, 2022; *see also*, Plaintiffs' SOAF at ¶¶37-40. Mrs. Garcia testified that even $200 or $250 a month less made a huge difference to her family. (*Exh. 1*, J. Garcia Dep. 189:22-190:17).

37. At the time of the erroneous denial, Plaintiffs had not made a payment on their mortgage in 24 months. Obi Dec. at Ex. 27 (Loan History Microfiche, WF_GARCIA_00000929-43)).

**RESPONSE**: Disputed and irrelevant. For clarification, when the foreclosure was filed on January 8, 2009, the loan was due for September 1, 2008 (*Exh. 14*, WF_GARCIA_00003101-003104 - Complaint to Foreclose Mortgage). According to the Loan History, the Garcias made a payment on October 15, 2008 that was posted to August 2008 (D.E. 101-27, p. 8 of 16, Obi Dec. at Ex. 27, Loan History Microfiche, WF_GARCIA_00000929- 43).

38. In January and December 2010, Plaintiffs were denied loan modifications because they did not provide Wells Fargo with all of the requested information the bank needed to evaluate them for a trial loan modification. (Obi Dec. at Ex. 28 (Plaintiffs' Jan. 6, 2010 Loan Modification Denial Letter (WF_GARCIA_00002989-90); Obi Dec. at Ex. 29 (Plaintiffs' Dec. 1, 2010 Loan Modification Denial Letter (WF_GARCIA_00000664-665)).

**RESPONSE**: Undisputed as to the content of the denial letters themselves but disputed as to the remaining fact statements. Julia Garcia testified the family sent Wells Fargo documents many times and Wells Fargo would send letters but would otherwise not communicate with the Garcias and they could never reach an actual person regarding the status of their home and that no one from Wells Fargo ever answered the phone. (*Exh. 1*, J. Garcia Dep. 119:16-123:7, 134:7-136:8, 211:17-213:22, 239:5-20). Eduardo Garcia testified that towards "the tail end" he and his wife would send documents from two different fax machines and would call the bank to confirm,

only to be told that they had not been received and that maybe their fax machine was malfunctioning. (*Exh. 2*, E. Garcia Dep. 280:8-281:7). Additionally, Wells Fargo was legally prohibited from advancing the Garcias' foreclosure because they had not been properly reviewed for HAMP. Wells Fargo made a false certification of HAMP compliance to advance the Garcia foreclosure. *See Exh. 12*, C. Bell Dep. 155:13-20; 156:21-157:5; 163:4-17; 168:20-169:9; 172:20-173:5. Wells Fargo's order of possession was entered on March 29, 2011. *See Exh. 15*, WF_GARCIA_00003090, 3089.

39. In February 2011, Plaintiffs requested but were denied a loan modification because their reported monthly expenses were greater than their reported monthly income. (Obi Dec. at Ex. 30 (Plaintiffs' Feb. 7, 2011 Loan Modification Denial Letter)).

**RESPONSE**: Undisputed as to the content of the denial letter dated 11 days prior to the foreclosure sale of the Garcias' home which was advanced in violation of law. (D.E. 101-30 and 101-31: Obi Dec. at Ex. 30 and Ex. 31). (*See also* Response to ¶ 38, *supra*).

40. In total, Wells Fargo offered to help Plaintiffs by extending nine potential loan modifications and approved Plaintiffs for four of them. (*See* ¶¶ 18-39, *supra*).

**RESPONSE**: Disputed. Wells Fargo's Special Forbearance Plans were not helpful as they contained unaffordable payment terms, and at least one was offered instead of a HAMP modification. *See* Plaintiffs' Response to ¶22. Of the offered modifications, Wells Fargo's March 2010 loan modification contained the lowest monthly payment amount at $1,871.60 (though requiring an immediate upfront payment of $3,029.75 within ten business days), yet was still $500 higher per month than the trial modification the Garcias qualified for under HAMP. *See* D.E. 101-23, Obi Dec. Ex. 23 (Plaintiffs' Mar. 27, 2010 Loan Modification Agreement); *see also Exh. 13*, WF_GARCIA_00001463-1464; *see also Exh. 16*, Defendant Wells Fargo Bank, N.A.'s Third

Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories, dated June 3, 2022. Throughout this time, Wells Fargo was advancing their foreclosure in violation of law and in violation of the HAMP agreements executed by Wells Fargo wherein Wells Fargo would receive over $6.5 billion in payments for performing HAMP services. *See Exh. 17*, WF_GARCIA_00003017-3053, Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement, p. 4, par. F. *See also* Responses to SUMF ¶¶ 18-39, *supra*.

41. Trial HAMP modifications could fail to convert to permanent modifications for several reasons. From the beginning of the HAMP program through June 2012, these reasons included missing documentation (34%), payment default during the trial payment period (22%), and borrowers withdrawing their requests for modifications (8%). Many borrowers who received trial HAMP modifications ultimately did not avoid foreclosure. (P. Ross Rep. p. 30-31 ¶ 74). Borrowers who obtained HAMP modifications frequently lost their homes in foreclosure, especially borrowers with long delinquencies and histories of breaking loan modification payment plans and failing to complete modification applications. (*Id*. at p. 31-32 ¶¶ 75, 79). In the first three years of the HAMP program (which includes the dates of the erroneous denial and the Garcias' foreclosure), only around half of all borrowers who received a trial modification were able to convert it into a permanent modification. (*Id*. at p. 32 ¶¶ 74, 80). Of those, approximately a quarter re-defaulted within two years and approximately 35% re-defaulted within four. (*See id*. at ¶¶ 77, 80). Together, these statistics give Plaintiffs, at most, a 40% likelihood of both getting a permanent modification and holding onto their property for a mere two years without re-defaulting. (*See id*.).

**RESPONSE**: Disputed and irrelevant. None of these statistics are specifically relevant to the Garcias. Likewise, there is a 100% failure rate for HAMP modifications that were not offered

but should have been. This paragraph also ignores Wells Fargo's legal obligations to comply with the HAMP regulations and the terms of the SPA and Wells Fargo's dual tracking of this loan. (*Exh. 12*, C. Bell Dep. 155:13-20, 156:21-157:5, 163:4-17, 168:20-169:9, 172:20-173:5); (*Exh. 15*, WF_GARCIA_00003090, 3089). *See also* Plaintiffs' SOAF ¶¶11-15, 19, 25. Wells Fargo's statements also ignore Wells Fargo's unsafe and unsound banking practices related to loss mitigation that were causing widespread needless harm to consumers all over the country. (*Exh. 18*, GARCIA 02470-02502 - Consent Order dated April 13, 2011); (*Exh. 19*, GARCIA 02503-02523 - 2013 Amendment to April 13, 2011 Consent Order); (*Exh. 20*, GARCIA 02524-02546 - Consent Order dated June 16, 2015 Amending the 2011 Consent Order and 2013 Amendment); (*Exh. 21*, GARCIA 01231-01265 - Consent Order dated April 20, 2018, and 01266-01281 - Consent Order for Civil Money Penalty dated April 20, 2018) (*Exh. 22*, GARCIA 01196-01230 - Consent Order with CFPB dated April 20, 2018); (*Exh. 23*, GARCIA 01282-01309 - Consent Order (Cease and Desist) and Consent Order (Civil Money Penalty) dated September 9, 2021). *See also, Exh. 12*, C. Bell Dep. 32:14-62:24, 66:12-74:5; 104:5-25, 105:11-21. There is no way for anyone to determine at this juncture how many of these negative statistics were simply the result of Wells Fargo's own inexcusable abuse of American consumers as set out in the 2011 consent decree and those additional consent decrees that followed touching upon these ongoing failures. *See* Plaintiffs' SOAF ¶¶16-18, 26-29, 31-36.

42. A foreclosure complaint was filed against Plaintiffs in January 2009. (Obi Dec. at Ex. 38 (Foreclosure Docket – Cook County Case No. 2009-CH-00855) (GARCIA_00015-27)). Garcia answered the complaint in February 2009 and a Judgment of Foreclosure was entered against Plaintiffs in September 2009. (*Id*.). The LaGrange Park Property was sold at a foreclosure sale on February 18, 2011. (Obi Dec. at Ex. 31 (Report of Foreclosure Sale and Distribution, Case

No. 09 CH 00855, WF_GARCIA_00003087); *see also* Ferguson Dec. at Ex. G (Report of Foreclosure Sale and Distribution)).

**RESPONSE**: Undisputed.

43. At the time of foreclosure, Plaintiffs had not made a payment on their mortgage loan for 30 months. (Obi Dec. at Ex. 27 (Loan History Microfiche, WF_GARCIA_00000929-43)). Plaintiffs received two notices of past due payments stating that Wells Fargo had been unable to reach Plaintiffs by telephone and for Plaintiffs to contact Wells Fargo to discuss payment of their past loan installments. (Obi Dec. at Ex. 32 (Letter Log (WF_GARCIA_00000918-928, at 925, 926)). Plaintiffs also received four notices of default and acceleration stating that their loan was in default and that if Plaintiffs did not bring their loan current, it would become necessary to accelerate Plaintiffs' mortgage note and that a foreclosure action may be initiated. (*Id*. at 920, 922, 923).

**RESPONSE**: Irrelevant and Disputed as follows. Disputed that at the time of foreclosure, the Garcias had not made a payment on their mortgage loan for 30 months. On the date of filing, January 8, 2009, the Garcias' loan *was due for September 1, 2008*. (*Exh. 14*, WF_GARCIA_00003101-003104 - Complaint to Foreclose Mortgage). According to the Loan History, the Garcias *made a payment on October 15, 2008 that was posted to August 2008* (D.E. 101-27, p. 8 of 16, Obi Dec. at Ex. 27, Loan History Microfiche, WF_GARCIA_00000929- 43).

Disputed that D.E. 101-32, Obi Dec. at Ex. 32 (Letter Log (WF_GARCIA_00000918-928, at 925, 926), supports the statement that "Plaintiffs also received four notices of default and acceleration stating that their loan was in default and that if Plaintiffs did not bring their loan current, it would become necessary to accelerate Plaintiffs' mortgage note and that a foreclosure action may be initiated." The "letter log recap" does not contain the language of any letters

purportedly mailed to the Garcias and does not prove that the letters were actually mailed. Further disputed on the basis that the Letter Log at 920 lists letters for 2007. The Garcias made all payments under the February 20, 2007 Temporary Forbearance Agreement and brought their account current. *See* Defendant's SUMF and Plaintiffs' Responses to ¶¶18-19.

Disputed as to Wells Fargo's right to proceed with foreclosure given Wells Fargo's admitted failure to comply with its legal obligations under HAMP and the prohibition on advancing foreclosures until eligible borrowers had been properly considered for HAMP assistance. *See* Plaintiffs' SOAF at ¶¶11-15, 19, 25.

44. Three months after the foreclosure, Plaintiffs filed a Chapter 7 bankruptcy petition. (Obi Dec. at Ex. 33 (Chapter 7 Bankruptcy Petition) (WF_GARCIA_00002824-72)); *see also* Ferguson Dec. at Ex. H (May 26, 2011 Petition for Bankruptcy)). In addition to a deficiency judgment in favor of Deutsche Bank National Trust Company (as Trustee for Morgan Stanley IXIS Real Estate Capital Trust, 2006-1), Plaintiffs sought to discharge over $130,000 in debt from 30 unsecured creditors. (Obi Dec. at Ex. 33 (Chapter 7 Bankruptcy Petition) (WF_GARCIA_00002842-48)).

**RESPONSE**: Undisputed.

## V. PLAINTIFFS' MEDICAL HISTORY AND ALLEGED EMOTIONAL DAMAGES

45. Mrs. Garcia has several medical conditions that pre-date the erroneous denial, including fibromyalgia, Major Depressive Disorder, and migraines. (J. Garcia Dep. p. 256 lns. 10-17, p. 280 lns. 2-3).

**RESPONSE**: Undisputed.

46. Mrs. Garcia's primary care physician, Dr. Anita Pillai, traces Mrs. Garcia's fibromyalgia and migraine pain back to a severe car accident that occurred in 1994. (Obi Dec. at

34 (Transcript of Dr. Anita Pillai ("Pillai Dep.")), p. 94 lns. 24-25, p. 95 lns. 2-5).

**RESPONSE**: Disputed. Dr. Pillai testified that a diagnosis of fibromyalgia is a diagnosis of exclusion and clarified that she was not testifying that Julia's fibromyalgia came from a 1994 car wreck. *See Exh. 8,* Pillai Dep. 100:12-101:7.

47. Dr. Pillai also linked Mrs. Garcia's depression to the chronic physical pain she experienced because of her other conditions. (Pillai Dep. p. 75 lns. 9-25, p. 76 lns. 2-19). Dr. Pillai was unable to conclude how much, if any, of Mrs. Garcia's medical conditions might be attributable to Wells Fargo. (Pillai Dep. p. 94 lns. 9-14). Dr. Pillai only spoke to Plaintiffs a handful of times about losing their home and she observed that they had "the same response that anybody [would] ha[ve]." (Pillai Dep. p. 37 lns. 2-14, p. 63 lns. 14-25).

**RESPONSE**: Disputed. Mischaracterizes Dr. Pillai's testimony. In the cited testimony regarding Mrs. Garcia's depression and chronic physical pain, Dr. Pillai was referencing her notes from a single visit by Mrs. Garcia on 8/25/2011. (*Exh. 8*, Pillai Dep. 66:2-3, 74:13-19, 75:12-23). Dr. Pillai's full testimony about the Garcias' "response" to losing their home, was in response to the question "[a]nd did Eduardo ever tell you that he believed that financial problems caused him anxiety?" To which she responded with a "yes," and when asked to provide more details, she added: "[b]oth of them were in the room. I remember that. Clearly Julia was in tears crying about losing their home and not having money and not being able to afford another home. And Eduardo was trying to comfort her at that time, and that's it. And he said they were all stressed out about money, and I took that as natural, as it could happen to anyone and that would be the same response that anybody had." (*Id*. at 36:21-37:9). Further, Dr. Pillai testified that Julia did not discuss any financial issues or money struggles with her prior to the foreclosure, but that it had been a fairly constant topic of stress since the foreclosure. (*Id*. at 85:13-20, 101:11-102:3).

Dr. Pillai also testified about a time in March of 2011 when Julia presented with temporomandibular joint (TMJ) arthralgia which can be caused from clenching your jaws tight, which could have been a stress reaction and persons having long term stress can have physical manifestations in their body including something like TMJ. (*Id*. at 103:4-106:13). March of 2011 was when Wells Fargo had the order for possession entered for the Garcias' home. Dr. Pillai also testified that stress causes the body to go into fight or flight mode which stresses the cardiovascular system and that stress will sometimes show up in a person's blood pressure. Julia developed high blood pressure over the time that Dr. Pillai was treating her health issues. (*Id*. at 106:23-107:15). Dr. Pillai also observed Julia with a significant increase in stress on April 21, 2011 (approximately the time the order of possession would become "live") and this caused her to prescribe a new antidepressant, she also noted difficulties sleeping, which could be caused by chronic stress, and that significant personal stressors like a foreclosure or losing your home could exacerbate her symptoms, and there would be nothing medically surprising about someone having more symptoms of a chronic disease when they had heightened personal stress. (*Id*. at 108:4-110:5).

Dr. Pillai also testified that in August of 2011, that a bone scan for Julia was normal and this test was a type of confirmation of her fibromyalgia diagnosis and that Julia's test result and lack of relief from the use of Vicodin also confirmed her fibromyalgia diagnosis. (*Id*. at 110:12-112:7). Dr. Pillai also testified that Julia experienced a dislocated jaw in 2013 when she felt her jaw move in church and it became dislocated. Dr. Pillai testified that a long-term TMJ problem can affect the fit of the jaw in the TMJ joint and that it was possible a cause of this dislocation was potentially from long-term TMJ issues. (*Id*. at 112:8-113:14). Dr. Pillai also testified that the long-term stress reported to her by Julia could be one of the contributing factors or ***a cause*** of the conditions that Julia was experiencing being worsened or more severe. (*Id*. at 114:9-16). Dr. Pillai

also testified that she first treated Julia Garcia for high blood pressure in 2018, and that she increased the strength of her blood pressure medicine in April of 2018, and seven years post-foreclosure, Dr. Pillai has observed Julia Garcia was always stressed, always experiencing various levels of depression, various levels of anxiety, and symptoms consistent with those conditions, and there has been no point in time between 2011 and her last visit with her prior to her deposition where Julia Garcia was not experiencing stress, depression, or anxiety and that her chronic anxiety and depression would feed off of her chronic disease like fibromyalgia, and that a person with those conditions should do all they can to eliminate whatever stress they can, and that Julia has always followed her instructions, and done all Julia can do to help herself get better, Julia has always been compliant with the Doctor's instructions and all of Julia's diagnoses were made to a reasonable degree of medical certainty. (*Id*. at 116:25-121:12).

48. Two other physicians who treated Mrs. Garcia confirmed that she did not discuss the foreclosure with them. (Obi Dec. at Ex. 35 (Transcript of Dr. Lawrence Frank ("Frank Dep.")), p. 52 lns. 2-25, p. 53 ln. 2; Obi Dec. at Ex. 36 (Transcript of Dr. Mark Loren Fehr ("Fehr Dep.")), p. 59 lns. 15-25, p. 60 lns. 2-16, p. 61 lns. 18-25, p. 62 lns. 2-13). Plaintiffs' medical records contain no diagnoses specifically based on the foreclosure.

**RESPONSE**: Disputed. *See* response to ¶47, *supra*. *See also* Dr. Frank's actual testimony: "in Ms. Garcia's case if she had been dealing with stress, anxiety, depression for a decade, that was not the subject of your inquiry or treatment, right? A. Correct. Q. Okay. You were dealing with an immediate pain issue related to back pain, right? A. Correct. Q. And as you said as far as things like her stress or her depression or her tearfulness, you weren't trying to take a detailed history of everything she's experienced over the last decade, you were trying to get the information you needed to make your diagnosis in that setting, right? A. Correct. Q. And so with respect to that,

you certainly don't have any opinions about what she may or may not have experienced in the decade prior to coming to see you about back pain, right? A. No, I just -- I know that she had chronic pain and that she presented with a certain type of back pain that we tried to treat. Q. Right. And is there any correlation in your experience with people suffering long-term depression or long-term anxiety that have physical pain manifestations after -- that it becomes a long-term thing? A. Yeah, there definitely are some mani- -- manifestations of anxiety and depression. So -- but, again, I don't pretend to be an expert in that or to what degree and all the rest, but that's very well-known to anybody that treats back trouble or orthopaedic conditions." (*Exh. 9*, Frank Dep. 89:9-90:19). Dr. Fehr testified he was a specialist and not a primary care doctor. He typically saw patients on referral from their primary care doctor for specific issues and concerns and then the referred patient was going back to their primary care doctor. (*Exh. 10*, Fehr Dep. 70:6-71:20).

49. Mrs. Garcia was advised to undergo psychotherapy to treat her depression but did not do so. (J. Garcia Dep. p. 277 lns. 14-23).

**RESPONSE**: Disputed. Julia Garcia's testimony on this issue was, "Do you think maybe if you paid attention to your emotional health, it might also help your physical health? MR. LOPEZ: Objection. Calls for a medical conclusion, and form of the question, but she can answer. THE WITNESS: I do take care of my emotional part, but since you were asking about medical, but I have, like, informal support, like pastoral care and spiritual care, which means a lot to me and help me a lot. I understand that these cannot be taken for many as a form -- formal psychotherapy, but for me spiritual support and pastoral care, type of care, means a lot." (*See Exh. 1*, J. Garcia Dep. 278:4-18).

50. Mrs. Garcia stated that managing Plaintiffs' loan payments became stressful in 2008, when Plaintiffs defaulted and started applying for loan modifications. (J. Garcia Dep. p. 255

lns. 14-17; E. Garcia Dep. p. 92 ln. 25, p. 93 lns. 2-5; p. 222 lns. 2-25, p. 223 lns. 2-4). The added stress of having to be the primary wage earner at this time aggravated Mrs. Garcia's medical conditions and took a toll on her health. (E. Garcia Dep. p. 114 lns. 9-22).

**RESPONSE**: Disputed. The reference to Mrs. Garcia's testimony is page 255, lines 14-17. (D.E. 101-2, p. 25 of 31). This is a question from Shawn Obi and the first line of an answer. Stress is not mentioned. The reference to Mr. Garcia's testimony at pages 92-93 also does not reference this statement. (D.E. 101-1, pp. 14-15 of 50). Likewise the references at Mr. Garcia's testimony at pages 222-223 do not support this statement. (D.E. 101-1, pp. 43-44 of 50). The final citation of Mr. Garcia's deposition at page 114 lines 9-22 appears to support the last sentence in this paragraph.

51. Mrs. Garcia started seeing "a lot of specialists" for pain in 2008 because stress aggravated her fibromyalgia and migraine pain. (J. Garcia Dep. p. 75 lns. 22-25, p. 75 ln. 2, p. 256 lns. 10-17).

**RESPONSE**: Disputed, the cited testimony does not support the fact statement.

52. Mrs. Garcia does not believe Wells Fargo caused her fibromyalgia because she was diagnosed before the foreclosure. (J. Garcia Dep. p. 256 lns. 10-17).

**RESPONSE**: Undisputed, but requires clarification. At the reference, J. Garcia Dep. p. 256:10-17, Mrs. Garcia testified that she was "diagnosed before, but [the fibromyalgia] was very manageable….but when I – when the stress come, the pain gets worst, and the same with – with the migraines." (D.E. 101-2, p. 26 of 31).

53. Mrs. Garcia has had migraines since 1994. (Obi Dec. at Ex. 37 Julia Garcia's Resp. to First Set of Interrog. p. 13).

**RESPONSE**: Undisputed, but requires clarification. Mrs. Garcia answered Interrogatory

No. 20, "...I was diagnosed with migraines in or around 1994, but with treatment they had all but gone away by approximately 2004. However, they returned when the issues with our Family Home began. The migraines have not gone away completely since." D.E. 101-37, Obi Dec. at Ex. 37, pp. 4-5 of 8.

54. Filing Plaintiffs' lawsuit against Wells Fargo and collecting documents for the lawsuit has caused Mrs. Garcia stress, which activates her fibromyalgia. (J. Garcia Dep. p. 259 lns. 8-20).

**RESPONSE**: Disputed. Julia actually testified that Wells Fargo's letter informing the Garcias of Wells Fargo's mistake reopened the wound of losing her home. *See Exh. 1,* J. Garcia Dep. 259:2-260:7.

55. Dr. David Hartman's independent medical examination of Mrs. Garcia found that she has multiple medical conditions that pre-date the erroneous denial, mismanaged medications and an ineffective treatment strategy. (Dr. David Hartman Declaration ("Hartman Dec.") at Ex. A (Dr. David Hartman Independent Medical Examination Report of Julia Garcia ("Hartman J. Garcia Rep."), p. 15, 23). Dr. Hartman stated that these circumstances would predictably predispose Mrs. Garcia to chronic psychological problems, poor stress tolerance, and a perception of chronic ill-being. (*Id.*).

**RESPONSE**: Disputed. Dr. Hartman is a psychologist retained by Wells Fargo as an expert to review the Garcias' medical records and perform independent medical examinations of Julia and Eduardo Garcia. (D.E. 111, ¶4, Declaration of Dr. David E. Hartman). Dr. Hartman is not a medical doctor. Dr. Hartman has provided no medical treatment to either of the Garcias. Despite this, Dr. Hartman states in his report that Ms. Garcia's combination of mismanaged treatment and exaggeration indicates that she will not benefit from her current treatment. Her

emotional display, headache and whole body pain symptoms are caused and worsened by her current medication treatment. So-called fibromyalgia treatment is ineffective and has worsened and extended her symptoms. Unless Ms. Garcia's entire treatment strategy is changed, symptoms will continue and progressively worsen. (D.E. 111-1, Neuropsychological Evaluation of Julia Garcia by David E. Harman, PhD, MS, ABN, ABPP). Dr. Hartman is not qualified to offer any of these opinions as he is not a medical doctor.

Further, Dr. Hartman's opinions contradict the testimony of the medical doctors who have actually treated Julia Garcia. *See* Dr. Pillai's testimony cited in Response to Paragraph 47 regarding Julia Garcia's medical conditions and her testimony that stress is "a contributing factor" to many of Julia Garcia's medical conditions. Dr. Frank agreed that long term stress and depression could lead to physical pain including back pain. *See Exh. 9*, Frank Dep. 89:9-90:19.

56. Dr. Hartman concluded that Mrs. Garcia's current symptoms are neither specific to the foreclosure, nor were they permanently changed by the foreclosure. (*See* Hartman J. Garcia Rep. p. 15). Mrs. Garcia's current symptoms developed before her 2008 financial difficulties, have fluctuated over time, and are associated with her other medical conditions, some of which are untreated. (*Id.* at p. 15-17).

**RESPONSE**: Disputed. Dr. Hartman is a psychologist retained by Wells Fargo as an expert to review the Garcias' medical records and perform independent medical examinations of Julia and Eduardo Garcia. (D.E. 111, ¶4, Declaration of Dr. David E. Hartman). Dr. Hartman is not a medical doctor. Dr. Hartman has provided no medical treatment to either of the Garcias. Dr. Hartman's opinions improperly stray beyond his expertise and he improperly makes medical diagnoses that contradict Julia Garcia's treating physicians. (D.E. 111-1, Neuropsychological Evaluation of Julia Garcia by David E. Harman, PhD, MS, ABN, ABPP). *See also* Dr. Pillai's

testimony cited in response to paragraph 47 above.

57. Mrs. Garcia takes medications that individually, and in combination, are likely to extend and worsen her symptoms, and which have risks for potentially dangerous interactions. (*Id.* at 19).

**RESPONSE**: Disputed. Dr. Hartman is a psychologist retained by Wells Fargo as an expert to review the Garcias' medical records and perform independent medical examinations of Julia and Eduardo Garcia. (D.E. 111, ¶4, Declaration of Dr. David E. Hartman). Dr. Hartman is not a medical doctor. Dr. Hartman has provided no medical treatment to either of the Garcias. Dr. Hartman's opinions improperly stray beyond his expertise and he improperly makes medical diagnoses that contradict Julia Garcia's treating physicians. (D.E. 111-1, Neuropsychological Evaluation of Julia Garcia by David E. Harman, PhD, MS, ABN, ABPP). *See also* Dr. Pillai's testimony cited in response to paragraph 47 above.

58. Dr. Hartman found Mrs. Garcia's medication regimen to be "peculiar" because it lacks a formal psychiatric evaluation and treatment for obvious depressive symptoms. (*Id.* at 22).

**RESPONSE**: Disputed. Dr. Hartman is a psychologist, ***not a psychiatrist***. (D.E. 111). Dr. Hartman is not a medical doctor of any type. (*Id.*) Dr. Hartman has provided no medical treatment to either of the Garcias. Dr. Hartman's opinions improperly stray beyond his expertise and he improperly attacks the treatment regimen of Julia Garcia's treating physicians. (D.E. 111-1, Neuropsychological Evaluation of Julia Garcia by David E. Harman, PhD, MS, ABN, ABPP). *See also* Dr. Pillai's testimony cited in response to paragraph 47 above.

59. During her examination, Mrs. Garcia informed Dr. Hartman that she had attempted to prevent her primary care doctor from diagnosing depression. (*Id.* at 22). Mrs. Garcia's medical records indicate that psychiatric referral was considered for Mrs. Garcia but was not acted upon.

(*Id*.). Mrs. Garcia herself does not believe in depression. (J. Garcia Dep. p. 253 lns. 3-18). Rather than undergo psychotherapy, Mrs. Garcia sought pastoral and spiritual care while acknowledging that these forms of care cannot replace formal psychotherapy. (J. Garcia Dep. p. 277 lns. 14-23, p. 278 lns. 10-18).

**RESPONSE**: Disputed. Mrs. Garcia did not testify that she "does not believe in depression." (*Exh. 1,* J. Garcia Dep. 253:3-18). Rather, Mrs. Garcia testified that "the added stress started to convert into a depression that – you know, we are people of faith, and we are – besides that, our culture, you know, Latinos are very strong about: 'No, no, you don't have depression. You're just going through a rough time, but everything is going to be okay. You're fine.' And I recall when my doctor diagnosed me with – with Major Depressive Disorder around – around the time that we were almost losing the house, I told her, 'No, no, I'm not depressed. Please don't say – don't put on my record that I am depressed.' 'Julia, you are.' And I'm like, 'No, I'm not depressed. I don't want to be depressed.'" *Id*. "I didn't want to accept it. But definitely my feelings after finally we had to move out of the house and dealing with looking at my husband, who never, never will exhibit any behavior about being depressed, and looking at my kids as well, how they were affected by the moving out of the house, I started to feel worst and worst and even doubting about my ability to keep up with my job, because my health started to deteriorate and – and with that my emotional stability." (*Id*. at 253:19-254:3). Mrs. Garcia further testified that "the first episode of Major Depressive Disorder was because of the house. And when we finally had to leave, I went to another episode, even worst….." (*Id*. at 279:16-20).

Mrs. Garcia testified that she "[couldn't] remember what doctor told [her] to go to see a therapist that helped [her] to deal with depression and anxiety, sadness." Mrs. Garcia did not go because she had "been so focused on the physical part" of her illness that she didn't pay attention

to her emotional health. She testified that she "[does] take care of [her] emotional part," but she has "like, informal support, like pastoral care and spiritual care, which means a lot to [her] and helps [her] a lot." Mrs. Garcia understands that these are not a form of "formal psychotherapy," but the spiritual support and pastoral care mean a lot to her. (*Id*. at 277:17-278:18).

60. Mrs. Garcia's test results on objective symptom and personality examinations showed evidence of symptom magnification. (Hartman J. Garcia Rep. at 9). Moreover, Dr. Hartman found that Mrs. Garcia may magnify her symptoms for secondary (financial) gain. (*Id*. at 13). Dr. Hartman concluded that Mrs. Garcia's self-reporting of her symptoms and their causes "appear to be non-credible as often as credible." (*Id*.).

**RESPONSE**: Disputed. Dr. Hartman is a psychologist retained by Wells Fargo as an expert to review the Garcias' medical records and perform independent medical examinations of Julia and Eduardo Garcia. (D.E. 111, ¶4, Declaration of Dr. David E. Hartman). Dr. Hartman is not a medical doctor. Dr. Hartman has provided no medical treatment to either of the Garcias. Dr. Hartman's opinions as to the cause of any symptom magnification is nothing more than the ipse dixit of the expert and there is not a shred of data that can tie symptom magnification, to the extent it actually exists, to secondary (financial) gain. Further, if Dr. Hartman's psychological opinions are to be believed at all, then the only data point that can be identified is a statement in his report which says "She is prone to amplify and express her psychological symptoms as physical sounding infirmities, viewing depression or similar symptoms as moral weakness, and this predates her mortgage-related stress." *See* D.E. 111-1, p. 25, Neuropsychological Evaluation of Julia Garcia by David E. Harman, PhD, MS, ABN, ABPP.

61. Mr. Garcia testified that his feelings of anxiousness, frustration, and being "on edge" started around the 2008 financial crisis (E. Garcia Dep. p. 102 lns. 12-17; p. 104 lns. 4-25,

p. 105 lns. 2-24). Mr. Garcia believes that filing the lawsuit against Wells Fargo has caused him emotional distress. (E. Garcia Dep. p. 229 lns. 17-20). He has never seen a doctor about emotional distress because "there is no option for [him] to complain about pains" and because he does not believe in depression. (E. Garcia Dep. p. 231 lns. 19-25, p. 232 ln. 2, p. 93 lns. 17-25, p. 94 lns. 2-18). Mr. Garcia's medical records noted a severe sleep disorder in 2009. (Hartman Dec. at Ex. B (Dr. David Hartman Independent Medical Examination Report of Eduardo Garcia) ("Hartman E. Garcia Rep."), p. 2). Mr. Garcia testified that there was "no room" for depression in his life and that he is a person with a positive outlook. (E. Garcia Dep. p. 103 lns. 12-25). Mr. Garcia denied having marital problems. (E. Garcia Dep. p. 204 lns. 18-25, p. 205 lns. 2-8, p. 207 lns. 6-25, p. 208 lns. 2-5).

**RESPONSE**: Disputed. Mr. Garcia's testimony is taken out of context. Mr. Garcia's testimony on this topic is properly considered by reviewing his deposition pages at *Exh. 2*, E. Garcia Dep. 102:12-107:20. While Eduardo Garcia says there is no room for depression in his life, his family testified he was depressed. (*Exh. 3*, B. Garcia Dep. 30:20-22, 84:14-85:2, 86:23-88:24, 89:8-90:25, 92:10-19, 99:24-100:22, 101:13-20, 123:2-4, 123:14-25); (*Exh. 1*, J. Garcia Dep. 209:11-210:13, 211:8-15, 213:18-22, 214:12-17, 215:7-216:2). Mr. Garcia's testimony about marital issues is taken out of context. Mr. Garcia's full testimony requires the reading of the transcript at *Exh. 2*, E. Garcia Dep. 202:18-205:16, 168:6-24, 218:23-220:12.

62. Dr. Hartman's independent medical examination of Mr. Garcia found that "[t]here were no indications of a diagnosable stress disorder specific to bank and mortgage difficulties." (Hartman E. Garcia Rep., p. 10). Dr. Hartman found that, although Mr. Garcia described the foreclosure as shocking and stressful, he did not describe any diagnosable symptoms at the time of the foreclosure, and he does not describe any continuing emotional conditions. (*Id.*). Rather,

Mr. Garcia experiences litigation-related stress and a sense of guilt for "losing the family home." (*Id.*).

**RESPONSE**: Disputed. Dr. Hartman's report is internally self-contradictory. Dr. Hartman states that Mr. Garcia described the foreclosure as shocking and stressful, and Mr. Garcia experiences [...] a sense of guilt for "losing the family home." This is also consistent with Mr. Garcia's testimony at *Exh. 2*, E. Garcia Dep. 168:6-169:24, 229:17-230:4, 268:7-268:20.

63. Dr. Hartman concluded that, "[f]rom a psychological perspective, Mr. Garcia did not show any observational indications of major depression or anxiety disorder." (*Id.* at 9). Dr. Hartman found that, to the extent Mr. Garcia experiences any current "chronic low-level depressive symptoms," his ongoing, untreated sleep apnea and hypertension likely influence his mental state. (*Id.* at 10).

**RESPONSE**: Disputed. Dr. Hartman's report at page 10 states "Diagnostically, Mr. Garcia's objective test results are consistent with (ICD-10) F34.1 Dysthymic disorder, connoting chronic, nonspecific low-level depression." D.E. 111-2, p. 11 of 24.

64. Dr. Hartman explained that "[h]ypertension is…associated with depressive disorder, stress-related complaints and somatoform disorders and may contribute to any chronic low level depressive symptoms experienced by Mr. Garcia." (*Id.* at p. 9). He also noted the influence of Mr. Garcia's untreated obstructive sleep apnea, explaining that "[d]aytime sleepiness or fatigue is a frequent concomitant of sleep apnea and even mild sleep apnea may worsen depression and the quality of life." (*Id.*)

**RESPONSE**: Disputed. *See* Plaintiffs' Responses to paragraphs 62 and 63 above.

65. Mr. Garcia's test results suggested "symptom magnification." (Hartman E. Garcia Rep., p. 8.). Accordingly, Dr. Hartman advised "some caution about uncritically accepting Mr.

Garcia's self-report about symptoms and their causes." (*Id.*)

**RESPONSE**: Disputed as to the allegation of "symptom magnification." Beyond that, this statement is undisputed and irrelevant.

## VI. PLAINTIFFS' ALLEGED MONETARY DAMAGES

66. Mr. Garcia understood that his credit score was negatively affected because he did not make his mortgage payments. (E. Garcia Dep. p. 248 lns. 10-17).

**RESPONSE**: Undisputed and irrelevant.

Dated: August 19, 2022

*Respectfully submitted,*

**EDUARDO GARCIA** and
**JULIA GARCIA**

*/s/ Nick Wooten*
Nicholas H. Wooten
NICK WOOTEN, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
*nick@nickwooten.com*

Rusty A. Payton,
PAYTON LEGAL GROUP
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
(773) 682-5210
*info@payton.legal*

Salvador J. Lopez
ROBSON & LOPEZ, LLC
180 W. Washington Street, Suite 700
Chicago, Illinois 60602
(312) 523-2166
*lopez@robsonlopez.com*

*Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **PLAINTIFF'S STATEMENT IN RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** was served via the Court's Electronic Filing System on all parties and counsel of record on the following date.

Dated: August 19, 2022

By: */s/ Nick Wooten*
One of Plaintiffs' Attorneys