# EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

EDUARDO GARCIA and JULIA GARCIA,

    Plaintiffs,

                              Case No.
vs.                          1:20-cv-02402

WELLS FARGO BANK, N.A.,

    Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


REMOTE 30(B)(6)DEPOSITION OF

WELLS FARGO BANK, N.A.

CARMEN BELL


JULY 28, 2022

9:33 A.M.


Chandler, Arizona


REPORTED BY:
SOMMER E. GREENE, CRR, RMR
AZ #50622

**CERTIFIED TRANSCRIPT**



AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

1        Q.   Paragraph 2 says, [As read] In each
2   instance in this order in which the board is required
3   to ensure adherence to and undertake to perform
4   certain obligations of the bank, it is intended to
5   mean that the board shall, subparagraph A, authorize
6   and adopt such actions on behalf of the bank as may
7   be necessary for the bank to perform its obligations
8   and undertakings under the terms of this order.
9             And subparagraph C, [As read] Follow-up
10  on any non -- material noncompliance with such
11  actions in a timely and appropriate manner.
12            Did I read that correctly?
13       A.   Yes.
14       Q.   Okay.  The next document may be relevant
15  to what you were mentioning earlier.  This is the
16  amendment to the April 13th, 2011, consent order.
17  It's number 2013-132.
18       A.   Yes.
19       Q.   Is this what you were mentioning earlier,
20  after the changes that came out of the I- -- the
21  Independent Foreclosure Review, that these con- --
22  original consent orders were modified?
23       A.   Yes.
24       Q.   Okay.
25            MS. KNIGHT:  And, Mr. Wooten, just for

1  the record, again, this highlighting is yours?

2            MR. WOOTEN:  Yes.  Yes.

3            MS. KNIGHT:  Okay.

4            MR. WOOTEN:  There will be highlighting

5  on all these consent decrees.  It's all mine.  So...

6            MS. KNIGHT:  Okay.  Thank you.

7       Q.   BY MR. WOOTEN:  So down in the first

8  paragraph that starts with "Whereas" on the first

9  page, it says, [As read] Article VII of the 2011

10 consent order required the bank, among other things,

11 to retain an independent consultant to conduct an

12 independent review of certain residential mortgage

13 loan foreclosure actions or proceedings for borrowers

14 who had a pending or completed foreclosure on their

15 primary residence any time from January 1st, 2009, to

16 December 31, 2010.

17            And in parentheses, it says, [As read]

18 The in-scope borrower population, the purposes of

19 which were set forth in paragraph 3 of Article VII of

20 the 2011 consent order.

21            Did I read that correctly?

22      A.   Yes.

23      Q.   Okay.  And the next "Whereas" says,

24 [As read] The bank has taken steps to comply with its

25 obligations under Article VII of the 2011 consent

1  order.

2        Correct?

3        A.   Yes.

4        Q.   And then it says in the next "Whereas"

5  paragraph, [As read] In the interest of providing the

6  greatest benefit to borrowers potentially affected by

7  the practices at the bank addressed in the 2011

8  consent order in a more timely manner than would have

9  occurred under the Independent Foreclosure Review,

10  the OCC, the Board of Governors of the Federal

11  Reserve System, the bank, and several other financial

12  institutions with mortgage loan servicing

13  operations -- collective- -- collectively referred to

14  as "participating servicers," have agreed to amend

15  their respective 2011 consent orders.

16        So that's what you mentioned earlier

17  about a number of the affected parties all agreed to

18  this type of amendment.  Right?

19        A.   Correct.

20        Q.   Okay.  And it goes on to say, the next

21  "Whereas" paragraph, [As read] The OCC and the bank

22  intend that the bank's obligations, under Article VII

23  of the 2011 consent decree -- or the consent order,

24  be replaced with the obligations specified in this

25  amendment to the consent order, in order pursuant to

1   12 U.S.C., section 1818(b), which include the bank

2   making a cash payment in the amount specified herein

3   to a qualified settlement fund for distribution to

4   the in-scope borrower population in accordance with a

5   distribution plan developed by the OCC and Board of

6   Governors in their discretion; and, 2, taking other

7   loss mitigation or other foreclosure prevention

8   actions in the amount specified herein.

9              Did I read all that correctly?

10       A.   Yes.

11       Q.   Okay.  On the next page, page 3,

12  Article I, that's titled, "The Qualified Settlement

13  Fund and Paying Agent."  And it says in paragraph 1,

14  [As read] Within 15 days of this amendment to the

15  consent order, the bank and/or its parent, affiliate,

16  or subsidiary, subject to an amendment to the

17  April 13th, 2011, consent order of the Board of

18  Governors will make a cash payment of $765,823,531

19  into a qualified settlement fund, in parentheses, the

20  fund from which payments to the in-scope borrower

21  population, which are borrowers who had a pending or

22  completed foreclosure on their primary residence any

23  time from January 1st, 2009, to December 31st, 2010,

24  will be made pursuant to a distribution plan

25  developed by the OCC and the Board of Governors,

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  collectively, the regulators, in their discretion.

2              Did I read that correctly?

3       A.   Yes.

4       Q.   Okay.  Over in Article III on page 6,

5  it's titled, "IC Reports and OCC Access to IFR

6  Information."

7              Let me get to the right document again.

8  I'm sorry.

9              It says, [As read] Within three days of

10  the effective date of this amendment to the consent

11  order, the bank shall confirm that its IC --

12             That would be your independent

13  consultant.  Right?

14      A.   Correct.

15      Q.   [As read] -- has provided the OCC with

16  the most recent data reports previously provided to

17  the bank's board or appropriate board committees.

18  Within three days of the effective date of this

19  amendment to the consent order, the bank shall

20  confirm that its IC has completed and provided to the

21  OCC the additional reporting as specified by the OCC

22  with information as of December 31st, 2012.  The bank

23  shall also take all reasonable steps to cause its IC

24  to provide any existing information, as requested by

25  the OCC, to assist the OCC in its analysis and public

1  reporting of Independent Foreclosure Review-related

2  activities.

3         Did I read that correctly?

4  A.   Yes.

5  Q.   The next page on Article IV is titled

6  "Foreclosure Prevention."  Paragraph 1, it says,

7  [As read] By no later than January 7 of 2015, the

8  bank shall provide loss mitigation or other

9  foreclosure prevention actions, in paren, foreclosure

10  prevention, in the amount of $1,225,317,650.  The

11  bank's foreclosure prevention action shall be in

12  addition to and shall not be used to fulfill the

13  bank's consumer relief obligations under the NMS.

14         Did I read that correctly?

15  A.   Yes.

16  Q.   So, for those members of the jury who are

17  not familiar with this alphabet soup of settlements

18  and consultants and agencies, NMS stands for

19  "National Mortgage Settlement."  Right?

20  A.   It does.

21  Q.   Okay.  And that dealt with a separate

22  settlement that was made by all the major mortgage

23  servicers related to servicing practices.  Is that

24  correct?

25         MS. KNIGHT:  Object to the form.

1              THE WITNESS:  Yes.

2         **Q.   BY MR. WOOTEN:  And this OCC order**

3    **requiring the payment of 765 million to a settlement**

4    **fund and 1.2 billion in foreclosure prevention is**

5    **separate and apart from any obligations that were**

6    **under the National Mortgage Servicing Settlement.**

7    **Right?**

8              MS. KNIGHT:  Object to the form.

9              And also, Mr. Wooten, the National

10   Mortgage Settlement is beyond the scope of the

11   notice, so the witness isn't prepared to talk about

12   it.  To the extent it ties in with what's stated

13   here, I'll allow it.  But, again, she's not been

14   prepared to discuss the -- the materials and the --

15   the substance of the National Mortgage Settlement.

16             MR. WOOTEN:  I -- I don't need to discuss

17   the materials or the substance.  I just want to

18   confirm that the amounts that are listed in this

19   document are separate and apart from any obligations

20   under the NMS.

21             THE WITNESS:  I -- I didn't do a

22   comparison; so I don't feel comfortable answering the

23   question.

24        **Q.   BY MR. WOOTEN:  All right.  How about**

25   **right here at the bottom of paragraph 1 where it**

1    says, [As read]  The bank's foreclosure prevention

2    actions shall be in addition to and shall not be used

3    to fulfill the bank's consumer relief obligations

4    under the NMS?

5            A.    That is what it states, yes, so I would

6    have to assume that that is the case that you can't

7    combine the two.

8            Q.    Let me just go back a second.  Under

9    paragraph 2 of Article IV, "Foreclosure Prevention,"

10   the second sentence says, [As read] While the bank's

11   actions may be -- may be affected by existing

12   investor requirements, the bank's foreclosure

13   prevention actions should reflect the following

14   guiding principles:

15               Letter A, [As read] Preference should be

16   given to activities designed to keep the borrower in

17   the home.

18               Letter B, [As read] The foreclosure

19   prevention actions should emphasize affordable,

20   sustain -- sustainable and meaningful home

21   preservation actions for qualified borrowers.

22               C, [As read] Foreclosure prevention

23   actions should otherwise provide significant and

24   meaningful relief or assistance to qualified

25   borrowers.

1            And D, [As read] Foreclosure prevention

2    actions should not disfavor a specific geography,

3    within or among states, nor disfavor low and/or

4    moderate income borrowers and not discriminate

5    against any protected class of borrowers.

6            Did I read that correctly?

7       A.   Yes.

8       Q.   Over on page 9 under Article V,

9    "Releases," paragraph 1 says, [As read] In

10   recognition of the bank's cash payments of

11   $765,823,531 to the fund and foreclosure commitments

12   made pursuant to this amendment to the consent order

13   under 12 U.S.C., section 1818(b), the comptroller

14   will not assess a civil money penalty under 12 U.S.C.

15   section 1818(i), or initiate any further enforcement

16   actions against the bank or its subsidiaries or

17   affiliates, including for remedies available pursuant

18   to 12 U.S.C., section 1818(b).

19            [As read] With respect to letter A, the

20   findings contained in the Article I of the 2011

21   consent order; B, the matters addressed in Article

22   VII of the 2011 consent order, including matters

23   related to the work or findings of the IC or IC

24   counsel under the IFR; and, C, any other past

25   mortgage servicing and foreclosure-related practices

1  that are addressed by the 2011 consent order through

2  the execution date of this amendment to the consent

3  order, provided that the terms of this amendment to

4  the consent order are satisfied.

5           Did I read that correctly?

6      A.   Yes.

7      Q.   Now, after this 2013 amendment went into

8  place, there was another amendment to this consent

9  order in 2015.  Correct?

10     A.   Yes.

11     Q.   Okay.  So I put that order up on the

12 screen.  It's number 2015-67.  It says it amends both

13 the 2011 and the 2013 order.  Correct?

14     A.   Yes.

15     Q.   Down in the first paragraph on the first

16 page of this order, it says, [As read] Whereas the

17 bank has failed to comply with Articles II, III, IV,

18 VIII, and IX of the consent order, the 15 remaining

19 actionable items of the 98 actionable items in the

20 consent order are included in this amendment, and

21 whereas the bank is in continuing noncompliance with

22 and in violation of the consent order and continues

23 to engage in unsafe and unsound practices.

24          Did I read that correctly?

25     A.   Yes.



1      Q.    And on the next page, on page 2, it says,

2   [As read] Whereas, upon execution of this amendment,

3   the OCC is placing the bank under the following

4   supervisory restrictions.

5            And then it lists all -- about five

6   specific restrictions that I won't run through

7   completely.  And at the bottom of the page, in the

8   next "Whereas" paragraph, it says, [As read] The OCC

9   will also take additional supervisory and/or

10  enforcement action, including possible civil money

11  penalties, subject to all appropriate procedural

12  processes in order to address the bank's overall

13  noncompliance with the consent order, the nature and

14  severity of which will reflect the nature, length,

15  and severity of the bank's continued noncompliance

16  through final termination of the consent order.

17           Did I read that correctly?

18      A.    Yes.

19      Q.    Okay.  Then under Article I under

20  "Comptroller's Findings," it says, [As read] The

21  comptroller's findings under Article I of the consent

22  order are hereby incorporated in full.

23           Paragraph 2, [As read] The OCC has

24  determined the bank has failed to comply with

25  Articles II, III, IV, VIII, and IX of the consent

1   order.

2           And number 3, [As read] The bank has --

3   the OCC has determined the bank is continuing

4   noncompliance with and in violation of the consent

5   order and continues to engage in unsafe and unsound

6   practices.

7           Did I read those three paragraphs

8   correctly?

9       A.   Yes.

10      Q.   Article III of this 2015 order is titled

11  "Comprehensive Action Plan."  And it says underneath

12  it, [As read] The provisions of Article III of the

13  consent order are hereby revised as follows.

14          And then over on page 5, under

15  paragraph 2, it says, [As read] The board shall

16  ensure that the bank achieves and thereafter

17  maintains compliance with the consent order,

18  including, without limitation, successful

19  implementation of the revised action plan.  The board

20  shall further ensure, upon implementation of the

21  revised action plan, the bank achieves and maintains

22  effective mortgage servicing, foreclosure and loss

23  mitigation activities as defined in the 2011 consent

24  order, as well as associated risk management,

25  compliance, quality control, audit, training,

1  staffing, and related functions.  In order to comply

2  with these requirements, the board shall --

3            And then under paragraph C, [As read] --

4  require corrective action to be taken in a timely

5  manner for any noncompliance with such actions.

6            Did I read that correctly?

7       A.   Yes.

8       Q.   On the next page, page 6, under the same

9  article, paragraph 3 says, [As read] The revised

10  action plan includes --

11            And then under letter E, [As read] --

12  governance and controls designed to comply with all

13  legal requirements as defined in the 2011 consent

14  order, supervisory guidance, and the requirements of

15  this amendment.

16            Did I read that correctly?

17       A.   Yes.

18       Q.   Under Article IV, with the compliance

19  program, paragraph 1 says, [As read] The bank has

20  demonstrated compliance with all the requirements of

21  Article IV of the consent order except for the

22  following provisions which remain in noncompliance.

23            And there's a paragraph number A that has

24  subparts, which are romanettes, romanette iv, v, and

25  vi are on page 7.  Romanette iv says, [As read]

1    Ongoing testing for compliance with applicable legal

2    requirements and OCC supervisory guidance is

3    completed by qualified persons with a requisite

4    knowledge and ability, parentheses, which may include

5    internal audit, and the parentheses, who are

6    independent of the bank's business lines --

7               Romanette v, [As read] -- measures to

8    ensure that policies, procedures, and processes are

9    updated on an ongoing basis as necessary to

10   incorporate any changes and applicable legal

11   requirements in OCC supervisory guidance.

12              And Romanette vi, [As read] Processes to

13   ensure that the risk management, quality control,

14   audit, and compliance programs have the requisite

15   authority and status within the organization so that

16   appropriate reviews of the bank's mortgage servicing,

17   loss mitigation, and foreclosure activities and

18   operations may occur and deficiencies are identified

19   and promptly remedied.

20              Did I read all that correctly?

21        A.   Yes.

22        Q.   Under Article VIII on page 8, it says,

23   [As read] The bank has demonstrated compliance with

24   all requirements of Article VIII of the consent order

25   except for the following provisions which remain in

1    noncompliance.

2              And it's paragraph A, [As read] The bank

3    shall implement its revised action plan and ensure

4    its management informations systems for foreclosure

5    and loss mitigation, as defined in the 2011 consent

6    order, or loan modification activities provide timely

7    delivery of complete and accurate information from

8    affected decisionmaking and include, at a minimum,

9    testing the integrity and accuracy of the new or

10   enhanced MIS to ensure the reports generated by the

11   system provide necessary information for adequate

12   monitoring and quality controls.

13             Did I read that correctly?

14        A.   Yes.

15        Q.   In 2015, where were you working at that

16   time?

17        A.   I was still on the performing service

18   side or customer service.  I --

19        Q.   All right.

20        A.   -- I believe I had other cash and tax and

21   insurance.  So, in addition to customer service, I

22   had some back-office routine functions like cash

23   and --

24        Q.   Pay escrow amounts?

25        A.   Escrow.  I don't know exactly in 2015 if

1 | I had escrow, but I had escrow at some point, yes.

2 |         MS. KNIGHT:  Mr. Wooten, we've been going

3 | about an hour.  Do you think you're almost done with

4 | this particular document?  I'm just trying to gauge

5 | for a quick break.

6 |         MR. WOOTEN:  Yeah.  I'm -- I'm -- I don't

7 | think I'm super far away.  I'm on page 9 of this

8 | document.  I don't have that much left.  It's only,

9 | like, about halfway through this document; so

10 | probably three or four more items.  You want to break

11 | now, or you want to --

12 |         MS. KNIGHT:  Okay.

13 |         MR. WOOTEN:  -- wait until we finish this

14 | document?

15 |         MS. KNIGHT:  Yeah.  Is that okay?

16 |         THE WITNESS:  Yes.

17 |         MS. KNIGHT:  Let's finish the document,

18 | yeah.

19 |         MR. WOOTEN:  Sure.

20 |     **Q.   BY MR. WOOTEN:  The next topic is**

21 | **Article IX, titled "Mortgage Servicing."  This also**

22 | **says [As read] The bank has demonstrated compliance**

23 | **with all the requirements of Article IX of the**

24 | **consent order, except for the following provisions,**

25 | **which remain in noncompliance.**

1              And it says, paragraph A, [As read] The

2    bank shall implement its revised action plan and

3    ensure effective coordination of communications with

4    borrowers, both oral and written, related to loss

5    mitigation or loan modification and foreclosure

6    activities, including, at a minimum, romanette i,

7    reasonable and good-faith efforts consistent with

8    applicable legal requirements are engaged in loss

9    mitigation and foreclosure prevention for delinquent

10   loans where appropriate.

11             And 2, Romanette ii, [As read] Expansion

12   of the single point of contact program so that each

13   borrower has access to an employee of the bank to

14   obtain information throughout the loss mitigation,

15   loan modification, and foreclosure processes.

16             Did I read all that correctly?

17        A.   Yes.

18        Q.   Okay.  Over on page 12, Article XIII,

19   "Other Provisions."  It says, [As read] The

20   provisions of this Article XIII of the consent order

21   are hereby revised as follows:  The bank is in

22   continuing noncompliance with and in violation of the

23   consent order and continues to engage in unsafe and

24   unsound practices.  The OCC will take additional

25   supervisory and/or enforcement action, including

1   possible civil money penalties, subject to all

2   appropriate procedural processes, in order to address

3   the bank's overall noncompliance with the consent

4   order, the nature and severity of which will reflect

5   the nature, length, and severity of the bank's

6   continued noncompliance through final termination of

7   the consent order.

8            Did I read that correctly?

9       A.   Yes.

10      Q.   Over on the next page, under paragraph 5,

11  it says, [As read] Although this amendment requires

12  the bank to submit certain action plans, programs,

13  policies, and procedures for the review or prior

14  written determination of no supervisory objection by

15  the deputy comptroller or the examiner in charge, the

16  board has the ultimate responsibility for proper and

17  sound management of the bank.

18           Did I read that correctly?

19      A.   Yes.

20      Q.   Over on page 16, there's an Article XIV,

21  titled, "Business Restrictions."  Is that correct?

22      A.   That is what it's titled, yes.

23      Q.   All right.  Under number 1, the first

24  sentence says, [As read] The bank shall not execute

25  any new contracts or amend or renew existing



1   contracts beyond current loan volume specified in

2   existing contracts for the acquisition by the bank of

3   residential mortgage servicing, residential mortgage

4   servicing rights, residential mortgage loans with

5   servicing, or residential mortgage origination

6   business entities until termination of the consent

7   order.

8           Did I read that correctly?

9       A.   Yes.

10      Q.   Number 2 says, [As read] The bank shall

11  not execute any new contracts for the bank to perform

12  residential mortgage servicing for other parties

13  until termination of the consent order.

14          Did I read that correctly?

15      A.   Yes.

16      Q.   Number 3, [As read] The bank shall not

17  outsource or subservice any new residential mortgage

18  servicing-related activities to other parties without

19  prior OCC supervisory nonobjection until termination

20  of the consent order.

21          Did I read that correctly?

22      A.   Yes.

23      Q.   I want to skip number 4.  But number 5,

24  [As read] The bank shall not appoint any new senior

25  officers who have responsibility for residential

1   **mortgage servicing, residential mortgage servicing**

2   **operations, residential mortgage servicing risk**

3   **management, and residential mortgage servicing**

4   **compliance without prior OCC supervisory nonobjection**

5   **until termination of the consent order.**

6               **Did I read that correctly?**

7       A.   Yes.

8       **Q.   All right.**

9               MR. WOOTEN:  All right.  Let's take a

10  short break.  Tell me what you guys need.

11              MS. KNIGHT:  Ten -- ten minutes.

12              THE WITNESS:  Ten minutes.

13              MS. KNIGHT:  Yeah.

14              MR. WOOTEN:  All right.  So I got 12:35

15  Central time.

16              12:45 fine with everybody?

17              THE WITNESS:  Uh-huh.  Yep.

18              MR. WOOTEN:  All right.  See you in ten

19  minutes.

20              THE VIDEOGRAPHER:  Okay.  We're going to

21  go off the video record.  The time is 10:35 a.m.

22              (A recess was held off the record.)

23              THE VIDEOGRAPHER:  We are going back on

24  the video record.  The time is 10:46 a.m. Arizona

25  time.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1        Q.    BY MR. WOOTEN:  Ms. Bell, where -- what
2   was your position with the bank in 2018?
3        A.    Did you say '18?
4        Q.    Yes, ma'am.
5        A.    In 2018, I led the customer contact and
6   default decisioning teams.
7        Q.    Okay.  Tell me what those teams handled.
8        A.    Customer service, the area that I
9   described to you earlier; account resolution -- some
10  people call it collections; as well as the home
11  preservation and underwriting teams.
12       Q.    Okay.  So that would be people who were
13  doing loss mitigation, loan modification work?
14       A.    That's correct.
15       Q.    All right.  Let me get my screen going
16  again.
17             So there was another consent order issued
18  involving the bank in 2018.  I have that up on the
19  screen.  It's numbers 2018-025.
20             Have you had an opportunity to see this
21  before your testimony today?
22       A.    Yes.
23       Q.    All right.  So on the first page of this
24  document, it says [As read] The OCC has identified
25  deficiencies in the bank's enterprisewide compliance

1  risk management program that constituted reckless,

2  unsafe, or unsound practices and resulted in

3  violations of the unfair acts or practices provision

4  of Section 5 of the Federal Trade Commission Act.

5  The OCC has informed the bank of the findings,

6  resulting from the examinations.

7            Did I read that correctly?

8       A.   Yes.

9       Q.   On the next page, under the

10 "Comptroller's "Findings," number 1 says, [As read]

11 Since at least 2011, the bank has failed to implement

12 and maintain a compliance risk management program

13 commensurate with the bank's size, complexity, and

14 risk profile.  The bank's failure to implement and

15 maintain a satisfactory compliance risk management

16 program has caused the bank to engage in reckless,

17 unsafe, or unsound practices and violations of law.

18           Did I read that correctly?

19      A.   Yes.

20      Q.   Okay.  I'm going to skip that next

21 paragraph.  I'm going to go a little bit deeper in.

22           On Article IV on page 7, paragraph 1,

23 [As read] Instructed the bank to submit an acceptable

24 compliance risk management program within 60 days of

25 this order.

1          Correct?

2      A.    Yes.

3      Q.    Okay.  Article VII on page 11 is titled,

4  "Remediation Program."  And it says -- it required

5  the bank [As read] to develop and implement a

6  remediation program within 120 days.

7          Is that correct?

8      A.    That's what it states, yes.

9      Q.    Okay.  All right.  Paragraph 2 says,

10  [As read] The bank shall develop and implement a

11  remediation program that, at a minimum, shall

12  include --

13          And then it's got a laundry list of

14  items.

15          But paragraph A [As read] requires the

16  inclusion of policies and procedures that define the

17  bank's methodology for identifying harmed or

18  otherwise affected consumers; calculating the

19  economic or other adverse impact on affected

20  consumers or customers, which, for the purpose of

21  this order, does not include emotional harm or

22  distress; communicating with affected customers; and

23  providing remediation to affected customers.

24          It goes on to say [As read] These

25  policies and procedures shall ensure that, at a

1  minimum, the bank --

2           And then it's got a list of romanette.

3  But the first one is, [As read] Number 1, clearly

4  defines the methodology for identifying affected

5  customers and calculating economic or other adverse

6  impact, including, but not limited to, the parameters

7  used in establishing the affected customer

8  population, the type of economic or other adverse

9  impact, and the appropriate forms of remediation.

10          [As read] Number 2, engages in a holistic

11  assessment of the economic or other adverse impact on

12  the affected customers when developing individual

13  remediation plans required by the remediation

14  program.

15          And then [As read] Number 3, establishes

16  criteria and standards for remediation plans,

17  including, A, evaluating the parameters used to

18  determine the affected customer population, the

19  economic or other adverse impact in the form of

20  remediation; B, locating and contacting affected

21  customers; C, developing affected disclosures and

22  communications used to inform affected customers of

23  any actual or potential harm and apprise customers of

24  their remediation options; D, their issuance in

25  tracking remediation payments dispersed to affected

```
 1   customers; E, the correcting of adjustment -- or

 2   adjustment of affected customers' accounts; and, F,

 3   procedures to request amendments to affected

 4   customers' credit reports from the credit reporting

 5   agencies.

 6              Did I read that correctly?

 7        A.   Yes.

 8        Q.   Do you know whether the bank had any

 9   remediation program in place prior to this consent

10   order?

11        A.   Yes.

12        Q.   Do you know when the first remediation

13   program was put in place by the bank?

14        A.   I don't know the exact date.

15        Q.   You know if the bank was -- faced any

16   civil penalties associated with these failures?

17              MS. KNIGHT:  Object to the form.  Vague.

18        Q.   BY MR. WOOTEN:  As a result of this

19   consent decree, was the bank assessed any civil money

20   penalties?

21              MS. KNIGHT:  Mr. Wooten, is there a

22   document you could put up to...

23              MR. WOOTEN:  Yeah, I can.

24              MS. KNIGHT:  Okay.

25              MR. WOOTEN:  I want to see if it was in a
```

1  separate document first, because it was actually in a

2  previous document with the CFPB.

3          Q.   BY MR. WOOTEN:  On the same day as the

4  order that we were just looking at was entered, there

5  was also an order entered by the Consumer Financial

6  Protection Bureau or the Bureau of Consumer Financial

7  Protection.

8               Are you familiar with that consent order?

9          MS. KNIGHT:  Well, I'm just -- this is

10  beyond the scope of the notice that the witness has

11  been designated to testify about; so she's

12  not prepared --

13          MR. WOOTEN:  Here's -- here's the tie-in

14  for you.  We'll just go over here.  Let me do it this

15  way so it's clear.

16          Q.   BY MR. WOOTEN:  Over in the "Definition"

17  section of the CFPB order, under part 3, there is a

18  letter J that says "The OCC Order."  And it says,

19  [As read] The OCC order means the consent order

20  issued by the office of comptroller, the currency,

21  and the administrative adjudication styled in the

22  matter of Wells Fargo Bank NA, Number AA-EC-2018-16

23  issued on or about April 20th of 2018.

24               Did I read all that correctly?

25          A.   That's what it states, yes.

1        Q.    Okay.  Let's go back to this article,

2    make sure we're -- now, this is the consent order we

3    just went over.  It -- if has the number in the style

4    AA-EC-2018-15.

5              Is that the same number mentioned in the

6    CFPB order?

7        A.    Yes.

8        Q.    All right.  So if you go back to the CFPB

9    order, and I'll find the section on penalties.

10             Section 10 of the CFPB order, page 23,

11   "Order to Pay Civil Money Penalty."  It says,

12   [As read] It is further ordered that under

13   section 1055(c) of the CFPA 12 U.S.C., section

14   5565(c), by reason of the violations of law described

15   in section IV of this consent order, taking into

16   account the factors in 12 U.S.C. section 5565(c)(3),

17   respondent must pay civil money penalty of $1 billion

18   to the bureau.

19             Under 12 U.S.C. section 5565(c)(4),

20   [As read] The amount respondent must pay will be

21   remitted by 500 million upon respondent's

22   satisfaction of its obligation to pay that amount in

23   penalties to the OCC for related conduct.

24             So, reading that together, are you able

25   to determine that there was a $500 million civil

1   **penalty issued by the OCC related to the consent**

2   **order that we just went over?**

3                MS. KNIGHT:  Same objection.  The witness

4   isn't prepared to talk about this particular consent

5   order as it's not one of the topics in the notice.

6   She can answer in her personal capacity if she knows.

7                THE WITNESS:  You stated that this civil

8   penalty was from the OCC.  I believe, if we go back

9   to the beginning of this document, this was issued by

10  the CFPB, which is not the OCC.

11          **Q.   BY MR. WOOTEN:  No, ma'am.  The order**

12  **that we're looking at here is the CFPB order.  Do you**

13  **see that heading on page 1?**

14          A.   Yes.  Which -- yes.

15          **Q.   But if you go back to the page we were**

16  **just looking at -- let me get back over here -- under**

17  **section 10, "Order to Pay Civil Money Penalty"?**

18          A.   Yes.

19          **Q.   At the bottom of page 23, it says,**

20  [As read] Respondent must pay civil money penalty of

21  $1 billion to the bureau.

22                Do you recognize "the bureau" as the

23  CFPB.  Right?

24          A.   That's correct.

25          **Q.   Okay.  And then it says under 12 U.S.C.,**

1   **section 5565(c)(4), [As read] The amount respondent**
2   **must pay will be remitted by $500 million dollars**
3   **upon respondent's satisfaction of its obligation to**
4   **pay that amount in penalties to the OCC for related**
5   **conduct.**

6              **You know what "remitted" means?**

7              MS. KNIGHT:  Object to the form.  Again,
8   if you can -- if you can revert back to the document
9   that the witness was prepared to discuss, given that
10  that was one of the topics in the notice.  This is
11  beyond the scope, so I'll place the objection there.

12             THE WITNESS:  Can you restate the
13  question?

14        Q.   BY MR. WOOTEN:  Yes.

15             **In reading paragraph 59 in total, are you**
16  **able to tell that the CFPB assert -- assessed a**
17  **$1 billion penalty but then basically credited Wells**
18  **Fargo $500 million for the payment that it had to**
19  **make to the OCC for related conduct?**

20             MS. KNIGHT:  Same objections.

21             THE WITNESS:  That's what's written here,
22  yes.

23        Q.   BY MR. WOOTEN:  Okay.  And so I was
24  **saying, from that paragraph, can you interpolate that**
25  **the OCC assessed a $500 million penalty for the**

1  consent order we went over back here at 2018-15?

2        A.   I can't answer that question.  I'm sorry.

3  I didn't -- no.

4        Q.   Okay.  Okay.  I think I found it.  This

5  order titled "21816."  It's titled "Consent Order For

6  a Civil Money Penalty."  And it repeats the same

7  information that we saw initially about

8  enterprise-wide compliance risk management program.

9  And I'll read the whole paragraph you want me to, but

10 I read that as being the same language we read in

11 2018-15.

12             Do you recognize that language?

13        A.   I agree.

14        Q.   Okay.  And this finding on paragraph 1 --

15 well, I like that.

16             That appears to be the same findings that

17 we saw in 2018-15.  Right?

18        A.   It does.

19        Q.   Okay.  Article II does, in fact, order a

20 $500 million civil penalty for the conduct identified

21 in 2018-15.  Correct?

22        A.   That's what it states, yes.

23        Q.   Okay.  So we can agree, then, that there

24 was a $500 million penalty related to this 2018

25 consent order?

1          A.    Yes.

2          Q.    Okay.  That was not the last consent

3    order related to this issue, though, was it?

4                MS. KNIGHT:  Object to the form.

5          Q.    There was another consent order issued in

6    2021.  Correct?

7          A.    There was another consent issue ordered,

8    yes.

9          Q.    Okay.  And this was in the form of a

10   cease-and-desist from the OCC?

11         A.    I'm -- I'm just reading it.  It -- it

12   intends -- that's what it states, yes.

13         Q.    And so what this says is [As read] The

14   OCC intends to initiate cease-and-desist proceedings

15   against the bank pursuant to 12 U.S.C. section

16   1818(b) through the issuance of a notice of charges

17   for engaging in unsafe or unsound practices related

18   to material deficiencies regarding the bank's loss

19   mitigation activities, including loan modification

20   decisions and operational practices, and inadequate

21   independent risk management and internal audit of the

22   bank's loss mitigation activities.

23                Did I read that correctly?

24         A.    That's what it states, yes.

25         Q.    Do you know what loan modification

 1            MS. KNIGHT:  (Inaudible).

 2       Q.   BY MR. WOOTEN:  Does that phrase include

 3   the HPA tool?

 4            MS. KNIGHT:  And, again, I'll give the

 5   same instruction if it would require the witness to

 6   reveal the substance of communications with its

 7   regulator.

 8            THE WITNESS:  Per counsel, I'm not able

 9   to answer the question.

10            MR. WOOTEN:  Okay.  We'll reserve on that

11   question.

12       Q.   BY MR. WOOTEN:  Article II,

13   "Comptroller's Findings."  [As read] The comptroller

14   finds and the bank either admits or denies the

15   following:

16            Number one, the bank has significant

17   deficiencies related to its loss mitigation

18   activities?

19            Number two, the OCC has identified and

20   previously communicated to the bank the following

21   deficiencies and unsafe or unsound practices with

22   respect to loss mitigation.

23            A, the bank has failed to fully implement

24   and maintain adequate loss mitigation practices and

25   related independent risk management practices

1   commensurate with the bank's size, complexity, and

2   risk profile.

3              B, the bank's loss mitigation decisioning

4   tools, applications, and end-user computing tools and

5   operational deficiencies have caused errors in the

6   bank's loss mitigation processes and controls that

7   negatively affected borrowers.

8              Did I read that correctly?

9        A.   That's what it states, yes.

10       Q.   Was the HPA tool a loss mitigation

11  decisioning tool?

12       A.   It is.

13       Q.   Next page.  Number 3, paragraph C,

14  [As read] The bank's inadequate controls,

15  insufficient independent oversight, and ineffective

16  governance related to loss mitigation activities have

17  caused the bank's failure to timely detect, prevent,

18  and quantify inaccurate loan modification decisions

19  and impaired the bank's ability to fully and timely

20  remediate harmed customers.

21             Did I read that correctly?

22       A.   Yes.

23       Q.   Paragraph D, [As read] The bank's

24  internal audit coverage of loss mitigation activities

25  are deficient and have failed to include all aspects



1  of previously identified loan modification decision

2  issues.

3              Did I read that correctly?

4        A.   That's what it states, yes.

5        Q.   Number 3, [As read] By reason of the

6  foregoing conduct, the bank has engaged in unsafe or

7  unsound practices with respect to its loss mitigation

8  activities along with inadequate independent risk

9  management and internal audit coverage of its loss

10  mitigation program.

11              Did I read that correctly?

12        A.   Yes.

13        Q.   In 2021, were you in charge of loss

14  mitigation for the bank?

15              MS. KNIGHT:  Object to the form.

16              THE WITNESS:  I was responsible for home

17  preservation, which includes similar code of conduct

18  and underwriting, yes.

19        Q.   BY MR. WOOTEN:  Over on page 5,

20  Article V, titled, "Loss Mitigation Program,"

21  paragraph 1 required the bank to establish,

22  maintain -- it says, [As read] The bank shall

23  implement and, thereafter, maintain an effective loss

24  mitigation program with respect to loss mitigation

25  activities in the bank's home lending business.

1              Did I read that portion of the sentence

2   correctly?

3         A.   Yes.

4         Q.   All right.  And paragraph 2 says,

5   [As read] The bank's loss mitigation program shall,

6   at a minimum, include, A, policies, procedures, and

7   processes that, Romanette i, ensure the bank conducts

8   loss mitigation activities in accordance with

9   applicable state and federal laws and regulations and

10  investor requirements; ii, ensure the bank conducts

11  effective and sustainable loss mitigation activities,

12  including loan modification decisions; iii, ensure

13  the bank performs quarterly evaluation of the

14  effectiveness of loss mitigation systems and tools

15  with a focus on manual processes and controls; iv,

16  ensure the bank adheres to its complaints management

17  policy in implementing procedures, including

18  standards for resolution, reporting, aggregation, and

19  analysis of customer complaints specifically related

20  to the bank's loss mitigation program; and, v, ensure

21  the bank clearly delineates roles, responsibilities,

22  and decision-making authorities with respect to its

23  loss mitigation program.

24             Did I read all that correctly?

25        A.   Yes.



1          Q.    Paragraph B required the bank to keep

2     accurate books and systems of record.  Is that right?

3          A.    Yes.

4          Q.    Paragraph C requires adequate staffing

5     and training for loss mitigation?

6          A.    Yes.

7          Q.    We'll skip number D.

8                Paragraph 3 says, [As read] The bank's

9     loss mitigation program shall also, at a minimum,

10    include, paragraph A, line of business reviews of all

11    loss mitigation activities; and, B, identification of

12    areas that need improvement, based on the results of

13    all loss mitigation decision reviews, which are then

14    incorporated into and addressed by the bank's loss

15    mitigation program.

16                Did I read that correctly?

17         A.    Yes.

18         Q.    C, on the next page, 7, [As read]

19    Measures to verify that loss mitigation decisioning,

20    assumptions, and inputs are updated in an ongoing and

21    timely manner and incorporate applicable changes in

22    state and federal laws of regulations and investor

23    requirements; D, analysis of potential risk of error,

24    arising from preimplementation changes to loss

25    mitigation tools; and E, post-implementation testing

1  and review processes to ensure that loss mitigation

2  tool changes have been made as intended.

3          Did I read all that correctly?

4      A.   Yes.

5      Q.   Okay.  Have you been responsible for

6  implementing this loss mitigation program?

7          MS. KNIGHT:  Object to the form.

8          THE WITNESS:  Can you be more specific,

9  please?

10     Q.   BY MR. WOOTEN:  With respect to this

11  required loss mitigation program in this consent

12  order that involve departments under your

13  supervision, have you been directly involved in

14  implementing this loss mitigation program?

15         MS. KNIGHT:  Object to the form.

16         THE WITNESS:  They -- directly involved

17  not with the areas that you're covering.  I am not in

18  charge of loss mitigation any longer.

19     Q.   BY MR. WOOTEN:  When did that cease?

20     A.   I moved into a new role in March of 2022.

21     Q.   Okay.  So you would have been in charge

22  of loss mitigation from -- it would have been within

23  your umbrella from when to when?  From March '22.

24  When did you begin?

25     A.   Started the role that I described in

 1  August of 2016.
 2       Q.   Okay.  Do you know if this September 9th,
 3  2021, consent order result in additional monetary
 4  penalties against the bank?
 5       A.   Is there a document that you can
 6  reference?
 7       Q.   Yes.  It's AA-ENF-2021-30, also number
 8  2021-036 titled "Consent Order."
 9            The second "Whereas" paragraph says,
10  [As read] The OCC intends to initiate civil money
11  penalty proceedings against the bank pursuant to
12  12 U.S.C. section 1818(i), through the issuance of a
13  notice of assessment of a civil money penalty for
14  engaging in, 1, unsafe or unsound practices related
15  to material deficiencies regarding the bank's loss
16  mitigation activities, including loan modification
17  decisions and operational practices, and inadequate
18  independent risk management and internal audit of the
19  bank's loss mitigation activities; and, 2, violations
20  of the 2018 consent order, AA-EC-2018-15, related to
21  enterprise-wide compliance risk management, the
22  2018 order.
23            Did I read that correctly?
24       A.   Yes.
25       Q.   On page 2 of that document, the con- --

1  the "Comptroller's Findings," it says, [As read] The

2  comptroller finds, and the bank neither admits nor

3  denies, the following:  1, The bank has significant

4  deficiencies related to its loss mitigation

5  activities; and, 2, The OCC has identified and

6  previously communicated to the bank the following

7  deficiencies and unsafe or unsound practices with

8  respect to loss mitigation.

9          And it looks like it has the same

10  information we looked -- looked at in the previous

11  order.  Correctly (sic)?

12      A.   It does.

13      Q.   Okay.  Article III is titled, "Order for

14  a Civil Money Penalty."  And therein, the OCC states,

15  [As read] The bank shall make -- make payment of a

16  civil money penalty in the total amount of

17  $250 million, which shall be paid upon the execution

18  of this order.

19          Did I read that correctly?

20      A.   You did.

21      Q.   Okay.  Over on page 5, under Article V,

22  "Closing," it says, [As read] Nothing in this order,

23  however, shall prevent the OCC from -- under

24  paragraph D -- utilizing the comptroller's findings

25  set forth in Article II of this order in future

1  enforcement actions against the bank or its

2  institution-affiliated parties to establish a pattern

3  or the continuation -- continuation of a pattern.

4           Did I read that correctly?

5     A.   Yes.

6     Q.   Now, you're familiar with -- you had the

7  opportunity to read our 30(b)(6) deposition notice in

8  your preparation.  Correct?

9     A.   As stated earlier, yes.

10    Q.   All right.  Let's try to knock out a

11 couple of these topics.

12          You've been working in servicing for --

13 you said 22 years.  Right?

14    A.   No.

15    Q.   Okay.  Tell me how long it was again?

16    A.   18 and a half.

17    Q.   18 and a half.  I'm sorry.  I got my

18 numbers confused.

19          During that entire time, Wells Fargo's

20 mortgage system of record is something commonly

21 referred to as MSP.  Is that right?

22    A.   That's correct.

23    Q.   Okay.  And that's a product that is --

24 the current company that owns it is called Black

25 Knight.  Right?

1  any materials, documents, records of any type related

2  to your preparation to testify that were not provided

3  to you by counsel?

4        A.   No.

5        Q.   Okay.  Tell me why Wells Fargo chose to

6  continue ongoing foreclosures that were impacted by

7  this 2011 consent decree?

8             MS. KNIGHT:  Object to the form.

9             THE WITNESS:  The consent order did not

10 prohibit Wells Fargo from continuing foreclosures.

11 It required a review.

12       Q.   BY MR. WOOTEN:  Okay.  And the review was

13 being done because of concerns with problems with the

14 process.  Right?

15            MS. KNIGHT:  Object to the form.

16            THE WITNESS:  I believe we have reviewed

17 twice what the -- why the OCC issued the consent

18 order.

19       Q.   BY MR. WOOTEN:  Okay.  At the time this

20 consent decree was entered, Wells Fargo had a

21 portfolio of $8,900,000 -- 8,900,000 loans according

22 to this consent order.  Correct?

23            MS. KNIGHT:  Object to the form.

24            THE WITNESS:  That hasn't changed since

25 we reviewed it earlier, so that is correct.

1        Q.   BY MR. WOOTEN:  So you said Wells Fargo

2   continued its existing foreclosures that were

3   impacted by the consent order because the consent

4   order did not prohibit Wells Fargo from doing so.  Is

5   that right?

6             MS. KNIGHT:  Object to the form.

7             THE WITNESS:  I'll need you to restate

8   the question because there's a lot in it, so I need

9   to ensure I'm answering it accurately.  I can state

10  what I said.

11       Q.   BY MR. WOOTEN:  Just a second.  I think

12  my question earlier was I asked you to tell me why

13  Wells Fargo chose to continue with foreclosures that

14  were affected by the consent order rather than

15  stopping them.

16       A.   I believe my answer was I -- there was

17  nothing in the consent order which prohibited

18  foreclosures.  In -- in addition, Wells Fargo also

19  has to ensure that we follow investor guidelines,

20  and -- and that's also another reason why you move

21  forward -- or the guidelines of the investor.

22       Q.   Okay.

23       A.   I will also just note and -- for purposes

24  of this, the Garcias' foreclosure was prior to

25  entering -- signing or entering into the consent

1  would have been some consumers who requested

2  mediation.  Right?

3          A.    Correct.

4          Q.    And then there would have been consumers

5  who pursued litigation.  Right?

6          A.    Correct.

7          Q.    And -- and all that was sort of triggered

8  by this initial communication that was sent out with

9  respect to this issue to the consumers that were

10 impacted.  Right?

11             MS. KNIGHT:  Object to the form.  Vague.

12             THE WITNESS:  Um, you're asking if those

13 reactions, whether a customer cashed their check and

14 moved forward --

15         Q.    BY MR. WOOTEN:  Let me ask it a better

16 way.

17         A.    -- went through a mediator?  I'm sorry.

18 I just don't understand --

19         Q.    Just strike the question.  Let me ask it

20 a better way.

21             There was no way for a consumer to know

22 this had happened to them until Wells Fargo told

23 them.  Right?

24         A.    Not to my knowledge.

25             MS. KNIGHT:  Object to the form.

1            Go ahead.

2            THE WITNESS:  Not to my knowledge, no.

3       **Q.   BY MR. WOOTEN:  Okay.  Good enough.**

4  **Let's try to move this along a little bit here.**

5            MS. KNIGHT:  We've been going over -- a

6  little over an hour, but if you're almost finished,

7  then we can probably just finish.  But if you have

8  another hour, a different -- different category.

9            MR. WOOTEN:  Yeah.

10           MS. KNIGHT:  What do you think?

11           MR. WOOTEN:  We've still got to cover the

12  HAMP stuff, and I'm still going through these

13  documents that we identified.  So if you want to take

14  a break, I'm fine with taking a break.

15           MS. KNIGHT:  What do you want to do?  Do

16  you --

17           THE WITNESS:  Doesn't matter to me.  I'd

18  rather get it done.

19           MS. KNIGHT:  Okay.  We'll keep going.

20      **Q.   BY MR. WOOTEN:  Okay.  Let's look at the**

21  **document that's been identified as Wells Fargo 66783.**

22      A.   I have the document in front of me.

23      **Q.   Okay.  This -- can you tell me what this**

24  **document is.**

25      A.   So it's similar to the last document as

1   part of the commitment to customer program that was

2   in place, which that was one of the programs that --

3   in the remediation space.  So similar to the document

4   we previously reviewed that covered the remediation

5   details, this is another form that was required to

6   assess the materiality of issue.

7        **Q.   All right.  And so it looks like there's**

8   **some type of scoring system on this document.**

9             **Can you explain what that is.**

10       A.   I didn't personally create the form; so I

11  can't describe the methodology behind it.  But to my

12  knowledge of preparing for today, it does have

13  weight -- a weight that's per question, based on the

14  answer that is provided to the question.

15       **Q.   Okay.  And I think the document also**

16  **includes a scale, when the scoring is done, to**

17  **evaluate the severity of the issue.  Right?**

18            MS. KNIGHT:  Object to the form.

19            THE WITNESS:  Are you referring to a

20  certain section on the form that you want me to

21  reference?

22       **Q.   BY MR. WOOTEN:  Yeah.  If you go down to**

23  **part G, which says "Conclusion," there's a legend.**

24       A.   Okay.

25       **Q.   And it says, "Risk level."  And it gives**

1  section A, there's a question 3.  [As read] Does the

2  issue appear to be systemic in nature, i.e.,

3  affecting multiple consumers due to one or more

4  common root causes?

5          And the answer says, [As read] Yes,

6  multiple consumers have been impacted by this issue.

7          Correct?

8      A.   Yes.

9      Q.   Okay.  Then right below that, question 4,

10  [As read] Does the issue appear to be within the

11  control of Wells Fargo or parties under Wells Fargo's

12  control?

13          And that answer was, [As read] Yes, this

14  issue is within the control of Wells Fargo.

15          Correct?

16      A.   Yes.

17      Q.   Under section D, there's a question that

18  says, does the -- it's [As read] Number 1, does the

19  risk -- does the issue appear to affect high-risk

20  consumers, protected classes, or vulnerable

21  populations, for example, service members, loss

22  mitigation, workout mortgage borrowers, foreclosures,

23  et cetera?  Or does the issue appear to involve

24  potential discrimination and/or pose potential fair

25  lending-related risk?

1              And the answer to that was, [As read]

2   Yes.  This issue impacts loss mitigation and

3   foreclosure loans.

4              Correct?

5        A.   Yes.

6        Q.   And number 2 says, [As read] Does this --

7   the issue appear to affect consumers nationwide?

8              And the answer was [As read] Yes, this

9   issue does affect consumers nationwide.

10             Correct?

11       A.   Yes.

12       Q.   All right.  Let's move to 66929, please.

13       A.   66929.  Okay.

14             I have the document in front of me.

15       Q.   Well, now, I got to give myself a second

16   to get it in front of me.

17             Just a second.  Making sure I have the

18   right order here.

19             Okay.  I've got to open it up on another

20   screen.  I'm sorry.  It's, obviously, one of the ones

21   I downloaded.

22             Let's just skip that one for a second and

23   go over to 66809.

24             MS. KNIGHT:  That one is not listed in

25   topic 17.  Are you sure -- can you look again?

1   it's signed April thir -- April 2009.

2          MR. WOOTEN:  Okay.  Do you have the

3   amended one that's signed in March of 2010?

4          MS. KNIGHT:  Uh, I don't think so.  Do

5   you have it?

6          MR. WOOTEN:  Yeah.  Let me screen-share

7   it.  I just want to look and see.  Give me just a

8   second.  I may have the 2009 one as well.  I've

9   got -- I think this is still the 2010 one.  Let me

10  just double-check that.  Let me just share this.

11         Q.  BY MR. WOOTEN:  Just a second.  My device

12  was locking up.  Can you see the amended and restated

13  commitment to purchase financial instrument and

14  service participation agreement?

15         A.  I -- I do see it.

16         Q.  Okay.  Highlights, again, are mine.  This

17  document, as I mentioned, was signed in March of 2010

18  by Mike -- Michael Held.

19         A.  Mike Heid.

20         Q.  Heid?  Is it H-e-i-d instead of H-e-l-d?

21         A.  That's correct.

22         Q.  Okay.  I've been reading that as "L" this

23  whole time.  I apologize.

24         All right.  So the first highlighted

25  portion of this document says, [As read] In

1   connection with the implementation of HAMP, the

2   primary purpose of which was the modification of

3   first lien mortgage loan obligations and the

4   provision of loan modification and foreclosure

5   prevention services relating thereto, quote, the HAMP

6   services, end quote.

7          Did I read that correctly?

8   A.   That is what it states, yes.

9   Q.   Is there any disagreement about this

10  being the purpose of HAMP?

11         MS. KNIGHT:  Object to the form.

12         THE WITNESS:  No.

13  Q.   BY MR. WOOTEN:  Okay.  Now, I'm actually

14  going to flip over to second page, paragraph B under

15  number 1, "Services."  This paragraph says, [As read]

16  Subject to section 10(c), servicer shall perform the

17  services described in Romanette i, the financial

18  instrument attached hereto as Exhibit B, the

19  financial instrument; Romanette ii, the service

20  schedule attached hereto collectively as Exhibit A;

21  iii, the guidelines and procedures issued by the

22  Treasury with respect to the programs outlined in the

23  service schedules, the program guidelines; and, iv,

24  any supplemental documentation instructions,

25  bulletins, frequently asked questions, letters,

1      Q.   There's a certification under Exhibit C.

2  I think if you'll compare those certifications back

3  to the representations of the warranties, you'll find

4  they more or less match up.

5           Have you had a chance to look at these

6  documents before today?

7      A.   As I believe we referenced, I looked at

8  the initial one.  I don't believe the amended one was

9  in my material.

10     Q.   So --

11     A.   It's the -- it's -- I think they're

12 pretty close to the same.

13     Q.   Are you aware that the HAMP program

14 required a participating servicer to consider a HAMP

15 modification prior to foreclosure for any delinquent

16 borrower?

17           MS. KNIGHT:  Object to the form.

18           THE WITNESS:  Yes, under the

19 circumstances that were outlined in the HAMP

20 document.  Correct.

21     Q.   BY MR. WOOTEN:  And Wells Fargo was

22 required to certify for each loan that it had

23 considered a borrower for HAMP prior to foreclosure.

24 Correct?

25           MS. KNIGHT:  Object to the form.

1              THE WITNESS:  I -- I'm not -- you're
2    asking if we certify -- had to certify at a loan
3    level?
4         Q.   BY MR. WOOTEN:  Yes.
5              **Are you familiar with the guideline that**
6    **required to you execute a certification to your**
7    **foreclosure counsel record that you had properly**
8    **considered a borrower for HAMP?**
9              MS. KNIGHT:  Mr. Wooten, I'm just going
10   to object, because that's not what the -- what the
11   certifications at the state level say, and I'm pretty
12   sure you know that.  It's right-party contact.  So
13   I'm just going to object to the extent that
14   misconstrues the obligation of the certifications
15   that are to be made at loan level.
16             Do you want to ask again?  Try?
17        **Q.   BY MR. WOOTEN:  No.  I'm going to -- hold**
18   **on just a second.  I'll find that.  We'll come back**
19   **to it.**
20             **Okay.  I found it.**
21             **This is a document, Wells Fargo**
22   **Garcia_625, certification in accordance with the**
23   **federal government's HAMP and the supplemental**
24   **directive 10-02, dated March 24th, 2010.  [As read]**
25   **The supplemental directive, Wells Fargo, as the**

1 | **servicer, hereby certifies that, Number 1, the**
2 | **borrower has been evaluated for HAMP and was**
3 | **determined to be ineligible for the program.**
4 | **Did I read that correctly?**
5 | A.    That's what it states, yes.
6 | **Q.    Okay.  And is that signed October 7th,**
7 | **2010, by M.Keith Hallman at HAMP --**
8 | MS. KNIGHT:  I'm going to place -- I'm
9 | placing a standing objection on the record, because
10 | that is not a complete statement of what the document
11 | says.  Your question to her was, you must certify, on
12 | a loan level, that you evaluated a particular loan
13 | for HAMP, when the certification is much broader than
14 | that.
15 | So I'm just going to place a standing
16 | objection on the record that you are not putting a
17 | complete statement of the document into the record.
18 | MR. WOOTEN:  Okay.  Well, Counsel, it
19 | actually requires that Wells Fargo certify all six of
20 | these points, but the only one I'm concerned about is
21 | number 1.
22 | MS. KNIGHT:  Actually, it requires them
23 | to establish that they've made efforts to outreach --
24 | I'm not going to argue with you about it.  Your
25 | question was, is the bank required to certify that it

1           THE WITNESS:  I don't have the dates in

2    front of me, but I know the Garcias were offered a --

3    a modification prior to the August time period in

4    which they did not make trial payments.

5           **Q.   BY MR. WOOTEN:  They were never offered a**

6    **HAMP modification.  Right?**

7           A.   I believe that is correct.

8           **Q.   Okay.  So this is a HAMP certification.**

9    **Right?**

10          A.   Yes.

11          **Q.   Okay.  So with respect to HAMP, they were**

12   **never offered a trial period plan and failed to make**

13   **payments.**

14          A.   On a HAMP-specific program, no.

15          **Q.   Okay.  [As read] The servicers**

16   **established right-party contact.  I sent at least two**

17   **written requests, asking the borrower to supply**

18   **required information in accordance with a**

19   **supplemental directive and has otherwise satisfied**

20   **the reasonable effort solicitation standard, and the**

21   **borrower failed to respond by the dates indicated.**

22          **We know that's not true also.  Right?**

23          MS. KNIGHT:  Object to the form.

24          THE WITNESS:  As we already acknowledged

25   and have not denied, we unfortunately had the error

 1 | for a legal conclusion.  And for speculation.
 2 |           THE WITNESS:  I -- I can't provide a
 3 | legal opinion.  I'll just restate that.
 4 |      **Q.   BY MR. WOOTEN:  No.  I'm not asking you**
 5 | **for a legal opinion, ma'am.  I'm asking you for a**
 6 | **factual opinion.**
 7 | **          If your program did not evaluate my**
 8 | **clients with the correct information, were my clients**
 9 | **properly evaluated?**
10 |           MS. KNIGHT:  Object to the form.  Same
11 | objections.
12 |           THE WITNESS:  You're asking it to me in
13 | conjunction with the certification?  We did not know
14 | at the time of this certification of the error to
15 | take it into account.  We have completely
16 | acknowledged that we did not properly evaluate the
17 | customer or relate it to the attorneys' fees error.
18 |      **Q.   BY MR. WOOTEN:  Okay.  Well, thank you**
19 | **for that.**
20 | **          And another facet of the HAMP program was**
21 | **that you could not advance a foreclosure until you**
22 | **had properly evaluated a consumer for HAMP.  Correct?**
23 |           MS. KNIGHT:  Object to the form.
24 |           THE WITNESS:  Um, there were various
25 | provisions within HAMP.  In this situation, we did

1          MR. WOOTEN:  Okay.

2          MS. KNIGHT:  NPV is not at issue in the

3    case, number one.  Number two, Ms. Bell has not been

4    designated to talk about NPV.  It's not a topic, and

5    it's not relevant to the case, and that's been well

6    established.  It's in the testimony from the

7    Hernandez transcripts.

8          If she can answer your questions about

9    NP -- NVP -- NPV on a personal level, she can do

10   that.  And I also would like you to allow her to

11   explain why your statements to her are incorrect.

12         MR. WOOTEN:  Okay.  And I think I allowed

13   her to answer the last question that was on the

14   record before you made your statements about me

15   misrepresenting something that started this side bar.

16   I don't have a question on the table right now.

17         MS. KNIGHT:  Okay.  Well, ask your

18   question.

19         MR. WOOTEN:  Okay.  Thank you.  I will.

20      **Q.   BY MR. WOOTEN:  Chapter C65.7.1 is titled**

21   **"Foreclosure Actions and Borrowers in Bankruptcy,"**

22   **and that's current as of September 1st of 2010.**

23         **And under "Foreclosure Actions," it says,**

24   **[As read] Number one, prohibition on referral and**

25   **sale.  A servicer may not refer any mortgage to**

1  | foreclosure or conduct a scheduled foreclosure sale
2  | unless and until at least one of the following
3  | circumstances exist.
4  |           The first bullet point says, [As read]
5  | The borrower is evaluated for HAMP and is determined
6  | to be ineligible.  Refer to section C65.6B, step 6,
7  | for information on second-level review.
8  |           Did I read that correctly?
9  |      A.   That is what it states.
10 |      Q.   Okay.  Now, again, you already said Wells
11 | Fargo did not properly evaluate the clients for HAMP
12 | because of the HPA tool error.  Correct?
13 |      A.   That's not what I stated.  I said that we
14 | regret that we -- that we regret -- sorry.  I'm not
15 | getting my own words right.
16 |           I stated that we acknowledge in 2010, we
17 | did not evaluate them properly.  We did not know that
18 | at the time, and as soon as we identified there was
19 | customer impact, which was when we started the review
20 | in 2018, we immediately took action to remediate
21 | customer impact.
22 |      Q.   Okay.  Did HAMP -- the requirements of
23 | HAMP, did they allow Wells Fargo to continue with
24 | foreclosure without a proper evaluation of the
25 | borrowers' eligibility?

1    the scheduled foreclosure sale date, the deadline, or

2    any extension thereof.

3              Does this bullet point appear to cover

4    the reasoning for the certifications that we looked

5    at a few minutes ago?

6              MS. KNIGHT:  Object to the form.

7              THE WITNESS:  We're required to certify

8    per what this bullet states.  And, as I stated, we

9    certified based on what we knew at the time, which is

10   that we did a review of the customer beforehand.

11             MS. KNIGHT:  For the record, this wasn't

12   a Freddie loan.  I don't think there's any material

13   differences between the non-GSE/GSE guidelines for

14   HAMP, but I just wanted to point out you're using a

15   Freddie document.  So, again --

16             MR. WOOTEN:  Sure.

17             MS. KNIGHT:  -- I think the requirements

18   are fairly similar across with what you're talking

19   about.  I just want to point that out for the record.

20        Q.   BY MR. WOOTEN:  Page C65-80, the section

21   C65.13, titled "Fair Treatment and Legal Compliance."

22   And the first heading is the letter A, "Compliance

23   With Applicable Laws."

24             And that says, [As read] The servicer's

25   implementation of HAMP and all actions taken under

1   this chapter must comply with all applicable federal,

2   state, and local laws and regulations, including but

3   not limited to section 5 of the Federal Trade

4   Commission Act and similar applicable laws that

5   prohibit unfair or deceptive acts or practices.

6            Did I read that correctly?

7       A.   Yes.

8       Q.   Moving over to page C65-82.  The heading

9   is C65.15, "Compliance."

10           It says, [As read] Servicers must comply

11  with all Freddie Mac HAMP requirements and must

12  document the execution of loan evaluation, loan

13  modification, and accounting processes.  Servicers

14  must develop and execute a quality assurance program

15  that includes either a statistically based, with a 95

16  percent confidence level, or a 10 percent stratified

17  sample of loans modified, drawn within 30 to 45 days

18  of final modification, and reported on within 30 to

19  45 days of review.

20           [As read] In addition, a trending

21  analysis must be performed on a rolling 12-month

22  basis.  The scope of the assessments will include,

23  among other things, an evaluation of the mortgage

24  file, servicing system, and all other documentation

25  required to be maintained to confirm the servicer's