**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EDUARDO GARCIA and JULIA GARCIA,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No.  20 C 2402** |
| | ) | |
| **WELLS FARGO BANK, N.A.,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2008, two years after refinancing their mortgage, Plaintiffs Eduardo and Julia Garcia faced a twin crisis.  At the same time the national economy cratered—and Mr. Garcia encountered difficulty finding work—the interest rate on Plaintiffs' adjustable-rate mortgage skyrocketed.  Their payments, once $1,600 a month, jumped to a monthly payment in excess of $3,000.  In a matter of months, the Garcias were in default, facing foreclosure and at risk of losing their home.  In April 2010, Plaintiffs applied for a mortgage modification under then-President Obama's signature "Home Affordable Mortgage Program," known as "HAMP," a modification which would have reduced their monthly payments.  In hindsight, everyone agrees the Garcias qualified for the loan modification they sought.  Defendant Wells Fargo, the loan servicer for the Garcias' mortgage loan, was therefore required to offer them a "trial" modification.  If they made three trial payments on time, Wells Fargo would make the modified payment permanent.

But in August 2010, Wells Fargo denied Plaintiffs' application.  As Wells Fargo would later admit, in developing software to evaluate HAMP applications, Wells Fargo introduced an error that resulted in more than a thousand erroneous denials.  As a result, Wells Fargo denied the Garcias a trial modification that both parties agree it should have granted and that both parties agree would have reduced Plaintiffs' monthly payments by more than 50 percent.  Wells Fargo admitted its error in a 2019 apology letter to Plaintiffs and mailed checks totaling $24,500 in compensation.  Wells Fargo later settled a class action stemming from the same error, agreeing

to pay more than $40 million to resolve the claims of approximately 1,250 class members. *See* Final Approval Order [337], *Hernandez v. Wells Fargo Bank, N.A.*, No. 3:18-cv-07354 (N.D. Cal. Jan. 9, 2022). Plaintiffs, not satisfied with the cash payments or the class action recovery, sued under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").[1]

Wells Fargo now moves for summary judgment, arguing that Plaintiffs cannot show its conduct was "unfair" under ICFA because they could have accepted an earlier modification offer, but chose not to do so: Specifically, in March 2010, Wells Fargo offered Plaintiffs an opportunity to modify their loan under Wells Fargo's standard loss mitigation procedures. Under that modification proposal, Plaintiffs would have paid approximately $3,000 up front and $1,871 per month thereafter, about $500 more per month than the offer Plaintiffs should have received under HAMP. Wells Fargo now contends that, had Plaintiffs accepted this earlier modification offer, the HAMP error would not have occurred—meaning, according to Wells Fargo, that Plaintiffs' refusal to accept the earlier offer defeats their unfairness claim. Wells Fargo argues, further, that, even if Plaintiffs had received the HAMP trial modification to which they were entitled, they would have ended up in foreclosure anyway.

As explained below, these arguments are insufficient to support summary judgment. True, Plaintiffs may have been able to afford the earlier modification. And it is also true that Plaintiffs may have been *unable* to afford the payments required under the HAMP modification, meaning that they would have lost their home even if their application for a HAMP modification had been granted. But those are factual disputes for the jury to weigh, not for the court to decide.

---

[1]     Plaintiffs were one of six parties to opt out of the *Hernandez* settlement. *See* Declaration of Jennifer Keough in Support of Motion for Settlement Approval, Ex. C [284-3], *Hernandez v. Wells Fargo* (August 10, 2020) (listing five opt-outs, including Eduardo Garcia, for original class settlement); Final Post-Distribution Accounting [344], *Hernandez v. Wells Fargo* (Nov. 29, 2022) (listing one opt-out among supplemental class of borrowers).

## FACTUAL BACKGROUND

### I.     Plaintiffs Refinance Their Mortgage at a Subprime Adjustable Rate.

In January 2006, Plaintiffs refinanced the mortgage on their home at 407 Beach Avenue in LaGrange Park, Illinois. (Defendant's Local Rule 56.1 Statement of Undisputed Material Facts [105] ("DSOF") ¶ 15; Plaintiffs' Statement in Response to Defendant's Local Rule 56.1 Statement of Undisputed Material Facts [127] ("PSOFR") ¶ 13.) America's Servicing Company—a division of Wells Fargo[2]—took over loan servicing duties a few months later. (PSOFR ¶ 13.)

When Plaintiffs refinanced, they signed an adjustable rate note for $223,000. (*See* Note [101-13].) The interest rate on that note was initially 8.14 percent—resulting in a monthly payment of $1,658.11—but would begin fluctuating in February 2008 and could increase up to 15.14 percent. (*Id.*) Mrs. Garcia testified that, while the Garcias understood the rate could fluctuate, the financial institution who provided financing told them this was not a concern because they would be able to refinance at an affordable rate later. (Deposition of Julia Garcia ("J. Garcia Dep.")[3] at 84:7–24.) As it turned out, when their interest rate skyrocketed in early 2008, pushing their monthly payment above $3,000, the Garcias were not able to refinance because housing prices had begun to crash. (*Id.* at 85:1–12; DSOF ¶ 20; PSOFR ¶ 20.)

### II.     Plaintiffs Encounter Financial Difficulties and Fall Behind on Their Mortgage.

Mr. Garcia initially worked as an independent carpenter (DSOF ¶ 6) and later formed a business called Woodland Lumber, which dissolved in November 2006, not long after it started. (*Id.* ¶ 11.) Before Woodland dissolved, the Garcias learned that their business partners had absconded with between $20,000 and $40,000, including Plaintiffs' entire investment in the

---

[2]     The court will refer to "Wells Fargo" when describing actions taken by America's Servicing Company.

[3]     Plaintiffs and Defendant have submitted separate excerpts of Julia Garcia's and Eduardo Garcia's depositions, pages of which overlap. (*See* [101-2] and [130-1]; [101-1] and [130-2].) For ease of reference, the court will cite just to "J. Garcia Dep." or "E. Garcia Dep." and will not otherwise specify the exhibit number.

business.  (*Id.* ¶¶ 12–13.)  After Woodland dissolved and the 2008 financial crisis loomed, Mr. Garcia found it difficult to find work.  (*Id.* ¶ 14.)  As Plaintiffs' financial problems mounted, they stopped making their car payments so that they could continue to stay current on their mortgage obligation.  (*Id.* ¶ 16; Deposition of Eduardo Garcia ("E. Garcia Dep.") at 88:6–25.)

In February 2007, when Plaintiffs fell behind on those payments, Wells Fargo offered and Plaintiffs accepted their first Temporary Forbearance Agreement.  (DSOF ¶ 18.)  They made all the required payments under that Agreement and brought their loan current by September 2007.  (*Id.* ¶ 19; Feb. 2007 Temporary Forbearance Agreement [101-15].)  In March 2008, however, Plaintiffs' mortgage payments increased from $1,658 to around $3,000.  (DSOF ¶ 20.)  That same month, worried about their ability to pay $3,000 per month over the long term, the Garcias applied for a loan modification, which was evaluated under Wells Fargo's standard (non-HAMP) loss mitigation process.  Wells Fargo denied the Garcias' request because their expenses exceeded their income.  (*Id.*; *see also* March 2008 Denial Letter [101-16].)  By September, the increased payments became too much for the Garcias; they fell behind again and were notified that they were in default.  (DSOF ¶ 21.)

Over the next several months, the Garcias entered into two other forbearance plans, but they were unable to make the required payments.  (*See id.* ¶ 22 (detailing failure to comply with non-HAMP forbearance plans in September 2008 and August 2009).)[4]  In December 2009, Mr. Garcia wrote a letter to Wells Fargo, explaining that the Garcias had been victims of fraud, were left with many debts, and that Mr. Garcia was having trouble finding work.  (*Id.* ¶ 24.)  In January 2010, Plaintiffs were again denied a loan modification, purportedly because they "did not provide

---

[4]        Plaintiffs wrote "disputed" in response to Paragraph 22, but the content of their response makes clear that they do not dispute the facts, but rather how those facts should be characterized.  (*See* PSOFR ¶ 22 (noting that the "Special Forbearance Plans" at issue "were not HAMP modifications"); *see also* November 2008 Letter [101-20] (detailing failure to comply with September 2008 agreement); September 2009 Letter [101-21] (detailing failure to comply with August 2009 agreement).)

. . . all of the information needed" (January 2010 Denial [101-28]), though Plaintiffs claim that they repeatedly did send the required documents.  (*See* PSOFR ¶ 38.)[5]

### III.     The HAMP Program Is Created During the Financial Crisis.

In response to the financial crisis—specifically, in response to the massive spike in default and foreclosure rates—then-President Obama announced the creation of HAMP in February 2009.  (Expert Report of Peter M. Ross [102-1] ("P. Ross Rep.") ¶¶ 18–20.)  The program went into effect in April.  (*Id.*)  HAMP was intended to balance the financial interests of borrowers and lenders/investors.  (*Id.* ¶ 26.)  To that end, HAMP directed that lenders evaluate loan modification requests using a formula that assessed whether "the financial return for investors from a modification was superior to the anticipated financial outcome of foreclosure proceedings."  (*Id.*)  Put differently, borrowers would qualify for a HAMP modification if a modification also served the financial interests of their lender.  To qualify for such a modification, a borrower had to meet certain requirements.  A borrower had to have a first lien mortgage loan, the loan had to be in default, the borrower had to document financial hardship, and the borrower's pre-modification monthly housing payment had to exceed 31 percent of their income.  (*Id.* ¶ 29.)  If a borrower met these requirements and submitted necessary paperwork, a sequential series of reductions would be applied to the loan until the payment was equal to or less than 31 percent of the borrower's income.  (*Id.* ¶ 34.)  Under that process, servicers would first capitalize the past due balance, then lower the interest rate, then extend the remaining term up to 480 months, and finally would reduce or defer the principal balance until it produced a monthly payment that was less than 31 percent of the borrower's gross income.  (*Id.*)

Borrowers who qualified for a HAMP modification were required to first make three successful "trial" payments in full and on time before their loan would be permanently modified.

---

[5]      The same thing happened in December 2010, when Wells Fargo apparently did not receive the documents Plaintiffs claim they sent.  (*See* December 2010 Denial [101-29]; DSOF ¶ 38; PSOFR ¶ 38.)

(*Id.* ¶ 36.)  As an incentive to servicers, for every borrower whose loan was successfully modified, the Treasury Department would pay the servicer $1,000 up front and $1,000 annually for up to five years thereafter, so long as the borrower remained current.  (*Id.* ¶ 45.)

## IV.    The March 2010 Modification Offer.

In March 2010, Wells Fargo offered the Garcias a loan modification that required them to make a one-time $3,000 down payment and monthly payments of $1,871.  (Plaintiffs' Local Rule 56.1 Statement of Additional Material Facts ("PSOAF") ¶ 37.)  That modification was not offered under HAMP.[6]  (*Id.*)  According to the Garcias, to comfortably afford their mortgage, the payments would have had to be $200 or $250 below the $1,871 payment proposed by this March 2010 modification offer.  (*Id.* ¶ 38.)  While Plaintiffs now dispute whether they technically "declined" the modification (*see* DSOF ¶ 27; PSOFR ¶ 27), Mr. Garcia testified that the family decided not to accept the modified payment because they needed a lower payment "to be completely certain that [they] would be able to continue on with it."  (E. Garcia Dep. at 138:4–20; *see also* April 2010 Letter [101-24] (noting that "[a]s [he] requested," Wells Fargo was cancelling Mr. Garcia's request for a loan modification).)   Mr. Garcia recalled being concerned that Mrs. Garcia's medical situation—as discussed below, she suffers from fibromyalgia, depression, and chronic migraines—was precarious and could become more challenging, which could prevent her from working, and affect the family financially.  (E. Garcia Dep. at 139:6–22.)

Mrs. Garcia similarly testified that their "intention was to negotiate" with Wells Fargo for a lower payment so they could "be sure [they] can pay [their] mortgage in a long term" rather than relying on others to help with the payments.  (J. Garcia Dep. at 126:7–15.)  Had she understood it was her last opportunity, Mrs. Garcia explained, she would nevertheless have found a way to make the $1,871 monthly payments, but that "with all the media talking about . . . this program,

---

[6]        The parties do not explain why the modification Wells Fargo offered the Garcias was not under HAMP.  But, as discussed below, Wells Fargo had only agreed to participate in HAMP earlier that same month.  *See* Background Section V, *infra*.

affordable house from President Obama," the Garcias believed Wells Fargo would work with them in good faith to modify their mortgage under HAMP. (*Id.* at 134:16–135:11.) Mrs. Garcia later reiterated that, if she had understood that Wells Fargo would not negotiate further, the family would have found a way to make their payments, whether it was by "wash[ing] cars in the church, sell[ing] baking goods, asking family, whatever." (*Id.* at 136:11–22.) Given the economic circumstances at the time, Mrs. Garcia understood that "[b]anks were working to help people to keep their houses," though she also understood that "if you don't pay something, they will take" the house. (*Id.* at 137:17–21.) She believed, though, that the bank was "obligated by the government, by the program that the President implemented," to negotiate with the Garcias and help them keep their home. (*Id.* at 174:12–23.) Instead, according to Mrs. Garcia, Wells Fargo "never assigned a human being to talk to [her] on the phone, or [her] husband, and explain and negotiate with [them] . . . the affordable housing, according to [their] budget, as the program of President Obama implemented." (*Id.* at 42:14–20.)

Mr. Garcia testified that, while he understood the family would lose their house to foreclosure without a modification, he was nevertheless unwilling to accept the modification Wells Fargo was offering because, unless they could reach an agreement that would set their monthly payments below the $1,871 per month proposed in March 2010, the Garcias "would again be faced with the same problem." (E. Garcia Dep. at 141:23–142:17.)

## V.    Wells Fargo Erroneously Denies Plaintiffs' HAMP Application.

When Wells Fargo agreed to participate in the HAMP program in March 2010, it executed a Service Participation Agreement and agreed to comply with Treasury regulations and guidance. (PSOAF ¶¶ 5–6; Servicer Participation Agreement [130-17] at WF_GARCIA_00003030.) Under HAMP and its various related agreements, Wells Fargo was required to consider delinquent borrowers for a HAMP modification before proceeding with foreclosure. (PSOAF ¶ 11.)

During the time Wells Fargo was considering HAMP modifications, a calculation error in the software application Wells Fargo used to determine eligibility—called the "Home Preservation

Application Tool" or "HPA Tool"—caused Wells Fargo to erroneously deny trial loan modifications for a number of borrowers facing foreclosure. (DSOF ¶¶ 3–4.) In April 2010, Plaintiffs applied for a HAMP trial loan modification, but they were improperly denied in August 2010 because of the HPA tool error. (*Id.* ¶ 33.) Had Wells Fargo offered Plaintiffs the HAMP modification to which they were entitled, the Garcias would not have owed any one-time down payment, and their monthly payments would have been reduced to $1,348.48. (PSOAF ¶¶ 39–40). Wells Fargo announced the error years later, in June 2018, and offered no-strings-attached cash payments to affected borrowers, including the Garcias.[7] (DSOF ¶¶ 3, 5.)

At the time they were erroneously denied, the Garcias had not made a mortgage payment in many months. (*Id.* ¶ 37; PSOFR ¶ 37.) Mr. Garcia testified that he understood that if he and his wife had been approved for a HAMP modification, they would have been required to make trial payments, which they had failed to do under previous (less generous) modification offers. (E. Garcia Dep. at 174:23–175:20.) But he testified that, without Wells Fargo's errors, the family "would have had a chance" to keep their house. (*Id.* at 175:21–176:9.) He said that he believed he and his wife could have afforded a $1,600 payment in late 2010 "even though back in March 2010 the $1,871 payment was too much." (*Id.* at 144:5–12.)

**VI. Plaintiffs Lose Their Home in Foreclosure.**

In January 2009, Wells Fargo filed a foreclosure complaint against Plaintiffs. (DSOF ¶ 42.) Judgment was entered against them in September of that year. (*Id.*) After the erroneous HAMP denial in August 2010, the Garcias were denied another modification in February 2011. (*Id.* ¶ 39.) Shortly thereafter, their home was sold in foreclosure. (*Id.* ¶ 42.) Though the parties dispute the precise details, both sides agree the Garcias were behind by many

---

[7]    Specifically, Wells Fargo sent Plaintiffs two checks—one for $14,500 in July 2019 and a second for $10,000 in November 2019. (DSOF ¶ 5.) Plaintiffs never affirmatively cashed those checks, but Wells Fargo later paid the $24,500 to their bankruptcy estate. *See* Order Granting Turnover of Funds [54], *In re Eduardo Garcia and Julia Escamilla*, No. 11-22208 (Bankr. N.D. Ill. June 1, 2021) (directing Wells Fargo to pay the $24,500 as property of the estate).

months at the time of the sale. (*Id.* ¶ 43, PSOFR ¶ 43.) In May 2011—three months after the foreclosure sale—Plaintiffs filed for bankruptcy, seeking to discharge $130,000 in unsecured debt and the deficiency judgment that followed them after the foreclosure. (DSOF ¶ 44.)

Mr. Garcia's credit was negatively affected in part because the Garcias failed to pay their mortgage. (*Id.* ¶ 66.) Mr. Garcia acknowledged, however, that he did not recall attempting to learn his actual score before or after the foreclosure. (E. Garcia Dep. at 248:18–21.)

## VII. Plaintiffs Suffer the Consequences of Losing Their Home.

Mrs. Garcia has fibromyalgia, depression, and migraines, all of which predate the erroneous HAMP denial. (DSOF ¶¶ 45, 53.) According to Anita Pillai, Mrs. Garcia's physician, her fibromyalgia and migraines began after a "long ago" car crash. (*See* Deposition of Dr. Anita Pillai ("A. Pillai Dep.") [101-34] at 94:24–95:5.) Dr. Pillai was unable to attribute a specific percentage of Mrs. Garcia's pain "to Wells Fargo," but agreed that foreclosure-related stress "could be one of the contributing factors" to her medical issues. (*Id.* at 94:9–23, 114:2–17.)[8] According to Mrs. Garcia, though she began having migraines in 1994, they had "all but gone away by approximately 2004" until they returned when "the issues with [the Garcias'] Family Home began." (*See* Interrogatory Responses [101-37] at 13–14.) Likewise, she testified that she does not claim Wells Fargo caused her fibromyalgia, but she said it had been "very manageable" and it was exacerbated by stress. (J. Garcia Dep. at 256:10–17; *see also* Interrogatory Responses [101-37] at 14.) Mrs. Garcia also said that the lawsuit against Wells Fargo itself caused her stress. (J. Garcia Dep. at 259:17–22.)

As for depression, Mrs. Garcia testified that she was diagnosed in 2009 or 2010 and that her symptoms were worst when the family was losing their home. (*Id.* at 75:6–23.) Mrs. Garcia said that, when she was diagnosed "around the time that we were almost losing the house," she

---

[8]     Notes from two other doctors Mrs. Garcia saw for pain-related issues do not reflect that she mentioned Wells Fargo or the foreclosure. (DSOF ¶ 48; *but see* PSOFR ¶ 48 (noting that both were specialists and were not treating Mrs. Garcia for stress-related issues).)

pleaded with her doctor not to tell her that she was depressed because she "didn't want to accept it." (*Id.* at 253:9–18.) Dr. Pillai said that Mrs. Garcia at one appointment "was in tears crying about losing their home and not having money and not being able to afford another home." (A. Pillai Dep. [130-8] at 37:2–5.) Mrs. Garcia stated that she has never gone to psychotherapy because she been "focused on the physical part of [her] illness" and did not "pay attention to [her] emotional health." (J. Garcia Dep. at 277:21–278:3.) But she later clarified that she does "take care of [her] emotional part," for example through "informal support, like pastoral care and spiritual care, which means a lot to [her] and help[s] [her] a lot." (*Id.* at 278:4–18.)

After the family had to move, Mrs. Garcia said she "started to feel worst and worst" and began to "doubt . . . [her] ability to keep up with [her] job." (*Id.* at 253:19–25.) Receiving the eviction notice, Mrs. Garcia said, was "the worst part" and left her "feeling really down." (*Id.* at 255:3–13.) Mrs. Garcia said that their "lives [were] like hell after that, hell to get an apartment to be in the same school district that [their] daughter needed because of special education services in La Grange Park." (*Id.* at 39:11–18.) She continued: "[A]nd Wells Fargo [is] sitting there, over there knowing—knowing that they made this mistake, but they never told me until 2019. Isn't that malicious?" (*Id.* at 39:20–23.) Mrs. Garcia admitted to having emotional problems during the 2008 and 2009 loan modification processes,[9] but said "the worst part was when [we] finally had to move out, and I got so down, so down." (*Id.* at 255:14–19.) Mrs. Garcia said the same was true of her marriage—there were financial-related stressors starting in 2008, but those issues worsened as the foreclosure progressed. (*Id.* at 214:9–17.)

According to Mrs. Garcia, the stress also affected her career. At the time of the erroneous HAMP denial, she worked as a "program manager" at the Alivio Medical Center, where she had been since 2003. (DSOF ¶¶ 7–8.) She ultimately left Alivio around 2012. (J. Garcia Dep. at

---

[9] Mr. Garcia likewise testified that Mrs. Garcia's health deteriorated during the negotiation process with Wells Fargo, including during the time before they rejected the March 2010 modification offer. (E. Garcia Dep. at 222:2–223:4.)

53:15–17.)  While Mrs. Garcia admitted to having "regular . . . professional disagreements," she insisted that the disagreements were not he reason she left the job.  (*Id.* at 63:5–14.)  Testimony from Mrs. Garcia's former coworkers and daughter suggests that the disagreements did play at least some role in the end of her employment with Alivio, but also that her medical issues became more serious near the time she left.   (DSOF ¶ 9; *but see* PSOFR ¶ 9 (providing additional context).)   For example, Mrs. Garcia's former coworker, Elena Briseño, testified that she understood Mrs. Garcia left Alivio because of disagreements with her supervisors over the organization's strategy.  (*See* Deposition of Elena Briseño [130-5] at 49:11–50:25.)  But Briseño also said that Mrs. Garcia "suddenly became sad and seemed sick" and when Briseño asked her about it, she mentioned the risk that the family might lose their home.  (*Id.* at 25:5–26:25.)  Briseño observed that Mrs. Garcia went to the doctor "a lot more often when she was going to lose her house."  (*Id.* at 71:3–8.)  Susan Vega, another of Mrs. Garcia's former coworkers, testified similarly.  (*See* Deposition of Susan Vega [101-12] at 32:7–19; [130-6] at 57:23–58:14 (testifying that Mrs. Garcia left Alivio because of abusive behaviors by her boss, but also that Mrs. Garcia's issues became "very, very severe" shortly before the family had to move).)

Mrs. Garcia's daughter Miriahm said that her mother left Alivio because "she just didn't like how things were playing out at work, and she just didn't agree to certain things" so she "didn't wish to continue working there."  (Deposition of Miriahm Garcia [101-9] at 108:23–109:7.)  Miriahm also testified, however, that her mom started becoming "overtaken by work" in 2010—around the time of the HAMP modification effort—and was "exhausted a lot" by her work and "struggling with health complications."  (*Id.* [130-4] at 61:3–62:9.)  Finally, Mrs. Garcia's spiritual advisor, Martha Koehler, understood there was a "change of executive director" at Alivio that may have contributed to Mrs. Garcia leaving, but also that Mrs. Garcia was having "some health issues and a lot of stress" at the time she resigned.  (Deposition of Martha Koehler [101-12] at 108:19–109:7.)

For her part, Mrs. Garcia said that she left her job because she could not "do it anymore" and could not "focus [her]self in doing everything that [she] used to do all the time easily."  (J.

Garcia Dep. at 255:19–24.) She was "crying all the time," including at work. (*Id.* at 255:3–13.) Mrs. Garcia testified that her "health got in the way" and she "started having very bad migraines" because—she believes—of "the stress" from "battling with Wells Fargo." (*Id.* at 55:12–56:24.) She explained that she had a lot going on at work but got "really, really preoccupied" with the possibility that the family would lose their home, and she was constantly trying to send Wells Fargo documents she had already sent, at the same time she was juggling work. (*Id.* at 56:25– 57:18.)

Mrs. Garcia testified that she has had no steady full-time employment since leaving Alivio in part because of health issues, for which she blames Wells Fargo. (*Id.* at 73:4–20 (testifying that her health issues have "accumulat[ed] . . . like a snowball").) Mr. Garcia likewise testified that he believed Mrs. Garcia stopped working because of the foreclosure, after which her "sickness came down upon her with more gravity." (E. Garcia Dep. at 220:4–12.)

There is a less robust record on Mr. Garcia's emotional distress and its causes. Mr. Garcia testified that being out of work made him feel angry, anxious, and frustrated at times. (*Id.* at 93:12–15, 104:4–15, 105:17–24.) But he also testified about the guilt and shame he felt around the foreclosure. He said that that "[f]or a long time" he and Mrs. Garcia "thought [they] had done things very badly" and caused the foreclosure. (*Id.* at 168:6–13.) He said he felt guilty and blamed himself for what followed, including Mrs. Garcia's "health situation" and issues with their son Byron, who "had not been able to finish his education." (*Id.* at 168:8–24.) He later explained that "for many years" he believed he "was in error until [he] received [Wells Fargo's] letter," at which point he realized "they are in error." (*Id.* at 268:7–13.)

Mrs. Garcia also testified to her husband's stress. She said that, although Mr. Garcia had been stressed over finances before, "when [they] had to leave the house," he "became so, like, isolated." (J. Garcia. Dep. at 209:23–25.) She said that Mr. Garcia is part of a large family that often celebrates together, but "after [Wells Fargo] took the house, he didn't want to go to any family parties. He didn't want to go even to church. He didn't want to see not even his parents

that are old." (*Id.* at 209:25–210:13.)  Mr. Garcia testified that filing this lawsuit against Wells Fargo caused him emotional distress as well.  (E. Garcia Dep. at 229:17–25.)

## DISCUSSION

### I.     Procedural History

In April 2020, Plaintiffs brought a two-count complaint under this court's diversity jurisdiction,[10] charging Wells Fargo with common law negligence and with violating the Illinois Consumer Fraud Act [1].  On Wells Fargo's motion, the court dismissed the negligence count. *See Maxwell as Trustee for Estate of Garcia v. Wells Fargo Bank, N.A.*, No. 20-cv-2402, 2021 WL 1209023, at *5–6 (N.D. Ill. Mar. 31, 2021) (dismissing negligence claim because HAMP does not create a duty of care for mortgage servicers).  The ICFA claim survived the motion.  Wells Fargo answered [25], the parties engaged in discovery, and Wells Fargo now seeks summary judgment on Plaintiffs' ICFA claim [100].

### II.     Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the court may not weigh conflicting evidence or make credibility determinations, the party opposing summary judgment must point to competent, admissible evidence that demonstrates a genuine dispute of material fact.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011).  In assessing the evidence at summary judgment, the court considers the facts in the light most favorable to the non-moving party, giving that party "the

---

[10]     The Garcias are citizens of Illinois.  (DSOF ¶ 1.)  Wells Fargo is a national banking association with its main office in South Dakota and its principal place of business in California. (*Id.*)

benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014).

This court's local rules require a party moving for summary judgment to file a statement of material facts, consisting of "concise numbered paragraphs" supported by citations to "specific evidentiary material." L.R. 56.1(a)(2), (d). The non-movant must file a responsive statement that admits or disputes each asserted fact. L.R. 56.1(b)(2), (e). "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also* L.R. 56.1(e)(3).

## III. Analysis

A claim under ICFA requires: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 550, 922 N.E.2d 309, 313 (2009). This framework is articulated in terms of "deceptive" acts and practices, but it applies to allegations of "unfair" acts and practices as well. *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014). Wells Fargo argues that: (1) Plaintiffs cannot establish that its error in processing Plaintiffs' HAMP modification application was unfair; (2) Plaintiffs cannot show actual damages; and (3) Plaintiffs cannot show that Wells Fargo proximately caused those damages. (*See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Br.") at 6.) The court evaluates those positions in turn.

### A. Plaintiffs Have Sufficiently Established Unfairness Under ICFA.

To evaluate whether conduct is "unfair" under ICFA, courts consider "1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18, 775 N.E.2d 951, 961 (2002). "All three criteria do not need to be

satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 418 (quotation marks and citation omitted).  Unfairness under ICFA "depends on a case-by-case analysis." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010).

Wells Fargo implicitly concedes that its failure to properly evaluate Plaintiffs for a HAMP modification offended public policy. (*See* Def.'s Br. at 6–11 (discussing only the second and third unfairness criteria).)  Indeed, it is undisputed that Wells Fargo executed a Servicer Participation Agreement in which it promised to administer the HAMP program in compliance with Treasury regulations and guidance. (PSOAF ¶¶ 5–6.)  But a Wells-Fargo-induced software error caused it to deny applications for a HAMP trial modification submitted by Plaintiffs (and many other borrowers); Plaintiffs could not have known about this error until well after the fact. (*See* DSOF ¶¶ 3–5, 33; Wells Fargo 30(b)(6) Dep. [130-12] at 130:21–131:2.)

"A practice offends public policy under ICFA where it violates statutory or administrative rules establishing a certain standard of conduct." *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 630 (N.D. Ill. 2019) (quotation marks omitted).  As is now well established, "[v]iolations of agency directives" like those implementing HAMP "can be a hallmark of unfairness under the ICFA." *See Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 753 (N.D. Ill. 2011) (violating HAMP directives states a claim under ICFA); *see also Lowry v. Wells Fargo Bank, N.A.*, No. 15-cv-4433, 2016 WL 4593815, at *7 (N.D. Ill. Sept. 2, 2016) ("Failure to honestly and effectually implement HAMP guidelines constitutes an unfair business practice under the ICFA.").

Rather than challenge the assertion that failure to implement HAMP violated public policy, Wells Fargo attacks only the second and third unfairness criteria, which ask whether the violation caused substantial injury to the Garcias and/or was "immoral, unethical, oppressive, or unscrupulous." *See Robinson*, 201 Ill. 2d at 417–18, 775 N.E.2d at 961.  Plaintiffs may be able to establish that Wells Fargo's conduct was "unfair" even if they do not establish both substantial

injury and oppressive conduct.  *See id.* ("All three criteria do not need to be satisfied to support a finding of unfairness").

The court nonetheless addresses both issues, holding that there are disputed material facts relevant to both.

### 1.      Substantial Injury

Wells Fargo does not suggest that Plaintiffs' alleged injuries—which include losing their family home—are not "substantial."   Instead, according to Wells Fargo, Plaintiffs' "decision to reject Wells Fargo's March 2010 modification offer" defeats Plaintiffs' ICFA claim as a matter of law because Plaintiffs must show not only that they were injured, but also that they could not have avoided those injuries.  (Def.'s Br. at 10.)  The parties agree that Wells Fargo offered Plaintiffs a (non-HAMP) loan modification in March 2010 under which Plaintiffs would have made a one-time $3,000 down payment and monthly payments of $1,871 thereafter.  (PSOAF ¶ 37.)  It is also undisputed that Plaintiffs did not accept that modification, though the parties quibble about whether Plaintiffs "decline[d]" it.  (*See* DSOF ¶ 27; PSOFR ¶ 27; Defendant's Reply to PSOFR at 4.)

According to Wells Fargo's read of the evidence, Plaintiffs "admit . . . they could have afforded" that loan modification and chose not to accept it.  (Def.'s Br. at 11.)  If that were undisputed, summary judgment might be warranted.  But it is not.  To be sure, there is some evidence that Plaintiffs might have afforded the March 2010 modification if they had tried.  As Wells Fargo repeatedly notes, Mrs. Garcia testified that if someone had told her "Mrs. Garcia, if you don't take this last opportunity, we're going to sell your house," she would have "f[ound] a way" to pay the $1,871 per month.  (*See* J. Garcia Dep. at 136:11–15.)  She said she did not know exactly how they would have come up with the money, but the family would "wash cars in the church, sell baking goods, ask[] family, whatever, if [Wells Fargo] would have explained to [her] that it was the last one."  (*Id.* at 136:16–22.)  In the court's view, Mrs. Garcia's testimony about how desperately she would have worked to keep her family home hardly demonstrates that

the Garcias actually had the means to afford a monthly payment $500 greater than the one to which they were entitled. There are only so many bake sales and car washes one family can muster.

In any event, Wells Fargo's summary of the evidence does not paint a full picture of Plaintiffs' testimony. As Mrs. Garcia testified, Plaintiffs "intention" when they opted not to accept the March 2010 modification "was to negotiate" with Wells Fargo for a lower payment so they could "be sure [they] can pay [their] mortgage in a long term" rather than relying on others to help with the payments "every month." (*Id.* at 126:7–23.) Mr. Garcia likewise testified that he understood that the family would lose their house to foreclosure without a modification, but he believed that unless they could negotiate a modification setting their monthly payment below $1,871, they "would again be faced with the same problem," *i.e.*, facing default and foreclosure. (E. Garcia Dep. at 141:23–142:17.) Put differently, Mr. Garcia explained that the family declined the proposed modification because unless they were offered a lower monthly payment, they were not "completely certain that [they] would be able to continue on with it." (*Id.* at 138:4–20.) Mrs. Garcia echoed her husband, testifying that a payment of $1,600 versus $1,900 would have made "a big difference" in Plaintiffs' ability to pay over the long term. (J. Garcia Dep. at 135:23–136:8.)

Mrs. Garcia testified that she believed Wells Fargo was "obligated by the government, by the program that the President implemented," to negotiate with the Garcias and help them keep their home. (*Id.* at 174:12–23.) Though not every delinquent borrower qualified for HAMP, as it turns out, the Garcias did. Wells Fargo was indeed required by law to evaluate the Garcias for HAMP before foreclosing. (PSOAF ¶ 11.) And if Wells Fargo had used an error-free software tool, Plaintiffs would have been offered a HAMP trial modification with no up-front payment and monthly payments of $1,348.48. (*Id.* ¶¶ 39–40.) In other words, the HAMP trial modification Plaintiffs were erroneously denied would have saved them $3,000 up front and $523 per month *more* than the March 2010 non-HAMP modification they passed up. Their payments would have been substantially lower than the $1,600 per month they planned to stretch to afford.

Given the dispute about whether the Garcias could have afforded the $1,871 per month non-HAMP modification over the long term, the court cannot conclude that Plaintiffs could "reasonably have avoided" their injury in this case—namely, the foreclosure and eventual sale of their family home. *See Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016). If, as their testimony suggests (and as seems likely), the Garcias could have paid $1,871 per month only for a short period, and only with the help of family or other community members, a reasonable jury could conclude that Plaintiffs would have "again be[en] faced with the same problem," as Mr. Garcia put it. (E. Garcia Dep. at 141:23–142:17.) In other words, their injury may not have been avoidable.

The caselaw Wells Fargo cites does not suggest otherwise. In *Siegel*, for example, the Seventh Circuit affirmed summary judgment in a case alleging unfair conduct that inflated gas prices. 612 F.3d at 933–34. But in that case, the plaintiff "testified that he could (and did) purchase gasoline from stations owned by non-defendants." *Id.* at 937. Here, on the other hand, Wells Fargo was the Garcia's only source for the HAMP trial modification to which they were entitled. Wells Fargo's other citations are unavailing for similar reasons. *See Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 834 (7th Cir. 2014) (plaintiff could have avoided bundled parking fee at concert venue by "opting instead for alternative entertainment"); *Phillips*, 173 F. Supp. 3d at 743 (plaintiff could have avoided injury by choosing not to continue buying virtual chips at online casino); *Mullen v. GLV, Inc.*, 488 F. Supp. 3d 695, 712 (N.D. Ill. 2020) (plaintiff could have avoided injury by enrolling her children at a different volleyball club).

Wells Fargo might ultimately convince a jury that the Garcias' loss of their home "could reasonably have been avoided" if they had accepted the more expensive non-HAMP modification. *See Batson*, 746 F.3d at 834. But, given the disputed material facts on the issue, a reasonable jury might not be convinced.

### 2.     Immoral, Unethical, Oppressive, or Unscrupulous Conduct

"[A] practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Saccameno*, 372 F. Supp. 3d at 631 (quotation marks and citation omitted); *see also Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill. App. 3d 307, 313, 662 N.E.2d 602, 608 (1st Dist. 1996) (oppressive conduct "leave[s] the consumer with little alternative but to submit").   In addition to challenging their injury claim, Wells Fargo argues that Plaintiffs cannot establish unfair conduct because they cannot show that Wells Fargo's failure to properly evaluate them under HAMP was immoral, unethical, oppressive, or unscrupulous.   (Def.'s Br. at 7–10.)   This argument is akin to the one already addressed, in that Wells Fargo emphasizes that the Garcias had a way to avoid Wells Fargo's allegedly unfair conduct: by accepting the $1,871 per month non-HAMP modification.  Thus, Wells Fargo contends, their conduct does not qualify as oppressive.[11]

At the outset, the court believes there is enough to Plaintiff's ICFA claim to reach a jury even if Wells Fargo's conduct was not oppressive.  Recall that "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 201 Ill. 2d at 418, 775 N.E. 2d at 961 (quotation marks and citation omitted).   Here, Wells Fargo's conduct indisputably violated public policy, and Plaintiffs have a reasonably strong position on substantial injury.  Indeed, other cases considering violations of HAMP have not even discussed oppressiveness, either because those courts assumed that criterion was met or because they found unfairness without it.   *See, e.g.*, *Boyd*, 787 F. Supp. 2d at 754 ("Taken together," a violation of HAMP and damages flowing from those violations "state an unfair conduct claim under the ICFA"); *David v. Bayview Loan Servicing, LLC*, No. 15-cv-9274, 2016 WL 1719805, at *6–7 (N.D. Ill. Apr. 26, 2016) (same); *Acevedo v. CitiMortage, Inc.*, No. 11-cv-4877, 2013 WL 1283807, at *4–5 (N.D. Ill. Mar. 26, 2013) (same).  Wells Fargo, on the other hand, has

---

[11]     The court uses the shorthand "oppressive" to include immoral, unethical, and unscrupulous conduct as well.

not identified a single case where a defendant was granted summary judgment under the same circumstances.

The court will nonetheless address the issue of oppressiveness. For largely the same reason Wells Fargo claims Plaintiffs could have avoided their injuries—by accepting the March 2010 modification offer—Wells Fargo urges that its conduct "did not impose a lack of meaningful choice on Plaintiffs." (Def.'s Br. at 7.) But Wells Fargo abstracts the facts of this case one degree of generality too far. The oppressive conduct at issue is not Wells Fargo's modification or delinquency-related behavior generally, but rather its failure to implement HAMP, which it was contractually obligated to do. (*See* PSOAF ¶¶ 5–6.) As noted, the Garcias could only obtain a HAMP modification through Wells Fargo. Indeed, Plaintiffs "had no choice in selecting [Wells Fargo] as [their] loan servicer and [they] had no ability to to get rid of [Wells Fargo] after it began mishandling [their] account." *Saccameno*, 372 F. Supp. 3d at 631. In fact, the Garcias had no way to know Wells Fargo *was* mishandling their account; they did not learn about Wells Fargo's error until years after they lost their home. (PSOAF ¶ 3.)

Wells Fargo repeats its refences to the other modification options offered to Plaintiffs—most notably, the March 2010 modification—but that modification was vastly more expensive than the HAMP trial offer would have been. (*Id.* ¶¶ 37, 40.) Wells Fargo suggests, further, that by offering any modification, even a materially worse modification, Wells Fargo effectively provided a "meaningful choice under ICFA." (*See* Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Reply") at 3 (citing *Tyler v. Bank of New York Mellon*, No. 19-cv-7863, 2020 WL 2735367 (N.D. Ill. May 26, 2020)).) But in the case Wells Fargo cites, *Tyler*, where the plaintiffs rejected the alternative modification the servicer had offered, the plaintiffs "did not qualify for a HAMP modification" at all. *Id.* at *9. Nor did the complaint "suggest that such conduct violated any HAMP guideline." *Id.* The plaintiffs in *Tyler* were not deprived of a meaningful choice because, unlike the Garcias, they were not entitled to make that choice in the first place. Though Wells Fargo reads *Tyler* to categorically bless a HAMP denial if a servicer

offers a non-HAMP modification, the same conduct can be fair to a set of consumers who are not entitled to such a modification, but oppressive and unfair to a set of consumers who are. Take a gym membership, for example. Asking a prospective member—who could choose any gym in town—to pay $100 a month would probably not be oppressive. But it may well be oppressive to lock out a current member—who has a contractual right to pay $75 a month—unless she agrees to pay $100. That is, effectively, what happened here.

The other cases cited by Wells Fargo are distinguishable because, like the prospective gym member, each involved meaningful alternatives that consumers declined to pursue in free markets. In *Siegel v. Shell Oil Co.*, as one example, the "choice" at issue was where to buy gasoline. 656 F. Supp. 2d 825, 833 (N.D. Ill. 2009). The plaintiff could have (and did) buy gas at several different stations, only some of which were engaged in allegedly unfair conduct. *Id.* Likewise, in *Robinson*, the court held that automobile leases with arguably excessive mileage penalties were not oppressive because the penalties were clearly set out in the lease and the plaintiffs "could have gone elsewhere to lease a car." 201 Ill. 2d at 419–20, 775 N.E.2d at 962. Finally, in *Saunders*, a case about unconscionably high overdraft fees, the plaintiff "was free to select another Bank" and had "all of the information necessary to make a meaningful choice in selecting banks." 278 Ill. App. 3d at 314, 662 N.E.2d at 608–09.

Unlike the market for gasoline, car leases, or banking services, the Garcias had no way even to know they had been erroneously denied, much less a different way to obtain a comparable modification. A reasonable jury could therefore conclude that Wells Fargo's conduct was oppressive.

*      *      *

In sum, Wells Fargo concedes that its conduct violated public policy, and a reasonable jury could conclude that Wells Fargo's erroneous denial of Plaintiffs' HAMP trial modification was oppressive and/or caused substantial injury. In other words, Wells Fargo's conduct was arguably unfair under ICFA. Accordingly, the court denies summary judgment on that basis.

21

**B.** **There Are Disputed Material Facts on Proximate Cause.**

Wells Fargo next contends that there is no "genuine issue of material fact regarding proximate cause" because Plaintiffs cannot show that they would have been harmed absent Wells Fargo's conduct. (Def.'s Br. at 11–16.) Wells Fargo emphasizes that Plaintiffs were already seriously delinquent, faced serious financial difficulties, and chose not to accept a different modification. As a result, Wells Fargo asserts, they cannot show that the erroneous HAMP denial proximately caused their foreclosure. (*Id.*) In short, Wells Fargo asks this court to conclude that the Garcias would have faced foreclosure regardless of Wells Fargo's conduct.

"[T]o prevail under ICFA, a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury." *Siegel*, 612 F.3d at 935. Proximate cause "encompasses two requirements: cause-in-fact and legal cause." *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 309 (7th Cir. 2010). Wells Fargo attacks only Plaintiff's ability to show cause in fact.[12] (*See* Def.'s Br. at 12–13.)

For cause-in-fact, the court considers "whether the injury would have occurred absent the defendant's conduct." *Young v. Bryco Arms*, 213 Ill. 2d 433, 446, 821 N.E.2d 1078, 1085 (2004). When "multiple factors . . . may have combined to cause the injury," the court must determine "whether defendant's conduct was a material element and a substantial factor in bringing about the injury." *Id.*, 821 N.E.2d at 1086. "If a plaintiff relies upon circumstantial evidence to show cause in fact, that evidence must be of such a nature and so related as to make the conclusion of causation more probable as opposed to merely possible." *Walker*, 288 F. Supp. 3d at 856 (quotation marks and brackets omitted).

---

[12] Legal cause, the other half of the equation, requires a plaintiff to show that "the ultimate injury was reasonably foreseeable, which is satisfied by proof that a reasonable person could foresee that his conduct could lead to the injury complained of." *Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 856 (N.D. Ill. 2017) (quotation marks omitted). Wells Fargo does not discuss legal cause and therefore concedes the issue. In any event, loss of the Garcias' home was a reasonably foreseeable result of their lender's failure to administer HAMP properly.

For two related reasons, Wells Fargo argues that Plaintiffs cannot show "that an erroneous denial on a single trial modification application can be disentangled from the morass." (Def.'s Br. at 13.) First, because Plaintiffs missed many payments and failed to complete previous modification trials, Wells Fargo urges, Plaintiffs cannot show it was probable that they would have successfully completed the HAMP modification. (*Id.* at 13–15.) Second—largely repeating its argument on substantial injury and oppressiveness—Wells Fargo claims that, because Plaintiffs chose not to accept the March 2010 modification, "the loss of Plaintiffs' home is fundamentally attributable to Plaintiffs' own conduct" rather than Wells Fargo's. (*Id.* at 16.)

The court turns now to those arguments. As with Wells Fargo's positions on unfairness, it is possible a jury might agree. But the court concludes that disputed material facts preclude summary judgment on the proximate cause issue, as well.

### 1. Plaintiffs' "Pattern of Nonpayment" Does Not Preclude a Jury Finding Proximate Cause.

According to Wells Fargo, Plaintiffs' "years of failing to make their loan payments, breaking modification payment plans, and failing to complete applications" means that Plaintiffs have not shown it is "probable" that they would have avoided foreclosure, had Wells Fargo granted them a HAMP trial modification. (Def.'s Br. at 13.)

Wells Fargo's general point—that the Garcias' financial problems did not start or end with the erroneous HAMP denial—is well-supported in the record. The undisputed facts show that Plaintiffs:

- Began experiencing financial difficulties when Woodland Lumber failed and Mr. Garcia thereafter struggled to find work (DSOF ¶¶ 10–12, 14);

- Stopped making car payments in order to have enough money for mortgage payments (*Id.* ¶ 16; E. Garcia Dep. at 88:6–25);

- Missed their first mortgage payment in January 2007 (PSOFR ¶ 17);

- Entered a Temporary Forbearance Agreement in February 2007 to bring their loan current (DSOF ¶¶ 18–19);

- Were in default as of September 2008 (*Id.* ¶ 21);

- Failed to bring their mortgage current under two Special Forbearance Plans in 2008 and 2009 (*Id.* ¶ 22);

- Faced foreclosure beginning in January 2009 (*Id.* ¶ 42);

- Had not paid their mortgage for nearly two years at the time of the August 2010 HAMP denial (*Id.* ¶ 37);

- Were denied a loan modification in February 2011 because their reported monthly expenses exceeded their income (*Id.* ¶ 39);

- Sought to discharge $130,000 in debt from 30 unsecured creditors at the time of their bankruptcy in May 2011 (*Id.* ¶ 44).

Plaintiffs characterize these "deadbeat borrower" arguments as "irrelevant." (Plaintiffs' Memorandum in Opposition to Wells Fargo's Motion for Summary Judgment ("Pl.s' Opp.") at 20.) The court disagrees with Plaintiffs on the relevance issue, but agrees with their larger argument that "the animating purpose of HAMP was to help homeowners in default and at risk of imminent foreclosure." (*Id.*) As Wells Fargo's own expert explains, if borrowers met the HAMP criteria (as the Garcias admittedly did), their loan terms would be modified following a set methodology "until the [mortgage] payment was equal to or less than 31% of the borrower's gross income." (P. Ross Rep. ¶ 34.) Put differently, given that HAMP modifications were intended to reduce payments to an affordable level—and were available only to delinquent borrowers who also had sufficient income to make a modification a better-than-foreclosure outcome for the lender (*id.* ¶ 26)—the Garcias' financial difficulties do not on their own support an inference that a trial HAMP modification would have failed to keep the Garcias in their home.

On reply, Wells Fargo cites several cases suggesting, in its view, that "the facts of the nonpayment are plainly relevant to, and sometime dispositive of, causation" in cases where that nonpayment leads to foreclosure. (Def.'s Reply at 7.) This is not one such time. In *Deutsche National Bank Trust Co. v. Pickar*, the plaintiffs alleged that they were deceived by the defendants, but the court found no deceptive conduct that had occurred prior to the time the plaintiffs defaulted.

*See* No. 12-cv-973, 2017 WL 3475083, at *5 (N.D. Ill. Aug. 14, 2017). And once the plaintiffs defaulted, the lender "became entitled to foreclose on the Mortgage," meaning that "any inaccurate or deceptive statements . . . after that time could not have caused the [plaintiffs] damage." *Id.* Those facts bear little relation to this case, which is based on unfair rather than deceptive conduct. Here, the Garcias indisputably had the right to be (properly) considered for a HAMP trial modification. (PSOAF ¶ 11.) Unlike in *Pickar*, then, Wells Fargo had a duty to comply with HAMP before it was "entitled to foreclose." *See* 2017 WL 3475083, at *5.

Nor is the court moved by Wells Fargo's citation to *Griffin v. U.S. Bank National Association*. In that case, the defendants repeatedly sent plaintiff information concerning his loan modification options and his servicer correctly determined that he did not qualify for a HAMP modification because the property at issue was not his primary residence. *See* No. 15-cv-6871, 2019 WL 4597364, at *5 (N.D. Ill. Sept. 23, 2019). The case has nothing to do with causation; instead, the court concluded that where the defendants "did not violate any duty under HAMP" and plaintiff had "been in default for over eight months," there was "nothing unfair in defendants' exercising their right" to foreclose. *Id.*[13]

Wells Fargo also marshals population-wide statistics and asks the court to infer that "[e]ven if Plaintiffs had been approved for and accepted the erroneously denied trial modification, the evidence does not suggest it is probable that Plaintiffs would have been able to save their home." (Def.'s Br. at 14.) According to Wells Fargo's expert, as of June 2012, only 53 percent of borrowers who received HAMP trial modifications successfully converted to permanent modifications because those borrowers did not supply the necessary documentation, missed payments during the trial period, or withdrew their requests for modification. (DSOF ¶ 41; P. Ross

---

[13] Wells Fargo cites two similarly inapposite out-of-circuit cases that do not address HAMP modifications or other mandatory loss mitigation efforts. *See* Def.'s Reply at 7–8 (citing *Rourk v. Bank of Am. Nat'l Ass'n*, 587 F. App'x 597, 600 (11th Cir. 2014) (failure to make payments fatal to breach of contract and wrongful foreclosure claim); *In re Turner*, BAP No. NC-14-1139, 2015 WL 3485876, at *11 (B.A.P. 9th Cir. June 2, 2015) (alleged defects in assignment and/or securitization process did not lead to wrongful foreclosure).)

Rep. ¶ 74.)  Even for those whose modifications did become permanent, a third or more of those borrowers defaulted again within four years.  (DSOF ¶ 41; P. Ross Rep. ¶ 77.)  Wells Fargo's back-of-the-envelope math suggests that taken together, Plaintiffs' chance of permanently modifying their loan and remaining current were "at most" 40 percent, which is "well short of the probability showing required."  (Def.'s Br. at 14.)

As Plaintiffs point out, "[n]one of these statistics are specifically relevant to the Garcias." (PSOFR ¶ 41.)  Indeed, even if the court were to credit Wells Fargo's math, it does not warrant summary judgment.  At trial, the Garcias will need to convince a jury that it is "probable as opposed to merely possible" that Wells Fargo's conduct was the but-for cause of their injury.  *See Walker*, 288 F. Supp. 3d at 856.  But the Garcias are not seeking summary judgment; as the non-moving party, they need only show that a reasonable jury could find Wells Fargo was the "probable" cause of their injuries.  Wells Fargo's summary statistics might have some relevance to the analysis, but the jury will be called on to consider the most relevant evidence: the facts specific to the Garcias, some of which suggest a HAMP trial modification may well have been successful.

Most notable is the monthly payment—$1,348—to which the Garcias would have been entitled if Wells Fargo has processed their HAMP application properly.  That payment represents not only a massive reduction from their pre-modification payment—more than $3,000 per month— but also a significant reduction even compared to the Garcias' initial payments upon refinancing their mortgage in 2006.  (*See* Note [101-13] (reflecting loan beginning at 8.14 percent interest requiring initial, pre-fluctuation payments of $1,658 per month).)  In other words, the HAMP payment would have cost Plaintiffs $300 less than their payments from 2006 through February 2008, which they paid mostly without incident.[14]  Both Mr. and Mrs. Garcia testified that a payment of $1,600—similar to what they were paying in 2006—would have been feasible for them in 2010.

---

[14]     Plaintiffs briefly fell behind on their payments in early 2007, took advantage of a Temporary Forbearance Agreement to bring the loan current, and remained current until their interest rate exploded in 2008.  (DSOF ¶¶ 18–19.)

(*See* E. Garcia Dep. at 144:5–12; J. Garcia Dep. at 135:23–136:8.) In the court's view, a reasonable jury could find that the Garcias could have made payments $250 below what they testified was comfortable, even considering their history and the summary statistics about HAMP modifications.

Wells Fargo dismisses this evidence, suggesting that Plaintiffs "willfully chose not to make *any* loan payments when they didn't find the payment to be 'comfortable.'" (Def.'s Reply at 11.) Wells Fargo calls the Garcias' conduct "pervasive nonpayment gamesmanship" (*id.* at 12), and contends it demonstrates that Plaintiffs believed they had the choice to pay nothing "until they were offered a modification they liked."[15] *Id.* at 11. But the Garcias would not have faced foreclosure in the first place if they had been able to bring the unmodified loan current. And, according to Plaintiffs' testimony, the modification offers involved uncomfortably high payments that they were not confident they could make. (*See, e.g.*, E. Garcia Dep. at 141:23–142:17.) Wells Fargo implies that Plaintiffs cannot show causation because they did not make partial payments against a delinquent balance that they could never hope to pay off without loss mitigation. But the court is unwilling to assume that Plaintiffs' evident disinterest in throwing good money after bad establishes that they would not have made the HAMP modification payments that they testified would have been affordable.

Wells Fargo contends that the Garcias' testimony "contradicts the record and cannot overcome summary judgment." (*See* Def.'s Reply at 12.) But the Seventh Circuit has "long held that a plaintiff may defeat summary judgment with his or her own deposition." *Paz v. Wauconda Healthcare and Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006). True, "conclusory statements" are not enough. *See Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). The same is true for statements that are "impossible for a reasonable person to credit." *Mills v. First Fed.*

---

[15]     As it turns out, of course, the Plaintiffs *did* actually have the right to a HAMP trial modification before Wells Fargo could foreclose.

*Sav & Loan Ass'n of Belvedere*, 83 F.3d 833, 844 (7th Cir. 1996). But the Garcias' testimony is not impossible to credit. While Wells Fargo accuses Plaintiffs of testifying that they could have afforded $1,600 payments only "after learning in discovery that the erroneously denied payments would have been less than that" (Def.'s Reply at 13), the court believes a reasonable jury could nevertheless credit that testimony.[16] Indeed, Plaintiffs' original mortgage payments—before their interest rate ballooned—were significantly *higher* than the HAMP-modified payments would have been. (*See* Note [101-13].)

The cases Wells Fargo cites to suggest the court should discount Plaintiffs' testimony are inapposite. Those cases involved record facts that entirely contradicted the plaintiffs' testimony. *See, e.g.*, *Spector v. U.S. Bank Nat'l Ass'n*, 286 F. App'x 333, 336 (7th Cir. 2008) (employer required employees to "bring in two loans per week" and loan applications in the record "conclusively establish[ed]" that plaintiff failed to do so); *Mills*, 83 F.3d at 843–44 (plaintiff testified that she never received any warnings of poor job performance, but defendant produced documented warnings of poor job performance); *Phillipson v. McAleenan*, No. 14-cv-8138, 2019 WL 4749909, at *7–8 (N.D. Ill. Sept. 30, 2019) (plaintiff testified he received "superior" evaluations but performance letters in the record showed he "received negative reviews" and was reprimanded and almost suspended "on multiple occasions"). The facts here are not nearly so clear.

The court also concludes that a reasonable jury could side with Plaintiffs even though they failed to enter into other loan modification agreements. (*See* Def.'s Br. at 15.) As discussed more fully elsewhere, none of those proposed loan modifications came close to offering the financial

---

[16] The court also questions how Wells Fargo can simultaneously argue that summary judgment is warranted because Plaintiffs could have afforded the $1,871 monthly non-HAMP modification payment but could not have afforded the $1,348 monthly HAMP payment. The court, of course, understands that parties make arguments in the alternative. But there cannot possibly be undisputed evidence that Plaintiffs could afford $1,871 per month but could not afford $1,348 per month. Wells Fargo's equally strenuous assertions in both directions suggest that summary judgment is inappropriate here.

terms the HAMP modification would have provided. Nor does Mr. Garcia's admission that Plaintiffs may not have successfully completed the trial modification warrant summary judgment. (*See id.* (citing DSOF ¶ 34).) Again, those facts might persuade a jury, but do not themselves extinguish the genuine disputes in the record.

The remaining cases cited by Wells Fargo amply illustrate how the causation questions in this case are too close for summary judgment. *Price v. Phillip Morris, Inc.*, for example, considered wide-ranging claims by a massive group of plaintiffs. In that case, the court concluded that the "lights" and "lowered tar and nicotine" language on packages of the defendant's Marlboro Lights and Cambridge Lights cigarettes was not the "'but for' cause of millions of purchasing decisions made over a period of some 30 years by the 1.14 million members of the plaintiff class." 219 Ill. 2d 182, 270, 848 N.E.2d 1, 53 (2005). In others, the causal nexus at issue was illogical. The plaintiff in *McGlenn* sued over a data breach that exposed his information, but he admitted that the identity theft he later suffered "necessarily relied on PII [personal identifying information] that was not disclosed" in the defendant's breach and *had* been exposed in a separate and unrelated data breach. *See McGlenn v. Driveline Retail Merch., Inc.*, No. 18-cv-2097, 2021 WL 4301476, at *10 (C.D. Ill. Sept. 21, 2021).[17]

In sum, the Garcias' "pattern of nonpayment" may influence a jury's decision, but it is not enough to grant summary judgment on causation.

---

[17]     Wells Fargo also cites *Anthony v. Country Life Mfg., LLC*, but there the court granted a motion to dismiss because, while plaintiff sufficiently established but-for causation, she did not establish legal causation—the other piece of proximate cause that is uncontested here. *See* No. 02-cv-1601, 2002 WL 31269621, at *2 (N.D. Ill. Oct. 9, 2002). *Bomar v. Pacific Union Financial, LLC* also addressed a different issue. That case granted summary judgment on unfairness grounds because the plaintiff could reasonably have avoided his injuries and therefore could not show substantial injury. *See* No. 15-cv-10842, 2017 WL 1478084, at *4 (N.D. Ill. Apr. 25, 2017). *Bomar* does not discuss but-for causation, which is a different standard. *See* Discussion Section III.B.2, *infra*.

**2.      Plaintiffs' Decision Not to Accept a More Expensive Modification Does Not Warrant Summary Judgment.**

Wells Fargo next claims that "Plaintiffs' willful decision not to make their loan payments, even when they testified they would have been able to, demonstrates that Wells Fargo was not the proximate cause of their foreclosure." (Def.'s Br. at 16.) Put differently, "[h]ad Plaintiffs decided to accept the March 2010 modification instead of continuing to pay nothing on their loan, and completed all necessary trial payments, they could have brought their loan current and obviated the need for a subsequent loss mitigation review altogether." (*Id.*)

Wells Fargo's argument mirrors its argument on substantial injury—*i.e.*, that Plaintiffs could "reasonably have avoided" their injuries. *See* Discussion Section III.A.1, *supra*. For largely the same reasons the court declined to grant summary judgment on that argument, it declines to do so here. In short, there is a dispute of material fact as to whether Plaintiffs could have afforded the significantly more expensive March 2010 modification in the long run, and whether their choice not to proceed with it requires the conclusion that they would not have met a much more modest obligation.

But Wells Fargo's causation argument is one step weaker. Whereas the standard for substantial injury asks whether Plaintiffs could have reasonably avoided the injury, the but-for cause standard is "whether the injury would have occurred absent the defendant's conduct." *Young*, 213 Ill. 2d at 446, 821 N.E.2d at 1085. Unlike the substantial injury test, but-for cause recognizes that "multiple factors . . . may have combined to cause the injury" and requires only that "defendant's conduct was a material element and a substantial factor in bringing about the injury." *Id.* In other words, a jury who believe that Plaintiffs could have afforded a different modification might still view Wells Fargo's failure to offer Plaintiffs a substantially more affordable modification—after they had already declined the March 2010 modification—as a "material element" and a "substantial factor" in bringing about Plaintiffs' foreclosure.

Neither case cited by Wells Fargo changes this conclusion.  *Pickar*—the case discussed above, alleging deceptive conduct after a foreclosure was already filed—did not involve a mandatory loss mitigation process, like the botched HAMP review at issue here.  *See* 2017 WL 3475083, at *5.  *Fogt v. 1-800-Pack-Rat, LLC*, where the court affirmed summary judgment for the defendants, is closer.  In that case, the plaintiff agreed to automatic credit card payments to cover the storage unit where she was storing her belongings, but she cancelled her credit card after it was compromised by fraud and failed to provide her new credit card information to the storage facility.  2017 IL App (1st) 150383, ¶ 34.  Unfortunately, the plaintiff also moved, and although she had her mail forwarded, she did not directly inform the storage facility of her new address, and never received the three mailings informing her that her rental payments were past due.  *Id.* ¶ 35.  She also never received the notice that her belongings would be sold at auction.  *Id.* ¶ 36.  The storage company conceded that it violated several notice provisions of the statute governing storage units, but the appellate court reasoned that plaintiff's own conduct caused her harm: had the plaintiff "complied with the requirement to update her credit card information," she would never have fallen behind in the first place.  *Id.* ¶¶ 59, 71.  Likewise, had she sent written notice of her change of address, as required by the storage agreement, she would have received the various notices.  *Id.* ¶ 71.  Either way, she would have saved her belongings from auction.  Wells Fargo has not suggested that any such failure on the part of the Garcias was the reason they were not offered the HAMP trial modification they concededly deserved.  To the extent Wells Fargo reads *Fogt* to suggest that a defendant's conduct must be the sole reason for a plaintiff's injury, that controverts binding Illinois Supreme Court precedent.  *See Young* 213 Ill. 2d 446, 821 N.E.2d at 1086 (plaintiff can establish proximate cause by showing defendant's conduct was a "substantial factor" in causing an injury).

**C.** **Wells Fargo is Entitled to Summary Judgment as to Credit Damages, but not as to Emotional Distress Damages.**

Finally, Wells Fargo asks the court to "dispose" of two categories of damages—emotional distress damages and credit harms damages—about which Wells Fargo believes there is no triable issue of fact. (Def.'s Br. at 17.) The court agrees with Wells Fargo that Plaintiffs have not cited any actual evidence of credit damage, but disagrees with respect to emotional damages.

### 1. Emotional Damages

For a claim to survive under ICFA, a plaintiff must allege the defendant's conduct caused damages. *See Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 589 (7th Cir. 2001) (citing 815 ILCS § 505/10a(a)). That can include emotional damages, including aggravation or inconvenience. *See Roche v. Fireside Chrysler-Pymouth, Mazda, Inc.*, 235 Ill. App. 3d 70, 86, 600 N.E. 2d 1218, 1228 (2d Dist. 1992).

In arguing that the Garcias are not entitled to recover emotional damages as a matter of law, Wells Fargo observes that (1) medical records do not refer to Plaintiffs' foreclosure; (2) those records show the conditions on which Plaintiffs' claims are based pre-date the foreclosure; (3) Mr. Garcia has "exaggerated some symptoms" and Mrs. Garcia may be "magnify[ing] her symptoms for secondary (financial) gain"; (4) other factors caused the emotional distress Plaintiffs faced— for example, Mr. Garcia's difficulty finding work, the process of applying for other loan modifications, and the lawsuit itself; (5) a jury will not be able to distinguish what portion of Plaintiffs' emotional distress was caused by the foreclosure; and (6) Plaintiffs' only evidence of their damages is their own conclusory testimony. (Def.'s Br. at 17–23; Def.'s Reply at 17–19.) The court will address each argument, though not necessarily in that order.

That the claim for emotional distress in this case is based on the Garcia's own testimony does not bar recovery. The Seventh Circuit has "long held that a plaintiff may defeat summary judgment with his or her own deposition." *Paz*, 464 F.3d at 664. When it is the injured party who "provides the sole evidence of mental distress, he must reasonably and sufficiently explain the

circumstances of his injury and not resort to mere conclusory statements." *Biggs v. Vill. of Dupo*, 892 F.2d 1298, 1304 (7th Cir. 1990) (brackets and quotation marks omitted). The Seventh Circuit has not, however, required "extensive" testimony; rather, plaintiffs must only "describe[] their emotional turmoil in reasonable detail and explain[] what they believe to be the source of that turmoil." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011).

The court has already held that Plaintiffs have presented evidence from which a jury could find that Wells Fargo's erroneous denial of Plaintiffs' HAMP application proximately caused their foreclosure. *See* Discussion Section III.B, *supra*. If the jury finds in favor of Plaintiffs on this issue, the question is whether that jury could also find that the Garcias' alleged emotional injuries (and the sequelae of those injuries) stemmed from the loss of their home rather than some other factor.

To start, the court can dispense with Wells Fargo's claim that Plaintiffs cannot prove damages because Mrs. Garcia's medical conditions "predate the foreclosure and error, in some cases by many years." (Def.'s Br. at 18; *see also id.* at 19 (making similar arguments about Mr. Garcia's sleep problems).) Plaintiffs do not dispute that Mrs. Garcia's fibromyalgia, depression, and migraines "pre-date the erroneous denial." (*See* PSOFR ¶ 45.) But Plaintiffs are seeking damages because Wells Fargo's conduct aggravated those conditions. (Pl.s' Opp. at 28–29.) In its reply, Wells Fargo concedes that Plaintiffs could claim aggravation-based damages, but argues that they have not produced sufficient evidence that Wells Fargo's conduct actually did aggravate their medical issues. (Def.'s Reply at 19–20.) Accordingly, the real question—to which the court will return—is not whether Plaintiffs had pre-existing conditions, but whether there is evidence that Wells Fargo's conduct made those conditions worse.

In addressing these issues, the court is unmoved by Wells Fargo's belief that Plaintiffs are, to put it colloquially, "making it up." Wells Fargo asserts on several occasions that Plaintiffs may not actually have suffered the stress (or stress-related symptom aggravation) that they claim. (*See* Def.'s Br. at 19 (citing expert, psychologist David Hartman, Ph.D., who "found that Mrs.

Garcia may magnify her symptoms for secondary (financial) gain"; *id.* at 20 (citing Hartman, who "noted that Mr. Garcia exaggerated some symptoms"); *id.* at 22 (noting Hartman "has advised caution about uncritically accepting Plaintiffs' self-reported symptoms and their causes").)  The court assumes that Mr. Hartman's report and testimony are admissible,[18] but the court is unwilling to grant summary judgment based on tests by an opposing party's expert that purport to find a plaintiff is faking her suffering.  That is particularly true in this case.  It does not take an expert to connect the loss of a family home during an economic crisis with significant stress and the consequences of that stress.  *Cf. Hammer v. Residential Credit Sols., Inc.*, No. 13-cv-6397, 2015 WL 7776807, at *39 (N.D. Ill. Dec. 3, 2015) (finding that "the nature of the causation issue"— whether stress aggravated plaintiff's cardiac condition—did not require expert testimony for the jury to resolve).

Some of Wells Fargo's other arguments downplay plaintiff-friendly evidence.  For example, Wells Fargo argues that the medical records in the case only reference the foreclosure once and "none contain a diagnosis based on that subject."  (Def.'s Br. at 22.)  While that may be true, Dr. Pillai, the Garcias' primary care physician, testified that Mr. Garcia told her that financial problems caused him anxiety.  (*See* A. Pillai Dep. [130-8] at 36:21:37–2.)  Dr. Pillai said that Mrs. Garcia, who was also in the room at the time, "was in tears crying about losing their home and not having money and not being able to afford another home" and Mr. Garcia was "trying to comfort her."  (*Id.* at 37:2–5.)  She testified that the Garcias' response was "the same response that anybody" would have in that situation.  (*Id.* at 37:5–9.)  True, "money"-related stress is not specific to the foreclosure, but Dr. Pillai stated that Mrs. Garcia had not complained about money issues "prior to her discussing the house foreclosure."  (*Id.* at 85:13–20.)  Then, after the Garcias

---

18      Plaintiffs suggest in two paragraphs that Mr. Hartman is not qualified to provide an opinion about them.  (*See* Pl.s' Opp. at 25–26.)  The court is not prepared to exclude an expert based on a stray citation to *Daubert*.  If Plaintiffs believe Mr. Hartman does not meet the standard for expert testimony, the court will consider a properly-briefed *Daubert* motion.

lost their home, Dr. Pillai said it had become a more frequent topic of conversation. (*Id.* at 101:18–102:3.)

Mrs. Garcia presented with temporomandibular joint ("TMJ") pain in March 2011—right around the time Wells Fargo obtained an order of possession for the Garcias' home. (*See id.* at 103:4–104:3 (discussing jaw pain); Order [130-15] (March 29, 2011 order confirming sale of Garcias' home and granting order of possession).) This malady was not linked directly to the foreclosure, but Dr. Pillai testified that stress can cause people to clench jaw muscles and grind their teeth, which can lead to TMJ pain. (A. Pillai Dep. at 104:15–25, 106:3–13.) Dr. Pillai testified, in addition, that stress can exacerbate insomnia and conditions like fibromyalgia. (*Id.* at 109:13–110:5.) She also noted that Mrs. Garcia was particularly stressed at an April 2011 appointment—around the time the Garcias faced eviction under the order of possession—at which time Dr. Pillai prescribed fluoxetine, an antidepressant used "for patients like this that have chronic stressors causing anxiety and depression that follows." (*Id.* at 108:5–10, 109:2–110:11.) Though Dr. Pillai could not testify that the foreclosure was the sole cause of various health problems, she agreed that stress related to the foreclosure "could be one of the contributing factors." (*Id.* at 114:2–17.)

In sum, the court does not agree that Plaintiffs "cannot adduce any other evidence on th[e] point [of whether Wells Fargo exacerbated their medical conditions] except for their own testimony." (Def.'s Br. at 22.) Even discounting Dr. Pillai's deposition, Plaintiffs' testimony is enough to avoid summary judgment on emotional damages. Mrs. Garcia acknowledged that she was diagnosed with depression before the erroneous HAMP denial, but stated that her depression worsened around the time of the foreclosure. (J. Garcia Dep. at 75:6–23.) Receiving the eviction notice, Mrs. Garcia said, was "the worst part," leaving her "feeling really down" and causing her to cry "all the time," including at work. (*Id.* at 255:3–13.) After the family had to move, she "started to feel worst and worst" and began to "doubt about [her] ability to keep up with [her] job." (*Id.* at 253:19–25.) Mrs. Garcia testified that the family's life post-foreclosure was "like hell . . . hell to get an apartment to be in the same school district that [their] daughter needed because of special

education services in La Grange Park." (*Id.* at 39:11–18.) Mrs. Garcia also testified that her fibromyalgia pre-dated Wells Fargo's conduct, but it had been "very manageable" until it was exacerbated by foreclosure-related stress. (*Id.* at 256:10–17; *see also* Interrogatory Responses [101-37] at 14.)

Mr. Garcia, too, acknowledged that factors beyond Wells Fargo's conduct affected his emotional state. For example, he testified that the financial crisis made him feel "frustrated" and "a little bit on edge" because he could not provide for his family. (E. Garcia Dep. at 105:7–24.) But his testimony also suggests that Wells Fargo's conduct made things worse. For example, he testified that "[f]or a long time" he and Mrs. Garcia "thought we had done things very badly" and caused the foreclosure. (*Id.* at 168:6–13.) He said he felt guilty and blamed himself for what followed, including Mrs. Garcia's "health situation" and issues with their son Byron, who "had not been able to finish his education." (*Id.* at 168:8–24.) He said he blamed Wells Fargo because it affected Byron "when [they] lost the house" and the family had "to go around looking for an apartment, to applying for apartments and not to have an acceptance." (*Id.* at 168:25–169:24.) Mr. Garcia testified that Byron had helped worked on the family's house since he was a small child "and to see that his dad couldn't keep the house . . . changed his relationship" to Mr. Garcia. (*Id.* at 170:5–17.) He said that "[t]hose were very difficult moments for [them] to accept." (*Id.* at 219:5–6.) About Wells Fargo, Mr. Garcia said that he believed "someone should speak up and say who was in error, if it was they or if it was I, because I believe that if it was I, I must accept that and not blame others, but I also think that if the error was on behalf of somebody else, I must remove that feeling of guilty from myself and continue forward." (*Id.* at 229:21–230:4.) He later explained that "for many years" he believed he "was in error until [he] received [Wells Fargo's] letter," at which point he realized "they are in error." (*Id.* at 268:7–13.)

Mr. Garcia testified about his wife's stress, and vice versa. Mr. Garcia said that Mrs. Garcia's health "decayed much, especially when [they] had to leave the house." (*Id.* at 219:2–5.) Similarly, Mrs. Garcia testified that, although Mr. Garcia had been stressed over finances before,

"when [they] had to leave the house," he "became so, like, isolated." (J. Garcia. Dep. at 209:23–25.) She noted Mr. Garcia's withdrawal from events involving his extended family, reporting that "after [Wells Fargo] took the house, he didn't want to go to any family parties. . . . . Not even for Mother's Day, Father's Day, Christmas. . . . [H]e didn't want to go." (*Id.* at 209:25–210:13.)

Wells Fargo argues that no jury could "separate out how much of the 'worsening' [of Plaintiffs' conditions] was caused by the foreclosure, let alone reasonably conclude that the bank was the proximate cause of Plaintiffs' claimed ailments." (Def.'s Br. at 20.) But the two cases Wells Fargo cites do not suggest that the jury's task is so insurmountable that the court must grant summary judgment. Neither case discusses confounding factors or the difficulty of separating injuries from different causal mechanisms. One involved unpersuasive and non-specific deposition testimony from the plaintiffs. *See Diedrich v. Ocwen Loan Servicing, LLC*, No. 13-cv-693, 2015 WL 1885630, at *9 (E.D. Wis. Apr. 24, 2015) (granting summary judgment where plaintiffs' testimony did not connect their injuries to defendant's conduct). In the other, the plaintiff conceded that she needed expert testimony to connect her injuries to the defendant and failed to provide it. *See Blanton v. RoundPoint Mortg. Servicing Corp.*, 825 F. App'x 369, 373 (7th Cir. 2020). In that case, the plaintiff designated her treating physician as her causation expert, but that doctor did not consider the cause of her injuries during treatment and the plaintiff did not provide an expert report. *Id.* The Seventh Circuit affirmed summary judgment because the plaintiff "failed to present any admissible evidence proving causation and damages." *Id.*

Neither party argues that expert testimony is required to show aggravation here, so it is not clear how *Blanton* applies. True, as Wells Fargo cautions, the Garcias cannot testify about the "causation of a health problem or offer a detailed medical diagnosis." *See McGill ex rel. McGil v. Menard, Inc.*, No. 11-cv-4950, 2013 WL 5253650, at *8 (N.D. Ill. Sept. 17, 2013) (quotation marks omitted). But Plaintiffs may "testify as to [their] perceptions of [their] physical and mental health during the relevant time period." *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15-cv-1164, 2018 WL 10609875, at *2 (N.D. Ill. Mar. 20, 2018). Indeed, "'before and after'

lay testimony may be competent evidence on issue of damages caused by exacerbation of preexisting medical condition," especially when a treating physician testifies to "a change in the disease process after the injury" and believes "as a matter of general causation that the preexisting condition could be exacerbated by the kind of injury the plaintiff suffered." *Hammer*, 2015 WL 7776807, at *39 (citing *Meyers v. Wal-Mart Stores, East, Inc.*, 257 F.3d 625, 630 (6th Cir. 2001)).[19]  That accurately describes the testimony at issue here.

The court also rejects the argument that Plaintiffs' testimony is "conclusory say-so."  (Def.'s Reply at 20.)  The court disagrees.  The level of detail Plaintiffs put forward "reasonably and sufficiently explain[s] the circumstances of [their] injury" and goes beyond "mere conclusory statements." *Biggs*, 892 F.2d at 1304.  Mrs. Garcia, for example, logically connects receiving the eviction notice—the final sign that the family would lose their house—to significant stress.  (*See* J. Garcia Dep. at 255:3–13.)  Likewise, she described the difficulties of finding a new apartment in the same school district as "like hell."  (*Id.* at 39:11–18.)  Mr. Garcia reported feeling guilt and personal responsibility for the loss of his family's home and the pain his children suffered, which is compelling and understandable, as well.  (*See* E. Garcia Dep. at 168:8–170:17.)

The facts here are like those in *Catalan*, where the court reversed the district court's opinion granting summary judgment to the defendant.  In that case, the plaintiff's medical records "indicate[d] that she was under increased stress during this time period because of her 'house

---

[19]     The court also rejects the argument that "the passage of time" means that the jury cannot separate out Wells Fargo's role in Plaintiffs' injuries from other causal factors.  (*See* Def.'s Br. at 21.)  Wells Fargo cites *Independent Trust Corp. v. Fidelity National Title Insurance Co. of New York* in support, but the plaintiff there alleged deception, meaning that it had to prove that it "was, in some manner, deceived by the falsehood."  577 F. Supp. 2d 1023, 1040 (N.D. Ill. 2008) (quotation marks omitted).  The plaintiff could not do so because it did not know of the allegedly false statements at the time it was allegedly deceived.  *Id.*  The court acknowledges that because Plaintiffs did not know about Wells Fargo's error at the time, they could not specifically discuss "Wells Fargo's conduct with their doctors" at the time it occurred.  (Def.'s Br. at 21.)  But as discussed above, they did discuss the foreclosure with Dr. Pillai, which is causally connected to Wells Fargo's then-unknown error.  In any event, the court is not comfortable concluding that Wells Fargo should avoid liability because its error remained secret for long enough to muddy the waters.

situation.'" 629 F.3d at 696. Each plaintiff also testified about their emotional distress. One said that it was "hard to feel like people aren't listening to you, that they're ignoring you." *Id.* She said it made her "nervous" and "shaky" and that it depressed and embarrassed her. *Id.* Her husband testified that he had to watch his wife "every day crying and being upset" and that he had to take care of their child, "try to console my wife, and at the same time, I couldn't let anybody know how I felt about it," which made him feel "useless." *Id.* The court there reasoned that although the plaintiffs' testimony was "not extensive," it was also "not conclusory" because it "described their emotional turmoil in reasonable detail and explained what they believe to be the source of that turmoil." *Id.* It continued: "[the defendant] will be free to argue on remand that any such distress was minor and that other stressors in the plaintiffs' lives were the true causes of their distress, but the plaintiffs' testimony is sufficient to preclude summary judgment for [the defendant] on the question of whether the plaintiffs suffered emotional harm as a result of [the defendant's] actions—and inaction." *Id.*

If anything, the Garcias testimony is more extensive than that of the plaintiffs in *Catalan*, as is the testimony of their family physician, Dr. Pillai.[20] Wells Fargo responds that *Catalan* "does not help" Plaintiffs (Def.'s Reply at 18 n.9) because the Seventh Circuit later distinguished *Catalan*. In the case Wells Fargo refers to, *Diedrich v. Ocwen Loan Servicing, LLC*, the court reasoned that *Catalan* only found that "the plaintiffs' self-reports of emotional distress stemming from the mortgage company's actions were sufficient to survive a motion for summary judgment," but the *Catalan* court had not yet determined "whether that emotional distress was sufficiently linked to the mortgage company's" allegedly illegal actions because "it left it for the district court

---

[20]    Plaintiffs' testimony is also more extensive than in the other cases cited by Wells Fargo where courts have rejected "conclusory" assertions of emotional distress. *See Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004) (no emotional distress for six-month period when defendant left inaccurate information on the plaintiff's credit report and plaintiff did not connect emotional distress to that conduct); *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (plaintiff did not attempt to prove "more than a transient and trivial shock" from receiving the defendant's collection letter that violated the automatic bankruptcy stay).

to determine on remand" whether those actions had, in fact, violated federal law.  839 F.3d 583, 593 (7th Cir. 2016).

Importantly, *Catalan* and *Diedrich* both concerned alleged violations of the Real Estate Settlement Procedures Act ("RESPA"), and specifically a mortgage servicer's obligations when responding to a borrower's "qualified written request" for information.  *See id.* at 586; *Catalan*, 629 F.3d at 680.  In *Diedrich*, the Seventh Circuit reasoned that *Catalan* did not specifically establish "what amount of evidence is sufficient to link an injury to a mortgage company's failure to respond properly to a qualified request for information." 839 F.3d at 593.[21]  But it held that the plaintiffs in that case—who said they were injured by "everything that Ocwen [their servicer] has put us through over three years of this lawsuit"—could not establish a causally-connected emotional injury because "Ocwen may have taken multiple actions that the Diedrichs might allege are damaging, but that might nevertheless be perfectly legal, such as initiating a foreclosure action." *Id.*

Wells Fargo's conduct at issue in this case has broader ramifications than a failure to respond to a written request under RESPA.  In *Diedrich,* the plaintiffs could not sufficiently connect the servicer's conduct to their foreclosure and the emotional consequences thereof.  Wells Fargo's erroneous HAMP denial in this case, in contrast, arguably did lead to a foreclosure, and Plaintiffs can survive summary judgment so long as a reasonable jury could believe Plaintiffs' injuries stem from that foreclosure.  *See* Discussion Section III.B, *supra*.  *Catalan*, at the very least, instructs that if Plaintiffs testify about emotional damages, "explain what they believe to be the source of that turmoil," and show a causal connection to Wells Fargo's conduct, the court

---

[21]    The Seventh Circuit has since clarified that *Catalan* "reversed summary judgment for the defendants partially on the ground that there was dispute of material fact as to the plaintiffs' allegations of emotional distress damages resulting from the defendant's egregious RESPA violations."  *Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1060 (7th Cir. 2018).  The court explained that in *Catalan*, the plaintiffs "were actually making their mortgage payments" and thus "[t]he RESPA violations were the source of their stress about the prospective loss of their home."  *Id.*

should deny summary judgment. 629 F.3d at 696. Here, Plaintiffs testified at several points about how the foreclosure and loss of their home specifically—rather than other, earlier financial stressors—caused their emotional damages.

Wells Fargo is correct that some of Plaintiffs' claimed emotional injuries are not obviously related to the erroneous HAMP denial. (*See, e.g.*, Def.'s Reply at 17–18.) Mrs. Garcia's stress from "need[ing] to fax Wells Fargo" various documents repeatedly while she was balancing a stressful time at work is likely not related to Wells Fargo's HAMP errors. (*See* J. Garcia Dep. at 56:25–57:12.) But immediately after talking about documents, Mrs. Garcia testified that "[i]t was a lot" for her emotionally because her "kids were getting nervous about moving out or being homeless, or my daughter not being in the same school district and not having the support that she used to have with the IEP in her school, that that was on my shoulders." (*Id.* at 57:13–18.) Unlike the difficulties with paperwork, the foreclosure and the stress that followed do tie directly to the alleged consequences of Wells Fargo's conduct at issue here. Likewise, Mrs. Garcia's testimony that the experience "has been hell." (*Id.* at 64:6.) While ambiguous on its own, she continued:

> I mean, looking for an apartment, and then now I have to move. And we move to that apartment, we suffer in that apartment, and then—and I said, "I just can't do this job anymore." I got so discouraged. I got so sad to see my husband, my kids in that apartment . . . without our things that I said "I'm not—I just can't work anymore. I am so exhausted. We moved twice from—from our home to the apartment in Brookfield so my daughter could finish high school in that school district, and then we move again to this apartment in Cicero. When we get here, and I said "I just can't do it anymore. I just can't." . . . . That [the foreclosure] was the event that caused—it's like they gave me a hit, like a soccer player, on my back out of my work when they took my home. I was so exhausted and depressed, depressed so deeply, deeply. When we got to this apartment, I said that—I thought that the other apartment was the worst that could happen to us, but when we got here . . . .

(*Id.* at 64:6–22.)[22] Again, that testimony credibly ties Mrs. Garcia's emotional injuries to the loss of the family's home, which is sufficiently connected to Wells Fargo's conduct to survive summary

---

[22]      This testimony—and other testimony discussed above related to Mrs. Garcia's job—also creates a dispute of material fact about whether and to what extent Wells Fargo's

judgment.  That distinguishes this case from the other RESPA cases Wells Fargo cites in addition to *Diedrich*.  The plaintiffs in those other cases faced the same problem as the Diedrichs did: they could not tie their emotional distress to RESPA violations—which typically allege a failure of process, not substance—rather than the trauma of the foreclosure process more broadly.  *See, e.g.*, *Moore*, 908 F.3d at 1061 (testimony that plaintiffs were stressed at imminent loss of their home "had essentially nothing to do with any arguable RESPA violations" and were instead the result of plaintiffs' inability to make mortgage payments); *Perron v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 858 (7th Cir. 2017) (plaintiffs could not connect breakdown of their marriage to RESPA violations because it was "far too attenuated" and "not the type of harm that faithful performance of RESPA duties avoids").[23]

All of this does not mean that the Garcias can recover for the stress they suffered before the erroneous HAMP denial.  (*See* Def.'s Reply at 18 (detailing other sources of stress).)  With respect to the distress they experienced after that denial, however, Plaintiffs need not "prove the emotional distress was caused *solely* by the alleged [HAMP] violation."  *Moore*, 908 F.3d at 1061. It is clear, at this stage, that material facts are in dispute about whether Plaintiffs suffered emotional distress, how that distress manifested, and to what extent the stress stemmed from

conduct caused Mrs. Garcia to stop working.  *See* Background Section VI, *supra*.  Accordingly, the court disagrees with Wells Fargo (*see* Def.'s Br. at 23.) that no jury would conclude that Wells Fargo's conduct played a material role in Mrs. Garcia's career, even if other factors also played a role.  *Cf. Brown v. I.C. Sys., Inc.*, No. 16-cv-9784, 2019 WL 1281972, at *7 (N.D. Ill. Mar. 20, 2019) (cited in Def.'s Br. at 23) (plaintiff could not prove non-speculative damages where she could not remember how much she had paid for a call blocker application she bought to block defendant's calls or how many months she paid for it).

[23]    As discussed in Discussion Section III.B, *supra*, *McGlenn*—which Wells Fargo cites again on emotional damages—is inapposite because the plaintiff's theory of proximate cause in that case was illogical and therefore improbable.  *See* 2021 WL 4301476, at *10 (plaintiff's identity was stolen, but that incident "necessarily relied on PII that was not disclosed" in defendant's data breach).  In the case before this court, a reasonable jury could find that Wells Fargo was the probable cause of at least some of Plaintiffs' emotional distress.  *See id.* (plaintiff must establish proximate cause is probable, not merely possible).

Wells Fargo's conduct as opposed to Plaintiffs' financial difficulties. It will be the jury's job—with the able assistance of the parties—to sort through the various causes of Plaintiffs' stress.

### 2. Credit Harm

Finally, Wells Fargo seeks summary judgment on Plaintiffs' "claims of credit harm" because those claims "have no evidentiary basis." (Def.'s Br. at 24–25.) On this issue, Wells Fargo is on more solid ground. As with all their claims, Plaintiffs must present some evidence of harm to their credit to survive summary judgment. *See, e.g.*, *Bomar*, 2017 WL 1478084, at *4 (granting summary judgment where plaintiff "offered no evidence . . . establishing that his credit score was diminished"). To do so in this case, Plaintiffs present nothing more than a few links to the websites of various credit reporting agencies discussing the "adverse credit impact of foreclosure and bankruptcy." (Pl.s' Opp. at 32.) They argue that "[i]t takes neither a rocket scientist nor a Rhodes scholar to understand that having a completed foreclosure and a Chapter 7 bankruptcy on your credit report destroys your credit standing." *Id.* But whether such a link is obvious to Plaintiffs, it still requires some evidence in the record to survive, and neither Plaintiffs' response to Defendant's Statement of Facts nor Plaintiffs' Statement of Additional Material Facts even discuss Plaintiffs' credit. To the contrary, Mr. Garcia testified that he did not recall attempting to learn his actual score before or after the foreclosure. (E. Garcia Dep. at 248:18–21.)

Plaintiffs' failure to provide any evidence on credit damage is particularly troublesome in a case like this, where Plaintiffs defaulted on their auto loan and their mortgage well before Wells Fargo's HAMP-related misconduct. (*See* DSOF ¶¶ 16–21.) Moreover, given that Plaintiffs discharged $130,000 in unsecured debt in bankruptcy, it is not obvious that they would have avoided bankruptcy even if they had secured the HAMP modification. (*See* DSOF ¶ 44.) Plaintiffs do not discuss how their credit would have been affected had they declared bankruptcy without facing foreclosure. In short, because Plaintiffs provide no evidence of credit harm, the court grants summary judgment as to credit damages.

**CONCLUSION**

For the reasons discussed above, the court denies Defendant's motion for summary judgment [100] except as to credit-related damages. The court had stricken the trial date pending its ruling on this motion. The parties are directed now to meet and confer regarding proposed trial dates. A report setting forth proposed trial dates shall be submitted on or before February 28, 2023.

ENTER:

Dated: January 30, 2023

_____
REBECCA R. PALLMEYER
United States District Judge